# EXHIBIT A

## Declaration of Mohammad A. Salameh

### "SUPPLEMENTAL RESPONSE TO DEFENDANT'S MOTION TO DISMISS"

Chesser v. Director, Bureau of Prisons

Civil Action No. 15-cv-1939-NYW

UNITED STATES DISTRICT COURT
DISTRICT OF COLORADO

Civil Action No.   15-cv-1939-NYW

ZACHARY A. CHESSER,
   Plaintiff,

v.

DIRECTOR, BUREAU OF PRISONS,
   Defendant

---

## DECLARATION OF MOHAMMAD A. SALAMEH, BEG. NO. 34338-054

I, Mohammad A. Salameh, state the following to be true under penalty of perjury pursuant to 28 U.S.C. § 1746:

1. I am an adult of sound mind who makes these statements freely.

2. I state all that follows based on personal knowledge.

3. I have reviewed some of the pleadings

1

in this case and I understand that the plaintiff,

Zachary Adam Chesser, is attempting to challenge

a national restriction on religious gatherings in

the Bureau of Prisons ("BOP") under the Religious

Freedom Restoration Act ("RFRA"), 42 U.S.C. §§ 2000bb-1

et seq., and the Establishment Clause. I also

understand he is challenging the BOP's practice

of using an inmate's ties to terrorism to hold

them in solitary confinement under RFRA

and his own conditions of confinement at

ADX Florence under RFRA.

4.    I further understand that he may use

2

this declaration at some future date to show that

I am similarly situated to him as a means of

moving the court to certify a class for any

of his claims or to otherwise broaden the scope

of the claims, such as through a motion to

consolidate similar lawsuits.

5.   I have reviewed this declaration and

I am satisfied it conveys the truth.

## My Beliefs

6.   I am a Sunni Muslim who

believes he should engage in all of the

religious gatherings Chesser lists in paragraph

3

of his Third Amended Complaint and Paragraph 2 of his "Declaration of Zachary A. Chesser in Support of Motion for Temporary Restraining Order and Preliminary Injunction." My later references to religious gatherings refer to these types of gatherings and beliefs.

7. The physical limitations I have been subjected to and may later be subjected to in solitary confinement prevent me from engaging in those religious gatherings to an extent which I believe is satisfactory. It is not even close. I believe the Terrorist

4

Confinement Policy, as described in Chesser's Third Amended Complaint, substantially burdens my ability to engage in these religious practices.

8.   I also believe that the threat of punishment if I engage in more religious gatherings than the one gathering allowed each week   by BOP Program Statement (PS) 5360 §§ 7(a) & 7(d) prevents me from exercising those beliefs satisfactorily in both quantity and kind.

9.   In my experience, the BOP has never restricted non-religious gatherings in the manner it currently restricts religious gatherings in PS 5360.

10.   If absolutely necessary to accommodating

5

my beliefs regarding religious gatherings and interactions, I would accept the idea of separating terrorists and/or people the BOP considers to be radicals — regardless of whether or not religion is a consideration— from the rest of the inmate population.

11. While I was in general population in the BOP from around June 1994 to September 11, 2001, Muslims were not restricted from engaging in religious gatherings and 5 daily group prayers sometimes involved more than 70 Muslims. We were not restricted

to particular locations except insofar as secular gatherings were also restricted, such as during lockdowns or placement in special Housing Units (SHUs) which involve solitary confinement. Over this period, the prisons where I was in general population further gave Muslims special time in the chapel for religious gatherings including 3 to 4 group prayers per day. I did not witness a special restriction on religious gatherings like the one in PS 5360 until 2004 or 2005. I participated in the gatherings when I could.

7

## Conviction and Incarceration History

12.    I was arrested on or around March 4, 1993.  On or around March 4, 1994,  I was convicted for my alleged role in the first World Trade Center bombing along with my co-defendants Ahmad Ajaj, Mahmud Abouhalima, and Nidal Ayyad.  On or around May 24, 1994,  we were all sentenced to 240 years in prison with other monetary penalties.  On or around October 13, 1999,  I was resentenced to 116 years and 11 months.

13.  On or around March 4, 1993, I

I began to be held in the BOP's Metropolitan Correctional Center ("MCC") for New York City. On or around March 4, 1994, I was transferred from MCC New York to U.S. Penitentiary ("USP") Lewisburg with my co-defendants. On or around May 25, 1994, we were transferred from USP Lewisburg and I wound up in USP Leavenworth. On or around July 22, 1995, I was transferred from USP Leavenworth to MCC New York where I met the aforementioned co-defendants. On or around August 11, 1995, we were transferred

9

to USP Lewisburg.  On or around December 18, 1995,  I was transferred to Federal Transfer Center ("FTC") Oklahoma City  from  USP Lewisburg  and  on  December 20, 1995  I was transferred back to USP Leavenworth. On or around      February 21, 1998,  I was transferred  from  USP Leavenworth  to FTC  Oklahoma City.  On or around February 4, 1998,  I was transferred from FTC  Oklahoma City  to USP Lompoc. On or around  January 6, 1999  I was transferred from USP Lompoc to FTC

Oklahoma City and on January 12, 1999 I was sent to USP Atlanta. On January 13, 1999 the BOP transferred me to MCC New York. On or around March 4, 1999, I was transferred to FTC Oklahoma City from MCC New York. On or around March 10, 1999, I was transferred from FTC Oklahoma City to MCC Seattle. On or around March 11, 1999 I was returned to USP Lompoc. On or around September 24, 1999, I was transferred from USP Lompoc to FTC Oklahoma City. On or around September 29, 1999, I was transferred from

11

FTC Oklahoma City to USP Atlanta. On or around October 7, 1999, I was transferred from USP Atlanta to MCC New York. On or around October 14, 1999, I was transferred from MCC New York to F.T.C. Oklahoma City. On or around October 22, 1999, I was transferred from FTC Oklahoma City back to USP Lompoc. On September 26, 2002, I was transferred from USP Lompoc to FTC Oklahoma City. On or around October 4, 2002, I was transferred to the Administrative Maximum Security Facility ("ADX") in Florence,

12

Colorado. On or around April 6, 2006, I was transferred along with Mohammed Al Owhali who is convicted of conspiring in the 1998 embassy bombings in Africa. to the Federal Medical Center ("FMC") in Butner, North Carolina from ADX Florence On or around July 20, 2006, we were returned to ADX Florence. I remain in ADX Florence.

14. At every single one of the above prisons except USP Leavenworth and USP Lompoc, I was *only* held in solitary

13

confinement.  Everytime I was held in solitary confinement at a facility other than ADX Florence,  I was held in some form of SHU. This was always because I am allegedly a terrorist, except my time in FMC Butner which was the result of a hunger strike— but I was already in ADX, so I would have been in solitary anyway and because of my alleged ties to terrorism.

15.  Also,  I was occassionally held in the SHUs at USP Lompoc and USP Leavenworth for my alleged ties to terrorism (occassions

14

involving other reasons will be omitted). On or around April 19, 1995, I was placed in the SHU at USP Leavenworth over the Oklahoma City bombing and released on April 25, 1995. On or around July 27, 1996, I was placed in the SHU at USP Leavenworth over the Olympics bombing for four days. On or around January 3, 1997, I was placed in the SHU at USP Leavenworth over the "Letter" bombings and I remained in the SHU until my transfer to USP Lompoc where I wasn't released from the SHU

at USP Lompoc until March 6, 1998.  On

September 11, 2001,  I was placed in the

SHU at USP Lompoc because of the 9-11

attacks,  until I was sent to ADX Florence over

their occurrence.  Also, Mohammed Saleh (convicted of terrorism)

was held in the SHU with me at USP Leavenworth over

the "Letter Bombings" and Olympics bombing.

16.    Shortly after arriving at ADX

Florence, on or around October 4, 2002, I was placed in

ADX's "H Unit" (without SAMs) with others being sent

to ADX over 9-11.   On or around November 14, 2002,

I was moved to "E Unit" in ADX's "General Population" ("ADX GP")

16

On or around March 18, 2005, I was placed on "Special Administrative Measures" ("SAMs") and transferred to ADX's "Special Security Unit" ("SSU" or "H Unit"). While I was in H Unit, the BOP would sometimes send me and other Muslims with alleged ties to terrorism to "Range 13" instead of H Units' "SHU" over things which only might yield SHU placement or even nothing in ADX-GP. Range 13 involves a complete and total severing of all contact with inmates and almost

17

no contact with staff.' My co-defendant Ramzy Yousef was held on Range 13 for about 7½ years and, to my knowledge, this was solely because of his alleged role in our case. On or around March 17, 2016, my SAMs were lifted and I went back to E Unit in ADX-G.P. On January 17, 2017, I was transferred to the "Intermediate Phase" of ADX's "Step-Down Program" ("J Unit" or "J/A Unit") and placed on "Range 2." Chesser came in shortly after me that same day and

we are the only people on Range 2 now.

