**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 15-cv-01939-NYW

ZACHARY A. CHESSER,

      Plaintiff,

v.

DIRECTOR, BUREAU OF PRISONS,

      Defendant.

---

**BUREAU OF PRISONS' MOTION FOR SUMMARY JUDGMENT**

---

Zachary Chesser is a convicted terrorist and radical jihadist who seeks the death of non-Muslims—especially Americans, whom he hates. He is in prison for soliciting murder. After he was convicted, the Bureau of Prisons ("BOP") assigned him to an open-population prison with few restrictions on his movement, but he failed that program. He attacked a non-Muslim inmate, thwarted prison staff, broke security rules, and incited other inmates to do the same. His prison writings praise terrorism against the United States and discuss how inmates can carry out jihad. He was sent to the ADX because he was too dangerous to manage in an open-prison setting.

Chesser has now progressed to the next-to-last phase of the ADX Step-Down Program, where his religious privileges include praying in congregation with other Muslim inmates every day. Chesser nevertheless claims his religious beliefs are unlawfully burdened under the Religious Freedom Restoration Act ("RFRA") because he desires to participate in group religious activities some 14 hours a day with a much larger group of Muslims than are assigned to his unit; to "teach" other Muslims; and to be taught by at least three Islamic "scholars" so that

he can become a "scholar" and issue religious directives known as fatwas to other Muslim inmates.[1] The BOP is entitled to summary judgment on this claim (Claim IV).

The undisputed evidence shows that the least-restrictive means of promoting the BOP's compelling interests in protecting institutional and national security require Chesser to complete the carefully constructed incremental steps of the ADX Step-Down Program. The undisputed evidence further shows that each of Chesser's proposed accommodations would circumvent that Program and severely compromise the compelling security interests.

Claim III, the other remaining claim, is likewise without merit. Chesser asserts that his rights under RFRA were violated when the BOP considered his "ties to terrorism" as the primary justification for transferring him to the ADX. The Tenth Circuit has made clear that the BOP *can* consider Chesser's underlying criminal conduct—including his crimes of terrorism—in designating him to the ADX. Further, the undisputed evidence shows that Chesser was referred to the ADX because he was a disruptive, unmanageable, and dangerous inmate, and not as a penalty for exercising any religious rights. That correctional judgment does not violate RFRA.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

### I.    Chesser is a radical jihadist and convicted terrorist.

#### A.    Chesser solicited the murder of non-Muslims and supported al-Shabaab.

1.    Chesser is a militant "jihadi." Chesser Dep., Ex. 1 at 87:10-16, 140:10, 282:4-7.

2.    In October 2010, when Chesser was 20 years old, he pled guilty to multiple crimes of terrorism. Jones Decl., Ex. 2 ¶ 9. He solicited the murder of people he viewed as having insulted Islam, including the creators of the *South Park* television series. *Id.* ¶¶ 18, 19. He

---

[1] Chesser failed to exhaust these demands for extensive teaching and studying privileges.

solicited bomb threats against U.S. military personnel and others. *Id.* ¶ 20. He attempted to provide resources to al-Shabaab, a designated foreign terrorist organization responsible for numerous mass-casualty attacks on civilians. *Id.* ¶¶ 10, 22, 23. Chesser was "███████████ ████████████████████████████████████████████." Letter to Bergen, Ex. 4 at ZAC 1115; Ex. 1 at 97:25-98:8. Chesser was a devotee of the radical Islamic cleric Anwar al-Awlaki, who "put al-Shabaab on the radar" for him. Ex. 2 ¶¶ 11-12; Ex. 1 at 62:2-5; 87:17-88:7.

3.       Chesser has long advocated that non-Muslims—the "kuffar"—must die. He asked the readers of Al-Awlaki's website, "[i]f someone is an apostate, and they are so openly, *can I just kill them right then and there* or are there conditions?" Ex. 2 ¶ 12 (emphasis added). He operated and administered radical websites on which he posted information seeking the death of his enemies, invoking "Allah [to] kill the murtad [apostates] . . . with a death more painful than all the deaths he caused by serving the agents of genocide." *Id.* ¶¶ 13-16. Chesser wrote that "videos of kuffar dying should be spread. " *Id.* ¶ 16. He posted a sermon by Al-Awlaki calling for Muslims to kill whoever has "defamed" Muhammad. *Id.* ¶ 17.

4.       Chesser's prolific internet postings included an "Al Qaeda Manual," which included "Guidelines for Beating and Killing Hostages," and "How to Destroy the West," in which he urged "Muslims to go buy guns and kill soldiers" and provided instructions to avoid detection of explosives at airports which ended with: "Boom! No more kuffar!" *Id.* ¶¶ 15, 20. In "Raising Al-Qaaida," Chesser wrote that "the best of things" are "martyrdom and jihaad in Allah's cause," and argued for "a normalization of the notion of dying for the sake of Allah." *Id.* ¶ 21; Ex. 1 at 155:16-17, 156:8-21; 163:17-20 (admitting harboring same views today).

5.       Chesser lied to the court in his criminal case to show "an image" of "contrition,"

but that is not what he felt: "I don't feel contrition for it, and I didn't feel contrition for it." Ex. 1 at 80:9-14; 82:9-19; *see also* Statement of Responsibility, Ex. 5. He lied when he said that "I completely reject the idea that killing can be justified in the name of Islam or any other religion," and when he suggested that he was not jihadi. Ex. 1 at 85:14-23; 87:8-16; 89:13-16; 94:11-14. He lied when he suggested that he opposed al-Shabaab's July 2010 bombing of a soccer match in Kampala, Uganda; his purpose was "to trick the FBI" and to "pretend I had changed." Chesser "Autobiography" excerpt, Ex. 6 at ZAC 1039; Ex. 1 at 88:21-89:2; 102:9-12.

6.      Chesser remains a jihadist. He has not deradicalized during his time in prison. Ex. 1 at 361:4-8 ("I pretty much have the same beliefs as I did.").

7.      Chesser still does not feel himself bound to obey the laws of the United States, which he assesses "as a cost-benefit-analysis-type thing mostly." *Id.* at 20:8-21:1.

8.      Chesser has identified six convicted terrorists, all of whom are or were on Special Administrative Measures ("SAMs") as "scholars" with whom he would like to study. Chesser Discovery Responses (excerpts), Ex. 3 at 39-40. These inmates are "muftis," and Chesser might seek fatwas, or religious rulings, from them. *Id.* at 40; Ex. 1 at 237:21-238:6.

9.      Chesser himself wants to issue fatwas to other inmates. Ex. 1 at 239:16-25.

10.     Chesser encourages other inmates not to interact with any BOP imam he feels is "bad." *Id.* at 246:15-22. On February 22, 2018, Chesser openly criticized a BOP imam, accusing the imam of "helping the enemies of Allah," i.e., BOP officials. Henderson Decl., Ex. 9 ¶ 37.

11.     Chesser continues to believe that it is acceptable to kill non-Muslims, especially Americans. Ex. 1 at 121:10-122:10; *see also id.* at 71:4-72:17 (explaining he is "not going to

criticize [al-Qaeda, the Taliban, and al-Shabaab] if they do it [i.e., kill Americans]").[2] Americans can be killed because "the U.S. is at war with Muslims." *Id.* at 70:11-22.

12.     Chesser "wouldn't mind it" and it "wouldn't bother [him]" if the *South Park* creators had died as a result of his internet postings. *Id.* at 305:4-17.

**B.     Chesser has inspired many other terrorists.**[3]

13.     Chesser "invented the idea of a Jihadist social media strategy and was the first person (at least the first in a position of influence) to recognize and write about the use of Facebook, Twitter, and Youtube in a strategic way." Ex. 3 at 81-82. He does "not know anybody else who attracted as much interest from the online [counterterrorism] crowd except people who were actually fighting." Ex. 2 ¶ 12 & Att. 5, BOP 2569.

