# Exhibit 2
# Declaration of David Jones

*Chesser v. Bureau of Prisons*, No. 15-cv-01939-NYW

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 15-cv-01939-NYW

ZACHARY A. CHESSER,

      Plaintiff,

v.

DIRECTOR, BUREAU OF PRISONS,

      Defendant.

---

## DECLARATION OF DAVID JONES

---

      I, David Jones, pursuant to 28 U.S.C. § 1746, and based upon my personal knowledge and information made known to me from official records reasonably relied upon by me in the course of my employment, hereby make the following declaration relating to the above-entitled matter:

      1.      I am employed by the United States Department of Justice, Federal Bureau of Prisons ("Bureau" or "BOP"). I am an Intelligence Analyst in the Bureau's Counter Terrorism Unit ("CTU"). I have held this position since November 2015. I have been employed with the BOP since January 1996. During my tenure with the BOP I have held positions of increasing responsibility. I have held investigative positions in the Bureau since 2001, including fourteen years in Special Investigative Services.

      2.      The CTU is a component of the Bureau's Intelligence and Counter Terrorism Branch. As an Intelligence Analyst in the CTU, my duties include collecting, analyzing, and

disseminating operational and strategic intelligence as it relates to counter-terrorism.  I provide

operational intelligence to Bureau staff in the field in support of investigative activities.

3.      As part of my official duties as an Intelligence Analyst in the CTU, I have access

to documents maintained and used by the Bureau in the ordinary course of business.  These

documents include, but are not limited to, information maintained in the SENTRY[1] database,

inmate central files, the Bureau's intelligence database, and intelligence documents.  All

attachments to my declaration are true and correct copies of records maintained by the Bureau in

the ordinary course of business.

4.      I am familiar with federal inmate Zachary Adam Chesser, Register Number

76715-083, who also calls himself Zakariyya Chesser and Abu Talhah Al-Amriiki.[2]  Chesser is

currently incarcerated in one of the final phases of the ADX General-Population Step-Down Unit

Program at the United States Penitentiary – Administrative Maximum ("ADX").  I am the CTU

Intelligence Analyst assigned to monitor Chesser's communications with persons outside the

prison.  I have been the Intelligence Analyst assigned to monitor Chesser's communications

since February 2017.

5.      The December 11, 2013, Profile and Assessment of Chesser, Attachment 1 to this

declaration,[3] is a critical CTU source document for the BOP's evaluation of Chesser and the

---

[1] SENTRY is the Bureau's national database that tracks various data regarding an inmate's
confinement, including but not limited to the inmate's institutional history, sentencing
information, program participation and completion, administrative remedies, and discipline
history.
[2] Abu Talhah Al-Amriiki means the "father of Talhah, the American."
[3] I am informed that the redacted version of the Profile and Assessment attached to my
declaration was produced to Chesser in discovery.  Information protected by the law-
enforcement privilege was redacted from the document before production to Chesser and is not
referenced in this declaration.  However, because the redacted version of the document contains

2

risks he presents in a prison setting and to the public.  The Profile and Assessment was prepared

by CTU personnel, who conducted an exhaustive analysis of available information about

Chesser.  The Profile and Assessment includes a detailed discussion of these topics:

- Chesser's criminal offense conduct (BOP 917-918);

- His conviction and sentence (BOP 919-920);

- His conversion to Islam and his immediate adoption of an extremist and militant interpretation of Islam (BOP 920-923);

- His role in developing a concept known as "Open Source Jihad," which is designed to promote lone or small-cell acts of terrorism (BOP 922-924);

- His personal interpretation of the concept of jihad, as manifested in his own writings found in his cell at the BOP Communications Management Unit in Marion, Illinois ("CMU Marion") (BOP 925-927);

- Chesser's history as a "homegrown" violent extremist who utilized the internet and social media to incite others and to advocate violence and terrorism (BOP 927-930); and

- Chesser's history of disruptive conduct at CMU Marion, including his attack on another inmate with whom Chesser had a religious disagreement (BOP 930), his threatening the safety of a non-Muslim inmate and attempting to control and manipulate CMU Marion staff members (BOP 931-932), and his repeated willful disregard of prison rules and regulations (BOP 932-933).

The Profile and Assessment concludes with the CTU's 20-page analysis of this information and

other intelligence about Chesser (BOP 933-952).

6.      In my role as a CTU Intelligence Analyst, I have studied the information and

analysis contained in the Profile and Assessment.  I rely on the information contained in the

Profile and Assessment in monitoring and analyzing Chesser's communications.  The Profile and

---

law enforcement sensitive information concerning the Bureau's monitoring of Chesser, as well as information about persons who are not parties to this case, the Bureau will ask the Court to restrict access to this document.

Assessment informs my judgment about the meaning of, and possible risks associated with, Chesser's communications.

7.      In this declaration, I discuss the information contained in the Profile and Assessment, the BOP's evaluation of that information, and how that information informed the BOP's correctional judgment that Chesser was appropriate for referral to and placement in the ADX in June 2014.

**I.      Chesser is a radical jihadist and convicted terrorist who disrupted the secure and orderly operation of a BOP prison, resulting in his designation to the ADX.**

8.      Chesser is a convicted terrorist who targeted non-Muslims for murder.  He supported and promoted other radical jihadists and terrorist groups, including al Qaeda.  As a BOP inmate, Chesser continues to demonstrate that he is a radical jihadist who advocates violence toward others.  His primary focus remains on those he deems to be the "kuffar," a derogatory term for non-Muslims.  Information contained in BOP records shows that Chesser continues to despise the United States and its citizens.  His prolific post-incarceration writings have praised the Boston Marathon bombers and emphasized his continuing commitment to the destruction of those many persons who run afoul of his jihadist agenda.

