# Exhibit 7
# Declaration of David Christensen

*Chesser v. Bureau of Prisons*, No. 15-cv-01939-NYW

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 15-cv-01939-NYW

ZACHARY A. CHESSER,

      Plaintiff,

v.

DIRECTOR, BUREAU OF PRISONS,

      Defendant.

---

**DECLARATION OF ASSOCIATE WARDEN DAVID CHRISTENSEN**

---

      I, David Christensen, pursuant to 28 U.S.C. § 1746, and based upon my personal knowledge and information made known to me from official records reasonably relied upon by me in the course of my employment, hereby make the following declaration relating to the above-entitled matter:

      1.      I am employed as an Associate Warden at the United States Department of Justice, Federal Bureau of Prisons (Bureau or BOP) facility known as the United States Penitentiary (USP) in Florence, Colorado.  I have held this position since December 2016.  I have been employed with the Bureau in positions of increasing responsibility since December 1996.  In my more than twenty years of correctional experience, I have served as a Correctional Officer at multiple United States Penitentiaries; as a Drug Treatment Specialist and later as a Community Treatment Oversight Specialist; as an Executive Assistant and Federal Prison Camp Administrator; and presently as an Associate Warden over USP Florence Operations.  In these

1

various roles, I have gained decades of experience across multiple facets of corrections, and within institutions of differing security levels or programming missions.  I understand not only what it takes to work a correctional post among inmates in a housing unit, but I also understand the challenges in supervising and overseeing multiple departments that deliver services or programs to those units.

2.      As an Associate Warden at USP Florence, I oversee the Correctional Services Department, among other departments.  The Correctional Services Department is primarily responsible for maintaining direct supervision of the inmate population as well as overall institutional security.  As part of my official duties, I have access to records maintained in the ordinary course of business by the Bureau, including but not limited to inmate Central Files, inmate property and related forms, Program Statements, institution supplements, and information maintained in the SENTRY[1] database.  All attachments provided herein are true and accurate copies of Bureau records maintained in the ordinary course of business.

3.      USP Florence is part of the Federal Correctional Complex (FCC) in Florence, Colorado.  FCC Florence also consists of a minimum-security Federal Prison Camp (FPC), a medium-security Federal Correctional Institution (FCI), and the United States Penitentiary – Administrative Maximum (ADX).

4.      I have been made aware of the instant lawsuit filed by inmate Zachary Chesser, Register Number 76715-083.  I am further aware that Chesser alleges that his current conditions

---

[1] SENTRY is the Bureau's national database which tracks various data regarding an inmate's confinement, including, but not limited to, an inmate's institutional history, sentencing information, participation in programs, administrative remedies, and discipline history.

of confinement in B/B Unit of USP Florence substantially burden the practice of his Muslim faith in that he is not able to engage in group prayer, studying, and teaching to the scope and extent he claims his faith requires.

5.      It is my understanding that Chesser believes he must engage in at least eight different types of congregate prayer with other Muslims at various hours of the day and night; that he must be outside his cell between 10 and 14 hours a day so that he can study to be a "scholar" and teach other Muslim inmates; and that he seeks various other religious privileges that require access to large numbers of Muslim inmates and many hours of out-of-cell time.  I submit this declaration to explain why, in the correctional judgment of the BOP, affording Chesser the religious privileges that he seeks in this lawsuit would jeopardize institutional security and national security.

**I.      The ADX Step-Down Program uses a careful, incremental approach designed to safely reintegrate Chesser into a fully open-population prison.**

6.      Chesser arrived at ADX Florence on June 12, 2014.  *See* Attachment 1, Inmate History Quarters, at 1.[2]  The ADX is the most secure prison in the federal system, housing less than 0.3% of all Bureau inmates.  It is designed to house inmates who require an uncommon level of security.  The unique security and control procedures implemented to control these inmates are designed to enhance the safety of staff, inmates, and visitors.  The main mission of the ADX is to affect inmate behavior such that inmates who demonstrate non-dangerous behavior and who participate in required programs will progress to another, more open-population Bureau facility.

---

[2] In this document, and throughout Bureau records, the acronym "FLM" denotes ADX Florence. The acronym "FLP" denotes USP Florence.

