# Exhibit 8
# Declaration of John Oliver

*Chesser v. Bureau of Prisons*, No. 15-cv-01939-NYW

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 15-cv-01939-NYW

ZACHARY A. CHESSER,

    Plaintiff,

v.

DIRECTOR, BUREAU OF PRISONS,

    Defendant.

---

**DECLARATION OF JOHN OLIVER**

---

    I, John Oliver, pursuant to 28 U.S.C. § 1746, and based upon my personal knowledge and information made known to me in my role as a specially retained expert in this case, hereby make the following declaration relating to the above-entitled matter:

    1.    Counsel for the Federal Bureau of Prisons ("Bureau" or "BOP") has retained me as an expert in the field of correctional security and correctional management. I have 27 years of experience in the field of correctional management, including 23 years of experience in facilities operated by the BOP. Among many positions with the BOP, I served as the Complex Warden of the Federal Correctional Complex in Florence, Colorado, which includes the United States Penitentiary – Administrative Maximum ("ADX") and the United States Penitentiary ("USP Florence"). Over the course of my career, I have managed institutions housing over 1500 inmates and complexes with over 7000 inmates. These institutions include prisons of all security levels, from low-security prison camps to the maximum-security ADX. A copy of my Curriculum Vitae is attached as Attachment 1 to this declaration.

1

2.      I have evaluated the demands for religious privileges that Plaintiff Zachary Chesser makes in this lawsuit. I address in this declaration the inherent dangers of the ADX, including, specifically, the dangers associated with creating the perception that Plaintiff is receiving accommodations that are so preferential as to be out of proportion to those provided to all other ADX inmates. I also discuss the careful construction of the ADX Step-Down Program, with its system of incrementally increasing privileges, and why it is essential that Plaintiff complete that Program.

**A.     The ADX, including its step-down units, is a unique and extremely dangerous environment in which correctional officers and inmates face substantial risks.**

3.      The correctional environment is a unique setting in which safety and security are maintained only by constant care and attention to a delicate balance of competing interests and priorities. Inmates are constantly observing staff and inmate interactions throughout the facility, looking for inmates who may be receiving special treatment through additional food, medication, recreation, or other incentives. Among other things, the perception of preferential treatment may suggest that an inmate is informing staff of other inmate activities, or has otherwise obtained some unfair advantage in the system. If an inmate (or group of inmates) is receiving what is perceived as something "special" or "additional," this creates unrest—regardless of the reason—posing a danger to both staff and other inmates.

4.      A small group of extremely violent and influential inmates can have a disproportionately negative impact on the safe and orderly operation of an institution. The mission of the ADX addresses this concern, as it is specially designed to safely house the BOP's most violent, predatory, disruptive, and escape-prone inmates in an environment providing each inmate an opportunity to demonstrate improved behavior and the ability (and motivation) to

reintegrate into an open-population correctional institution. The formidable challenges associated with maintaining safety and security in the ADX are addressed through the physical configuration of the prison, which is designed to reduce physical contact among inmates and between inmates and staff. Inmates in the ADX general-population units are single-celled and do not have cellmates until the Pre-Transfer phase of the ADX Step-Down Program. Risks inherent in confining this population are also addressed through extremely cautious management of inmates on a day-to-day basis. These controls are essential for safely confining an inmate population that presents a serious, ongoing threat to the institution, other inmates, and correctional staff.

5. The ADX is unique in the federal system, and special knowledge and understanding of the inmates housed at the ADX is required to safely and securely manage the inmate population. The security needs of ADX inmates and staff require very restrictive procedures for movement of the inmates, interaction with staff and other inmates, recreation, visitation, and programming. While a significant focus of the institution is on finding ways to provide life-enhancing programming opportunities for inmates housed at the ADX, the paramount consideration must always be the safety of staff and inmates and the protection of the public. Staff and inmate safety, as well as the protection of the public, can never be sacrificed for the sake of the delivery of a program or service. Over the years, the BOP and ADX staff have developed and refined policies and procedures striking an effective balance between programming needs on the one hand, and security concerns on the other. This balance has resulted in many inmates effectively programming out of the ADX to lower-security environments.