I remain in J Unit with Chesser.

17. Around 23. years ago, I was alleged to have hit a guard at MCC New York without causing any injury and received a "200-series"[1] incident report. That is my only incident report for violence and it did not prevent me from being returned to open population at all. Other than that, I only have 300-series incident reports for things

---

[1] The BOP has "100-series," "200-series," "300-series," and "400-series" infractions. 100-series is the highest and 400-series is the lowest.

like refusing a work assignment; none of which is recent.

## SHUs

18. The SHUs I was housed in generally allowed inmates to pass items and notes, speak to each other and engage in 1 to 2 hours of recreation per day, five days per week. Sometimes one would have a cellmate. Usually, other inmates would be in nearby cages at recreation. The only communications restriction was a reduction in phonecalls.

## ADX-GP

19.   I   was   initially   held   in   ADX-GP   because of my   alleged   ties   to   terrorism.   After my   SAMs   were   lifted,   I   continued to   be held   in   ADX-GP   because of my alleged   ties   to   terrorism.   I   never   did   anything   to violate   the   rules   and   cause myself to   wind up   in   ADX   on either   occassion.   In   ADX-GP,   I   was   originally   able   to   have   physical   contact   with   other inmates at   recreation   and   religious   gatherings   were   not   specifically   prohibited   until   the   changes

in PS 5360 in 2004 or 2005. In 2005, there were 2 murders at ADX Florence by non-terrorists. The prison then stopped allowing physical contact at recreation and installed cages to keep us all apart. No serious act of violence (or any act of violence as far as I remember) was perpetrated by a terrorist at ADX Florence while I was in ADX-G P.

20. In ADX-GP, recreation occurred 5 times per week, half indoors and half outdoors. After the murders, outdoor recreation

22

allowed ~~free~~ conversation with 4-6 other people and indoor only one to two others — one at a time. At indoor recreation, one could visibly see 3-4 people in their cells. There was no specific prohibition on communicating with other inmates in ADX-GP. I could not choose who I was with at recreation and eventually ADX began spreading Muslims out in a manner which actually made it physically harder to engage in them than

in H Unit where we were kept closer together.

Both times I was in ADX-GP,
I was around alleged [2] terrorist
Muslims (see. Att. 1) and ones not alleged
to be terrorists as well as non-Muslims like that. In
ADX-GP, I could send/receive any amount of letters,
but I only had 2 15-minute phonecalls per month.
Communications of those not accused of terrorism
are not as scrutinized at ADX.

SAMs

21. Att. 2 is the last SAMs I was given.

[2] By "alleged" I mean I have knowledge the BOP accuses them
of terrorism-related things

24

My alleged ties to terrorism as a result of my case and alleged views which haven't changed since I was arrested (i.e., the fact of the allegations) were the only reason the BOP ever gave me for imposing SAMs on me, so I didn't actually "do" anything to cause any of the changes in my level of custody as far as I know. However, the "Spain Incident" described later (which is 100% about terrorism) may be an undisclosed cause. After reading Document 67-11 in this case, and comparing Chesser's alleged conduct to others who were put on SAMs

25

including myself, I'm not sure how he would not have met SAMs criteria. They (the BOP, FBI, and DOJ) justify SAMs as needed to: (1) prevent our use of codes, (2) prevent our advocacy of Jihadism and terrorism, (3) prevent our solicitation of terrorism, and (4) prevent us from bypassing BOP censorship. Docs. 67 and 67-11 allege all of those things against Chesser in that he did everything SAMs are meant to prevent.

22.   The BOP and FBI did not enforce the SAMs prohibition on cell-to-cell

communication. We could talk through our doors and when out on our ranges to shower or clean. We received 2 hours of recreation on an almost-daily basis and we could communicate with one another like in ADX-GP. Most SAMs inmates were Muslims alleged to have ties to terrorism.

23. I am not aware of any use by an alleged terrorist organization like Al-Qa'idah

27

of imprisoned people to initiate, solicit, aid or otherwise further terrorism or other illegal activities, excluding potentially the vicarious use of the fact of their incarceration and conditions of their confinement as a propaganda tool.

## ADX's J Unit

24.   In J Unit, I have generally had 90 minutes of both indoor and outdoor recreation everyday with physical contact with Chesser, as he is the only person on my range. When I arrived, Mohamed Odeh

28

and Ahmed Ghailani were both upstairs on Range 4 (both are convicted in the 1998 embassy bombings), but Odeh recently left to go to the next phase of the Step-Down Program. Another Muslim without terrorism ties is on Range 1. Range 3 is outside when we are inside for recreation while Ranges 1 and 4 are in their cells where we can approach them to talk. We're outside when Range 1 is inside, but we're in our cells when Range 4 is inside. Engaging in a religious gathering here can result in

an incident report and at least 1 year's return to ADX-GP.

Inmates I've Met

25.   Attachment 1 is a table showing a non-comprehensive list of Muslims with alleged ties to terrorism whom I've met in solitary confinement in the BOP and where I met them.

26.   Mostafa Kemal Mostafa (Abu Hamza Al-Misri), whom I met in ADX's H Unit has no hands, is blind in one eye and half-blind in the other.  He is also elderly.

27.   Omar Abdel Rahman ("the Blind Shaykh"),

whom I met in the SHU at MCC New York, was blind and is elderly.

28.   Clement Hampton-El, a co-defendant of Omar Abdel-Rahman who passed away in 2014 and whom I met in the MCC New York SHU and ADX, was elderly, had a breathing problem which he attributed to poisonous gas he'd breathed and had a seriously maimed foot he said was blown apart by a mine.

29.   Jose Padilla, who is on SAMs in ADX's H Unit, is clearly catatonic and hadn't spoken or reacted to anyone's speech since I was in H Unit. He didn't even touch clothing left for him in his cell for a month and he doesn't go to recreation at all.

30.   Wali Shah, whom I met in H Unit, whose case

31

is related to mine, is missing three fingers, has shrapnel throughout his body in such high density that you can see it from afar, and has seriously maimed legs from what he says was an explosion.

## 9/11 ADX Referrals

31.    I was a part of at least 13 inmates who were sent to ADX Florence because of our alleged ties to terrorism right after the 9/11 attacks. In these cases, no misbehavior was alleged to precipitate the ADX referrals. The inmates included: me, Ahmad Ajaj, Nidal Ayyad,

Mahmud Abouhalima,  Ebrahim El-Gabrowny, El-Sayyid Nosair,  Mohammed Saleh,  Fadil Abdelghani,  Amir Abdelghani,  Tariq Al-Hasan,  Faris Khallafalla, Clement Hampton-El,  and Ghazi Abu Meizar.

## ADX Inmates

32.  I am only aware of one incident of violence on par with other ADX inmates' reasons for ADX placement allegedly perpetrated by an alleged Muslim terrorist. I did not witness it and I've never witnessed or heard of any violence by an alleged Muslim terrorist in the BOP which caused

serious injury besides this. It was an alleged stabbing of a guard at MCC New York in 2000 by Mamdouh Salim. I have read #67-11 in this case and my experience in prison is that the type of disciplinary history Chesser has is less significant than most inmates held in "high security" prisons (USPs) as a result of disciplinary infractions. Further, serious violence like stabbings, gang assaults and assaults with weapons were common occurrences in USPs, but usually the perpetrators would be released

from solitary confinement back to a USP once they served time in solitary for violating rules. Gangs would frequently attack inmates if they wanted to force the BOP to send them to another prison. In my experience, no inmate would ever be sent to ADX Florence over the conduct alleged in #67-11 without the allegations related to terrorism. The following is what I have found to be typical conduct of non-terrorists referred to ADX Florence and it includes the least-severe acts:

35

a. Murder while in prison;

b. Attempted murder of BOP staff;

c. Multiple assaults on staff causing serious injury in a short period;

d. Frequent fights or assaults on staff in a short period, but such that the inmate does this in a USP after making it up to "high security," then gets sent to a Special Management Unit ("SMU") and does it there until they get sent to ADX;

e. Orchestrating or carrying out an attempted murder as part of one of the most-dangerous prison gangs in the BOP, which the BOP labels "disruptive groups";

f. Multiple attempted murders of inmates in a short period;

g. Frequent assaults on inmates causing serious injury whereby one works up to a USP or is in a USP, then continues to do this in a SMU until they are sent to ADX;

h. Being the leader of a major criminal conspiracy while in prison, such as leading the criminal acts of a major gang or leading a major nation-wide drug ring;

i. Soliciting (as opposed to advocating) the murder of

36

law enforcement;

j. Escaping or seriously attempting to escape from a "secure" (i.e., not "minimum security") BOP facility; and

k. Instigating a prison riot.