14.     Chesser has personally influenced many terrorist attacks and attempted attacks against the United States that occurred *after* he was sent to prison.[4] He invented the idea of "Open Source Jihad," a strategy used in "lone wolf" and other terrorist attacks. Ex. 2 ¶¶ 13, 28. Chesser's article "is directly linked to Tsarnaev and the Qazis' cases, *as well as virtually every terrorist plot in the West* since July 2010 when it was used by Al-Qa'idah in the Arabian Peninsula ('AQAP') to develop the first official strategy of using Westerners to carry out 'inspired' or decentralized attacks without overseas direction. The strategy was originally named

---

[2] Chesser believes "it might be permissible to kill" undersigned counsel, a non-Muslim, but he "can't say for sure one way or the other" because he cannot issue fatwas. Ex. 1 at 307:5-308:11.
[3] For purposes of this motion, the BOP does not dispute Chesser's claims about his influence.
[4] Chesser's communications are linked to acts of terrorism by "four or more ADX inmates: Dzhokar Tsarnaev, Faisal Shahzaad, Raees Qazi, and Shahrayar Qazi." Ex. 3 at 80-81. Dzhokar and Tamerlan Tsarnaev bombed the Boston Marathon. Ex. 2 ¶ 30. The Qazi brothers plotted to attack New York City using a weapon of mass destruction. *United States v. Qazi*, No. 12-60298-CR, 2015 WL 728386 (S.D. Fla. Feb. 19, 2015). Faisal Shahzaad pled guilty to an attempted car bombing in Times Square. *See* D.O.J. News Release, 2010 WL 2503008 (June 21, 2010).

after my article and the 'open source' terminology is still used to describe the strategy today.'"
Ex. 3 at 80-81; *id.* at 82 (Chesser has personally influenced "dozens of alleged terrorists").

15.      Chesser influenced Liban Mohammed, who is on the FBI's Most Wanted list. Ex.
1 at 293:15-22; *see also* https://www.fbi.gov/wanted/wanted_terrorists/liban-haji-mohamed.

16.      Chesser also influenced Al-Awlaki, who took over the idea of "Open Source
Jihad" from Chesser and was one of the people "most responsible for promoting it." *Id.* at
292:20-293:11. That does not bother Chesser. *Id.* at 293:13-14.

17.



*Id.* at ZAC 1122 (emphasis added).

18.      Chesser understands his influence to be greater because he is a prisoner: "

." *Id.* at ZAC 1123.

**C.      Chesser has continued to support violent jihad as a BOP inmate.**

19.      Chesser was designated to the Communications Management Unit at the U.S.

Penitentiary in Marion, Illinois ("CMU Marion") on May 2, 2011. Ex. 2 ¶ 24. CMU Marion is an

open-population unit in which Chesser had 15 to 16 hours of out-of-cell time and extensive

communications privileges.  *Id.* ¶¶ 25, 26.

> **1.** **Chesser's CMU communications and writings promoted jihad.**

20.     At the CMU, Chesser promoted violent jihad.  Ex. 2 ¶ 27 & n.7.  In May 2013,

email, he wrote in an email to a BBC reporter that the Boston Marathon attackers relied on his

"Open Source Jihad" article. *Id.* ¶ 28. Chesser told the reporter, " ███████████████████

████████████████████████████████████████████████████████████████████

████████." *Id.* ¶ 29 (emphasis added); Ex. 1 at 145:10-18; 146:10-13. He wrote a poem called

"The Star of Rolling Stone," praising Dzhokhar Tsarnaev ████████████████████████

████████ victims of the bombing—which included an eight-year-old boy. Ex. 2 ¶ 30.

21.     Chesser still exalts the Boston Marathon bombing, which he calls a "legitimate

act." Ex. 1 at 140:18-25; 141:4-10. He admires Tsarnaev's "bravery" and would not retract

anything he said in "The Star of Rolling Stone." *Id.* at 136:16-24; 137:11-20; 138:24-139:3.

22.     In October 2013, Chesser wrote a rap poem entitled "Jihad's my Sabbatical,"

which he dubs "satire" in the manner of Jonathan Swift.  Ex. 2 ¶ 31; Ex. 1 at 123:4-9. Chesser

advocated violence using weapons and acts of terrorism and described himself as an Islamic

radical and international terrorist. Ex. 2 ¶ 31. Then Chesser wrote another email stating:

> So let the record forever hold that I advocate violence; I advocate terrorism; I
> believe they are necessary to achieve reform; I believe they are morally justified
> . . . *I hate America; I hate its people*; *I beg my Lord to kill them*; I shall forever fight
> them within the bounds of the law; I shall ever stand against them.

*Id.* ¶ 32 (emphasis added).

23.     In December 2013, CMU Marion staff discovered several jihadist writings in

Chesser's cell. *Id.* at ¶ 33; Ex. 1 at 53:9-11. Chesser's writings identified the United States as "█

7

██████████████" and encouraged killing non-Muslims, concluding that no Muslim is exempt from this obligation to kill because ███████████████████████████ ██████████████████████████████████." Ex. 2 ¶ 34. Chesser explained how *inmates* can continue to carry out violent jihad:



*Id.* ¶ 35. Chesser further wrote that a way to support jihad was to "Establish Islam in Prison Politics," including preparing the inmates' "████████████," and describing prisons as ████████ ██████████████████████." *Id.* ¶¶ 36-37 (emphasis added)[5]; Ex. 1 at 54:19-55:2 (Chesser was "thinking of stuff . . . *that would work in prison*") (emphasis added).

> ### 2. Chesser attacked an inmate, tried to manipulate staff, and broke institution rules at CMU Marion.

24.     At CMU Marion, Chesser entered another inmate's cell and attacked him. Ex. 2 ¶ 42. Chesser admitted that he "defiantly started the exchange." *Id.* Chesser initiated the attack because he believed the other inmate disrespected Islam. *Id.* ¶ 43. Chesser views that inmate as "a delusional racist weirdo" whom he hates "on a personal level." Ex. 1 at 165:11-14. Chesser thinks the inmate deserved the attack, and that it "might do him some good." *Id.* at 167:11-17.

25.     Chesser has sought to define Islam for other Muslim inmates. One inmate who Chesser did not consider to be a true Muslim "repented from the issue which caused me to consider him non-Muslim and he agreed with me when I clarified it to him." Doc. 3 at 20-21.

---

[5] "Mujahidin" refers to Muslims who are fighting against non-Muslim forces.

26.     At CMU Marion, Chesser attempted to bargain about an inmate's safety in exchange for stopping another inmate's transfer to the ADX. He sent an email to staff stating that "[t]his guy [redacted] will not be safe if he comes out in this unit and he will not be safe if he is sent to Terre Haute for other reasons. However, if you all will drop the attempt to send [redacted] to ADX or SMU, then I believe *I could probably work something out* with regard to this unit . . ." Ex. 2 ¶ 45 (emphasis added). Chesser was mad at the inmate he said "will not be safe" because the inmate had converted to Islam and then left the faith nine months later. Ex. 1 at 275:20-25. Prison officials viewed Chesser's conduct as manipulative and disruptive to security: "Chesser's actions threaten the security and orderly running of the institution by attempting to manage and control the inmate population, including those inmates who are placed in, and released from, the Special Housing Unit, and preclude staff from making and enforcing decisions based on the safety of inmates and security of the institution." *Id.* ¶¶ 46-47.

27.     Chesser repeatedly broke other rules as well, including rules governing the locations in which group prayer could be conducted under proper supervision. *Id.* ¶¶ 50-51. He developed a cipher designed to allow him to communicate in code with other inmates. *Id.* ¶ 49.