**A.      Chesser solicited murder and advocated violence toward non-Muslims.**

9.      In October 2010, when Chesser was 20 years old, he pled guilty to communicating threats in violation of 18 U.S.C. § 875(c); soliciting others to engage in conduct constituting a felony that threatened the use of physical force against another in violation of 18 U.S.C. § 373; and attempting to provide material support to Al-Shabaab, a designated foreign terrorist organization, in violation of 18 U.S.C. § 2339B.  Attachment 2, *United States v.*

*Chesser*, No. 1:10-cr-00395-LO, Plea Agreement, Doc. 31.[4]  Chesser was sentenced to 300

months in prison.  Attachment 3, 2/20/2018 Public Information Inmate Data for Chesser.  He is

currently scheduled to be released from BOP custody on June 16, 2032.  *Id.* at BOP 5562.

10.      Information known to the BOP shows that Al-Shabaab is responsible for mass-

casualty attacks on civilians, including the July 2010 bombings targeting the World Cup soccer

tournament in Kampala, Uganda, and the September 2013 attack on the Westgate shopping mall

in Nairobi, Kenya.  Attachment 1 at BOP 917 (stating that Al-Shabaab "has claimed

responsibility for bombings, shootings, and assassination of numerous civil figures, government

officials and journalists") (citing U.S. Department of State, Office of the Coordinator for

Counterterrorism, Country Reports on Terrorism 2012, Chapter 6, Foreign Terrorist

Organizations, May 30, 2013).

11.      Chesser has admitted to being a devotee of the radical Islamic cleric Anwar Al-

Awlaki, who was killed by a U.S. drone strike in Yemen in September 2011.  Al-Awlaki "was

designated by the United States as a 'Specially Designated Global Terrorist' on July 12, 2010,

because of his position as a leader of 'al Qa'ida of the Arabian Peninsula' . . ., a Yemen-based

terrorist group that had claimed responsibility for numerous terrorist acts against United States,

Saudi, Korean and Yemeni targets since its inception in January 2009."  Attachment 4, *United*

*States v. Chesser*, No. 1:10-cr-00395-LO, Statement of Facts, Doc. 32, at ¶ 1.

12.      Chesser told a Senate Committee that he "did not question al-Awlaki's

theological arguments."  Attachment 5, *Zachary Chesser: A Case Study in Online Islamist*

*Radicalization and Its Meaning for the Threat of Homegrown Terrorism*, Senate Committee on

---

[4] In the plea agreement, Chesser admitted "the facts set forth in the statement of facts filed with
this plea agreement" and agreed "that those facts establish guilt of the offense charged beyond a
reasonable doubt."  Attachment 2 at 1-2.

Homeland Security and Governmental Affairs (Feb. 2012), at BOP 2560; *see also* Attachment 1 at BOP 922 (discussing Chesser's communications with the Senate Committee).  It was Al-Awlaki who "put al-Shabaab on the radar" for Chesser.  Attachment 5 at BOP 2561.  Chesser posted on Al-Awlaki's website:

> My sole desire in my heart is to join al-Shabaab in establishing the Khilafa.  It is so engraved upon my heart that I began lamenting the time it is going to take to raise the money or means and then travel to Somalia.  I don't know how to get there, so that is an issue.  Another one is based on things I look up and post on the Internet. I am worried that I will be arrested when I try to leave the country.  Does anyone know how to help me?

*Id.*  Chesser followed up with this post on Al-Awlaki's website:  "If someone is an apostate, and they are so openly, *can I just kill them right then and there* or are there conditions?"  *Id.* (emphasis added).  Chesser met his wife on Al-Awlaki's website.  *Id.* at BOP 2562.

13.     In December 2009, Chesser began to operate his own internet blog, which he called "themujahidblog.com."  Attachment 4 ¶ 3; *see also* Attachment 5 at BOP 2564-2565 (discussing Chesser's posts on themujahidblog, including his discussion of a "jihadi forum" that "would go miles and miles toward influencing the youth . . .").  Chesser described the purpose of his blog as "primarily devoted to spreading knowledge regarding Jihad and the Mujahideen." Attachment 4 ¶ 3.[5]  Chesser admitted to posting an article entitled "Open Source Jihad," "which discussed a strategy mujahideen could use to elude capture and death while maintaining relevance and striking capability."  *Id.* ¶ 15; *see also* Attachment 1 at BOP 922-924 (discussing the development of the tactics of Open Source Jihad and its promotion of "lone wolf" terrorist attacks).

---

[5] The term "mujahideen" commonly refers to guerrilla fighters in Islamic countries who are fighting against non-Muslim forces.

14.     Chesser administered "RevolutionMuslim.com," a radical website "which contained Islamic postings and information supportive of violent jihad."  Attachment 4 ¶ 4; *see also* Attachment 5 at BOP 2565 (noting that other moderators and followers of Revolution Muslim have been arrested for terrorist offenses in the United States and United Kingdom).   He established his own youtube.com page called "AlQuranWaAlaHadeeth," in which he targeted U.S. military personnel.  Attachment 4 ¶ 8.  Chesser uploaded videos supporting violent jihad, including videos showing the preparation of an improvised explosive device ("IED"), followed by the detonation of an IED that killed military personnel.  *Id.* ¶ 9, 13.  He posted videos called "The Mujahideen Are Calling You" that documented footage of scenes from Afghanistan and U.S. Army helicopters in flight.  *Id.* ¶ 14.  He posted comments about violent jihad on other websites, including "AlQimmah," the official web forum for Al-Shabaab.  *Id.* ¶ 7.  Chesser posted a lecture by Al-Awlaki "espousing participation in violent jihad" on his AlQuranWaAlaHadeeth youtube.com website.  *Id.* ¶ 11.