3

7.      The Step-Down Program is the primary way in which the Bureau achieves this

mission of cycling inmates back to open-population institutions.  As inmates demonstrate their

ability to function in less-restrictive custodial environments, they advance through the Step-

Down Program with the goal of transferring them to a less-restrictive BOP institution.  As is

most relevant to Chesser and this declaration, the final two stages of the ADX Step-Down

Program are physically located in USP Florence.

8.      Chesser was housed in an ADX general-population unit until January 17, 2017,

when he was approved for placement in the ADX Step-Down Program.  *See* Attachment 1 at 1;

*see also* Attachment 2, FLM 5321.07(1)B, *General Population and Step-Down Unit Operations*

(September 1, 2015), at 4-5, § C.1 (describing Intermediate Unit of ADX step-down program).

Inmates in the second step of the ADX Step-Down Program are housed in the Intermediate Unit,

also known as "J/A Unit."

9.      On August 17, 2017, Chesser entered the next phase of the ADX Step-Down

Program.  He was transferred to what is known as the "Transitional Unit.  *See* Attachment 1 at 1.

The Transitional Unit of the Step-Down Program, also known as "B/B Unit Phase I," is

physically located in USP Florence.  *See* Attachment 2 at 5, § C.2. (describing "Transitional Unit

(B/B Unit Phase 1")).

10.     If Chesser successfully completes B/B Unit Phase 1, he will be transferred to the

final phase of the ADX Step-Down Program located in the Pre-Transfer Unit at USP Florence.

This final phase of the Step-Down Program is also known as "B/B Unit Phase 2."  *See id.* at 5-6,

§ C.2. (describing "Pre-Transfer Unit (B/B Unit Phase II")).  Upon successful completion of that

phase of the Step-Down Program, Chesser will be considered for transfer out of the ADX Step-

4

Down Program for designation to a less-restrictive prison. *See id.* at § C.3. (setting forth list of "factors to be eligible for consideration for transfer out of the program to the general population of a high security institution").

11.     There are no existing plans or proposals to designate Chesser back to ADX Florence once he completes the ADX Step-Down Program. The ADX is a programming institution. That means the vast majority of inmates who are designated to the ADX at some point during their incarceration are expected to move through the various phases of the ADX Step-Down Program and to successfully complete the Program. For these inmates, of whom Chesser is one, the ADX is not a permanent assignment, nor is there any expectation that an inmate like Chesser will return to the ADX once he successfully completes the Step-Down Program and moves to another institution.

## II.     Chesser's conditions of confinement in B/B Unit include the opportunity for congregate prayer under conditions that are safe for both inmates and staff.

12.     As a participant in the ADX Step-Down Program in the Transitional Unit (B/B Unit Phase 1), Chesser is ordinarily allowed to be outside his cell a minimum of 30.5 hours per week. *See* Attachment 2 at § C.2.d. The four-week B/B Weekly Activities Schedule is attached at Attachment 3.

13.     Inmates in the Transitional Unit are assigned to one of two groups. Chesser's group is housed on Range # 7, as referenced on the B/B Weekly Activities Schedule.[3] His group is composed of ten individuals, including Chesser. Two other inmates in Chesser's group

---

[3] A "range" is the indoor area outside the inmates' cells.

identify as Muslim.  When Chesser is out of his cell, he is unrestrained and may freely move about the unit.

14.     Chesser does not have a cellmate in the Transitional Unit.  However, he does have contact with other individuals on a daily basis, including the other inmates in his group.  He also has daily contact with FCC Florence staff members.  Various staff members conduct weekly rounds so that all inmate concerns may be heard; correctional officers perform regular rounds during all three shifts; Chesser's unit team is available to him every day, either in person or by writing an Inmate Request to Staff (a "copout").  Inmates in the Transitional Unit also receive regular visits from medical staff, education staff, religious services staff, and psychology staff when they perform their rounds, and upon request if needed.