6. The ADX operates four distinct programs: the General Population and ADX Step-Down Unit program; the Control Unit Program; the Special Security Unit (SSU) Program; and the High Security Adult Alternative Housing Program. Unless an inmate is referred for placement to the Control Unit or has Special Administrative Measures, or "SAMs," the inmate will ordinarily be placed into the General Population and Step-Down Program. As an inmate in this Program demonstrates periods of clear conduct and positive institution adjustment, it is possible for the inmate to progress from the general-population units, through the Intermediate, Transitional, and Pre-Transfer units, with increasing degrees of personal freedom and privileges at each stage, and to be transferred out of the Program to an open-population institution. An inmate's eligibility for advancement in the Program is reviewed, at a minimum, every six months. His continued placement is then closely scrutinized on a regular basis to ensure only those inmates who require the security and controls of the institution are housed at the ADX.

7. While most inmates "work" their way to the ADX through progressive acts of predatory violence and/or extremely disruptive behavior, demonstrating they cannot function in a less-secure institution without posing a risk to the safety and security of the institution staff, inmates, and the public, a small percentage (5%) of inmates are designated directly to the ADX following sentencing. For these inmates, common threads include long sentences (including life sentences), vast community and financial resources allowing for extreme escape risk potential, a particularly brutal or highly publicized crime, and/or being the head of or a highly influential member of an organized crime association, gang, or terrorist group.

8. For these reasons, designation to the ADX is of no small significance. As of September 18, 2017, the population of the ADX was 429 inmates. The most common reason for

placement at the ADX is for assaulting other inmates (26%). Murdering or attempting to murder fellow inmates is the second largest reason (24%). Fourteen percent of inmates were designated to the ADX for assaulting staff. Three percent are housed at the ADX for murdering or attempting to murder staff. In addition, the ADX accepts a small number of particularly dangerous or violent inmates from state correctional agencies when states believe that their own facilities are insufficient to address the risks that a particular inmate poses.

9. Almost every inmate housed at the ADX (99.1%) has committed or been involved in some form of violence, be it in the community before incarceration or while in prison. Four hundred and ten inmates (95.6%) of the current population were involved in violent altercations prior to incarceration or in between periods of incarceration. Three hundred and ninety (91.1%) were involved in violence while incarcerated. Two hundred and thirty-eight (55.5%) assaulted staff at some point during their incarceration. Of that 238, 118 committed the assault on staff with a weapon. One hundred and fifty-four (36%) were involved in one or more murders while incarcerated. Finally, 270 (63%) assaulted other inmates during their incarceration.

10. As these numbers indicate, the inmates housed at the ADX are the most potentially violent within an institution to staff, other inmates, and visitors, and may also be extreme escape risks. These inmates can, through a variety of ingenious methods, still perpetrate assaults, attempt escapes, and otherwise disrupt institutional operations even under the most stringently monitored circumstances.

11. For this reason, the risks associated with this uniquely violent, predatory, and dangerous inmate population are not eliminated simply by placement at the ADX. Correctional personnel who enter the institution put their lives on the line every day. They are physically

exposed to inmates when they perform tasks like delivering meals, escorting inmates to recreation, and engaging in other daily contacts while performing their duties. In completing these tasks, and despite the care that is taken, ADX correctional officers may still be physically assaulted by inmates, as the below examples demonstrate. Officers are also assaulted with thrown feces, urine, and other substances. Staff who are exposed to human excrement are at significant risk of becoming ill. Recently, one ADX staff member who was hit in the face with feces suffered a compromised immune system and developed a severe case of shingles.