However, my experience is that if an alleged Muslim terrorist commits even minor infractions, they can be sent to ADX or, if they're in ADX, Range 13.

## Range 13

33. I was placed on Range 13 along with several other alleged terrorists for going on a hunger strike. Initially, ADX staff said it was to facilitate observation, but we were held on Range 13 for a long time

37

after ending our strike to punish us. In ADX-GP, non-terrorists on hunger strike weren't even always sent to the SHU. On Range 13, in addition to other harsh conditions, we had recreation in what was basically a concrete ditch for our cells, so we had no communication.

## Spain Incident

34. In 2002, while in the SHU at USP Lompoc, I began corresponding with some Muslim prisoners in Spain. Later in 2002 and 2003, my co-defendants Ayyad and Abouhalima, but

38

not Ajaj, corresponded with them too.
When ADX staff told me I wasn't supposed
to write to other prisoners, I stopped.
In or around February 2005, I saw
a report by NBC news that some of
these Spanish prisoners were charged with
terrorism.   In or around late February
2005, I saw a report that members
of Congress were pressuring the Department
of Justice regarding our communications. On or
around that same date, Warden Robert
Hood at ADX issued a "general correspondence

39

restriction" for me, Ayyad and Abouhalima but not Ajaj. On or around March 17, 2005 Ayyad, Abouhalima and I were placed on SAMs and we were sent to H Unit the next day. I never encouraged violence in any letter and I've never violated BOP rules on correspondence. We never received incident reports for this. We were never told this had anything to do with our SAMs, but I'm not aware of any other possible explanation except that someone decided we were a

greater threat than others had previously

thought based solely on allegations which

have been made against us since 1993.

Executed on this __16 th__ day of

February, 2017 in Florence, Colorado.

_____

Mohammad A. Salameh

Reg. No. 34338-054

# ATTACHMENT 1

(To Exhibit A — Declaration of Mohammad Salameh)

Terrorist Confinement Policy Data — M. Salameh

"SUPPLEMENTAL RESPONSE TO
DEFENDANT'S MOTION TO DISMISS"

*Chesser v. Director, Bureau of Prisons*

Civil Action No.  15-cv- 1939-NYW

# TERRORIST CONFINEMENT POLICY DATA : PERSONAL EXPERIENCE OF MOHAMMAD A. SALAMEH

I, Mohammad A. Salameh, state the following to be true pursuant to 28 U.S.C. §1746:

1.  The table from pages 3-7 following my signature is filled out according to my personal knowledge according to the instructions below.

2.  The table's "NAME" column indicates the name I knew the indicated individual by. Each individual is a Muslim whom I am aware was accused of ties to terrorism by the U.S. government.

3.  A check in the "MCC" column indicates I met the individual in MCC New York in solitary confinement.

4.  A check in the "H Unit" column indicates I met the inmate in ADX's H Unit while on SAMs. If I met them in H Unit while we were both on the way to ADX-General Population ("ADX-GP") before I was on SAMs, I did not use that to check "H Unit" but I did use it to check "ADX-GP's" column.

1

5. If I checked "ADX-GP" it means I met them in ADX-GP and/or H Unit on the way to ADX-GP prior to the imposition of SAMs.

6. If I checked "ADX-SDP" it means I met them in the ADX-Step-Down Program.

7. If I checked "SHU" it means I met them in a Special Housing Unit other than a SHU at MCC or ADX. This and all above meetings were in solitary confinement in the Bureau of Prisons.

8. A check for "SAMs" indicates I have personal knowledge they were on Special Administrative Measures ("SAMs") and a check for "SAMs (R)" means I have personal knowledge their SAMs were removed.

Executed on this _16th_ day of February, 2017 in Florence, Colorado.

Mohammad A. Salameh
Reg. No. 34338-054

2

| NAME | MCC | HUNIT | ADX-GP | ADX-SDP | SHU | SAMs | SAMs(R) |
|---|---|---|---|---|---|---|---|
| 1. Ahmed Khalfan Ghailani | | ✓ | ✓ | ✓ | ✓ | ✓ | |
| 2. Mohamed Saddig Odeh | | ✓ | | ✓ | ✓ | ✓ | |
| 3. Nidal Ayyad | ✓ | ✓ | ✓ | | ✓ | ✓ | ✓ |
| 4. Mahmud Abouhalima | ✓ | ✓ | ✓ | | ✓ | ✓ | ✓ |
| 5. Ahmad Ajaj | ✓ | | | | ✓ | | |
| 6. Ramzi Yousef | | ✓ | | | ✓ | | |
| 7. Eyad Ismoil | ✗ | ✓ | | | ✓ | ✓ | |
| 8. Wali Khan Amin Shah | | ✓ | | | ✓ | ✓ | |
| 9. Omar Abdel Rahman | ✓ | | | | | | |
| 10. El-Sayyid Nosair | ✓ | | ✓ | ✗ | | | |
| 11. Ebrahim El-Gabrowny | ✓ | | ✓ | ✓ | | | |
| 12. Mohammed Saleh | ✓ | | ✓ | ✓ | | | |

3

| NAME | MCC | H Crit | ADX-GP | ADX-SDP | SHU | SAMs | SAMsCR |
|------|-----|--------|--------|---------|-----|------|--------|
| 13. Clement Hampton-El (Passed away, "Abd ar-Rashid") | √ | | | | | | |
| 14. Fadil Abdelghani | √ | | √ | | √ | | |
| 15. Amir Abdelghani | √ | | | | | | |
| 16. Faris Khallafalla | √ | | | | | | |
| 17. Tariq Al-Hasan | √ | | | | | | |
| 18. Victor Alvarez | √ | | | | | | |
| 19. Mamdouh Salim | √ | √ | | | √ | | |
| 20. Khalfan Mohammed | ✗ | √ | | | √ | √ | |
| 21. Wadeh El-Hage | √ | √ | | | √ | | |
| 22. Mohammed Al-Owhali | √ | √ | | √ | √ | √ | |
| 23. Richard Reid | | √ | √ | | √ | √ | |
| 24. Adis Madunjanin | | √ | | | √ | | |

4

| NAME | MCC | H/Unit | ADX-GP | ADX-SDP | SHU | SAMs | SAMs(R) |
|---|---|---|---|---|---|---|---|
| 25. Umar Farook Abdulmutallab | | √ | | | √ | | |
| 26. Sulaiman Abu Ghayth | | √ | | | √ | | |
| 27. Ali Al-Timimi | | √ | | | √ | | |
| 28. Usama Kassir | | √ | | | √ | | |
| 29. Abdul-Hakeem Murad | | √ | | | √ | √ | |
| 30. Ayman Faris | | √ | | | √ | √ | |
| 31. Ahmad Abu Ali | | √ | | | √ | | |
| 32. Mohammad Almuayyad | | √ | | | √ | √ | |
| 33. Uzair Paracha | | √ | | | √ | √ | |
| 34. _____ Hashimi | | √ | | | √ | √ | |
| 35. Zacharias Mussaoui | | √ | | | √ | | |
| 36. Shahrayar Qazi | | | √ | | | | |

5

| NAME | MCC | HUnit | ADX-GP | ADX-SDP | SHU | SAMs | SAMs(R) |
|---|---|---|---|---|---|---|---|
| 37. ~~Muhannad~~ Muhannad Hamadi (Iraqi) | | | √ | | | | |
| 38. Khalid Al-Fawwaz | | | √ | | | | |
| 39. Faisal Shahzad | | √ | | | | √ | |
| 40. Mohammed Jabara | | √ | | | | √ | |
| 41. Ahmed Abdel-Sattar | | √ | | | | √ | √ |
| 42. Mostafa Kemal Mostafa (Abu Hamza Al-Masri) | | √ | | | | √ | |
| 43. Dzokhar Tsarnaev | | √ | | | | √ | |
| 44. Shaban Hafedh  Shaban | | √ | | | | √ | |
| 45. Omar Rezaq | | | | | √ | | |
| 46. Musa Abu Marzoug | √ | | | | | | |
| 47. Khalid Al-Jawary | √ | | | | √ | | |
| 48. Ghazi Abu Meizar | √ | | | | | | |