**D.     Chesser was sent to the ADX because he posed serious security threats.**

28.     Based on Chesser's conduct in the CMU, he was referred for possible designation to the ADX in December 2013. *Id.* ¶ 52. The Warden at CMU Marion found that continuing to keep Chesser in the CMU "creates a risk to institutional security and good order, or poses a risk to the safety of staff, inmates or others, or to public safety." *Id.* ¶ 54 (explaining that Chesser had "participat[ed] in, organiz[ed], or facilitate[ed]" group misconduct in the CMU); *see also id.* ¶¶ 55-58 (detailing Chesser's disruptive conduct at CMU Marion). Chesser also met the ADX

referral factor of conviction of a crime of terrorism. *Id.* ¶ 61.

29.     The Warden provided specifics to support his assessment. Chesser was subscribing to an increasingly radicalized and dangerous ideology that manifested itself in both his writings and his actions. *Id.* ¶ 56. Chesser overtly expressed his hatred of America and its people and begged his "lord to kill them[.]" *Id.* Chesser was increasingly intolerant of any person who dared to challenge him, as shown by his attacking a CMU inmate who had complained about Chesser's disruptive call to prayer. *Id.* ¶ 57. Chesser refused to obey rules designed to ensure the orderly operation of the institution, and he encouraged other inmates to disobey those rules. *Id.* Chesser exhibited anger toward an inmate who had rejected Islam. *Id.*

30.     The Warden referenced the extensive extremist writings found in Chesser's cell, in which Chesser "justified the use of violence and even killing of non-Muslims who are considered to have engaged in conduct not suitable to Chesser's personal belief system." *Id.* ¶ 58. The Warden pointed to Chesser's writings identifying opportunities for violent jihad in prison, including fighting "Kuffar" inmates and taking advantage of opportunities to escape. *Id.*

31.     The Warden concluded that Chesser "requires greater security and controls than which can be afforded him while in a typical general population setting, or in a CMU." *Id.* ¶ 59. Chesser was approved for ADX placement on April 30, 2014.  *Id.* ¶ 60.

32.     While Chesser's ADX referral discussed the incident reports he received for engaging in unauthorized group prayer, those incidents were but one of many examples of the management problems Chesser created at CMU Marion. *Id.* ¶ 61. The BOP's concern with Chesser's unauthorized congregate prayer at CMU Marion was that he was breaking institutional security rules by praying at times and in physical locations where group activity could not be

properly supervised. *Id.* Chesser was not penalized for exercising his faith, but for violating rules designed to protect the safety and security of the institution. *Id.*

33.     One point that was *not* considered in Chesser's transfer to the ADX is his alleged involvement with a group he has referred to in this lawsuit as "Jama'ah Ad-Da'wah As-Sahihah," or "JDS." Ex. 1 at 258:15-18 (describing JDS as a "pseudo Jihadi prison organization"). The BOP has not identified Chesser as a member of this group, nor did any information related to JDS enter into the BOP's decision to transfer him to the ADX. Ex. 2 ¶ 63.

**E.     Chesser's beliefs require near-constant contact with other Muslim inmates.**

34.     Chesser believes that he must engage in eight types of congregate prayer, including the five daily prayers of the Muslim faith, prayers on two special holidays, prayers during eclipses, prayers for rain, prayers during Ramadan when the Quran is read aloud, prayers when a person of "major benefit to Islam dies," and "random" group prayers. Ex. 3 at 23-31. He may need a minimum of 40 other inmates for group prayer. *Id.* at 18.

35.     Chesser believes that he must teach as many Muslim inmates as he can "up to 10 hours per day. *Id.* at 31, 34-35.

36.     Chesser believes that he must spend "about 10 to 14 hours per day" studying Islam until he becomes an "Islamic scholar." *Id.* at 32-33; *see also id.* at 36-39.

37.     Chesser believes that he must engage in what he calls "remembrance and conversation" with other Muslim inmates, interacting with them on "Islamic subjects through the giving and attendance of lectures, encouraging good deeds, discouraging sins, reviewing texts we've memorized, reciting the Quran, and discussing Islamic subjects." *Id.* at 42-43.

38.     Chesser believes that he must "celebrate" and "feast[]" with other Muslims on

special occasions, including Islamic holidays, weddings, and childbirth. *Id.* at 44-45.

39.     Chesser believes that he should "promote the well-being" of other Muslims by promoting their morale, smiling at them, shaking hands, making them happy, and having good manners with them, among other positive personal interactions. *Id.* at 46-47.

**II.     The protocols in the ADX Step-Down Program are required to prevent Chesser from harming institutional and national security.**

**A.     Security will be compromised if Chesser does not complete the Program.**

40.     The ADX is the most secure prison in the federal system, but its primary mission is to program inmates to less-restrictive, open-population environments where they have physical contact with other inmates and staff.  Christensen Decl., Ex. 7 ¶ 6. The BOP carries out this mission by means of the ADX Step-Down Program.

41.     The ADX Step-Down Program is based on a system of incrementally increasing privileges and decreasing restrictions over the course of multiple "steps." *Id.* ¶¶ 7, 28-29. Out-of-cell time is slowly increased to ensure inmates can handle fewer restrictions without compromising the safety and security of other inmates and staff.  *Id.* ¶ 28. This incremental approach is effective; less than 3% of inmates who complete the Program return to the ADX. *Id.* ¶ 29; *see also* Oliver Decl., Ex. 8 ¶ 5 (discussing why ADX Step-Down Program is effective).

42.     Chesser has progressed to the next-to-last, or "Transitional," phase of the ADX Step-Down Program. Ex. 7 ¶ 9. Inmates in this phase are housed in the U.S. Penitentiary in Florence in a housing unit known as "B/B Unit." *Id.* If Chesser successfully completes this phase, he will move to the final "Pre-Transfer" phase. *Id.* ¶10. After that, he will be considered for designation to the general population of a less-restrictive facility. *Id.*

43.     In the judgment of ADX correctional officials, Chesser needs to complete the

Step-Down Program and to comply with the rules and restrictions at each step. *Id.* ¶¶ 27, 30. In Chesser's case, officials have looked at his conduct and determined that he needs measured periods of adjustment and careful reintroduction to unrestrained physical contact. *Id.* ¶ 31. In the officials' correctional judgment, these behaviors show Chesser is a dangerous inmate, from both an institutional and national security perspective. *Id.* ¶¶ 26-27. The restrictions in the Transitional phase are necessary to ensure (1) that Chesser will not repeat the conduct that compromised security at CMU Marion, and (2) that he will not incite other inmates or people outside the prison to carry out terrorist attacks and compromise national security. *Id.* ¶ 27.

**B.     The B/B group prayer protocols are necessary to protect security.**

44.     In the Transitional phase of the Step-Down Program, Chesser is typically outside his cell approximately 30 hours per week. Ex. 7 ¶ 12. During that time, Chesser has unrestrained physical contact with prison staff and nine other inmates, two of whom are Muslim. *Id.* ¶ 13.

45.     Chesser can pray with his group when his range is scheduled for indoor and outside recreation, or approximately 30 hours per week. *Id.* ¶ 16. He can perform any type of congregate prayer, including Jumu'ah prayer. Henderson Decl., Ex. 9 ¶ 27; Ex. 1 at 189:8-14.

46.     B/B Unit security protocols allow for congregate prayer to be conducted in a safe and secure manner. Prayer during indoor recreation time is conducted in a specially designated room located on the housing range outside the cells. Ex. 7 ¶ 17. Chesser can also study Islamic texts with other inmates in that room. Ex. 9 ¶ 28. The room has a large Plexiglass window that allows inmates to be observed by correctional staff. *Id.* ¶ 17. This secure, controlled location protects the inmates who are praying by reducing the likelihood of interference from other inmates, including potential assaults. *Id.* ¶ 20. These procedures also protect staff, who can more

easily respond to a confined location if a fight or assault were to break out. *Id.* ¶ 22.