15.     Chesser admitted that he posted information to a website called "Al Fallujah Islamic Forums," including a link to "200 plus books on various beneficial subjects," e.g., "books on Jihad, Islam and Warfare."  His posting included a section he call the "Al Qaeda Manual," which included information on communications, transportation, and "Guidelines for Beating and Killing Hostages," among other topics designed to promote violent jihad.  *Id.* ¶ 17. Chesser admitted that he made other postings supporting violent jihad, including an article entitled "Counter Counter Terrorism #12 – Actually Leaving for Jihad," and an article entitled "How to Destroy the West," in which he listed violent jihad methods, including "put[ting] out a message to the Muslims to go buy guns and kill soldiers[.]"  *Id.* ¶ 20.

16.     Chesser's postings promoted the idea that certain people ought to be killed. Chesser posted this statement on his Facebook page about a Muslim guest on the Sean Hannity

television show: "May Allah kill the murtad[6] . . . with a death more painful than all the deaths he caused by serving the agents of genocide." Attachment 5 at 2565. Chesser wrote that "videos of kuffar dying should be spread. Death is an extraordinarily powerful image. There is nothing stronger in killing one's sympathy for the enemy than seeing him die enough times that there is no longer a shock factor." *Id.*

17.     Chesser published an audio clip of a sermon by Al-Awlaki called "The Dust Will Never Settle Down," in which Al-Awlaki called for the assassination of anyone who has "defamed" Muhammed: "Harming Allah and his messenger is a reason to encourage Muslims to kill whoever does that." *Id.* ¶ 23(D). Chesser published Al-Awlaki's sermon on the RevolutionMuslim.com, the mujahidblog.com, and the AlQimmah websites. *Id.* ¶¶ 24-25.

18.     Chesser personally targeted specific individuals for death. He created and narrated a video entitled "Defense of the Prophet Campaign." *Id.* ¶ 24. In the video, Chesser (1) made statements about an episode of the *South Park* television series that depicted the Prophet Muhammed in a bear costume; (2) included the aforementioned speech by Al-Awlaki providing "the Islamic justification for killing those who insult or defame Muhammed"; and (3) posted photographs of the *South Park* Creators, Theodoor van Gogh, and other persons who have been publicly targeted for death by Islamists. *Id.* ¶¶ 23-24; *see also* Attachment 5 at BOP 2564 (discussing the video). The photograph Chesser posted of Mr. van Gogh, a producer who made a film critical of the treatment of women in Islam, showed his murdered, partially decapitated body with two knives impaled in his torso. Attachment 4 ¶ 23.

19.     Chesser admitted that he solicited the murder of the creators of *South Park* and an individual in Florida referred to as "JG," who had participated in a Facebook group that Chesser

---

[6] A "murtadd" is an apostate in Islam.

found insulting.  *Id.* ¶ 22.  Chesser admitted that these postings "objectively constituted messages to an audience that likely included individuals around the world who "[w]ere inclined to engage in violent jihad against what they believed to be the enemies of Islam"; who "[u]nderstood the messages to constitute requests to attack [the *South Park* creators] and JG"; and who "[c]ould potentially be willing and capable to attack [the *South Park* Creators] and JG in response to those messages[.]"  *Id.* ¶ 32.

20.     Chesser admitted that he solicited bomb threats targeting U.S. military personnel and others.  *Id.* ¶ 33.  He admitted that he "unlawfully distributed information pertaining to the manufacture and use of explosives, destructive devices, and weapons of mass destruction, with the intent that such information be used by mujahideen around the world."  *Id.*  He admitted that he "posted on various websites links to detailed information on the construction and use of explosive devices, and tactics associated therewith, in support of violent jihad and against civilians, law enforcement authorities, and military forces of the United States and its allies in America and overseas."  *Id.*  He designed a plan to plant fake bombs in order to desensitize the public and law enforcement authorities to the threat of actual bombs.  *Id.* ¶ 34.  One of Chesser's postings was called "Desensitizing Federal Agents – Fake Attacks" (June 15, 2010).  *See* Attachment 5 at BOP 2563.  He posted information on a jihadist website instructing others how to evade detection of explosives at airports.  Attachment 4 ¶¶ 35-39.  One of his messages ended with the words, "Boom!  No more kuffar!"  *Id.* ¶ 39.

21.     Three weeks before Chesser's arrest in July 2010, he wrote a document called "Raising Al-Qaaida: A Look Into the Long Term Obligations of the Global Jihaad Movement." Attachment 6; *see also* Attachment 5 at BOP 2569 (discussing Chesser's publication of "Raising Al-Qaaida").  Chesser identified "the best of things" as "martyrdom and jihaad in Allah's cause,"

and argued for "a normalization of the notion of dying for the sake of Allah and a return to its (jihaad's) treatment as a regular act of worship . . ." *Id.* at BOP 5447.