15.     Chesser can recreate both indoors and outside with those inmates in his group.  *See* Attachment 2 at § C.2.d.

16.     FCC Florence correctional professionals, including myself, have evaluated the unique situation of inmates in B/B Unit.  Those inmates have successfully programmed to the point where they have reached the final phases of the ADX Step-Down Program.  The officials have determined that this group of inmates, which includes Chesser, can be allowed to demonstrate that they can safely engage in group prayer without jeopardizing institutional security.  Chesser is allowed to pray with other inmates in his group during the times he is scheduled for indoor activities and for outside recreation.

17.     When B/B Unit inmates are scheduled for indoor activities, they can pray together in a specially designated room located on the housing range.  *See* August 22, 2017, Memorandum re: Religious Activities Procedures Bravo-Bravo, Attachment 4 at ¶ A.  The room

6

designated for group prayer has a large Plexiglass window that allows inmates to be carefully observed by correctional staff.  Correctional officials have determined that, when group prayer is conducted, "*[t]here will be no mixing of ranges or security levels/phases, due to separation and security concerns*."  *Id.* at ¶ C (emphasis in original).  Chesser uses this room to pray with other Muslim inmates.[4]

18.     When B/B Unit inmates are scheduled for outdoor recreation, they can pray together on the outdoor recreation yard.  Correctional staff monitor inmates at outside recreation to ensure they behave appropriately and refrain from assaults, fights, or other infractions.  Chesser also takes advantages of this opportunity to pray with other Muslim inmates.  Depending on the schedule for the five daily Muslim prayers, inmates on the outside recreation yard may be able to perform up to three of the five daily Muslim prayers during their outdoor recreation period.

19.     Chesser's opportunities for group prayer in B/B Unit are the most that can be allowed without compromising institutional security and the effective operation of the ADX Step-Down Program.  These protocols for group prayer protect both inmates and staff in a housing unit where ADX inmates are re-learning how to safely conduct themselves in an open-population environment.

20.     The secure, predictable, visible location for indoor group prayer in B/B Unit allows Chesser and other inmates to be closely observed by correctional staff.  Inmates who

---

[4] Given the relatively small number of inmates currently assigned to B/B Unit Phase 1, inmates who wish to pray together typically have access to the room during their entire indoor recreation period.  Since the room was designated for group religious activities on August 22, 2017, only Muslim inmates have used the room for such activities.

know that the room is designated for religious activities are less likely to attempt to interfere with those activities and, thus, less likely to offend the participants and trigger a violent encounter. Segregating Chesser and his fellow congregants in a designated room also protects them as they engage in religious practices that require their complete attention and that may place them in a physically vulnerable position (include kneeling and prostrations).  In those circumstances, Chesser and others are more susceptible to assault from other B/B Unit inmates, but placing them in a special room reduces that risk.

21.     The designated prayer room also promotes the BOP's compelling interest in preventing conduct that could compromise national security.  Chesser admits that he is a radical jihadist.  Limiting group prayer to a defined location helps the BOP monitor Chesser to ensure that he does not use group prayer times as a means to spread his dangerous jihadist views, which are calculated to incite violence and are likely to create dangers both in the institution and outside the prison.

22.     The designated prayer room also protects correctional staff.  If staff must respond to an assault or fight involving inmates who are at prayer, it is safer for staff to respond to a single, separated, and isolated room rather than an entire range of cells.  If inmates were praying on the housing range, and a fight or assault were to break out, the assailants could very easily retrieve weapons or other contraband from their open cells to bring to the fight.  In the designated group prayer room in B/B Unit, however, there are fewer spaces for inmates— whether congregants or would-be assailants—to hide and retrieve weapons.  Security problems could quickly arise if inmates were allowed to group together for prayer on the housing range.

Inmates could more easily band together to prevent correctional or medical staff from accessing the housing unit.

23.     Group prayer can be accommodated in the outdoor recreation area in B/B Unit because it is under constant monitoring by staff.  In addition, group prayer is feasible on the B/B Unit recreation yard because of the relatively small numbers of inmates who are on the outdoor recreation yard at one time.[5]  To date, there have been no incidents of assaults, disruption, or fights as a result of Chesser and other inmates engaging in group prayer during outdoor recreation.  So long as prayer on the B/B Unit outside recreation yard does not compromise the safety and security of the inmates, staff, and the institution, Chesser and other inmates will continue to be able to pray together during outside recreation.