12. Even more serious assaults are not uncommon at the ADX. Inmates can defeat restraints or engage in aggressive and dangerous conduct even when they are restrained. Inmate-on-inmate assaults are a serious security risk in the ADX step-down units, despite the fact that inmates are only designated to these units after demonstrating clear conduct and positive adjustment to the ADX. It is in the Step-Down Program that inmates prepare to move from the more restrictive environment of the ADX to a more open-population setting, and in these units inmates are allowed to have physical contact (often for the first time) with other inmates without a wall, fence, or restraints separating them. These are examples of the dangers of physical contact between ADX inmates in the ADX step-down units:

- On November 15, 2011, two inmates stabbed a fellow inmate in an attempt to kill him while they were inside the indoor recreation area. The victim was stabbed at least 66 times and hospitalized with life-threatening injuries. After several weeks in the hospital, the inmate eventually recovered. This case was prosecuted and both inmate attackers pleaded guilty. (*United States v. McMillan and Wilson*, Case No. 13-cr-00475-RM (D. Colo.)).

- On April 4, 2013, an inmate began striking another inmate with a six-inch plastic weapon, causing facial lacerations. This case, while not criminally prosecuted, was the subject of civil litigation. (*Dunbar v. United States, et al.*, Case No. 14-cv-01838-MJW (D. Colo.)).

6

- On November 2, 2016, one inmate struck another in the head with a weapon. A second inmate then joined in the assault. The inmate victim suffered a deep laceration to his face and forehead. The case is currently being prosecuted against one of the inmate attackers. (*United States v. Cole*, Case No. 17-cr-00171-RM (D. Colo.)).

13. As these serious incidents show, the more physical contact an ADX inmate has with staff and other inmates, the more likely it is that an assault can occur. Prison management is risk management in trying to prevent assaults from occurring or, once they occur, de-escalating them as quickly and efficiently as possible.

## B.   The amount of out-of-cell time in the Step-Down Units is carefully calibrated to reintegrate Chesser into an open-population environment.

14. A critical, ongoing challenge for correctional officials is the need to defuse the ever-present dangers associated with the unique mission of the ADX. The BOP has an obligation to protect inmates, staff, and members of the public from the serious risks engendered by the highly dangerous ADX inmate population. It must attempt to address and eliminate actual threats, but the more difficult task is to identify and mitigate *potential* threats to the safe, secure, and orderly running of the ADX. It is these possible, but unknown and uncertain risks that are most difficult to plan for and control. It is therefore imperative that ADX officials make predictive judgments about what *may* occur and how those eventualities may compromise the safety and security of staff, inmates, and the public. Sound correctional judgment requires that ADX correctional officials constantly attempt to proactively predict inmate behavior and plan for worst-case scenarios. Mistakes can result in serious harm to, and possibly the death of, both staff and inmates.

15. This is the context in which ADX officials have allowed access to group activities, including group prayer, in B/B Unit. ADX officials have implemented a religious

accommodation that accounts for critical safety and security needs, while also taking into consideration that the inmates who have progressed to the final phases of the ADX Step-Down Program have demonstrated an ability to safely engage in some positive interactions with staff and a small number of other inmates.  Lines like these are extremely difficult to draw.  The BOP has a compelling security interest in maintaining this line.  To a lay person, a slight alteration of this line would seem to be an easy thing to do; it is not.  Moving the line even slightly to accommodate additional group prayer opportunities for Plaintiff would create an unacceptable risk to the safety and security of the volatile ADX environment.

16. Plaintiff indicates that he would need to engage in group religious activities for ten to fourteen hours on the average day. This is not feasible in both the Transitional and Pre-Transfer phases for several reasons.

17. The schedule for B/B Unit for the four ranges (two ranges each of Pre-Transfer- and Transitional-phase inmates) has been carefully constructed to ensure that every single inmate receives nearly identical access to every type of programming authorized for inmates in that phase.  This means that each inmate in the Transitional phase receives the same amount of outdoor recreation, indoor activities, commissary time, and breakfast time.  These times have been deliberately calibrated to ensure that ADX inmates who have not previously had this level of out-of-cell time can adjust successfully to an open-population environment.