6

| NAME | MCC | H. Unit | ADX-GP | ADX-SDP | SHU | SAMs | SAMs (R) |
|------|-----|---------|--------|---------|-----|------|----------|
| 49. John Walker Lindh | | ✓ | | | | ✓ | ✓ |
| 50. Jose Padilla | | ✓ | | | | ✓ | |
| 51. | | | | | | | |
| 52. | | | | | | | |
| 53. | | | | | | | |
| 54. | | | | | | | |
| 55. | | | | | | | |
| 56. | | | | | | | |
| 57. | | | | | | | |
| 58. | | | | | | | |
| 59. | | | | | | | |
| 60. | | | | | | | |

7

# ATTACHMENT 2

(To Exhibit A — Declaration of Mohammad A. Salameh)

## Salameh's SAMs (March 2015)

"SUPPLEMENTAL RESPONSE TO DEFENDANT'S MOTIONTODISMISS"

*Chesser v. Director, Bureau of Prisons*
Civil Action No. 15-cv-1939-NYW



**U.S. Department of Justice**
Federal Bureau of Prisons

*United States Penitentiary –*
*Administrative Maximum*

*Florence, Colorado  81226*

March 23, 2015

NOTICE TO        MOHAMMAD SALAMEH, REG. NO. 34338-054

FROM:            J. Oliver, Complex Warden

SUBJECT:         **Notification of Extension of Special Administrative Measures**

You were convicted of charges arising from the 1993 World Trade Center bombing.
You are serving a sentence of 116 years, 11 months in prison.  Because of your
proclivity for violence, the Attorney General placed you under Special Administrative
Measures (SAM).

The United States Attorney for the Southern District of New York (USA/SDNY)
requested renewal of your SAM.  The Federal Bureau of Investigation (FBI) agrees that
your SAM should be continued.  In reaching the conclusion that there is a substantial
risk that your communications or contacts could result in death or serious bodily injury to
others, the USA/SDNY cites your central role in the 1993 World Trade Center bombing
that resulted in the deaths of six individuals and injuries to over 1,000 others.  Among
other things, you rented the apartment and shed where the attack was planned, opened
a bank account used throughout the planning, helped procure chemicals that were used
in the attack, surveilled the eventual location where the bomb was placed in the parking
garage of the World Trade Center, and rented the Ryder van used to transport the
bomb to the target.  Those who played a role in the 1993 attack are viewed as heroes
by other Islamic extremists in their war against the United States.  Your involvement in
that attack demonstrates that you are a violent jihadist, committed to waging war on the
United States, and that you are well-positioned to inspire others who share your views.

In addition, the USA/SDNY reports that your conduct while subject to SAM, including
your repeated requests in recent years to have contact with individuals who raise, or
appear to be associated with individuals who raise, national security concerns; your
attempts to send a number of prohibited publications to your cousin; your two hunger
strikes; your comments to BOP staff during a January 2011 meeting, in which you
stated that being imprisoned had not changed your "ideals as it does some inmates,"
reinforce the need for continued imposition of your SAM.  Although not all of these
incidents constitute violations of the SAM, they nonetheless demonstrate that you

Notification of Extension of Special Administrative Measures
Mohammad Salameh, Reg. No. 34338-054
March 23, 2015
Page 2

continue to hold extremist and violent views that lend further support for continued imposition of the SAM.

In December 2008, you attempted to arrange a meeting between your family and the family of another SAM inmate as part of an effort to petition the government of Jordan to broker a prisoner exchange with the United States. Specifically, on December 4, 2008, you called your brother, Majdi, in Jordan and gave him the address and telephone number for the parents of inmate Mohamed Sadeek Odeh. You provided your brother with this information so that your brother could discuss Odeh's parents a proposed exchange of inmates between the United States and Jordan. In requesting that your family contact the family of another inmate, you attempted to circumvent the SAM imposed on you. SAM inmates are explicitly prohibited from corresponding with other inmates within the institution and from relaying messages through their authorized contacts to unauthorized third parties.

According to the FBI, you had one SAM violation during the past year. During a December 5, 2014, telephone call with your brother, an approved contact, you instructed him to convey a message to a lawyer in Jordan who is not an approved contact.

Based upon information provided of your proclivity for violence and your continuing espousal of jihadist views, it was found there is substantial risk that your communications or contacts with persons could result in death or serious bodily injury to persons, or substantial damage to property that would entail the risk of serious bodily injury to persons. Therefore, pursuant to 28 C.F.R. § 501.3, we will continue to implement the SAM in order to restrict your access to the mail, the media, the telephone, and visitors. This SAM will commence immediately upon expiration of the prior SAM authorization period and will be in effect for a period of one year, subject to any further direction.

1. **General Provisions:**

    a. **Adherence to Usual United States Marshals Service (USMS), Bureau of Prisons (BOP), and Detention Facility (DF) Policy Requirements** – In addition to the below listed SAM, you must comply with all usual USMS, BOP, and non-BOP DF policies regarding restrictions, activities, privileges, communications, etc. If there is a conflict between USMS/BOP/DF policies and the SAM, as set forth herein, where the SAM is more restrictive than

**"Sensitive But Unclassified"**

Notification of Extension of Special Administrative Measures
Mohammad Salameh, Reg. No. 34338-054
March 23, 2015
Page 3

> usual USMS/BOP/DF policies, then the SAM shall control. If usual USMS/BOP/DF policies are more restrictive than the SAM, then USMS/BOP/DF policies shall control.

b.  **Interim SAM Modification Authority** – During the term of this directive, the Director, Office of Enforcement Operations (OEO), Criminal Division, may modify your SAM as long as any SAM modification authorized by OEO:

  i.  Does not create a more restrictive SAM;

  ii.  Is not in conflict with the request of the USA/SDNY, FBI, or USMS/BOP/DF, or applicable regulations; and

  iii.  Is not objected to by the USA/SDNY, FBI, or USMS/BOP/DF.

c.  **Inmate Communications Prohibitions** –

  i.  You are limited, within the USMS/BOP/DF's reasonable efforts and existing confinement conditions, from having contact (including passing or receiving any oral, written, or recorded communications) with any other inmate, visitor, attorney, or anyone else, except as outlined and allowed by this document, that could reasonably foreseeably result in you communicating (sending or receiving) information that could circumvent the SAM's intent of significantly limiting your ability to communicate (send or receive) threatening or other terrorism related information.

  ii.  The USMS/BOP/DF may permit you to communicate with other SAM inmates orally only during certain predesignated times, the place and duration to be set by the USMS/BOP/DF. You shall not have any physical contact with other inmates during this predesignated time, and all such predesignated sessions may be monitored and/or recorded. Upon request of the FBI, a copy of the recordings will be provided by the USMS/BOP/DF to the FBI to be analyzed for indications that the inmates are attempting to pass messages soliciting or encouraging acts of terrorism, violence, or other crimes.

**"Sensitive But Unclassified"**

Notification of Extension of Special Administrative Measures
Mohammad Salameh, Reg. No. 34338-054
March 23, 2015
Page 4

    d. **Use of Interpreters/Translators by the USMS/BOP/DF** – Interpreter/ translator approval requirement:

        i. The USMS/BOP/DF may use Department of Justice (DOJ) approved interpreters/translators as necessary for the purpose of facilitating communication with you.

        ii. No person shall act as an interpreter/translator without prior written clearance/approval from the USMS/BOP/DF, which shall only be granted after consultation with the FBI and USA/SDNY.

        iii. Interpreters/translators utilized by the USMS/BOP/DF shall not be allowed to engage in, or overhear, unmonitored conversations with you. Interpreters/translators shall not be alone with you, either in a room or on a telephone or other communications medium.