47.     Chesser and the other inmates in his group can also pray together when they are on the outside recreation yard. *Id.* ¶18. In the judgment of ADX correctional officials, group prayer can be accommodated in the outdoor recreation area because it is under constant monitoring by staff and the number of inmates on the yard is relatively small. *Id.* ¶ 23.

48.     ADX correctional officials have determined that Chesser's opportunities for group prayer in B/B Unit are the most that can be allowed without compromising institutional security and the effective operation of the ADX Step-Down Program. *Id.* ¶ 19. The protocols for group prayer protect both inmates and staff in a housing unit where ADX inmates are relearning how to live in an open-population environment. *Id.* ADX officials have considered other locations for group prayer, but there is nowhere else where group prayer can be effectively monitored by staff. *Id.* ¶ 24. At any other location, including in inmates' cells, the security protections associated with conducting prayer in a secure, visible location are lost. *Id.* Prison staff must be able to maintain full visual contact when B/B Unit inmates are together. *Id.*

49.     Limiting group prayer to specific locations also helps the BOP monitor Chesser, a confirmed jihadist, to ensure that he will not use group prayer as a vehicle for inciting other inmates in a manner that could harm both institutional and national security. *Id.* ¶ 22.

50.     Chesser prays with other inmates when he has indoor and outdoor recreation. *Id.* ¶18. The inmates also intone the call to prayer. Ex. 1 at 186:9-16. Depending on the out-of-cell schedule, Chesser can pray as many as three of the five daily Muslim prayers with other inmates. *Id.* ¶ 18; Ex. 1 at 185:13-186:6. Since he has been in B/B Unit, he has led all five daily prayers for his group. Ex. 1 at 189:20-23; 190:18-24. When he is inside his cell at one of the prayer

times, he prays the prayer in his cell. *Id.* at 186:22-187:1. He believes it is acceptable to perform

group prayer without physically touching others when it is done out of necessity. *Id.* at 347:6-12.

51.    In addition to the five daily prayers, Chesser has prayed at least one of the two

special holiday prayers with other inmates in B/B Unit. Ex. 1 at 223:6-19; Fact 34, above.[6] He

can pray the "eclipse" prayers, prayers for rain, the prayers for the dead, and "general group

prayers" with other inmates when he is outside his cell. Ex. 1 at 224:12-15, 225:21-226:2;

228:24-229:13; 229:25-230:15; Fact 34. He can engage in various forms of "remembrance and

conversation" and promote the well-being of other Muslims when he is outside his cell. Ex. 1 at

248:5-15, 248:5-249:7; 254:3-9; Facts 37, 39.

**C.    The controls in B/B prevent Chesser from harming institutional security.**

**1.    Chesser's out-of-cell time and contact with other inmates must be limited to protect security.**

52.    The BOP cannot accommodate Chesser's requests to be out of his cell many

hours every day and for access to large numbers of Muslim inmates without compromising

security. The amount of out-of-cell time Chesser is afforded in B/B Unit is the product of a

considered decision about how best to reintegrate him into an open-population unit. Ex. 8 ¶ 22.

Officials are carefully watching Chesser to see if he can handle conflicts with inmates without

resorting to violence and establish respectful relationships with prison staff. Ex. 7 ¶ 30. Chesser's

current amount of out-of-cell time also gives staff a better opportunity to more closely observe

him and to quickly identify and address any concerning behaviors. *Id.*

53.    Chesser continues to demonstrate difficulty engaging in positive interactions with

---

[6] "Fact" references a paragraph in this Statement of Undisputed Material Facts.

BOP officials. On February 22, 2018, Chesser argued with and openly criticized a BOP imam visiting B/B Unit, accusing the imam of "helping the enemies of Allah," i.e., BOP officials. Ex. 9 ¶ 37. In the judgment of ADX officials, Chesser continues to need the controls and careful monitoring of B/B Unit to ensure that he does not incite violence among other inmates. *Id.*

54.     In the judgment of ADX correctional officials, additional out-of-cell time for Chesser would thwart the correctional goals of the Step-Down Program and potentially re-trigger the behaviors he exhibited at CMU Marion. Ex. 7 ¶ 31. Chesser is subject to an incremental program in which additional freedoms are slowly earned and added. *Id.* ¶ 41. Affording Chesser much more out-of-cell time now, before it is clear that he can safely and effectively function in a completely open-population environment, poses unacceptable risks to institutional security and compromises the integrity of the ADX Step-Down Program. *Id.* ¶ 31.

55.     Even with the close controls of the ADX Step-Down units, there have been violent inmate-on-inmate assaults and attacks on staff. *Id.* ¶ 38; *see also* Ex. 8 ¶¶ 8-12. It is crucial to limit the number of inmates in B/B Unit to reduce the risk of violent attacks in this volatile environment, where the extremely dangerous ADX inmate population is taking its first steps in an open-population setting. Ex. 7 ¶ 38; Ex. 8 ¶ 13.

56.     In the correctional judgment of ADX officials, the numbers in Chesser's group must be limited to protect security. Increasing the inmate population of either the Transitional or Pre-Transfer phase of B/B Unit would significantly harm the core mission of the final two phases of the ADX Step-Down Program. Ex. 7 ¶ 37. The Transitional and Pre-Transfer units were designed for the purpose of housing a relatively small number of inmates, to allow staff to effectively monitor them and to carefully track their progress as they transition from confinement

in restrictive housing to an open-population setting. *Id.*

57.     In the judgment of ADX officials, exempting Chesser from the restrictions of the Step-Down Program would cause serious security issues with other inmates. *Id.* ¶ 32. Fairness toward all inmates, as well as the appearance of fairness, are paramount correctional objectives. *Id.* Acceding to Chesser's demands for additional out-of-cell time, specialized study with Islamic "scholars," and near-constant interactions with other Muslim inmates would establish an obvious disparity between himself and other inmates. *Id.* ¶ 45.  If an inmate is perceived as receiving something "special" or "additional," that disparity will trigger unrest in the unit and pose a danger to both staff and other inmates. Ex. 8 ¶¶ 3, 18-20; *see also* Ex. 7 ¶¶ 32, 45.

### 2.     Chesser's proposals would compromise institutional security.

58.     Chesser's various proposals to increase his out-of-cell time and his access to other Muslim inmates cannot be accommodated, either because the BOP has no authority to provide the accommodation, or because providing it would compromise critical security interests.

### a.     Removing Chesser from the Program compromises security.

59.     Chesser first proposes that the BOP "concentrate" Muslim terrorists in a "Terrorism Prison," "Terrorism Unit," or in other special housing conditions, for the purpose of providing Muslims more religious privileges with fewer restrictions than any other religious group. Ex. 3 at 52-53, 89-90; *id.* at 95, 102 (proposing a "terrorism system" progressing Muslim inmates through various types of their own housing units). He wants Muslim terrorists to live in "open population." *Id*. at 53. The effect of these proposals would be "reduced solitary" for Muslims who have been convicted of terrorism. *Id.* at 103.

60.     In the judgment of BOP officials, moving Chesser into one of these special forms

17

of confinement would contravene the BOP's compelling security interest in requiring him to complete the ADX Step-Down Program. Ex. 7 ¶ 34. Correctional officials have determined that Chesser requires the security controls in B/B Unit at this time, and he needs to prove that he can function in a less-restrictive environment. *Id.*

61.     In addition, these proposals are both impossible to implement and contrary to sound correctional judgment. *Id.* ¶ 43. The BOP cannot create a housing unit or "system" exclusively for Muslim inmates without compromising security because it would have the effect of granting substantial privileges that are not available to any other group, including the coveted privileges of selecting the inmates with whom one lives and having more out-of-cell time than almost any other BOP inmates.  *Id.* Nor can the BOP allow an inmate, including Chesser, to avoid the carefully constructed incremental steps of the Step-Down Program. *Id.* Such disproportionately preferential treatment would be perceived as unfair and create a dangerous situation in B/B Unit and in institutions throughout the BOP. *Id.* ¶ 44; *see also* Ex. 8 ¶ 20.