22.     Chesser admitted to providing material support to al-Shabaab.  Attachment 4 ¶ 40. His wife was his partner in this endeavor.  She helped him facilitate a plan "to travel to Somalia for the purpose of joining al-Shabaab and engaging in violent jihad." *Id.* ¶ 41.  Their first attempt to get to Somalia was foiled by Chesser's mother-in-law, who hid her daughter's passport so she could not travel.  *Id.*  Chesser and his wife were arrested in July 2010, after they drove together to John F. Kennedy Airport, where they attempted to execute a plan in which Chesser would board a flight to Uganda with his baby son. *Id.* ¶¶ 49-50.  Chesser brought his son with him because the plan was "to make it appear less likely that Chesser was actually continuing on to Somalia to join al-Shabaab and engage in violent jihad." *Id.* ¶ 50.  That plan also failed.

23.     When Chesser was prevented from boarding the flight to Uganda, he immediately called an FBI Special Agent to "reiterate[] that he no longer supported violent Islamist extremism," Attachment 5 at BOP 2570, but his dissembling did not prevent his arrest.   Chesser was arrested on July 21, 2010.  *Id.*  Chesser's wife pled guilty to making material false statements to a federal agent, in violation of 18 U.S.C. § 1001, in furtherance of Chesser's attempts to leave the United States to join al-Shabaab.  She was sentenced to three years' probation, deported, and ordered not to return to the United States.  Attachment 1 at BOP 922.

**B.      Chesser continued to embrace violent jihad in his words and actions at the CMU.**

24.     Following his sentencing, Chesser was designated to CMU Marion on May 2, 2011.  Attachment 7, Inmate History Quarters for Chesser.

25.     Chesser had a great deal of freedom in the CMU.  CMUs operate as open, general-population units in which the inmates reside, eat, and participate in programming available to BOP inmates.  In this open-population setting, CMU inmates enjoy between 15 and 16 hours of out-of-cell time every day, from approximately 6 a.m. to approximately 9:15 p.m.  During this time, the inmates are unrestrained and are in direct physical contact with staff and all other inmates in the unit.

26.     CMU inmates have extensive communications privileges.  They can send and receive written correspondence and emails to an unlimited number of contacts outside the prison.  They can make telephone calls and receive visitors.  The CTU monitors all non-legal communications between CMU inmates and people outside the prison.

### 1.     Chesser used his communications and writings to promote jihad.

27.     Throughout the period of his incarceration in the CMU, Chesser attempted to promote violent jihad through communications with people outside the prison and in his other writings.  I discuss here several examples of writings that he produced while he was incarcerated in the CMU.[7]

28.     In a May 21, 2013, email to a BBC reporter, Chesser bragged about coining the term "Open Source Jihad" in an article that he wrote in 2010.  Attachment 1 at 923 (discussing Chesser's email); *see also* Attachment 8, 5/21/2013 email re: Open Source Jihad Revisited: Boston, Syria, BOP 2764-2767.[8]  Chesser claimed that his article "███████████████████████ ████████████████████," which subsequently included an article about the concept

---

[7] A detailed analysis of Chesser's communications is found in the Profile and Assessment. Attachment 1 at BOP 940-952.
[8] Because Chesser's emails about the Boston Marathon bombing were rejected and not allowed to be sent, the BOP will request a restriction on access to those documents.

in its own magazine.  *Id.*  Chesser claimed that the Boston Marathon attackers relied on that article, and, by extension, the ideas of Chesser himself.  *Id.*

29.     Chesser praised the actions of the Boston Marathon bombers in another email he attempted to send to the BBC from the CMU.  Chesser said that "█████████████████████

███████████████████████████████████████████████████████████████

███████."  Attachment 9, 5/17/2013 email re: Answers P4 (emphasis added), BOP 2665; *see also* Attachment 1 at 924 (analyzing Chesser's email).

30.     After Chesser attempted to send these emails, he wrote a paean to Dzhokhar Tsarnaev entitled "The Star of Rolling Stone."  Attachment 10, 10/1/2013 email re: The Star of Rolling Stone, BOP 2625-2626; *see also* Attachment 1 at BOP 924 & BOP 949 (discussing Chesser's email).  Dzhokhar Tsarnaev, along with his brother Tamerlan, are the terrorists who bombed the Boston Marathon in April 2013.  The extremely inflammatory language in Chesser's poem ██████████████████████████████████████████████████████████████████, while exulting Dzhokhar Tsarnaev as a "hero" of "Jihaad."  *Id.*

31.     On October 7, 2013, Chesser attempted to send an email to his wife that included his original rap poem entitled "Jihad's my Sabbatical."  Attachment 11, 10/7/2013 email re: Jihad's my Sabbatical, BOP 1643-1645.[9]  The poem "openly advocated violence using weapons and acts of terrorism, and described the subject of the poem (himself, inmate Chesser) as a kidnapping, Islamic radical, and international terrorist."  *Id.*; *see also* Attachment 1 at BOP 950.  Chesser claims the poem is "satire," and he likens his work to that of the satirist Jonathan Swift.  Attachment 11 at BOP 1643.

---

[9] The BOP will request a restriction on access to this email, which was rejected for security reasons.

32.   On October 31, 2013, Chesser attempted to send an email to his wife that he entitled "For Immunity, Not Qualified."  Attachment 12, 10/31/2013 email re: For Immunity, Not Qualified, BOP 3501.[10]  In that email, Chesser said:  "So let the record forever hold that I advocate violence; I advocate terrorism; I believe they are necessary to achieve reform; I believe they are morally justified."  *Id.*  Further, he confirmed his extreme hatred toward the United States and its citizens:

> I hate America; I hate its people; I beg my Lord to kill them; I shall forever fight them within the bounds of the law; I shall ever stand against them.