24.     There are no other locations in B/B Unit where group prayer can be conducted without compromising security.  Critically, there is nowhere else where group prayer can be effectively monitored by staff.  If prayer occurs at random locations on the housing range, staff cannot identify in advance when prayer is occurring.  The security protections that are associated with confining prayer to a secure, visible location are lost.  *See* paragraphs 21 and 22, above.  For the same reasons, multiple inmates are not allowed to congregate in a cell to pray during their indoor recreation period.  When B/B Unit inmates are together, correctional staff must be able to maintain full visual contact with those inmates.[6]

---

[5] Different considerations might counsel against allowing group prayer on a recreation yard in an large open-population institution.

[6] I am aware that Chesser complains that his prayer time is reduced because he must complete other tasks during his indoor recreation time and that his opportunity for prayer during outdoor recreation is limited when there are lockdowns at USP Florence.  *See* Attachment 2 at 7 (authorizing institution staff to cancel B/B Unit outside recreation during an institutional emergency, which includes lockdowns).  These are issues every inmate in a general-population

**III.     The BOP's security interests require that Chesser complete the ADX Step-Down Program and comply with all B/B Unit security protocols and restrictions.**

25.     In my role as Associate Warden, I am aware that Chesser was referred to the ADX because he disrupted the safety and security of the open-population Communications Management Unit (CMU) in Marion, Illinois.  He set himself up as an inmate leader, ignoring prison policies and regulations and inciting other inmates to do so; he attempted to undermine the authority of prison staff; and he assaulted another inmate over a dispute about group prayer. I am also aware that Chesser is a convicted terrorist and committed jihadist who continues to advocate for physical violence against non-Muslims, including non-Muslim people outside the prison.  I am aware that he has expressed a deep-seated hatred for the United States and the citizens of this country.

26.     These facts inform the BOP's judgment about how to manage Chesser.  A committed jihadist who attacks another inmate, who tries to tell prison staff which inmates should remain at the institution and which inmates should go, and who thinks he can make the rules about how inmates group together is a dangerous inmate.

27.     The BOP has a compelling security interest in preventing Chesser from engaging in the type of conduct he exhibited at CMU Marion, which jeopardized the safety and security of inmates, staff, and the public.  The BOP also has a compelling interest in preventing Chesser from causing further harm to national security by preventing him from inciting other inmates and

---

prison must face.  Chesser needs to learn to comply with institution schedules and accept that lockdowns are common occurrences in open-population institutions.  USP Florence correctional staff have decided not to exempt inmates in B/B Unit from lockdowns because of concern that such an exemption would cause resentment and unrest among USP Florence inmates, who are subject to fewer security controls than ADX inmates.

persons outside the prison to carry out terrorist attacks against the United States.  These compelling security interests are advanced by requiring Chesser to complete all phases of the ADX Step-Down Program and to comply with all rules and restrictions associated with each phase of that program.

> **A.** **Protecting institutional security requires that Chesser complete the ADX Step-Down Program as designed.**

28.     The ADX Step-Down Program is a carefully designed program.  The current limits on Chesser's out-of-cell time in the Transitional Unit reflect a deliberate choice by correctional officials.  Until very recently, Chesser was single-celled and had no unrestrained physical contact at all with other inmates and staff.  A key correctional goal of the ADX Step-Down Program is to help an inmate like Chesser successfully reintegrate into an open-population environment.  That reintegration process is taken in incremental steps, slowly increasing the amount of out-of-cell time.  By employing a step-by-step approach, the Step-Down Program helps to ensure inmates are ready to handle fewer restrictions without compromising the safety and security of inmates and staff.

29.     The approach of incrementally adding additional freedoms has been shown to be extremely effective.  Inmates who complete the Step-Down Program routinely demonstrate that they can be safely housed in less-restrictive institutions.  Since the Step-Down Program began, less than three percent of the inmates who complete the Program are returned to the ADX.  At this time, the ADX Step-Down Program is the BOP's best means to ensure that the unusually dangerous population of ADX inmates, including Chesser, can learn to comply with prison rules and safely transition to open-population prisons.