18. These activities—along with the necessary allocation of time for medical appointments and lock-downs—completely fills the B/B Unit schedule.  Activities are literally taking place in B/B Unit from 6:30 a.m. to 8:55 p.m., seven days a week, except during prescribed lockdown periods or during times when correctional officers are delivering lunch and

dinner to the inmates in their assigned cells. Not every inmate is out of his cell during all of those times, but one of the four ranges of inmates is out during almost all of those hours. Altering this carefully constructed schedule in any way, resulting in one group of inmates receiving less time (no matter how seemingly insignificant) than another group, would create a major security problem in the unit.

19. The safety and security of a housing unit depends on inmates being treated fairly and equally by prison staff. Perceived differences in treatment among inmates, even if unfounded or exaggerated, can create serious security problems. For example, while I was assigned as a shift supervisor at USP Florence in 1997, the Muslim inmates had exhausted their allotted time in the chapel and a group of Christian inmates were waiting to occupy the space for their scheduled activity. The Muslim inmates had not finished their activity and the Chaplain's Assistant allowed them to continue an additional ten minutes. This additional ten minutes in the chapel very nearly created a significant disturbance that, although religious in origin, had the potential to quickly expand to include religion, race, and other group-identity conflicts throughout the institution.

20. To put this security principle in context here, removing Plaintiff and another inmate from their cells for group religious activities (1) during the times currently allocated to other inmates for their activities, or (2) during times when no other inmates are permitted to be on the range (such as before 6:30 a.m. or after 9 p.m.) would create an uproar in the unit from inmates who will view Plaintiff as obtaining a benefit they do not enjoy. Plaintiff—as well as the other inmates of his faith group—would be at risk of retribution from these inmates, as would correctional staff. A slight inequality in out-of-cell time may seem to be a minor thing to persons

who are not in prison, but an inmate's perspective is different. His freedom and his privileges are very limited; he engages in a constant comparison of his himself with the inmates with whom he is forced to live, whom he may dislike, and whom he probably fears. When an inmate believes he is being subjected to unfair or unequal treatment, that closed environment can quickly turn toxic. When inmates feel they are not getting what they deserve or feel like they are being mistreated or disrespected in comparison with other inmates, they will lash out. There is a notable example of this in B/B Unit. In 2015, an inmate assaulted an officer in B/B Unit whom he believed treated him in a disrespectful manner. The officer received outside medical treatment and the inmate was returned to the ADX. The level of violence can escalate quickly if anything is perceived as disrespect.

21. Sound correctional practice requires that no inmate be afforded more out-of-cell time than other inmates. To protect the safety and security of the institution, Plaintiff must receive the same amount of out-of-cell time as all other inmates. It is simply unfeasible to provide Plaintiff an average of ten-to-fourteen hours per day when the limited window of out-of-cell hours—that time, described above, between 6:30 a.m. and 8:55 p.m.—when the time must be split evenly between four different ranges.

22. Moreover, the amount of out-of-cell time Plaintiff is afforded in B/B Unit is the product of a careful, considered decision about how best to reintegrate inmates into an open-population unit. The Step-Down Program takes a measured approach to reintroducing inmates into a setting where they have physical contact with others.

23. Compelling interests of security and safety require that Plaintiff be permitted to worship with only those inmates on his range. Neither Plaintiff nor any other ADX inmate can