2. **Attorney/Client Provisions:**

    a. **Attorney[1] Affirmation of Receipt of the SAM Restrictions Document** – Your attorney (or counsel) – individually by each if more than one – must sign an affirmation acknowledging receipt of the SAM restrictions document. By signing the affirmation, the attorney acknowledges his/her awareness and understanding of the SAM provisions and his/her agreement to abide by these provisions, particularly those that relate to contact between you and your attorney and the attorney's staff. The signing of the affirmation does not serve as an endorsement of the SAM or the conditions of confinement, and does not serve to attest to any of the factors set forth in the conclusions supporting the SAM. However, in signing the affirmation, your attorney and precleared staff[2] acknowledge the restriction that they will not forward third

---

[1] The term "attorney" refers to the inmate's attorney of record, who has been verified and documented by the USA/SDNY, and who has received and acknowledged receipt of the SAM restrictions document. As used in this document, "attorney" also refers to more than one attorney where the inmate is represented by two or more attorneys, and the provisions of this document shall be fully applicable to each such attorney in his/her individual capacity.
[2] "Precleared" when used with regard to an attorney's staff, or "precleared staff member," refers to a co-counsel, paralegal, or an investigator who is actively assisting

**"Sensitive But Unclassified"**

Notification of Extension of Special Administrative Measures
Mohammad Salameh, Reg. No. 34338-054
March 23, 2015
Page 5

party messages to or from you.

i.   The USA/SDNY shall present, or forward, the attorney affirmation of receipt of the SAM restrictions document to your attorney.

ii.  After initiation of the SAM and prior to your attorney being permitted to have attorney/client privileged contact with you, your attorney shall execute a document affirming receipt of the SAM restrictions document and return the original to the USA/SDNY.

iii. The USA/SDNY shall maintain the original of the SAM acknowledgment document and forward a copy of the signed document to OEO in Washington, D.C. and the USMS/BOP/DF.

b.  **Attorney Use of Interpreters/Translators –**

i.   **Necessity Requirement –** No interpreter/translator shall be utilized unless absolutely necessary where you do not speak a common language with the attorney.  Any interpreter/translator shall be precleared.[3]

ii.  **Attorney Immediate Presence Requirement –** Any use of an interpreter/translator by the attorney shall be in the physical and

---

the inmate's attorney with the inmate's defense, who has submitted to a background check by the FBI and USA/SDNY, who has successfully been cleared by the FBI and USA/SDNY, and who has received a copy of the inmate's SAM and has agreed – as evidenced by his/her signature – to adhere to the SAM restrictions and requirements. As used in this document, "staff member" also refers to more than one staff member, and the provisions of this document shall be fully applicable to each such staff member in his/her individual capacity.  A "paralegal" will also be governed by any additional DF rules and regulations concerning paralegals.

[3] "Precleared," when used with regard to in interpreter/translator, refers to an interpreter/translator who is actively assisting the inmate's attorney with the inmate's post-sentencing proceedings, who has submitted to a background check by the FBI and USA/SDNY, who has successfully been cleared by the FBI and USA/SDNY, and who has received a copy of the inmate's SAM and has agreed – as evidenced by his/her signature – to adhere to the SAM restrictions and requirements.

**"Sensitive But Unclassified"**

Notification of Extension of Special Administrative Measures
Mohammad Salameh, Reg. No. 34338-054
March 23, 2015
Page 6

immediate presence of the attorney – i.e., in the same room.  The attorney shall not patch through telephone calls, or any other communications, to or from the inmate.

   iii. **Translation of Inmate's Correspondence** – An attorney of record may only allow a federally approved interpreter/translator to translate the inmate's correspondence as necessary for attorney-client privileged communication.

c. **Attorney/Client Privileged Visits** – Attorney/client privileged visits may be contact or noncontact, at the discretion of the USMS/BOP/DF.

d. **Attorney May Disseminate Inmate Conversations** – Your attorney may disseminate the contents of your communication to third parties for the sole purpose of providing necessary legal services relating to your post-sentencing proceedings – and not for any other reason – on the understanding that any such dissemination shall be made solely by your attorney, and not by the attorney's staff.

e. **Unaccompanied Attorney's Precleared Paralegal(s) May Meet with Client** – Your attorney's precleared paralegal(s) may meet with you without the need of your attorney being present.  These meetings may be contact or noncontact, at the discretion of the USMS/BOP/DF.

f. **Simultaneous Multiple Legal Visitors** – You may have multiple legal visitors provided that at least one of the multiple legal visitors is your attorney or precleared paralegal.  These meetings may be contact or noncontact, at the discretion of the USMS/BOP/DF.  An investigator or interpreter/translator may not meet alone with you.

g. **Legally Privileged Telephone Calls** – The following rules refer to all legally privileged telephone calls or communications:

   i. **Inmate's Attorney's Precleared Staff May Participate in Inmate Telephone Calls** – Your attorney's precleared staff are permitted to communicate directly with you by telephone, provided that your attorney is physically present and participating in the legal call as well.

**"Sensitive But Unclassified"**

Notification of Extension of Special Administrative Measures
Mohammad Salameh, Reg. No. 34338-054
March 23, 2015
Page 7

ii.   **Inmate's Initiation of Legally Privileged Telephone Calls** – Your
initiated telephone communications with your attorney or precleared staff
are to be placed by a USMS/BOP/DF staff member and the telephone
handed over to you only after the USMS/BOP/DF staff member confirms
that the person on the other end of the line is your attorney.  This
privilege is contingent upon the following additional restrictions:

1)   Your attorney will not allow any non-precleared person to
communicate with you, or to take part in and/or listen to or overhear
any communications with you.

2)   Your attorney must instruct his/her staff that:

a)   Your attorney and precleared staff are the only persons
allowed to engage in communications with you.

b)   The attorney's staff (including the attorney) is not to patch
through, forward, transmit, or send your communications to
third parties.

3)   No telephone call/communication, or portion thereof, except as
specifically authorized by this document:

a)   Is to be overheard by a third party.[4]

b)   Will be patched through, or in any manner forwarded or
transmitted to a third party.

c)   Shall be divulged in any manner to a third party, except as
otherwise provided in Section 2d above.

d)   · Shall be in any manner recorded and preserved.[5]  Your

---

[4] For purposes of the SAM, "third party" does not include officials of the USMS/BOP/
DF, FBI, Department of Justice (DOJ), or other duly authorized federal authorities when
acting in connection with their official duties.  This section does not allow monitoring of
attorney/client privileged communications.
[5] Except by the USMS/BOP/DF, FBI, DOJ, or other duly authorized federal authorities.

**"Sensitive But Unclassified"**

Notification of Extension of Special Administrative Measures
Mohammad Salameh, Reg. No. 34338-054
March 23, 2015
Page 8

attorney may make written notes of attorney client privileged communications.

4) If the USMS/BOP/DF, FBI, or USA/SDNY determines that you have used or are using the opportunity to make a legal call to speak with another inmate or for any other nonlegal reason that would circumvent the intent of the SAM, your ability to contact your attorney by telephone may be suspended or eliminated.

h. **Documents Provided by Attorney to Inmate** – During a visit, your attorney may provide you with, or review with you, documents related to your post-sentencing proceedings and/or material prepared by your attorney related to such proceedings, so long as any of the foregoing documents are translated, if translation is necessary, by a precleared interpreter/translator. Any documents not related to your post-sentencing proceedings must be sent to you via general correspondence and will be subject to the mail review provisions of subparagraphs 2i and 3g. Documents previously reviewed and cleared for receipt by you, and already in your possession at the outset of the visit, may be discussed or reviewed by you and your attorney during the visit.

i. None of the materials provided may include inflammatory materials, materials inciting violence, military training materials, or materials that may be used to pass messages from inmate to inmate, unless such materials have been precleared by the USA/SDNY and FBI.

ii. The USA/SDNY may authorize additional documents to be presented to you. If any documents not listed or described above need to be transmitted to you, consent for the transmission of the document can be obtained from the USA/SDNY without the need to formally seek approval for an amendment to the SAM.

i. **Legal Mail**[6] – Your attorney may not send, communicate, distribute, or

---

This section does not allow monitoring of attorney/client privileged communications.
[6] Legal mail is defined as properly marked correspondence (marked "Legal Mail") addressed to or from the inmate's attorney. All other mail, including that otherwise defined by the USMS/BOP/DF as Special Mail, shall be processed as "nonlegal mail."

**"Sensitive But Unclassified"**

Notification of Extension of Special Administrative Measures
Mohammad Salameh, Reg. No. 34338-054
March 23, 2015
Page 9

divulge your mail, or any portion of its contents (legal or otherwise), to
third parties, except when disclosure of the contents is necessary for the
sole purpose of providing necessary legal services related to your post-
sentencing proceedings – and not for any other reason.  In signing the
SAM acknowledgement document, your attorney and precleared staff
will acknowledge the restriction that only inmate case-related documents
will be presented to you, and that the attorney and his/her staff are
strictly prohibited from forwarding third party mail to or from you.