62.     Second, Chesser proposes that the BOP send him back to a CMU or build more CMUs. Doc. 3 at 77, 88-90. Chesser failed out of a CMU before, and correctional officials rejected him for placement in a CMU in June 2017 because he had obeyed rules and programmed at the ADX and could be moved through the Program to an open-population prison. Ex. 2 ¶ 64. In their judgment, the ADX Step-Down Program is the right housing assignment for Chesser. Facts 43, 52-57. Nor can the BOP simply decide to construct new prisons; that authority lies with Congress, which would have to appropriate funds for that purpose.

63.     Third, Chesser proposes that he be placed on SAMs. Ex. 3 at 105-06. However, it is not up to an inmate to be placed on SAMs, or even up to the BOP. That authority lies

exclusively with the Attorney General. *See* 28 C.F.R. § 501.3(a). The Attorney General has not found that SAMs are warranted in Chesser's case.

### b.    Dismantling the Program compromises security.

64.    Chesser's other proposals would require alterations of B/B Unit protocols that would effectively dismantle the ADX Step-Down Program.

65.    Chesser wants to eliminate all divisions between the Transitional and Pre-Transfer phases and the four ranges in B/B Unit for purposes of group prayer. He proposes that (1) all four ranges on B/B Unit recreate together rather than in four separate groups, Ex. 1 at 203:21-24; (2) all Muslim inmates in B/B Unit be let out of their cells for prayer, even at times they are normally locked down, *id.* at 203:25-204:3, and (3) when Chesser's range is out, let Muslim inmates from the other ranges join him for prayer. *Id.* at 204:4-6.

66.    The important correctional justifications for separating the Transitional and Pre-Transfer Units would be undermined by Chesser's proposals to allow different ranges or inmate groups in B/B Unit to co-mingle during group prayer, or to collapse all ranges and both phases into one large group. Ex. 7 ¶ 39. Inmates are selected for assignment to particular ranges in B/B Unit based on many factors, including a careful analysis of their criminal backgrounds, institutional conduct, security threat group validations, and threat assessments. Ex. 8 ¶ 23. ADX officials carefully select the population of each phase, evaluating detailed histories of each inmate to reduce the risk of violence. Ex. 7 ¶ 39. Some inmates in the Transitional Unit cannot be housed with inmates in the Pre-Transfer Unit for reasons of security, including separations based on information learned from threat assessments. *Id.*

67.    Motivating the inmate population is another important reason for the separation of

the Transitional and Pre-Transfer Units. *Id.* ¶ 40. Transitional Unit inmates must spend time in

that unit to show they are capable of functioning with fewer controls. *Id.* They must earn the

privilege of transitioning to the Pre-Transfer phase, where they will have more out-of-cell time

and a cellmate. *Id.* The BOP has a security interest in ensuring that inmates earn increased

privileges by programming appropriately. *Id.* And fairness requires that the limited window of

out-of-cell hours in B/B Unit be split evenly between four different ranges. Ex. 8 ¶ 21.

68.     Chesser's next proposal is to combine the final two phases of the Step-Down

Program and move them to the ADX. Ex. 1 at 208:21-209:3. This proposal is both logistically

impossible and a threat to security. Ex. 7 ¶ 36. All units in the ADX are in use; there is nowhere

to put B/B Unit inmates who do not need the ADX security controls. *Id.* For ADX inmates who

do need those controls, forcing them to move to other institutions would compromise their

security and the security of the facilities where they are transferred. *Id.*

69.     Chesser's third proposal is to move more Muslim inmates into his unit. Ex. 1 at

208:12-17. This action would compromise security by destroying the integrity of the Step-Down

Program. Ex. 7 ¶ 38. The Transitional and Pre-Transfer units were designed to house a relatively

small number of inmates, to allow staff to effectively monitor them and carefully track their

progress as they transition from restrictive housing to an open-population setting. *Id.*

70.     Even with the close controls of these units, there have been violent inmate-on-

inmate assaults and attacks on staff. *Id.* ¶ 38; *see also* Ex. 8 ¶¶ 8-12 (discussing extreme dangers

associated with ADX inmates, including attacks in the Step-Down units). It is crucial to limit the

number of inmates in B/B Unit to reduce the risk of violent attacks in this volatile environment,

where extremely dangerous inmates are taking their first steps in an open-population setting. Ex.

7 ¶ 38; Ex. 8 ¶ 13 (discussing increased likelihood of assaults in ADX Step-Down units).

        **D.**    **The controls in B/B Unit prevent Chesser from harming national security.**

71.     ADX correctional officials know that Chesser is a committed jihadist who advocates violence against non-Muslims. Ex. 7 ¶ 47. The protocols and restrictions in B/B Unit minimize Chesser's opportunities to incite and radicalize other inmates by monitoring group prayer and carefully controlling his out-of-cell time. *Id.* ¶ 49.

72.     ADX officials have determined that it is imperative that Chesser not be allowed to gain power and authority over other inmates by serving as an inmate leader, including as their "teacher." *Id.* ¶ 50. No inmate is allowed to exercise authority over or to provide directions to any other inmate, and that principle of correctional management is particularly important in Chesser's case because he openly advocates violence towards others, including particularly non-Muslims and United States citizens. *Id.*; *see also* Ex. 9 ¶ 36. Elevating a confirmed jihadist to a formal mentorship role over inmates who may one day be released, and who have contacts on the street, jeopardizes prison security and national security. Ex. 7 ¶ 50; Ex. 9 ¶ 36.

73.     Providing Chesser with his own set of Islamic "scholars"—including, potentially, other terrorists—to instruct him would create unacceptable risks to security. Ex. 7 ¶ 51. That unique means of studying is not offered to any other inmate in the ADX Step-Down Program. *Id.* In the judgment of BOP officials, giving Chesser that disproportionately greater privilege would not only create unrest and dissension in the housing unit, *id.* ¶ 51, Ex. 9 ¶¶ 30-31, but would also be contrary to the BOP's interest in protecting national security. National security is put at risk if a confirmed jihadist who advocates violence toward non-Muslims is given the means to study to the point that he can issue "fatwas" that might prove dangerous to inmates, staff, and the public.

Ex. 7 ¶ 56. This would give Chesser a ready means to radicalize other inmates. *Id.* ¶ 57.

74.     Chesser's proposal to study "remotely" does not assuage these security concerns. Ex. 3 at 106; Ex. 1 at 243:19-244:18. He is prohibited from having a laptop to prevent him from committing crimes using the internet. Ex. 7 ¶ 53. This is a particular concern for Chesser, given his criminal history. Allowing him to have extensive telephone conversations with "scholars" risks dangerous information passing between Chesser and his teacher. *Id.* ¶ 55; Ex. 9 ¶ 33.

75.     As for studies with inmate "scholars," Chesser has not been approved by the FBI to communicate with convicted terrorists who are subject to SAMs, for studying purposes or for any other reason. Ex. 7 ¶ 56.  Even if such an arrangement were feasible, it would be contrary to sound correctional judgment to allow Chesser to be taught by other terrorists who are motivated by the same radical ideology as him. *Id.* Moreover, the BOP prohibits communications between inmates in different housing units and prisons. Ex. 9 ¶¶ 33. The reason for this prohibition is to prevent dangerous information from passing between institutions, including directives for hits and information about the business of gangs and security threat groups. *Id.* ¶ 34.

76.     The BOP allows Chesser to engage in religious studies in a manner that does not jeopardize institutional or national security. *Id.* ¶¶ 30-31. He can purchase his own study materials and can request books and Islamic teaching videos from the Religious Services department. *Id.* ¶ 28. He may take correspondence courses that are of interest to him. *Id.* He can request a pastoral visit from an imam who is willing to meet with him. *Id.* ¶ 29. For an inmate in Chesser's position, these means of engaging in religious studies are the most that can be allowed without compromising compelling security interests. *Id.* ¶ 30.