*Id.*  In the email, Chesser scolded the BOP for its alleged illegal "censor[ship]" of his inflammatory writings.  *Id.*

33.   On December 4, 2013, BOP staff discovered several original writings in Chesser's cell that reveal his conception of jihad.  Attachment 1 at BOP 924-927.  Included in those writings was Chesser's explanation of Anwar Al-Awlaki's "44 Ways to Support Jihad." *Id.* at 925; *see also* Attachment 13, Chesser's "Explanation of the 44 Ways of Supporting Jihad with Special Additions for Prisoners").[11]

34.   Chesser's extensive notations to Al-Awlaki's "44 Ways" article are replete with references to violent jihad and the need to attack the "kuffar."  Chesser emphasized that violent jihad and fighting are the individual obligations of all Muslims.  Attachment 1 at BOP 925.  He specifically identified the United States as an enemy "at war with Islam itself," then proceeded to list three pages of offenses against Islam allegedly committed by the United States.  Attachment

---

[10] The BOP will request a restriction on access to this email, which was rejected for security reasons.  I am informed that the particular language I quote here was previously released in a document filed in this case; therefore, it is not redacted in my declaration.

[11] The BOP will request a restriction on access to this document, which, to the BOP's knowledge, has not been publicly disseminated.  Al-Awlaki's original "44 Ways to Support Jihad" is available at https://www.slideshare.net/kingabid/44-ways-to-support-jihad.

13 at BOP 575-577.  He explicitly encouraged a campaign of targeting and killing non-Muslims, with no Muslim exempt from the obligation to kill because "[███████████████

████████████████████████████████████████████████

████████████████████████████████████████████."

*Id.* at BOP 584.

35.      Chesser's commentary on the "44 Ways" shows that he does not view imprisonment as the end of the prisoner's ability to carry out violent jihad:



*Id.* at 599 (emphasis added).  Chesser wrote that he anticipates that his jihad in prison "██

███████████████████████████████."  *Id.* at BOP 596.  As discussed below in connection with Chesser's attack on a fellow inmate, he put that maxim into practice when he was incarcerated in the CMU.

36.      Chesser wrote his own follow-up article to Al-Awlaki's "44 Ways," which he called "Abu Talhah's Additions to the 44 Ways of Supporting Jihad."  Attachment 1 at 926.  Chesser added these seven additional "Ways" to those set forth by Al-Awlaki:

> 45.      Organize Da'way to Fit the Strategies of the Mujahidin
>
> 46.      Neutralize Informants
>
> 47.      Help Brothers and Sisters Make Tabah from Cooperating
>
> 48.      Establish Islam in Prison Politics
>
> 49.      Follow the Sunnah When Giving the Khutbah[12]

---

[12] The khutba is the sermon delivered following Jumu'ah prayer.

50.     Study the Religion in a Formal Way

51.     Pushing People to Act

*Id.* at 927; *see also* Attachment 14, Chesser's "Abu Talhah's Additions to the 44 Ways of Supporting Jihad," BOP 719-728.

37.     In "Way" number 48, "Establish Islam in Prison Politics," Chesser provided instructions on how to further jihad in prison, with the goal of preparing the inmates' "████████ ████." *Id.* at BOP 722.  Chesser viewed prisons as "████████████████████████ █████████████." *Id.* at BOP 722-723 (emphasis added).

38.     In Chesser's "Way" number 49, "Follow the Sunnah When Giving the Khutbah," Chesser advocated for "████████████" and "██████████████████████████████ ████████████████████████████." *Id.* at BOP 723.

39.     Chesser's writing, a list of sixty-five "Islamic Conclusions of Sharh ut-Turuq," again advocated violent jihad as a religious obligation.  Attachment 1 at BOP 927; *see also* Attachment 15, Chesser's "Islamic Conclusions of Sharh ut-Turuq," BOP 713-718.  Among other admonitions to engage in violent jihad, Chesser wrote that "████████████████████ ████████████████████████," and that if Muslims do not "██████████████████████, ████████████████████████████." *Id.* at BOP 716 (emphasis added).

40.     Chesser's jihadi writings at the CMU are consistent with staff observations of his conduct in the housing unit, including his interactions with other CMU inmates.  While at CMU Marion, Chesser assumed a leadership role over a small group of "younger, more radicalized inmates," who "share similar beliefs as Chesser, in particular regarding jihad, anti-American sentiments, and advocating violence and terrorism against the U.S. military and what are considered innocent victims, such as the Boston Marathon bombing."  Attachment 1 at BOP 933.  Further, "[b]oth staff and inmates have reported observing Chesser praising Allah for the

outcome of acts reported in the news media where an American soldier was killed, as well as for

other acts of terrorism which resulted in the loss of non-Muslim lives, particularly those of

Americans." *Id.* Staff observed "Chesser routinely promoting radical views within the unit to

the point of nearly becoming involved in physical altercations with other inmates." *Id.* at BOP

934. As further described below, Chesser did in fact attack a non-Muslim inmate who crossed

Chesser in connection with a dispute about congregate prayer.

### 2. Chesser attacked an inmate, tried to manipulate staff, and broke institution rules.

41.     Chesser was a disruptive influence on the inmate population and the security of

CMU Marion. Chesser set himself up as a decisionmaker in the unit. He targeted inmates he

disliked and tried to advance those he preferred. He engaged in conduct designed to manipulate

staff to take actions that would advance Chesser's personal goals for the rules that would be

applied in the unit and which inmates would be housed there.