30.     The Step-Down Program's measured period of adjustment and careful reintroduction of unrestrained physical contact is crucial in Chesser's case.  Chesser has shown that he has difficulty interacting with other inmates and staff in a positive way.  He has a history of physically attacking another inmate who disagreed with him and of attempting to displace the authority of prison staff.  By limiting Chesser's out-of-cell time, the Transitional phase gives him an opportunity to learn how to handle conflicts with other inmates without resorting to violence and to establish respectful relationships with prison staff.  Chesser has never had these skills, and he cannot develop them overnight.  A slower transition, with steadily increasing exposure to inmates and staff, also gives staff a better opportunity to assess Chesser's progress and to identify and address concerning behaviors as soon as they arise.

31.     I am aware that Chesser claims that he must be out of his cell ten to fourteen hours a day so that he can engage in all manner of group prayers, as well as studying Islam and teaching other Muslim inmates.  Allowing Chesser to be outside his cell up to fourteen hours a day so that he can participate in these religious activities will thwart these correctional goals and potentially re-trigger his behaviors that compromised safety and security at CMU Marion.  Safety and security will be jeopardized if Chesser is pulled out of the existing Step-Down Program, or if the Program is somehow reconfigured to accommodate the extensive religious privileges he seeks.  The opportunities that Chesser now has to pray in congregation—for multiple hours every week during his indoor and outdoor recreation periods—protect institutional security by carefully reintroducing Chesser to group activities in an open-population setting.  Affording Chesser more such opportunities right now, before it is clear that he can

safely function in a completely open-population environment, poses unacceptable risks to institutional security and compromises the integrity of the ADX Step-Down Program.

32.     Moreover, exempting Chesser from the Step-Down Program would trigger serious security problems with other inmates in the Step-Down Program.  Fairness toward all inmates, as well as the appearance of fairness to all, are paramount correctional objectives.  Staff must hold all inmates to the same standards and expectations; if one inmate or group of inmates actually has a benefit that others do not, or even if other inmates merely perceive that a particular group has a unique benefit, the prison can quickly become unruly, dangerous, and even riotous.  If inmates perceive that Chesser is streamlined through or given priority of place in the ADX Step-Down Program, that obvious disparity in treatment would cause jealousy and dissension in the unit.  The unit cannot be managed if one inmate is treated in a manner that is so obviously preferable to the rest of the inmate population.

33.     I am aware that Chesser also claims that his religious beliefs require that he have access to more Muslim inmates than are currently housed on his range in B/B Unit.  He makes various proposals to achieve that goal, all of which would require the dismantling of the current ADX Step-Down Program.

34.     The first of these proposals is that Chesser be removed from B/B Unit altogether. As I have explained, the BOP has a compelling security interest in requiring him to complete the ADX Step-Down Program.  Chesser requires the security controls in B/B Unit at this time, and he needs to prove that he can function in a less-restrictive environment.  He will not have met that requirement until he successfully completes the ADX Step-Down Program.

35.     I am informed that Chesser also suggests combining the final two phases of the ADX Step-Down Program and moving those phases to the ADX; placing more Muslim inmates in the Transitional Unit; allowing different ranges within B/B Unit to pray together; and permitting Muslim inmates in B/B Unit out of their cells at the times established for the five daily prayers, even if the inmates are not scheduled to be out of their cells at that time.  Each of these alternatives would compromise the BOP's compelling security interests.

36.     First, Chesser's proposal to combine the final two phases of the Step-Down Program presents insurmountable logistical difficulties and would compromise security.  In the first place, all units in the ADX are currently in use; there is simply no room for B/B Unit inmates.  Moreover, the inmates who are currently housed at the ADX have been found to require the security controls of that institution.  Forcing the BOP to transfer ADX inmates to other facilities would compromise the security of other institutions and the inmates themselves, and finding a suitable alternative institution for ADX inmates would present tremendous difficulties.

37.     Second, it is impossible for the BOP to move more Muslim inmates into the Transitional Unit without compromising institutional security.  Increasing the inmate population of either the Transitional or Pre-Transfer phase of B/B Unit would significantly harm the core mission of the final two phases of the ADX Step-Down Program.  Both units were designed for the purpose of housing a relatively small number of inmates, and that deliberate design has many security benefits.  The small inmate population allows staff to closely monitor those inmates and to carefully track their progress as they make the transition from confinement in restrictive housing to living in a more open-population setting.  That transition can be difficult, and even

with the small number of inmates in B/B Unit and close monitoring by staff, violence has

erupted.