be allowed to pray with inmates from other ranges in the B/B Unit or other housing units in the ADX or USP Florence.  This is in large part for Plaintiff's own safety.  Inmates are selected for assignment to particular ranges based on myriad factors, including a careful analysis of their criminal backgrounds, institutional conduct, security threat group validations, and threat assessments, among other considerations.  It is not an exaggeration to say that these housing determinations can be life or death decisions.  For example, if an inmate is inadvertently housed on the range with an inmate from a rival group, once the inmates are let out onto the range, they are likely to engage in a physical altercation.  Inmates will wait years to avenge an act that may have occurred "on the streets" or in another prison, or may initiate an altercation just because they are from rival groups.  It should also be noted that if an inmate does *not* take action against a rival group member, and other inmates discover he did not engage in physical violence, that inmate's life will now be in danger from the threat of violence from his own group.  Inaction is considered weakness and no self-identified prison group or gang at that level of security will be perceived as weak.  Altercations such as these also have the potential to spill over and affect the other inmates on the range, or even other ranges entirely.   This is not to say that Plaintiff is a predatory inmate, though his criminal offense speaks for itself. Rather, other inmates may not take kindly to Plaintiff's avowed stances on *kuffar* or non-believers; this would place Plaintiff's safety at risk. In contrast, staff have carefully vetted and screened those inmates currently on Plaintiff's range. He is much safer, and the institution's need for security and safety are much more ensured, when he engages in congregate worship with only those fellow inmates in the same Transitional phase of B/B Unit.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my information, knowledge, and belief.

Executed this 28th day of February, 2018, in San Antonio, Texas.

                                                          s/ *John Oliver*
                                                          John Oliver

Attachment 1:  Oliver Curriculum Vitae

# Exhibit 1
# Declaration of John Oliver

# Oliver Curriculum Vitae

*Chesser v. Bureau of Prisons*, No. 15-cv-01939-NYW

John Charles Oliver

A proven, mission and goal oriented leader who exemplifies the cornerstones of leadership, integrity, loyalty, commitment and unselfishness.  Dedicated to training and developing best practice concepts and cultivating a highly successful operation, focusing on the safety and relentless training of staff, inmate accountability, communication and re-entry initiatives. Demonstrates keen insight of how to manage disruptive gangs and crisis situations derived from working in 13 different federal institutions, with nine of those duty stations at the most difficult Maximum Security Penitentiaries in the nation. Managed inmates at all levels in the State of Colorado Department of Corrections, the Federal Bureau of Prisons and in private Corrections with the GEO Group.

**PERSONAL SKILLS**

- Testified in the penalty phase of trial of *United States v. Jessie Con-Ui*, Case No. 3:CR-13-123 (MD. Pennsylvania)
- Testified in the penalty phase of trial of *United States v. Donald Fell*, Case No. 2:01-CR-12 (D. Vermont)
- Testified in the penalty phase of trial of *United States v. Tsarnaev*, Case No. 13-CR-10200-GAO (D. Massachusetts)
- Testified in a homicide trial of *United States v. Rivera*, Case No. 10-CR-00164-REB-02 (D. Colorado)
- Testified in civil trial of *Lindh v. Warden*, Case No. 2:09-CV-215-JMS-MJD (SD. Indiana)
- Testified in homicide trials of *United States v. William Sablan*, Case No. 00-CR-00531-WYD (D. Colo.) and *United States v. Rudy Sablan*, Case No. 00-CR-00531-02 (D. Colo.)
- Testified as a defendant in a Use of Force lawsuit at USP Lewisburg (inmate David Womack)
- Testified as a defendant in a Use of Force lawsuit at ADX Florence (inmate Fredrick Bustillos)
- Taught Use of Force, Emergency Preparedness and Crisis Management to Lieutenants, Captains and Wardens

**CAREER HISTORY**

**Senior Warden:**  10/2015 to Present - Big Spring Correctional Center (BSCC), Big Spring, TX

Responsible for an 80 million dollar budget, four institutions with approximately 3500 low security, deportable alien inmates and 500 staff, making BSCC the largest Bureau of Prisons private contract facility.  In January of 2016, I coordinated a highly successful, intensive GEO corporate audit of BSCC's Work Place Violence program.  The audit was completed without a single findings and commendation from the Corporate Director of the company's Work Place Violence program.  In June of 2016, I coordinated a second highly successful audit for the year with the Bureau of Prisons audit (CFM) resulting in 40% few findings than the previous year.  Upon my arrival, I implemented the highly successful Suicide Management Risk Plans (SMRP) at BSCC, reducing the frequency and duration of formal suicide watches.