3.  **Inmate's Nonlegal Contacts:**

    a.   **Nonlegally Privileged Telephone Contacts –**

        i.   You are limited to nonlegally privileged telephone calls with your
immediate family members, as well as your cousin, Mojahed Salama,
your nephew, Mahmud Khalid Bdair, and your niece, Aseel Ramadan
Amin Salameh.[7]

        ii.   The quantity and duration of your nonlegal telephone calls with your
immediate family members, as well as Mojahed Salama, Mahmud Khalid
Bdair, and Aseel Ramadan Amin Salameh, shall be set by the
USMS/BOP/DF, with a minimum of one call per month.

    b.   **Rules for Telephone Calls –** For all nonlegally privileged telephone calls or
communications, no telephone call/communication, or portion thereof:

        i.   Is to be overheard by a third party.

        ii.   Is to be patched through, or in any manner forwarded or transmitted, to a
third party.

        iii.   Shall be divulged in any manner to a third party.

---

[7] The inmate's "immediate family members" are defined as the inmate's
(USMS/BOP/DF or FBI verifiable) spouse, children, parents, and siblings.  Requests for
additional nonlegal contacts may be submitted and will be considered on a case-by-
case basis.

**"Sensitive But Unclassified"**

Notification of Extension of Special Administrative Measures
Mohammad Salameh, Reg. No. 34338-054
March 23, 2015
Page 10

   iv.      Shall be in any manner recorded or preserved.[8]

All telephone calls shall be in English unless a fluent USMS/BOP/DF or FBI
approved interpreter/translator is available to contemporaneously monitor the
telephone call.  Arranging for an interpreter/translator may require at least 14 days'
advance notice.

c.  **Telephone SAM Restriction Notifications** – For all nonlegal telephone calls
    to your immediate family member(s), as well as Mojahed Salama, Mahmud
    Khalid Bdair, or Aseel Ramadan Amin Salameh,:

   i.      The USMS/BOP/DF shall inform you of the telephone SAM restrictions
           prior to each telephone call.

   ii.     The USMS/BOP/DF shall verbally inform your immediate family
           member(s), as well as Mojahed Salama, Mahmud Khalid Bdair, or Aseel
           Ramadan Amin Salameh on the opposite end of your telephone
           communication of the SAM restrictions.  The USMS/BOP/DF is only
           required to notify your communication recipient in English.

   iii.    The USMS/BOP/DF shall document each such telephone notification.

d.  **Family Call Monitoring** – All calls with your immediate family member(s), as
    well as Mojahed Salama, Mahmud Khalid Bdair, or Aseel Ramadan Amin
    Salameh, shall be:

   i.      Contemporaneously monitored by the FBI.

   ii.     Contemporaneously recorded (as directed by the FBI) in a manner that
           allows such telephone calls to be analyzed for indications the call is
           being used to pass messages soliciting or encouraging acts of violence
           or other crimes, or to otherwise attempt to circumvent the SAM.

---

[8] Except for the USMS/BOP/DF, FBI, DOJ, or other duly authorized federal authorities.

**"Sensitive But Unclassified"**

Notification of Extension of Special Administrative Measures
Mohammad Salameh, Reg. No. 34338-054
March 23, 2015
Page 11

    iii.    A copy of each telephone call recording involving an inmate/immediate family member or authorized contact shall be provided to the FBI by the USMS/BOP/DF. These recordings shall be forwarded on a call-by-call basis as soon as practicable.

e.    **Improper Communication** – If telephone call monitoring or analysis reveals that any call or portion of a call involving you contains any indication of a discussion of illegal activity, the soliciting of or encouraging of acts of violence or terrorism, or actual or attempted circumvention of the SAM, you shall not be permitted any further calls to your immediate family members or authorized contacts for a period of time to be determined by the USMS/BOP/DF. If contemporaneous monitoring reveals such inappropriate activity, the telephone call may be immediately terminated.

f.    **Nonlegal Visits** –

    i.    **Limited Visitors** – You shall be permitted to visit only with your immediate family members, as well as Mojahed Salama and Mahmud Khalid Bdair. The visitor's identity and family member relationship to you will be confirmed by the USMS/BOP/DF and FBI in advance.

    ii.    **English Requirement** – All communications during your nonlegal visits will be in English unless a fluent USMS/BOP/DF or FBI approved interpreter/translator is readily available to contemporaneously monitor the communication/visit. Arranging for an interpreter/translator may require at least 14 days' advance notice.

    iii.    **Visit Criteria** – All nonlegal visits shall be:

    1)    Contemporaneously monitored by the USMS/BOP/DF and/or FBI, in a manner that allows such visits to be analyzed for indications the visit is being used to pass messages soliciting or encouraging acts of violence or other crimes, or to otherwise attempt to circumvent the SAM.

    2)    Permitted only with a minimum of 14 calendar days advance written notice to the USMS/BOP/DF facility where you are housed.

**"Sensitive But Unclassified"**

Notification of Extension of Special Administrative Measures
Mohammad Salameh, Reg. No. 34338-054
March 23, 2015
Page 12

3)   Without any physical contact.  All such meetings shall be noncontact to protect against harm to visitors or staff.

4)   Limited to one adult visitor at a time.  However, your FBI verified minor children may visit with a preapproved adult visitor.

g.   **Nonlegal Mail** – Nonlegal mail is any mail not clearly and properly addressed to/from your attorney and marked "Legal Mail" (incoming and outgoing). Nonlegal mail is limited to only your immediate family, as well as Mojahed Salama, Marwan Salama, Mahmud Khalid Bdair, Aseel Ramadan Amin Salameh, U.S. courts, federal judges, U.S. Attorney's Offices, member of U.S. Congress, the BOP, and other federal law enforcement entities.

i.   **General correspondence with limitations:**  Correspondence is restricted to immediate family members, as well as Mojahed Salama, Marwan Salama, Mahmud Khalid Bdair, and Aseel Ramadan Amin Salameh.  The volume and frequency of outgoing general correspondence with immediate family members, as well as Mojahed Salama, Marwan Salama, Mahmud Khalid Bdair, and Aseel Ramadan Amin Salameh, may be limited to three pieces of paper (not larger than 8 ½ x 11), double-sided, once per calendar week to a single recipient, at the discretion of the USMS/BOP/DF.  The identity and your family member relationship will be confirmed by the USMS/BOP/DF and FBI.

ii.   **General correspondence without limitations:**  There is no volume or frequency limitation on correspondence to/from U.S. courts, federal judges, U.S. Attorney's Offices, members of U.S. Congress, the BOP, and other federal law enforcement entities, unless there is evidence of abuse of these privileges, threatening correspondence is detected, circumvention of the SAM is detected, or the quantity to be processed becomes unreasonable to the extent that efficient processing to protect the security, good order or discipline of the institution, the public or national security may be jeopardized.

iii.   **All nonlegal mail shall be:**

**"Sensitive But Unclassified"**

Notification of Extension of Special Administrative Measures
Mohammad Salameh, Reg. No. 34338-054
March 23, 2015
Page 13

1) **Copied** – Shall be copied (including the surface of the envelope) by the warden, or his/her designee, of the facility in which you are housed.

2) **Forwarded** – Shall be forwarded, in copy form, to the location designated by the FBI.

3) **Analyzed** – After government analysis and approval, if appropriate, your incoming/outgoing nonlegal mail will be forwarded to the USMS/BOP/DF for delivery to you (incoming); or directly to the addressee (outgoing).

iv.  The federal government will forward your nonlegal mail to the USMS/BOP/DF for delivery to you or directly to the addressee after a review and analysis period of:

1) A reasonable time not to exceed 14 business days for mail which is written entirely in the English language.

2) A reasonable time not to exceed 60 business days for any mail which includes writing in any language other than English, to allow for translation.

3) A reasonable time not to exceed 60 business days for any mail where the federal government has reasonable suspicion to believe that a code was used, to allow for decoding.

v.  **Mail Seizure** – If outgoing/incoming mail is determined by the USMS/BOP/DF or FBI to contain overt or covert discussion of or requests for illegal activities, the soliciting or encouraging of acts of violence or terrorism, or actual or attempted circumvention of the SAM, the mail shall not be delivered/forwarded to the intended recipient but referred to the FBI for appropriate action. You shall be notified in writing of the seizure of any mail.