**IV.     Chesser has not exhausted his claim seeking religious studies and to teach others.**

77.     Since he arrived at the ADX, Chesser has exhausted only one administrative remedy related to congregate religious practices. Ex. 9 ¶ 17.

78.     In that remedy, Chesser stated: "As a Muslim, I sincerely believe a number of group activities such as five-times daily group prayer, classes and other activities are recommended and/or obligated by my faith. . . . By 'classes,' I mean *religious* classes." *Id.* This remedy did not state that Chesser sought permission to teach other Muslim inmates. It did not indicate the scope and extent of the studying privileges Chesser seeks in this case, including his request to be taught by multiple religious "scholars" up to 14 hours every day. *Id.* ¶ 25.

79.     Nothing in this remedy gave the BOP the information it needed to investigate the actual teaching and studying claims Chesser has brought in this lawsuit. *Id.* ¶ 26.

## ARGUMENT

### I.     Chesser's conditions do not violate RFRA (Claim IV).

Assuming the religious privileges Chesser seeks are motivated by sincerely held religious beliefs, well-established compelling interests justify the BOP's correctional judgment that the restrictions imposed are necessary to protect national and institutional security. Under RFRA, even if a government action substantially burdens a person's free exercise of religion, that action must be upheld where the government "demonstrates that application of the burden to the person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. §§ 2000bb–1(b). Here, the undisputed facts show that both prongs of the test are clearly met.

#### A.     The BOP has compelling interests in preventing Chesser from harming both the security of the prison and national security.

It is well established that the BOP has compelling interests in protecting both institutional

and national security. The Supreme Court has emphasized that "prison security is a compelling state interest" and has recognized "the urgency of discipline, order, safety, and security in penal institutions." *Cutter v. Wilkinson*, 544 U.S. 709, 723 & 725 n.13 (2005); *see also id.* at 722 (RLUIPA, the RFRA analogue for state inmates, does not "elevate accommodation of religious observances over an institution's need to maintain order and safety").

The BOP has a "uniquely federal penological interest in addressing national security risks[.]" *Rezaq v. Nalley*, 677 F.3d 1001, 1014 (10th Cir. 2012) (finding that the BOP "established that continued placement of [convicted terrorists] in general population units could compromise prison safety, or given the unique criminal backgrounds of these plaintiffs, national security"). In particular, the BOP has an interest in "[a]ddressing national security risks posed by inmates with terrorist ties and sympathies[.]" *Yousef v. United States*, No. 12-cv-2585-RPM, 2014 WL 1908711, at *2 (D. Colo. May 13, 2014), *appeal dismissed* (10th Cir. May 1, 2015).

There is a clear potential for Chesser to harm institutional and national security. The undisputed record evidence shows that he is a radical jihadist who seeks the death of non-Muslims—the "kuffar." Facts 1-23. Chesser's list of targets for death is long. It includes the creators of *South Park*; a person who made Facebook posts that he disliked; U.S. soldiers; any Muslim he deems to be an "apostate"; hostages captured by Islamists; and, ultimately, *every single American*. *Id.* 2-5, 11, 17, 20-23. In Chesser's words: "I hate America; I hate its people; *I beg my Lord to kill them*; I shall forever fight them within the bounds of the law; I shall ever stand against them." *Id.* 22 (emphasis added); *see also id.* 11 (he is "not going to criticize" terrorist groups like al Qaeda, the Taliban, and al-Shabaab" if they kill Americans).

To protect others from Chesser, the BOP cannot assume that Chesser's threats are mere "satire," or that he will act "within the bounds of the law." *Id.* 27. The undisputed record

24

evidence shows that Chesser is a liar. He lied to the Court in his criminal case. *Id.* 5. He lied to

the FBI. *Id.* And he does "[n]ot particularly" feel himself bound to obey the laws of the United

States, which is "a cost-benefit-analysis-type thing mostly." *Id.* 7.

At the CMU, Chesser was an advocate for terrorism. The undisputed evidence shows that

he extolled the Boston Marathon bombing as a "legitimate act" and praised its perpetrator for his

"bravery." *Id.* 21. He begged his "Lord to kill" the Americans he despised. *Id.* 22. He wrote long

tracts of jihadist propaganda in which he encouraged killing non-Muslims. *Id.* 23. He put in

writing his ideas about how to "Establish Islam in Prison Politics," which included preparing the

inmates' " ███████████ ." *Id.* Chesser wrote that prison " ███████████████

███████████████████ ." *Id.* (emphasis added).

Chesser also put jihad into practice at CMU Marion. When he had the freedom to walk an

open yard 16 hours a day, he became a disruptive and dangerous force. *Id.* 24-27. He attacked

another inmate over a dispute about religion. *Id.* 24. He tried to manipulate prison staff to get rid

of an inmate he did not like, and to bring back to the CMU an inmate he did like. *Id.* 26. He

broke prison security rules and incited other inmates to break the rules. *Id.* 27.

Chesser proudly claims that he is a source of inspiration to other terrorists. He is the

inventor of the concept of "Open Source Jihad" used by "lone wolf" terrorists and others. *Id.* 14.

He has influenced "*virtually every terrorist plot in the West since July 2010*," including the

Boston Marathon bombing. *Id.* (emphasis added). He has inspired "dozens of alleged terrorists

with [his] personal contacts and direct online communications[.]" *Id.* Chesser's influence over

other jihadists is heightened because he is a "high-profile" prisoner who has gained even more

influence because of his arrest. *Id.* 18. Chesser wants to continue to exert influence over others.

He proposes to study with six terrorists in BOP custody to reach a level of scholarship allowing him to personally issue fatwas, including to his fellow inmates. *Id.* 8-9.

In short, the BOP has compelling interests in preventing Chesser from inciting terrorism in the prison and outside it. Chesser cannot dispute the existence of these interests.

**B.      There are no less restrictive means to prevent harm to the security interests.**

Under the second prong of the RFRA defense, the BOP must establish that its actions are the least restrictive means of furthering its compelling interests. In order to meet this prong, the government must show "it lacks other means of achieving its desired goal." *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2780 (2014). "[I]f a less restrictive means is available for the Government to achieve its goals, the Government must use it." *United States v. Playboy Entertainment Group, Inc.*, 529 U.S. 803, 815 (2000).

To show that the least restrictive means have been employed, the BOP "need not refute every conceivable alternative, but [it] 'must refute the alternative schemes offered by the challenger.'" *Newland v. Sebelius*, 881 F. Supp. 2d 1287, 1298 (D. Colo. 2012) (quoting *United States v. Wilgus*, 638 F.3d 1274, 1289 (10th Cir. 2011)). In evaluating whether the means used are the least restrictive, the Court must "give 'due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources.'" *Werner v. McCotter*, 49 F.3d 1476, 1479-80 (10th Cir. 1995) (quoting S. Rep. No. 111, 103d Cong., 1st Sess. 9-11, reprinted in 1993 U.S.C.C.A.N. 1892, 1900) (superseded by statute on other grounds); *see also* 1993 WL 286695, at *10.

The deference due to BOP officials is even greater here, where Chesser presents a threat not only to institutional security, but also to national security. The officials' national security

assessment, based on their "informed judgment," is "entitled to deference." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 33, 34-35 (2010); *see also Ziglar v. Abbasi*, 137 S. Ct. 1843, 1861 (2017) ("courts traditionally have been reluctant to intrude upon the authority of the Executive in military and national security affairs"); *Franklin v. Massachusetts*, 505 U.S. 788, 818 (1992) (judicial deference "pervades the area of national security"); *Citizens for Peace in Space v. City of Colo. Springs*, 477 F.3d 1212, 1221 (10th Cir. 2007) (courts give deference in matters relating to national security "even when constitutional rights are invoked").