42.     In August 2013, Chesser entered another inmate's cell and struck him repeatedly.

Attachment 1 at BOP 930; *see also* Attachment 16, October 11, 2013, Discipline Hearing Officer

Report, IR # 2480658, BOP 48-51. Chesser admitted that he "defiantly started the exchange."

*Id.* at BOP 48. Even though Chesser's victim was caught unawares, he quickly got the better of

Chesser and placed him in a "bear hug"; for that reason, the victim sustained only minimal

injuries. *Id.* at BOP 49. Chesser was disciplined for his actions. He lost 27 days of Good

Conduct Time and was placed on telephone restrictions for 90 days. *Id.* at BOP 50. Chesser was

found to have committed the offense of assaulting another inmate. *Id.* at BOP 48. This

discipline, as with all the discipline Chesser received at CMU Marion, has never been

overturned.

43.     Chesser initiated the attack because he viewed the inmate as having mocked and disrespected Islam.  An investigation concluded that Chesser had a practice of loudly calling the five daily Muslim prayers so as to project the call on the housing range and throughout the CMU.  Attachment 17, December 19, 2013, Administrative Maximum Referral for Chesser, at BOP 83.  In response, the inmate Chesser attacked had started to sing "God Bless America" at the same time as the call to prayer.  *Id.*  The inmate complained to staff about the call to prayer, and staff directed Chesser to stop.  *Id.*  Chesser attacked the inmate in retaliation.  *Id.*; *see also* Attachment 1 at BOP 930.  In an email to his wife, Chesser also claimed that the attack would benefit him in his civil suit against the institution.  Attachment 1 at BOP 948.

44.     On yet another occasion, Chesser inappropriately intruded into the process for managing the inmate population at CMU Marion.  Staff were aware that Chesser had taken offense when a fellow CMU inmate converted to Islam, and then subsequently rejected that faith.  Attachment 1 at BOP 931.  When that inmate was involved in a fight on November 29, 2013, and placed in the Special Housing Unit ("SHU"), Chesser attempted to manipulate the situation for his benefit and that of another inmate Chesser happened to like.  The inmate Chesser liked was being referred for a possible transfer to the ADX at the time.  Attachment 1 at BOP 931.

45.     On December 4, 2013, Chesser sent an email to CMU Marion staff in which he attempted to bargain with staff about the safety of the inmate in the SHU to get something Chesser wanted:

> This guy [redacted] will not be safe if he comes out in this unit and he will not be safe if he is sent to Terre Haute for other reasons.  However, if you all will drop the attempt to send [redacted] to ADX or SMU, then I believe I could probably work something out with regard to this unit, although I have no control over Terre Haute's issue.  Terre Haute's Muslim population is a different crowd than the one here anyway.  I am a witness that most if not all of what has thus far been told to

[redacted] about the reasons for his facing ADX are not true, and it all seems to be the product of gossip anyway, so it is wrong to make him face an investigation like this to being with.  Those guys [redacted] and [redacted] were stirring up rumors with the non-Muslims, and that led to a lot of speculation about [redacted] which was unfounded.

Attachment 18, 12/4/2013 Request to Staff from Chesser, BOP 124.

46.     From a correctional perspective, Chesser's email raises serious concerns.  He sets himself up as an authority figure over, or a spokesperson for, the inmate population.

47.     Chesser was disciplined for his attempt to interfere with and to manipulate staff in this manner.  The Discipline Hearing Officer concluded:

> In his Request to Staff, Chesser attempted to extort staff by negotiating the release of [redacted] from the Special Housing Unit in exchange for guarantees over the physical safety and welfare of [redacted].  Chesser's actions threaten the security and orderly running of the institution by attempting to manage and control the inmate population, including those inmates who are placed in, and released from the Special Housing Unit, and preclude staff from making and enforcing decisions based on the safety of inmates and security of the institution.

Attachment 19, December 17, 2013, Discipline Hearing Officer Report, IR # 2523214, BOP 119. Chesser was found to have committed the offense of conduct which disrupts or interferes with the security or orderly running of the institution, most like extortion.  *Id.* at BOP 118, 120.  He lost 27 days Good Conduct Time, and lost commissary, telephone, and visiting privileges for 90 days.  *Id.* at BOP 120.  This disciplinary decision has not been overturned.

48.     Chesser does not get to decide how other inmates will be managed.  He does not get to decide which inmates will be safe on a prison yard and which inmates will not be safe.  He does not get to decide what discipline an inmate "deserves."  He does not get to decide where inmates will be housed.

49.     At CMU Marion, Chesser also developed a communications scheme to evade detection by correctional staff.  In December 2013, during an inventory of Chesser's property, staff discovered a series of papers containing elaborate instructions for a cipher.  Attachment 20, 12/5/2013 Incident Report # 25233351, with attachments, BOP 312-317, 322-327.[13]  The cipher was written to enable Chesser to communicate with other persons via code.  The instructions state:  "There are two parts of this method:  the message and the key.  You scramble/unscramble the message based on the key."  *Id.* at BOP 314.  Chesser claimed that he does "not think there is policy against possessing code," *id.* at BOP 312, but he is wrong.  Inmates are not allowed to develop methods for communicating in code or to communicate in code, which is a threat to the safety and security of staff and other inmates.  If they are caught with encoding or cipher materials, they can be charged with possessing unauthorized materials.  That is what happened to Chesser.  He lost both commissary and email privileges as a result.  *Id.*

50.     At CMU Marion, Chesser was not only manipulative and a threat to others, but a repetitive rule breaker.  Chesser took it upon himself to decide what rules he would obey, and when, and he encouraged other inmates to break rules.  *See* Attachment 1 at BOP 932 (discussing Chesser's "Willful Disregard of Institution Rules and Regulations").