38.      Serious inmate-on-inmate assaults have occurred in B/B Unit.  Several inmates

required hospitalization.  Staff have been injured on multiple occasions and some have been

threatened with death.  In June 2014, a D/B Unit inmate used a sharpened weapon to seriously

assault another inmate.  The assailant followed the victim around the Unit to continue the assault,

waving the weapon at staff when they attempted to stop the assault.  The victim was seriously

injured and taken to an outside hospital.  Another serious fight between two inmates occurred in

November 2014.  When staff attempted to break up the fight, one of the inmates threatened to

kill a responding staff member.  That fight was reportedly triggered by one inmate perceiving

that the other was overusing a communal amenity (the computer) in the Unit.  In December

2014, a B/B Unit inmate seriously assaulted two staff members, both of whom required treatment

by medical providers outside the prison.  In December 2016, a B/B Unit inmate assaulted another

inmate, rendering his victim unconscious for a period of time.  The assailant was found to be in

possession of a seven-inch homemade weapon.[7]  Limiting the number of inmates in B/B Unit

reduces the risk of violent attacks on staff and inmates in this volatile environment, where the

extremely dangerous ADX inmate population is taking its first steps in an open-population

setting.

39.      Third, Chesser's proposal to allow different ranges or inmate groups in B/B Unit

to co-mingle during group prayer, or to collapse all ranges and both phases into one large group,

---

[7] I am informed that Chesser claims that Muslims inmates are immune from group conflicts.
This is not my experience as a correctional professional.  The victim of the assault in D/B Unit in
June 2014 was a Muslim inmate.

15

would undermine the important correctional justifications for separating the Transitional and Pre-Transfer Units.  The inmate population of each phase is carefully selected.  Correctional staff evaluate detailed histories of each inmate to ensure that there are no reasons to suspect that the inmates assigned to a particular unit will behave violently towards each other.  However, correctional staff sometimes conclude that there are inmates in the Transitional Unit who cannot be housed with inmates in the Pre-Transfer Unit for reasons of security, including separations based on information learned from threat assessments conducted by BOP intelligence personnel.

40.     Motivating the inmate population is another important reason for the separation of the Transitional and Pre-Transfer Units.  Inmates in the Transitional Unit must spend time in that unit to show that they are capable of safely functioning with fewer controls.  They must earn the privilege of transitioning to the Pre-Transfer phase, where they will have more out-of-cell time and learn to live with a cellmate.  The Bureau has a security interest in ensuring that inmates earn these increased privileges by programming appropriately rather than by jumping the line, as Chesser wants to do.

41.     Fourth, with regard to Chesser's proposal to open up the cells of all Muslim inmates in B/B Unit for the five daily prayers, even when the inmates are not scheduled to be out of their cells, that would thwart the correctional purposes behind limiting inmates' out-of-cell time in both the Transitional and Pre-Transfer Units.  Inmates in the final phases of the ADX Step-Down Program are not allow to freely roam their housing units at times of their choosing. They are subject to an incremental program in which additional freedoms are slowly earned and added, and there are sound correctional reasons for those limitations.  Chesser has demonstrated

that he requires those security controls and limitations to prevent him from disrupting the secure and orderly operation of the housing unit.

42.     I am also aware that Chesser has proposed scenarios for housing him exclusively with Muslim inmates.  These proposals would require broad changes in BOP operations that extend far beyond alterations to the ADX Step-Down Program.  Chesser proposes creating a "terrorism unit" and developing a "terrorism system," in which terrorists would be placed in their own special housing units, separate from other inmates; would be given access to special religious privileges and programming opportunities; and, in general, would be subject to fewer restrictions on their interactions with each other than almost any other inmates in the Bureau.