**SES Complex Warden:**  10/2014 to 10/15 - United States Penitentiary/Administrative Maximum, (ADX), FCC Florence, CO

Responsible for a 100 million dollar budget, over 3200 inmates from minimum to maximum security with approximately 1000 staff managing the most disruptive, violent, aggressive, escape prone inmates in the agency, including a number with national security implications.  In October of 2014, I coordinated program review preparation for the Correctional Services Department and received the first ever "Superior" rating for the Florence Complex Correctional Services department. Developed and activated the first High Security Secure Mental Health Unit for Steps Towards Awareness Growth and Emotional Strength (STAGES). Received reaccreditation for FCC Florence at the ACA Winter Panel Hearing. Increased communication with staff and inmates, thus reducing number of uses of force and

assaults on staff, reduced the number of occurrences of hunger strikes and reduced the number of administrative remedies. Increased inmate programming from 85% to 98% at the ADX within 45 days of assuming my position as Complex Warden.  Implemented new Privilege Incentive Program resulting in unprecedented numbers of inmates completing education courses and paying disciplinary fines, all the while reducing disruptive behavior and preparing for re-entry into society.  Implemented a specialized ADX general population unit for those inmates with unique security needs to prepare them for re-entry into an open population penitentiary.

**SES Warden:**  10/2013 to 10/2014 - United States Penitentiary/Special Management Unit, FCC Florence, CO

Presented eight hour workshop "ON BECOMING AN EFFECTIVE CORRECTIONAL LEADER" at the International Corrections and Prisons Association (ICPA) Conference attended by over 30 senior corrections officials from Africa and the Caribbean. Member of the AUSP Thomson activation team April 2014. Reduced staff/inmate assaults and altercations by 34% within 90 days of assuming my position by establishing controls, increasing communication and managing gangs effectively. Completed a PREA Audit and a highly successful CNA Audit. Resolved all previous Unfair Labor Practices (ULP) and Grievances amassed prior to my arrival through inclusion and communication with the local Union. During my 12 month assignment, not a single ULP or Grievance filed due to my communication plan.  I was responsible for transitioning the Special Management Unit (SMU) to a GP USP due to an agency dictated mission change. Implemented highly successful Suicide Management Risk Plans (SMRP) at the complex, reducing the number of formal suicide watches.

**Warden:**  4/2011 to 10/2013 - Federal Correctional Institution/Federal Prison Camp, Terre Haute, IN

I supervised approximately 150 staff in the supervision of 1600 inmates, managing the Communication Management Unit (CMU) in which approximately 40 inmates requiring enhanced communication monitoring due to potential threat to national security.  Developed and activated the first Medium Security Mental Health program, Steps Toward Awareness Growth and Emotional Strength (STAGES), Drug Abuse Program (DAP) and, most recently, a highly sought after Residential Drug Abuse Program (RDAP).  Developed lockdown procedures for the securing and unlocking inmates before and after count, greatly increasing staff safety which was adopted at several high security institutions with great success.

**Associate Warden:**  8/2009 to 4/2011- Federal Correctional Complex, Coleman, FL

Responsible for 2 USPs, 2 FCIs and a female prison camp housing over 750 inmates in four lock down units throughout the nation's largest complex.  Supervised the nation's largest Correctional Services Department with a staff compliment of over 700 line staff and supervisors, managing over 7000 inmates complex wide. Selected to represent the agency in a dispute with OSHA and received a favorable decision in a landmark case affecting the entire agency concerning armory operations. In August of 2010, I was able to coordinate and spearhead a program review preparation for the Correctional Services Department and received the first ever "Superior" rating for a Correctional Services department of this magnitude.

**Associate Warden:**  9/2007 to 8/2009 - Federal Correctional Complex, Terre Haute, IN

As an Associate Warden in a USP, my specific correctional responsibilities included custody and supervision of inmates and responding to numerous emergencies and institution disturbances. Was prepared and trained to use physical control in situations where necessary, such as in fights among inmates, assaults on staff and riots.  I assisted with the planning, development and execution of the North Central Crisis Management Training.