4. <u>**Communication with News Media:**</u> You shall not be permitted to speak, meet, correspond, or otherwise communicate with any member or representative of the

**"Sensitive But Unclassified"**

Notification of Extension of Special Administrative Measures
Mohammad Salameh, Reg. No. 34338-054
March 23, 2015
Page 14

news media in person; by telephone; by furnishing a recorded message; through the mail, your attorney, or a third party; or otherwise.

5. **Religious Visitation:**

   a.   You shall not be allowed to engage in group prayer with other inmates.

   b.   If a USMS/BOP/DF and/or FBI approved religious representative is to be present for prayer with you, the prayer shall be conducted as part of a contact or noncontact visit, at the discretion of the USMS/BOP/DF.

6. **No Communal Cells and No Communication Between Cells:**

   a.   You shall not be allowed to share a cell with another inmate.

   b.   You shall be limited within the USMS/BOP/DF's reasonable efforts and existing confinement conditions, from communicating with any other inmate by making statements audible to other inmates or by sending notes to other inmates, except as permitted in Section 1c above.

7. **Cellblock Procedures:**

   a.   You shall be kept separated from other inmates as much as possible while in the cellblock area.

   b.   You shall be limited, within the USMS/BOP/DF's reasonable efforts and existing confinement conditions, from communicating with any other inmate while in the cellblock area.

8. **Access to Mass Communications:**  To prevent you from receiving and acting upon critically-timed information or information coded in a potentially undetectable manner, your access to materials of mass communication is restricted as follows:

   a.   **Publications/Newspapers –**

   i.   You may have access to publications determined not to facilitate criminal activity or be detrimental to: national security; the security, good order or discipline of the institution; or the protection of the public.  This

**"Sensitive But Unclassified"**

Notification of Extension of Special Administrative Measures
Mohammad Salameh, Reg. No. 34338-054
March 23, 2015
Page 15

determination is to be made by the USMS/BOP/DF, in consultation with the USA/SDNY.

ii. Sections of the publication/newspaper which offer a forum for information to be passed by unknown and/or unverified individuals, including but not limited to classified advertisements and letters to the editor, should be removed from the publications/newspapers prior to distribution to you.

iii. If restricted by the USMS/BOP/DF rules, a publication will be denied. If acceptable, upon delivery, the USMS/BOP/DF will review the publication and make the initial determination. If the FBI's expertise is required, the publication will be forwarded to the FBI for review. The USMS/BOP/DF will also forward the publication to the FBI if translations are needed to make the determination. (In these cases, the FBI shall respond to the USMS/ BOP/DF within 14 business days.) You shall then have access to the remaining portions of the publications/ newspapers deemed acceptable, in accordance with the USMS/BOP/DF policy.

iv. In order to avoid passing messages/information from inmate to inmate, you shall be allowed to share institutionally purchased publications/ newspapers with other SAM inmates only after each publication/ newspaper is physically screened by staff to ensure that messages cannot be passed between the SAM inmates. Publications/newspapers individually purchased by you may not be shared with any other inmate.

b. **Television and Radio** – You are authorized to have television and radio viewing and listening privileges, in accordance with standard and applicable USMS/BOP/DF policies and procedures.

c. **Termination or Limitation** – If the USMS/BOP/DF determines that the mass communications are being used as a vehicle to send messages to you relating to the furtherance of terrorist or criminal activities, your access may be limited or terminated for a period of time to be determined by the USMS/BOP/DF.

**"Sensitive But Unclassified"**

Notification of Extension of Special Administrative Measures
Mohammad Salameh, Reg. No. 34338-054
March 23, 2015
Page 16

9.  **Access to Books:**

  a.  You may have access to all books which do not facilitate criminal activity or present a substantial threat to national security or the security, discipline, or good order of the institution. This initial determination is to be made by the USMS/BOP/DF and, if the USMS/BOP/DF determines that the FBI's expertise is required, the book(s) will be forwarded to the FBI for review. In conducting its analysis, the FBI will determine whether the book advocates or promotes acts of terrorism or violence and/or whether access to the book by you would pose a substantial threat to national security.

  b.  In order to avoid passing messages/information from inmate to inmate, you shall be allowed to share institutionally purchased books with other SAM inmates only after each book is physically screened by staff to ensure that messages cannot be passed between the SAM inmates. Books individually purchased by you may not be shared with any other inmate.

10. **Transfer of Custody:**  In the event that you are transferred to or from the custody of the USMS, BOP, or any other DF, the SAM provisions authorized for you shall continue in effect, without need for any additional DOJ authorization.

11. **Inmate's Consular Contacts:**  You, as a citizen of a foreign country, shall be allowed Consular communications and visits, consistent with the USMS/BOP/DF policy. The Consular contacts shall comply with the U.S. Department of State (DOS) Consular notification and access requirements.[9]  Prior to permitting any Consular contact, the FBI will verify the Consular representative's credentials with the DOS.

---

[9] *See* Consular Notification and Access, Instructions for Federal, State, and Local Law Enforcement and Other Officials Regarding Foreign Nationals in the United States and the Rights of Consular Officials to Assist Them, DOS. The DOS contact is the Consular Notification and Outreach Division, Office of Policy Coordination and Public Affairs, DOS, telephone (202) 647-4110 or http://www.travel.state.gov/law/consular/counsular_753.html.

**"Sensitive But Unclassified"**

Notification of Extension of Special Administrative Measures
Mohammad Salameh, Reg. No. 34338-054
March 23, 2015
Page 17

## CONCLUSION

The SAM set forth herein, especially as they relate to attorney/client-privileged communications and family contact, are reasonably necessary to prevent you from committing, soliciting, or conspiring to engage in additional criminal activity.  Moreover, these measures are the least restrictive that can be tolerated in light of the ability of you to aid, knowingly or inadvertently, in plans that create a substantial risk that your communications or contacts with persons could result in death or serious bodily injury to persons.

With respect to telephone privileges, the SAM are reasonably necessary because of the high probability of calls to co-conspirators to arrange terrorist or criminal activities.

With respect to mail privileges, the SAM are reasonably necessary to prevent you from receiving or passing along critically timed messages.  Accordingly, your interest in the timely receipt and/or submission of mail, with the possible danger the contents of the mail may post to others, was weighed.  It was determined that delaying mail delivery to allow authorized personnel to examine a copy of the mail is the least restrictive means available to ensure that the mail is not being used to deliver requests for, or to assist in, violent threats and/or terrorist activities.

To the extent that the use of an interpreter/translator is necessary, the government has the right to ensure that the interpreter/translator given access to you is worthy of trust.

The SAM's prohibition of contact with the media is reasonably necessary. Communication with the media could pose a substantial risk to public safety if you advocate terrorist, criminal, and/or violent offenses, or if you make statements designed to incite such acts.  Based upon your past behavior, it is believed that it would be unwise to wait until after you solicit or attempt to arrange a violent or terrorist act to justify such media restrictions.

The SAM's limitations on access to mass communications are reasonably necessary to prevent you from receiving and acting upon critically timed messages. Such messages may be placed in advertisements or communicated through other means, such as the television and/or radio.  It is believed that limiting and/or delaying

**"Sensitive But Unclassified"**

Notification of Extension of Special Administrative Measures
Mohammad Salameh, Reg. No. 34338-054
March 23, 2015
Page 18

mass communication patterns you may develop with the outside world, and ensure that the media is not used to communicate information that furthers terrorist, violent, and/or criminal activities.

These conditions are imposed by the BOP at the request of the Attorney General, through his designated agent, the Assistant Attorney General.

Received: March _____, 2015
          (18 pages)                    _____
                                        Mohammad Salameh
                                        Reg. No. 34338-054

**"Sensitive But Unclassified"**

# EXHIBIT B

## Declaration of Zachary A. Chesser on TCP Math

"SUPPLEMENTAL RESPONSE    TO
DEFENDANT'S   MOTION TO DISMISS"

*Chesser v. Director, Bureau of Prisons*
Civil Action No. 15-cv-1939-NYW

UNITED STATES DISTRICT COURT
DISTRICT OF COLORADO

Civil Action No. 15-cv-1939-NYW

ZACHARY A. CHESSER,
    Plaintiff,

v.

DIRECTOR, BUREAU OF PRISONS,
    Defendant.

Declaration of Zachary A. Chesser on Terrorism
Confinement Policy Data Math, Number   1

I, Zachary A. Chesser, state the following pursuant
to 28 U.S.C. §1746:

1.   This declaration is meant to explain

the methodology I am using to derive statistics

for my Supplemental Response to Defendant's Motion

to Dismiss [Doc.67].