Prison officials may make predictive judgments: "[N]ational security . . . concerns arise in connection with efforts to confront evolving threats in an area where information can be difficult to obtain and the impact of certain conduct difficult to assess . . . . In this context, conclusions must often be based on *informed judgment rather than concrete evidence*, and that reality affects what we may reasonably insist on from the Government." *Humanitarian Law*, 561 U.S. at 34-35 (emphasis added). The BOP's predictive judgment about Chesser's national security concerns is entitled to deference because "it is not reasonably possible for an outside nonexpert body to review the substance of such a judgment." *Dep't of Navy v. Egan*, 484 U.S. 518, 529 (1988); *cf. Overton v. Bazzetta*, 539 U.S. 126, 132 (2003) (court "must accord substantial deference to the professional judgment of prison administrators" in "determining the most appropriate means to accomplish" correctional goals).

### 1.    Security will be compromised if other means are used.

The undisputed facts show that both institutional and national security will be compromised if Chesser is not required to complete the ADX Step-Down Program and to comply with all of its restrictions and close controls.

The Step-Down Program is a carefully constructed system, in which privileges are

restored in incremental steps that allow for close scrutiny of Chesser's conduct toward inmates and staff and for signs that his militant jihadism is jeopardizing the security of the prison or the public. Facts 40-43. The Step-Down Program slowly reintroduces him to unrestrained physical contact with others by limiting his out-of-cell time and the number of inmates in his orbit. *Id.* 52, 54, 56-57. His interactions with other inmates, including during group prayer, are carefully monitored. *Id.* 47, 49, 53, 56, 69, 71. He is closely watched to ensure he does not gain power over other inmates or set himself up in a mentorship role, including as their "teacher." *Id.* 72.

In the judgment of correctional officials, Chesser needs these controls to ensure, to the extent possible, that he will not incite acts of terrorism or repeat the disruption he caused at CMU Marion. *Id.* 43, 53, 54. Skipping any of the steps in this incremental process poses unacceptable risks. *Id.* 54. Chesser had many failures in an open-population environment. *Id.* 24-32. He continues to demonstrate difficulty showing respect to others, including a BOP imam he accused of "helping the enemies of Allah," i.e., BOP officials. *Id.* 10. He is still a jihadist. *Id.* 1, 6, 9-12. The risks with Chesser are high, but the ADX Step-Down Program is designed to mitigate those risks and work toward safely integrating him into a prison with fewer restrictions. *Id.* 52.

Prison officials have carefully considered where to draw the lines when it comes to facilitating the correctional goals of preventing Chesser from harming institutional and national security. They have decided that Chesser can be outside his cell some 30 hours a week with nine other inmates, but that he must work his way to the next phase and earn the privileges of more out-of-cell time and contact with a larger inmate population. *Id.* 54, 67. The officials have integrated congregate religious privileges into the Program, but in their judgment, these privileges must be subject to security protocols in the extremely dangerous environment of the ADX step-down units. *Id.* 44-49. Chesser can pray with other inmates and study religious texts

with them as a member of the group—a fellow congregant and equal among equals—during those times he is allowed to be outside his cell. *Id.* 50-51. These activities can be effectively monitored to minimize the risks to inmates, officers, and the public. *Id.* 46-49. Chesser can study his religion, too, using his own books and books and videos available through the prison library. *Id.* 76. He can request pastoral visits from people who can provide him scholarly advice. *Id.*

In the judgment of ADX officials, these are the right lines to draw for an inmate in Chesser's position, who is slowly being reintegrated into an open-population environment in the ADX Step-Down Program. Activities on the other side of this line are too dangerous for Chesser right now, before he completes the Program. He cannot teach other inmates or preach to them because, in the BOP's judgment, these are means for Chesser to gain power and exert authority over the inmate population. *Id.* 72. This ban is necessary to protect institutional and national security from threats posed by an unrepentant jihadist who is known to view prison as "█████ ███████████████████████," and who believes there is always an opportunity for jihad "███████████████████"—i.e., prison staff. *Id.* 23.

Chesser's opportunities to study his religion in B/B Unit are also the most that can be allowed at this time. His extraordinary demand that the BOP provide him his own personal set of Islamic scholar-instructors cannot be accommodated in a prison environment where perceptions of even slight inequalities trigger violent reactions. *Id.* 57, 73. The same goes for Chesser's request for the special privilege of "remote" learning that is not available to any other inmate. *Id.* 74. The BOP has a compelling security interest in declining to elevate Chesser to the position of a "scholar" who can issue fatwas to other inmates and, possibly, to persons outside the prison. *Id.* 9, 73. The undisputed facts about Chesser's history suggest that any fatwa he might issue would

be a threat to the safety of non-Muslims, especially other inmates and BOP staff.

### 2.      Chesser's proposals pose unacceptable risks.

Chesser wants far more religious privileges than he has in B/B Unit, all of which require many hours of out-of-cell time and access to large numbers of Muslim inmates. *Id.* 34-39. The undisputed facts show that Chesser's proposed accommodations would create unacceptable risks to both national security and the security of the prison.

### a.      Chesser cannot be removed from the Step-Down Program.

Chesser makes several proposals that hinge on his removal from the ADX Step-Down Program altogether. *Id.* 59-63. Implementing these proposals would compromise the BOP's compelling interest in requiring him to complete the Program. *Id.* 43. If Chesser is allowed to exit the Program, the dangers that brought him to the ADX in the first place remain unaddressed, putting both institutional and national security at risk. *Id.*

There are additional security problems with each of Chesser's proposals:

In his first proposal, Chesser proposes the creation of a prison system within the BOP for Muslims convicted of terrorism—what he calls "terrorism units" or a "terrorism system." *Id.* 59. Chesser would have the BOP create special housing conditions for Muslim terrorists to provide them more congregate religious privileges than those available to any other BOP inmates.

This proposal to bring Muslim terrorists together clearly poses unacceptable risks, especially if Chesser would be at such an institution, given his desire to pursue terrorist goals. In addition, this approach is fundamentally at odds with the bedrock correctional rule of fair and even-handed treatment of inmates. *Id.* 57, 61. In the judgment of correctional officials, such lopsided preferences for one inmate group will trigger dissension and violence among other inmates. *Id.* 57. The BOP has a compelling interest in avoiding those scenarios.

The "system" Chesser proposes would not be simply an accommodation, but an affirmative promotion of one religious group above all others. RFRA "does not differentiate among bona fide faiths[,] . . . confers no privileged status on any particular religious sect, and singles out no bona fide faith for disadvantageous treatment." *Cutter*, 544 U.S. at 723-24; *see also Abdulhaseeb v. Calbone*, 600 F.3d 1301, 1320 (10th Cir. 2010) (under RLUIPA, government must "refrain from substantially burdening religion," but need not "affirmatively subsidize religion"; prison did not have to pay a Muslim spiritual leader or pay for books).

Chesser's second proposal, to return him to a CMU or for the BOP to build more CMUs, also would contravene the BOP's compelling security interests. *Id.* 62. Chesser is being tracked through the ADX Step-Down Program because he was found to be too dangerous to remain in an open-population CMU. *Id.* 28-32. BOP correctional officials have determined that the Step-Down Program is exactly where Chesser needs to be. The undisputed record here provides no basis for Chesser to override this judgment call.

Finally, Chesser's proposal to put him on SAMs, *id.* 63, is not warranted. As an initial matter, Chesser's beliefs would be more difficult to accommodate under SAMs than in B/B Unit, where Chesser can pray in congregation whenever he is outside his cell. And the BOP cannot put Chesser on SAMs. That decision lies with the Attorney General. *See* 28 C.F.R. § 501.3(a).