51.     When Chesser was incarcerated at CMU Marion, the institution had rules governing the locations in which group prayer could be conducted in that unit.  In the judgment of correctional staff at CMU Marion, these rules were necessary to allow congregate prayer to be properly supervised and conducted in a manner that would not interfere with the secure and

---

[13] The materials found at BOP 318 to 321 were part of the property gathered in the search and appear to be unrelated to Chesser's encoding scheme.  To prevent the dissemination of Chesser's cipher, the BOP will seek a restriction on access to the cipher documents.

orderly operation of the institution.  Inmates at CMU Marion had "repeatedly complained to staff about the practice of Islamic inmates calling the prayer, particularly at times when many inmates are asleep."  Attachment 1 at BOP 948.  This disruption to the unit demonstrates that rules are necessary, which is why CMU Marion staff established specifically identified religious programming areas for congregate prayer.  *Id.*  Chesser did not obey these rules.  As a result, between November 3, 2011, and September 17, 2012, he received four incident reports.

## II.  Chesser was transferred to the ADX because he disrupted the inmate population and the security of CMU Marion.

52.  By December 2013, correctional staff had determined that Chesser could not be managed at CMU Marion without jeopardizing the safety and security of the institution.  On December 19, 2013, then CMU Marion Warden J.S. Walton referred Chesser for possible designation to the ADX.  Attachment 17, December 19, 2013, Memorandum re: Administrative Maximum Referral for Chesser, BOP 83-89.

53.  The procedures for referral to the ADX are governed by a memorandum issued by Blake Davis, the former Assistant Director for the BOP's Correctional Programs Division.  Attachment 21, October 15, 2012, Memorandum re: Administrative Maximum Facility (ADX) General Population Referral Procedures, BOP 5424-5433 ("Davis Memorandum").

54.  The Davis Memorandum establishes two criteria for ADX placement.  *Id.* at 5425 (inmate referred to the ADX "will originally meet one or both of the following criteria . . .").  In assessing Chesser's conduct at CMU Marion, Warden Walton determined that Chesser met the following criterion:

> The inmate's placement in other correctional facilities creates a risk to institutional security and good order, or poses a risk to the safety of staff, inmates or others, or to public safety.

Attachment 17 at BOP 83; *see also* Attachment 21 at BOP 5425.  Based on Chesser's conduct,

Warden Walton also found that Chesser met the following factor for ADX placement, as defined

in the Davis Memorandum:

> The inmate has been identified as participating in, organizing, or facilitating any
> group misconduct that adversely affected the orderly operation of a correctional
> facility.

Attachment 17 at BOP 83; *see also* Attachment 21 at 5425-26.

55.     Warden Walton provided a detailed explanation of the facts supporting Chesser's

referral to the ADX.  Attachment 17 at BOP 83-88.  He summarized significant portions of the

information contained in the CTU's Profile and Assessment of Chesser.  Warden Walton noted

that Chesser was a "disruptive influence on the inmate population and security of the unit," and

that he has been involved in "indoctrination activities, which have included the circumvention of

BOP policies and regulations, attempting to function as an inmate leader, engaging in physical

violence and assaults against other inmates, advocating for physical violence against others, and

attempting to usurp and circumvent the authority of staff by making demands regarding the care

and custody of other inmates based on his perceived influence among the inmate population."

*Id.* at BOP 83.

56.     Warden Walton provided specifics to support his assessment.  He explained that

information about Chesser showed that he was subscribing to an increasingly radicalized and

dangerous ideology that manifested itself in both his writings and his actions.  Warden Walton

pointed to Chesser's overt expression of hatred of America and its people and Chesser's

exhortation begging his "lord to kill them[.]"  *Id.* at BOP 84.

57.     Warden Walton discussed Chesser's increasing intolerance toward any person who dared to challenge him, including his attack on another CMU inmate who had made a complaint about Chesser's engaging in the call to prayer in a loud and disruptive manner.  *Id.* at BOP 84-85.  He emphasized Chesser's refusal to obey institution rules designed to ensure the orderly operation of the institution, and Chesser's encouraging other inmates to disobey those rules.  *Id.*  He described Chesser's anger toward an inmate who had rejected Islam and then criticized what the inmate saw as the fanaticism of Chesser and other Muslim inmates in the CMU.  *Id.* at BOP 86.  Warden Walton noted that this was the inmate who Chesser had told staff he might be able to protect—provided that the BOP met Chesser's demand to stop another inmate's referral to the ADX.  *Id.*

58.     Warden Walton described the extensive extremist, radical writings staff located in Chesser's cell, in which Chesser "justified the use of violence and even killing of non-Muslims who are considered to have engaged in conduct not suitable to Chesser's personal belief system." *Id.* at BOP 86-87.  Warden Walton pointed to the fact that these writings included statements in which Chesser identified opportunities for violent jihad in the prison setting, including fighting "Kuffar" inmates and taking advantage of opportunities to escape.  *Id.* at BOP 87.  These statements demonstrate that Chesser is receptive to the idea of physical violence against other inmates and staff.  Chesser has already assaulted another inmate.  The fact that Chesser may regard this assault as minor does not eliminate the BOP's concern about his violent propensities, particularly given his clear devotion to violent jihad and his expressed desire to kill Americans.