43.     These proposals, like the ones for reinventing the ADX Step-Down Program, are both impossible to implement and contrary to sound correctional judgment.  The BOP cannot make decisions about where and under what conditions inmates will be housed based on their religion.  Neither can it set up a housing structure in which inmates of one religious group gain privileges that are not available to any other group, including the coveted privileges of selecting the inmates with whom they will live and having more out-of-cell time than almost any other BOP inmates.  The BOP cannot consider an inmate's religion in making decisions about his advancement through the ADX Step-Down Program, nor can it allow inmates to avoid the carefully constructed incremental steps of the Step-Down Program for religious reasons.

44.     As I discussed above, fairness and the appearance of fair and evenhanded treatment toward all inmates are paramount correctional objectives.  If inmates perceive that Muslim inmates are streamlined through or given priority of place in the ADX Step-Down Program, or that special housing conditions (e.g., prisons, units, or "systems" of confinement)

are available only to Muslims, that obvious disparity in treatment would create an untenable security situation in B/B Unit and, possibly, in institutions throughout the Bureau.

45.     I am informed that Chesser seeks other group religious activities that, if allowed, would pose a serious threat to institutional security in B/B Unit.  To ensure that Chesser is ready to progress to an open-population environment, Chesser needs to complete the Step-Down Program, with the limits on out-of-cell time and constraints on his activities that entails.  Giving in to his requests for opportunities for specialized study with Islamic "scholars" and his demands for near-constant interactions with other Muslim inmates (including opportunities for "feasts," "celebrations" for "holidays, weddings and childbirth," and attending and giving "lectures") sets up an obvious disparity between himself and other inmates.  That disparity would trigger serious institutional security problems and create chaos in the competitive, jealous prison environment. Further, these activities—which could not be effectively monitored—would give Chesser additional opportunities to promote jihadism and incite violence among the inmate population.

46.     Institutional security and national security require that Chesser complete the ADX Step-Down Program as it is constructed and that his interactions with other inmates be monitored and regulated in accordance with the rules of that Program.

**B.      Protecting national security requires that Chesser complete the ADX Step-Down program, which minimizes his opportunities to encourage acts of violence against non-Muslims.**

47.     I am aware that Chesser is a committed jihadist who advocates violence against non-Muslims.  He has acknowledged that he continues to adhere to the jihadist ideology that motivated his crimes of conviction and his disruptive and dangerous conduct at CMU Marion. The BOP has a compelling interest in protecting national security by preventing Chesser from

radicalizing inmates who may be inspired by him to carry out acts of terrorism upon their release, or to incite their contacts outside the prison to commit terrorist acts.

48.     The BOP's requirement that Chesser complete the ADX Step-Down Program promotes the BOP's compelling interest in protecting national security.  The protocols and restrictions in B/B Unit minimize Chesser's opportunities to incite and radicalize other inmates. Those controls include monitoring group prayer and limiting and carefully controlling Chesser's time outside his cell.

49.     I am aware that Chesser claims that he must "teach" other Muslim inmates as much as ten hours every day, and that he needs to teach as many Muslims as he can.  Allowing Chesser to function in the role of teacher and mentor to other inmates would compromise the security of the institution and threaten security outside the prison.

50.     It is imperative that Chesser not be allowed to gain power and authority over other inmates by serving as an inmate leader, including as their "teacher."  It is a fundamental principle of sound correctional management that no inmate is allowed to exercise authority over or provide directions to any other inmate, and it is particularly important for the BOP to abide by that rule in Chesser's case and prohibit him from "teaching" other inmates while he is in the Step-Down Program.  The BOP has a compelling security interest in preventing a confirmed jihadist who promotes violence toward non-Muslims to serve in a mentorship role to other inmates.  The fact that Chesser can talk with other inmates in B/B Unit naturally carries some risk that he will convey information that might harm national or institutional security interests.  However, according Chesser the status of a teacher-scholar gives added authority to his opinions.  To protect the safety and security of the institution, the BOP cannot hand him that authoritative role.

51.     It would also be contrary to the BOP's compelling security interests for the BOP to provide Chesser with own set of Islamic "scholars" to instruct him.  That unique means of studying is not offered to any other inmate in the ADX Step-Down Program (or to any other BOP inmate, to my knowledge).  As I have discussed throughout this declaration, an accommodation that is so obviously at odds with those provided to the rest of the inmate population risks inmate unrest that jeopardizes the safety and security of the institution.