**Correctional Services Administrator, Regional:**  11/2005 to 09/2007 - Northeast Regional Office, Philadelphia, PA

I was responsible for the overall mission of the Correctional Services departments in the region. I represented the Bureau of Prisons serving as an expert witness in two death penalty cases. Conducted annual Captain's conference in the Northeast region and conducted classes at New Captain's and New Lieutenant's Training for participants throughout the prison system. Planned, coordinated and executed a highly successful Crisis Management Training (CMT) for approximately 500 staff from various agencies, planning training, housing, subsistence and transportation.  Due to the success of my CMT, I was requested to assist with the planning and execution of the highly successful Western and North Central Regional Crisis Management Training.  Developed and implemented a technical Use of Force training slide show specifically how to supervise and execute a calculated use of force for new Lieutenants so effective, it was still in use until my retirement in September of 2015.

**Captain:**  9/2002 to 11/2005, FCI Jesup, GA; USP Lewisburg, PA

I served as the department head in the Correctional Services department as the resident expert on all custodial and security questions arising at the institution and had full and final technical responsibility when problems occur during the course of any given shift. Analyzed custodial and security needs by determining the composition of correctional posts to maximize utilization of available resources by eliminating, redesigning, or restructuring posts which are not essential or do not provide maximum utilization of assigned employees. Responsibility for supervising all matters pertaining to keys, locks, locking devices, and all security features. I was also responsible for development of security features, searches of inmates, their quarters, work areas, and the entire reservation.

**Lieutenant:**  9/1996 to 9/2002, USP Lompoc, CA; USP Florence, CO; ADX Florence, CO
**Senior Officer Specialist:**  7/1994 to 9/1996, FCI Florence, CO; ADX Florence, CO
**Officer to Senior Officer Specialist:**  5/1992 to 7/1994, FCI Florence, CO
**Correctional Officer:** 1990 to 5/1992, CO DOC – Fremont Correctional Facility, Canon City, CO
**Airman to Sergeant, 1985 to 1989 United States Air Force -** Wurtsmith Air Force Base, Wurtsmith, MI

**Leadership Activities**

Principals of Leadership II national instructor; OIC and Lead Instructor for New Tactics Development Group (PHX); Assisted with development of national staff SHU training and SHU 3 man cell procedures; Member of the Center Tower Work Group; Member of the Dignitary Protection and Residential Security Work Group, the Tactical Leadership Manual Development Work Group and the TRUSCOPE Work Group; Joint Policy Committee (JPC) member for Stab Resistant Vests and developed the concept for and 1 of 6 co-authors of the Bureau of Prisons Correctional Officer Task Book; Lead Instructor for the FEMA ICS courses; Regional Instructor for Wardens Training, National Instructor for New Captains Training/New Lieutenants Training, Program development/Consultant and Facilitator for National Captain's Curriculum Development Web Based Program (CENTRA); The only SES Supervisory Lead Tactical Trainer in the Bureau of Prisons; OIC and Lead Tactical Trainer for 4 National Tactical Trainer Courses and the National Lead Tactical Trainer Course; Member, Team Leader and Commander of the top tactical team in the BOP.

**Education**

Adams State College, Alamosa, CO – 2 years; Community College of the Air Force

**Job Related Training**

FEMA Courses: IS-1, IS-100, IS-100-LE, IS-100-FW, IS-200, IS-240, IS-241, IS-300, IS-400, IS-546, IS-547, IS-700, IS-800, IS-907; Incident Command System-Train the Trainer; FBI Active Shooter Training; Lean Six Sigma Basics, BOP; Top Secret Security Clearance until retirement 9/26/2015.

**Awards**

6/2017 GEO Central Region Warden of the Year, Regional Award;
9/2012 BOP New Warden of the Year, National Award;
6/2009 Executive Staff Member of the year, FCC Terre Haute;
4/2000 & 4/2001 Special Operations Response Team Leader of the year, FCC Florence

**REFERENCES**

References are available on request.