2.   Sources.  I am accepting the statistics

of Mark Collins. #67-11 passim, that there are 195,000

1

BOP inmates, 404 of whom are in ADX, 429 of whom are terrorists, I am also accepting his assertion that 44 terrorists are in ADX, 19 are in SHUs and 17 are on SAMs at ADX. I also accept his assertion that 2 are in a SMU. This yields 65 terrorists held in solitary confinement on 8/2/16. I am also using Mohammed Salameh's declaration which is Exhibit A to the Response to which this is attached ("S"). I am also using the declarations of Ahmed Ghailani ("G") and Mohamied Odeh ("O") which are attached to my most recent proposed TRO motion. I will incorporate abbreviations from all of these

sources. I will reference individuals, on occasion,

by their number in Att. 1 to S, G and O,

with reference to the letter I use for the declaration.

Thus, "S23," "G9," and "O17" all refer to Richard

Reid. I rely on spellings in "S," as I believe

S is more accurate in this regard.

3. Unique Individuals.   I am doing my

best to cross reference S, G and O to

determine where an individual is the same

person as another listed individual. I am

unable to find potential duplicates across

declarations for the following individuals:

- S: 9, 10, 12-18, 42-43, & 45-47
- G: 12, 17 &18

· O: 5, 7, 8, 27, 29, 30, 33 & 34

G6 is Salaneh himself and is the only individual

in G which overlaps with O but not S,

so I will use S's numbering for all overlapping

individuals except G6 when I am not being

specific about every reference to that individual.

4  Overlapping Individuals.  After investigation

and careful consideration,  I believe the other

listed individuals overlap.  I will write their

number in S and in parentheses indicate where

I think they overlap: 1 (O25, he is Ghailani), 2 (G11, and he is

Odeh), 3 (O10), 4 (G7, O11), 5 (O32), 6 (G25, O14). 7 (O15), 8 (O9),

9(X), 10(X), 11 (O16), 12-18(X), 19 (G5, O2), 20(G4, O3), 21(G20, O6)

G

4

22(G16, O4), 23(G9, O17), 24(G26), 25 (G22), 26(G21),

27(G29), 28(G1, O26), 29 (O13), 30 (G15, O22), 31(G14,

O20), 32 (O18), 33(O23), 34 (G2), 35 (G24, O35),

36(G27), 37 (G13), 38 (G10), 39 (G19), 40(G3, O24),

41 (G8, O21), 42(X), 43(X), 44 (G23 and O12), 45(X),

46(X), 47(X), 48 (G28, O31), 49 (O1), 50(O28). And

G6 is Salaweh and is O12.

5. Court Case Additions. I will use *Boyer v. Fed*

*Bureau of Prisons*, No. 10cv1196 (D.D.C), to assume Randall

Todd Royer (discussed later) was in ADX before I met

him in a Communication Management Unit (CMU). I

will use *Lindh v. Warden*, No.09cv215 (S.D.Ind.) to

assume John Walker Lindh is no longer in ADX.

I will use *United States v. Rahman*, No. 96-1044L,

189 F 3d 88 (2d Cir. 1999), to assume Fadil Abdelghani

has been released from prison (S14).

6. Clement Hampton-El   Clement Hampton-

El (S13) was with me in the CMU from May 2011

to May 2014 and he has passed away. He told

me he was in ADX before the CMU in ADX-GP

and ADX-SDP, and he said he met the individuals

at S5, S1S, S17, and S45 there, among others

7. Additions from the CMU.   I met S5, S8, S10,

S11, S12, S13, S17, S30 and S45 in the CMU after they

left ADX, but S5 was sent back to ADX.  I will use

this to add 8 to the list who have left ADX. Also,

6

due to unanimous reports from individuals formerly

in the other CMU, including Kevin James and Tariq

Mehanna, I will assume S3, S29 and S33 left ADX.

O5 was in the CMU SHU for 10 months or 11

months while he waited to be sent to ADX,

so I will count him as not being in a SHU

any longer.

    8. Additions from ADX.  I met S22 and S44 in

ADX-GP as well as Ali Al-Marri, Raees Alam Qazi

and someone I will refer to as "Sayfullah," [1] all

of whom are Muslims with alleged ties

[1] Sayfullah's alleged ties to terrorism are not publicly
available, so I will keep his legal name private
to protect his interests.

to terrorism. Qazi and Sayfullah are still in ADX-GP. S44 and Al-Marri went home. S22 went to ADX-SDP around March 2015, so I will assume he left ADX. Also, I haven't found anyone who says S15 is still here and he is close to the end of his sentence, so I will assume he left ADX. Also, a man named Noor ad-Din Dukka (phonetic) from a terrorism case was leaving ADX when I arrived and I spoke to him, so I will count him as having left. Also, I will assume S44 was removed from SAMs when I saw him and when he was released. This adds 5 who left ADX and 1 who left SAMs

to the declarations. Also, S2, the declarant in
"O", left ADX after I got his statement, so that
adds 6. Also, S41, G12, O27 and O34 are not
in ADX-SDP, so I will assume they left, so now
the number in this section is 10.

9. Summary. My experience along with
the declarations so far adds 24 former ADX
inmates, 1 former SAMs inmate, and 1 former
SHU inmate (or 2 if you count me).

10. Construing Data. SAMs (Q) obviously
adds a former SAMs inmate. I will also
assume "MCC" and "SHU" no longer applies,
because those (both of which indicate SHUs)

are meant to be temporary and my witnesses

have been in ADX for a long time. If someone

is not proven to be been in ADX or if they left ADX,

I can't them as a "unique person" not

covered by the declaration of Mark Collins,

because he used a instant sample which is

not terribly helpful. (Odeh isn't counted as unique)

11.   Unique People. Al-Marri, Royer, S3,

S8, S9, S10, S11, S12, S13, S14, S15, S16, S17, S18, S22, S29,

S30, S33, S41, S44, S45, S46, S47, S49, G12, O7, O8 *

O27, O29, O30, O33, & O34 are unique additions,

so 33 are added to Collins' 65, i.e., 98 "terrorists"

\* while I didn't distinguish between H Unit and SAMs for O's data, I asked
Sobaneh and he said O7 and O8 weren't in H Unit. I assume similar for others

10

have been held in solitary in the described

situations.

   12. SHUs. The following additions are

made to Collins' assertions on SHUs: me[1], S1[2], S2[3],

S3[4], S4[5], S5[6], S8[7], S9[8], S10[9], S11[10], S12[11], S13[12], S14[13], S15[14], S16[15], S17[16],

S18[17], S19[18], S20[19], S21[20], S22[21], S28[22], S34[23], S39[24], S45[25], S46[26], S47[27],

S48[28], G17[29], G6[Salameh 30], O5[31], O7[32], O8[33], O29[34], O30[35], O33[36] This

36 added to his 19 is 55.

   13. SAMs(R). The following additions are made

to Collins' SAMs number which only includ N ADX:

S1[1], S2[2], S3[3], S4[4], S7[5], S8[6], S20[7], S22[8], S23[9], S29[10], S30[11], S32[12],

S33[13], S34[14], S41[15], S44[16], S48[17], SH9[18], G6[19], O27[20] This 20 added

to his 17 makes 37.

14. <u>ADX</u>. The 24 covered above who left ADX added to Collins' 44 equals 68.

15. ~~Percentages~~. The following are the <u>minimum</u> statistics for terrorists and people with alleged ties to terrorism being in: solitary (22.8%), SHUs (12.8%), ADX (15.9%), and SAMs (8.6%). Based on the 0.2% frequency of non-terrorist placement at ADX, a terrorist/someone tied to terrorism is 79.5 times as likely to go to ADX as a non-terrorist.

16. <u>Table/scale</u>. While numbers are preliminary, the visual below demonstrates the BOP's security heirarchy for terrorists

using percentages in reference to solitary confinement
based on current data:



The positioning is meant to show security level

Executed on this 15th day of February, 2017

Zachary A. Chesser

**FILED**
**UNITED STATES DISTRICT COURT**
**DENVER, COLORADO**

**FEB 23 2017**

**JEFFREY P. COLWELL**
**CLERK**

Clerk of the Court

Enclosed is a motion to supplement Doc. 70. It is 3 pages. The entirety of the rest is a single attachment which has its own exhibits and attachments.

Thank you

Zachary A. Chesser