### b.    Chesser cannot be allowed to dismantle the Program.

Chesser next proposes accommodations aimed at B/B Unit specifically. His proposals would effectively destroy the correctional purposes behind the carefully constructed rules and protocols in the ADX Step-Down Program.

Chesser proposes to eliminate all divisions between the Transitional and Pre-Transfer phases of the Program and the four ranges in B/B Unit, to bring more Muslims into B/B Unit to

pray with him, and to give Muslim inmates more out-of-cell time than any other inmates in B/B Unit. *Id.* 65. None of these proposals are consistent with sound correctional judgment.

The BOP has explained that the divisions between the phases of the Program, the small numbers of inmates in the Unit, and the existing schedules for out-of-cell time serve critical purposes. *Id.* 66-67. By these mechanisms, ADX officials control this extremely dangerous population. Officials are able to carefully observe and monitor Chesser and his fellow inmates to make informed judgments about who is capable of functioning with fewer security controls. Correctional professionals know that one way inmates show they are ready to leave the ADX is to abide by these rules and earn the privilege of fewer restrictions. Granting Chesser's request for an exemption so that he can congregate with other Muslims whenever he wants—even at times when the entire Unit is locked down—would exempt him from this process, would be perceived as grossly unfair by other inmates, and would create serious security problems. *Id.* 67.

The BOP cannot simply combine the Transitional and Pre-Transfer phases or move B/B Unit back to the ADX, as Chesser proposes. *Id.* 68. The ADX is completely full, and implementing Chesser's proposal would require the BOP to ship dangerous inmates to facilities that do not have the security controls ADX inmates need.

In sum, none of Chesser's alternatives would achieve the government's compelling interests. The amount of congregate religious activities and studying privileges Chesser is allowed in B/B Unit is the least restrictive means to achieve the BOP's desired goals. The Court should enter judgment in favor of the BOP on Claim IV.

## II.    Chesser's transfer to the ADX did not violate RFRA (Claim III).

The Court has carefully circumscribed what remains of Claim III. According to Chesser, the claim challenges his ties to terrorism as the primary justification for transferring him to the

ADX, which he contends is a violation of RFRA. *See* Doc. 159 at 2.

However, as this Court recognized, considering an inmate's terrorism-related crimes in making ADX placement decisions is not actionable under RFRA. *Id.* at 2 n.2 ("If 'ties to terrorism,' simply refers to the substance of his conviction, this court agrees with the BOP that consideration of such ties, whether primary or not, does not appear to be actionable under RFRA."). The Tenth Circuit has confirmed that the BOP can consider an inmate's ties to terrorism in deciding to designate him to the ADX. *Rezaq*, 677 F.3d at 1013-14 (approving the consideration of terrorism-related crimes in transferring inmates to the ADX to promote national security); *see also Gowadia v. Stearns*, 596 F. App'x 667, 673 (10th Cir. 2014) (concluding "the BOP properly considered Plaintiff's underlying criminal conduct" in transferring him to the ADX). Here, it was appropriate for the BOP to consider that Chesser is a convicted terrorist— and a militant jihadist who seeks to incite others—in transferring him to the ADX. Facts 28-30.

In defining Claim III, the Court "liberally construe[d]" Chesser's reference to "'ties to terrorism' as shorthand for his allegation that he was penalized for attempting to exercise his Muslim faith by being falsely accused of participating" in the group known as "JDS" and "because he organized group prayer for Muslims." Doc. 159 at 2 n.2. This is also not a viable RFRA claim. First, the undisputed facts show that Chesser's purported connection with JDS had nothing to do with his transfer to the ADX. The BOP's Counter Terrorism Unit has confirmed that the BOP does not consider Chesser to be a member of JDS, and that no information about JDS factored into the decision about Chesser's ADX transfer. *Id.* 33.[7]

Second, the undisputed facts show that Chesser was not sent to the ADX "because he

---

[7] Even if there were a connection between Chesser and JDS and the BOP had relied on that information, that would not have violated RFRA. He does not have a right, "religious" or otherwise, to participate in a "terrorism-related security group[.]" *See* Doc. 159 at 2 n.2.

organized group prayer for Muslims" or for any other reason related to his religious practice. *See* Doc. 159 at 2 n.2. Chesser was sent to the ADX because he was a dangerous and disruptive force in a less-restrictive prison. He was sent to the ADX because he attacked and threatened other inmates, set himself up as an authority figure in the unit, tried to manipulate staff, developed a scheme for communicating in code with other inmates, advocated that non-Muslims be killed, overtly expressed his hatred of America and his wish for the death of its people, and created discord in the unit by being intolerant of anyone who dared to disagree with him. *Id.* 28-31.

Another of the many factors that the BOP took into account in Chesser's ADX transfer was that he repeatedly broke, and incited other inmates to break, security rules governing the times and places in which CMU inmates were allowed to engage in congregate prayer. *Id.* 32. Chesser had no right to make a unilateral decision to break prison rules.[8] It was Chesser's defiance of institutional security protocols, not his "attempt[] to exercise his Muslim faith," that factored into the BOP's judgment that ADX placement was required to address Chesser's risks. That correctional decision is committed to the discretion of BOP officials. 18 U.S.C. § 3621(b) (BOP "shall designate the place of the prisoner's imprisonment"). That discretionary decision does not violate RFRA. The Court should enter judgment in favor of the BOP on Claim III.

## III.    Chesser did not exhaust a RFRA claim about teaching and studying.

Chesser has not exhausted that aspect of Claim IV which asserts that he cannot study and teach to the extent his religious beliefs require. Chesser has exhausted only one administrative remedy about congregate religious activities since he arrived at the ADX in June 2014. Facts 77.

---

[8] The inmate Chesser attacked had complained about loud and disruptive group prayer in the unit, showing that rules about group prayer are required to maintain order in a prison.

That remedy gave no hint of the broad teaching and studying privileges he seeks in this lawsuit. Chesser's remedy simply referenced his belief that he must have "religious classes." *Id.* 78. Nothing in that cursory statement gave any hint of the extraordinary levels of teaching and studying he now demands. The remedy did not state that Chesser believes he must teach other inmates up to 10 hours each day. *Id.* It did not state he must study up to 14 hours per day with his own personal set of Islamic scholar-instructors until Chesser himself reaches the level of an Islamic scholar who can issue fatwas. *Id.* Nor did the remedy mention Chesser's proposals for "remote" learning with Islamic scholars via computer, telephone, or Skype. *Id.*

In short, nothing in Chesser's barebones statement about "religious classes" presaged the claim he asserts in this lawsuit. Neither did it give the BOP "a fair opportunity to consider the grievance" or enable prison officials to "tak[e] appropriate measures to resolve the complaint internally." *Kikumura v. Osagie*, 461 F.3d 1269, 1283 (10th Cir. 2006) (internal quotation marks and citations omitted). The BOP has met its burden to prove the affirmative defense of exhaustion. *Jones v. Bock*, 549 U.S. 199, 212 (2007). Chesser's unexhausted teaching and studying claims cannot be brought in this Court. *Id.* at 212.

## CONCLUSION

The Court should enter judgment in favor of the BOP on Claims III and IV.

Respectfully submitted on March 2, 2018.

ROBERT C. TROYER
United States Attorney

*s/ Susan Prose*
Susan Prose, Assistant U.S. Attorney
1801 California Street, Suite 1600
Denver, CO 80202
Tel: 303-454-0100; Fax:  303-454-0404
E-mail: susan.prose@usdoj.gov

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**CERTIFICATE OF SERVICE (CM/ECF)**

I hereby certify that on March 2, 2018, I directed that the foregoing document, and the exhibits and unpublished decisions referenced therein, be placed in the United States mail addressed to the following non-CM/ECF participant:

Zachary A. Chesser
Reg. No. 76715-083
USP Florence – High
U.S. Penitentiary
P.O. Box 7500
Florence, CO  81226

_s/ Susan Prose_
Susan Prose
United States Attorney's Office