59.     Based on the known information about Chesser, Warden Walton concluded that Chesser "requires greater security and controls than which can be afforded him while in a typical

general population setting, or in a CMU.  His disciplinary history, conduct and behavior has

shown a disregard for rules and regulations, a threat to the physical safety of other inmates and

staff, and adverse effect on institution safety and security."  *Id.* at BOP 84.

60.     On April 9, 2014, Chesser received a hearing on the Warden's recommendation

for transfer to the ADX.  Attachment 22, ADX General Population Hearing Administrator's

Report, BOP 203-212.  Based on the evidence, the Hearing Administrator found that Chesser

met the criteria for ADX placement.  *Id.* at BOP 211.  The Assistant Director of the BOP's

Correctional Programs Division approved Chesser for placement in the ADX on April 30, 2014.

Attachment 23, ADX General Population Placement Decision, BOP 202.

61.     One of the factors that warrants consideration for ADX placement is that an

inmate has been "convicted of, charged with, associated with, or in any way linked to terrorist

activities and, as a result, presents national security management concerns which cannot

adequately be met in an open population institution."  Attachment 21 at BOP 5425.  While

Warden Walton did not specifically focus on this factor, Chesser's criminal conviction, as well

as his subsequent conduct in the CMU in which he engaged in and encouraged jihadist activities,

shows that he also meets this factor.  As Warden Walton noted in his recommendation, Chesser's

"militant, radicalized actions" not only threatened the security of staff, inmates, and the

institution, but also advocated violence toward persons outside the prison.  Attachment 17 at

BOP 84.

62.     While Chesser's ADX referral discussed the incident reports he received for

engaging in unauthorized group prayer, those incidents were but one of many examples of the

management problems Chesser created at CMU Marion.  Moreover, the issue with Chesser's

23

unauthorized congregate prayer at CMU Marion was that he was breaking institutional security rules by praying at times and in physical locations where the group activity could not be properly supervised.  Chesser was not penalized for exercising his faith, but for violating rules designed to protect the safety and security of the institution.

63.      One point that was *not* a factor in Chesser's transfer to the ADX is his alleged involvement with a group he refers to as "Jama'ah Ad-Da'wah As-Sahihah," or "JDS."  I am aware that Chesser has asserted that his ties to JDS are the "real" reason he was sent to the ADX. This is inaccurate.  The BOP has not identified Chesser as a member of this group, nor am I aware of any documentation showing such an affiliation.  If Chesser is somehow involved with this group, that fact did not enter into the BOP's decision to transfer him to the ADX.

64.      In June 2017, Chesser was considered for CMU placement.  However, Chesser was found not to warrant CMU placement.  During the period of his incarceration at the ADX, Chesser participated in activities and programs and did not have any communications-related issues or incident reports.  Therefore, Chesser was advanced to the next phase of the ADX Step-Down Program.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

and correct to the best of my information, knowledge, and belief.

Executed this 28th day of February, 2018, in Washington, D.C.

<u>s/ *David Jones*</u>
David Jones
Intelligence Analyst
Counter Terrorism Unit

| | |
|---|---|
| **Attachment 1:** | CTU Profile and Assessment of Chesser (Dec. 11, 2013) |
| **Attachment 2:** | *United States v. Chesser*, No. 1:10-cr-00395-LO, Plea Agreement, Doc. 31 |
| **Attachment 3:** | 2/20/2018 Public Information Inmate Data for Chesser |
| **Attachment 4:** | *United States v. Chesser*, No. 1:10-cr-00395-LO, Statement of Facts, Doc. 32 |
| **Attachment 5:** | *Zachary Chesser: A Case Study in Online Islamist Radicalization and Its Meaning for the Threat of Homegrown Terrorism*, Senate Committee on Homeland Security and Governmental Affairs (Feb. 2012) |
| **Attachment 6:** | Zachary Chesser (aka "Abuu Talxah Al-Amrikii"): "Raising Al-Qaaida: A Look Into the Long Term Obligations of the Global Jihaad Movement" |
| **Attachment 7:** | 2/8/2018 Inmate History Quarters for Chesser |
| **Attachment 8:** | 5/21/2013 Chesser email re: Open Source Jihad Revisited: Boston, Syria |
| **Attachment 9:** | 5/17/2013 Chesser email re: Answers P4 |
| **Attachment 10:** | 10/1/2013 Chesser email re: The Star of Rolling Stone |
| **Attachment 11:** | 10/7/2013 Chesser email re: Jihad's my Sabbatical |
| **Attachment 12:** | 10/31/2013 email re: For Immunity, Not Qualified |
| **Attachment 13:** | Chesser's "Explanation of the 44 Ways of Supporting Jihad with Special Additions for Prisoners" |
| **Attachment 14:** | Chesser's "Abu Talhah's Additions to the 44 Ways of Supporting Jihad" |
| **Attachment 15:** | Chesser's "Islamic Conclusions of Sharh ut-Turuq" |
| **Attachment 16:** | October 11, 2013, Discipline Hearing Officer Report, IR # 2480658 |
| **Attachment 17:** | December 19, 2013, Administrative Maximum Referral for Chesser |
| **Attachment 18:** | 12/4/2013 Request to Staff from Chesser |
| **Attachment 19:** | December 17, 2013, Discipline Hearing Officer Report, IR # 2523214 |
| **Attachment 20:** | 12/5/2013 Incident Report # 25233351, with attachments |
| **Attachment 21:** | October 15, 2012, Memorandum re: Administrative Maximum Facility (ADX) General Population Referral Procedures |
| **Attachment 22:** | ADX General Population Hearing Administrator's Report for Chesser |
| **Attachment 23:** | ADX General Population Placement Decision |