52.     I am aware that Chesser claims the BOP can allow him to study in other ways: through online-based universities, phone calls to various scholars outside prison, or Skype or other virtual connections to scholars. As an initial matter, I am not aware that Chesser has exhausted any of these requests through the Bureau's Administrative Remedy Program, which he must do prior to filing a lawsuit about them. Even if he had, none of these remote-learning schemes would be safe or secure in a correctional environment.

53.     As to online-based or Skype options, Bureau inmates are not permitted to possess a laptop under any circumstances. The concern is that the inmate could easily connect to the outside world via the internet or communications platforms to further criminal aims.[8] Even in those uncommon scenarios where inmates are given access to a legal discovery laptop, the machine is not kept in the inmate's cell but rather in a controlled environment (like an Education Department room, for example). Further, such laptops are for one use only: discovery review in a pending criminal case. When those machines have been provided, they are scrubbed of internet capabilities and are read-only machines; they cannot generate new files or change old ones. The machine can only view data.

_____

[8] This concern is especially relevant to Chesser, given his offense conduct.

54.     What Chesser proposes is a world beyond these read-only machines. He wants to access the internet or communicate in real time with outside scholars. No inmate, especially Chesser, is permitted to have unmonitored communications with outside parties, unless they are engaging in attorney-client privileged communications. Allowing Chesser to do so would jeopardize institutional security by letting him engage in the same sort of conduct that so greatly disrupted CMU Marion.

55.     These rationales apply equally to Chesser's proposal of listening in on lectures or calling specific scholars over the phone. It would allow him to engage in unmonitored communications with outsiders to the possible detriment of institutional security and his progression through the Step-Down Program.

56.     Chesser's requests would also be contrary to the BOP's important interest in protecting national security.  National security is put at risk if a confirmed jihadist who advocates violence toward non-Muslim is given the means to study to the level at which he can issue "fatwas," or religious rulings, to others, as Chesser has indicated he wants to do.  The BOP cannot let an overt jihadist attain that level of authority and control over other inmates. Chesser's jihadi aims for his "studies" are made clear by his suggestion that he be allowed to study with convicted terrorists who are housed in the ADX Special Security Unit under Special Administrative Measures.  In the first place, Chesser has not been approved by the FBI to communicate with those inmates.  But even if such an arrangement were feasible, it would be contrary to sound correctional judgment to allow Chesser to receive guidance and instruction from terrorists who, like him, adhere to a radical ideology that motivated them to carry out terrorist attacks against the United States.

21

57.     Chesser has made clear that he is a radical jihadist who advocates violence toward non-Muslims.  The BOP has a compelling security interest in preventing interactions that would further incite Chesser himself, especially communications that would give him additional opportunities (as a formal mentor) to incite other inmates.  Chesser may become further radicalized on his own, but the BOP must decline to create situations that would give him an approved means to radicalize other inmates and to receive personal instruction from convicted terrorists who will confirm and bolster his radical agenda.  Rather than seeking to teach other inmates and to study with convicted terrorists, Chesser can work with his Unit Team to request the opportunity to take correspondence courses.  Since his arrival in B/B Unit, he has not made such a request.

58.     Until Chesser successfully completes the ADX Step-Down Program and proves that he can interact with other inmates without advocating violence against non-Muslims, the restrictions in B/B Unit are the least-restrictive measures that can be applied without compromising security.  These restrictions are the BOP's only tools to prevent Chesser from leaving behind him a trail of inmates who will be incited and inspired by Chesser's militant jihadism to attack other inmates, prison staff, and the United States and its citizens—whether personally or through their contacts outside the prison.

Pursuant to the provisions of 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my information, knowledge, and belief.

Executed this 28th day of February 2018, in Florence, Colorado.


_s/ David Christensen_
David Christensen
Associate Warden
USP Florence, Colorado


**Attachment 1:** February 8, 2018, Inmate History Quarters

**Attachment 2:** FLM 5321.07(1)(B), General Population and Step-Down Unit Operations (September 1, 2015)

**Attachment 3:** B/B Weekly Activities Schedule

**Attachment 4:** August 22, 2017, Memorandum re: Religious Activities Procedures Bravo-Bravo