# Exhibit 9
# Declaration of Jason Henderson

*Chesser v. Bureau of Prisons*, No. 15-cv-01939-NYW

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 15-cv-01939-NYW

ZACHARY A. CHESSER,

    Plaintiff,

v.

DIRECTOR, BUREAU OF PRISONS,

    Defendant.

## DECLARATION OF JASON HENDERSON

I, Jason Henderson, pursuant to 28 U.S.C. § 1746, and based upon my personal knowledge and information made known to me from official records reasonably relied upon by me in the course of my employment, hereby make the following declaration relating to the above-entitled matter:

1. I am employed as the Supervisory Chaplain at the United States Department of Justice, Federal Bureau of Prisons (Bureau or BOP) facility known as the Federal Correctional Complex (FCC) in Florence, Colorado. I have been employed with the Bureau since April 2006 and have served as the Supervisory Chaplain since March 2013.

2. As part of my official duties, I am familiar with the Bureau policies related to religious practices as well as the institution-specific policies for the United States Penitentiary (USP) in Florence, Colorado.  I have access to records maintained in the ordinary course of business by the Bureau, including but not limited to inmate Central Files, inmate requests to staff (also known as "copouts") maintained by Chaplaincy Services, Program Statements, institution

supplements, administrative remedy filings, and information maintained in the SENTRY[1] database. All attachments provided herein are true and accurate copies of Bureau records or policies maintained in the ordinary course of business.

3. USP Florence is part of the Federal Correctional Complex (FCC) in Florence, Colorado. FCC Florence also consists of a minimum-security Federal Prison Camp (FPC), a medium-security Federal Correctional Institution (FCI), and the United States Penitentiary – Administrative Maximum (ADX).

4. I have been made aware of the instant lawsuit filed by inmate Zachary Chesser, Register Number 76715-083. I am further aware that Chesser alleges that his current conditions of confinement in Bravo/B Unit of USP Florence substantially burden the practice of his Muslim faith.

5. I submit this declaration to explain which issues Chesser has grieved and exhausted through the Bureau's Administrative Remedy process, as well as to describe the religious privileges available to inmates in B/B Unit.

**I. Chesser has not exhausted any request seeking to teach other Muslim inmates or to engage in the kind of studies he seeks in this lawsuit.**

6. Plaintiff arrived at ADX Florence on June 12, 2014. *See* Attachment 1, SENTRY Inmate History Quarters, at 1.[2] Like all other inmates newly arriving to ADX Florence, Chesser received a copy of the Admission and Orientation ("A&O") handbook upon his arrival. The

---

[1] SENTRY is the Bureau's national database which tracks various data regarding an inmate's confinement, including, but not limited to, an inmate's institutional history, sentencing information, participation in programs, administrative remedies, and discipline history.
[2] In this document, and throughout Bureau records, the acronym "FLM" denotes ADX Florence. The acronym "FLP" denotes USP Florence.

A&O handbook informs the inmate about institution-specific rules, procedures, disciplinary codes, and the like; one of the many things it discussed is how ADX inmates can request and access materials from ADX Chaplaincy Services. *See* Attachment 2, Excerpts of ADX A&O Handbook, June 2012, at page 21. It informed Chesser that he could write a request to Chaplaincy Services for materials. *Id.*

7. Chesser's signature on June 12, 2014, the day he arrived, indicated that he was given an A&O handbook and staff informed him how to request religious materials from this department. *See* Attachment 12, Federal Bureau of Prisons Intake Form for Chesser.

### A. Chesser's requests to ADX staff and administrative remedies

8. Records indicate that while Chesser was housed at ADX Florence from June 12, 2014, to August 17, 2017, he wrote ten separate requests to Chaplaincy Services. *See* Attachment 3, Chesser ADX Copouts to Chaplaincy. They concerned various matters including Chesser's request for a religious food tray (also known as a common fare tray or certified religious diet), for programming materials, for medication during Ramadan, for Islamic calendars, for prayer rugs, for lists of Arabic- or English-language books on Islam, for Special Purchase Orders for buying religious items from outside vendors, for ADX prayer schedules, and for a copy of the Quran. *See id.* None of the copouts located in Chaplaincy Services files posed requests for congregate prayer, or group or individual Islamic studying, teaching, or learning. Neither did they ask for materials regarding outside courses or classes Chesser could take to further his Islamic learning.

9. Since Chesser arrived at B/B Unit at USP Florence on August 17, 2017, he has sent five separate requests to USP Florence Chaplaincy Services. *See* Attachment 4, Chesser

3

USP Florence Copouts to Chaplaincy. He requested various things including the list of Islamic books at the USP Chaplaincy library, a prayer schedule, a missed religious meal, and various Islamic books. *See id.* None of the copouts located in Chaplaincy Services files posed requests for congregate prayer, or group or individual Islamic studying, teaching, or learning. Neither did they ask for materials regarding outside courses or classes Chesser could take to further his Islamic learning.

10. Chesser is able to file administrative remedies on any issue regarding his confinement. The Bureau has a four-tiered Administrative Remedy Program for inmate grievances. 28 C.F.R. § 542.10 *et seq.* The first step is informal resolution with prison staff. 28 C.F.R. § 542.13(a). A Request for Informal Resolution Form (also known as a BP-8) is not assigned a Remedy ID number and is not tracked in SENTRY. The second step is the filing of a formal Request for Administrative Remedy (also known as a BP-9) at the institution in which the inmate is incarcerated. *Id*. An administrative remedy at this level, and subsequent levels, is assigned a Remedy ID number and tracked in SENTRY. The third step occurs if the inmate feels the response to his BP-9 is not satisfactory. Within 20 calendar days of the date the Warden signs the response, the inmate may then appeal the complaint to the Regional Director, by filing a Regional Office Administrative Remedy Appeal (also known as a BP-10). *See* 28 C.F.R. § 542.15(a). The fourth step occurs if an inmate is dissatisfied with the Regional Director's response. If that is the case, an inmate may appeal to the General Counsel in Washington D.C., by filing a Central Office Administrative Remedy Appeal (also known as a BP-11) within 30 calendar days of the date the Regional Director signed the response. *Id.* An inmate may not raise in an appeal an issue he did not raise in a lower level filing. *See* 28 C.F.R. § 542.15(b)(2).

11.     An inmate has not exhausted his administrative remedies until he has properly and timely sought review at all three formal levels, that is, steps 2-4 as described above.

12.     Since July 1990, the Bureau has maintained information related to administrative complaints filed by inmates under the Bureau Administrative Remedy Program in SENTRY. One of the many functions of the SENTRY database is to track administrative remedy complaints and appeals. It allows computerized searching of complaints and appeals filed by a specific inmate.

13.     Each formal complaint (*i.e.*, BP-9, BP-10, and BP-11) is logged into SENTRY at the receiving location. If the complaint is an initial filing, it receives a unique Remedy ID Number upon initial entry, which follows the complaint throughout the appeal process. Each Remedy ID Number also contains an extender that identifies the level of review. The extension F-1 indicates the complaint was filed at the institution level (BP-9). The extension R-1 indicates the complaint or appeal was filed at the regional level (BP-10). The extension A-1 indicates the appeal was filed at the national level (BP-11). The number at the end of the extension may change if the remedy or appeal is initially rejected and is then re-filed due to a technical problem, such as improper form, failing to include documentation, or improper filing at that level.

14.     Chesser's administrative remedy index indicates that as of February 14, 2018, he had fully exhausted forty separate BP-11s to the final, national level. *See* Attachment 5, Administrative Remedy Generalized Retrieval, dated February 14, 2018.[3] Only eleven of his

---

[3] Note that this Attachment reflects 51 separate filings by Chesser to the BOP's Central Office. *See* Attachment 5 at 27. Eleven of those filings, however, were rejected for various procedural

Central Office grievances were filed after his transfer to ADX Florence in June 2014. *See id.* at 22-27. Six of those eleven filings raised issues regarding Chesser's religious practices. *See id.* at 23, 24, 26, 27.

15. On December 2, 2014, the BOP's Central Office received Chesser's Central Office Administrative Remedy Appeal No. 796698-A1. *Id.* at 23. This filing was rejected back to Chesser because he had not first raised the grievance at the institutional level. *See id.* Chesser did not re-file this grievance with the Central Office, so it was not fully exhausted.

16. On February 20, 2015, the BOP's Central Office received his Central Office Administrative Remedy Appeal No. 806081-A1. *Id.* at 24. This too was rejected back to Chesser because he had not first raised the issues at the institutional or regional levels. *See id.* Chesser did not re-file this grievance with the Central Office, so it was not fully exhausted.

17. On June 8, 2015, the BOP's Central Office received Chesser's Central Office Administrative Remedy Appeal No. 810333-A1 wherein he requested group prayer with other inmates. *Id.* at 24. The Central Office responded to this appeal on September 8, 2015. *See* Attachment 6, Administrative Remedy Packet No. 810333-A1, at 1. Chesser had written in part, "As a Muslim, I sincerely believe a number of group activities such as five-times daily group prayer, classes and other activities are recommended and/or obligated by my faith. . . . By 'classes,' I mean *religious* classes." *Id.* at 4 (emphasis in original). While this administrative remedy was fully exhausted at all levels, the grievance does include any request to teach other

---

reasons and returned to Chesser for him to re-file. Thus, Bureau officials would consider that only forty of these filings were fully exhausted; a rejected request for administrative remedy does not constitute a full response on the merits.

Muslim inmates, nor does it request access to specific courses beyond what materials ADX Florence Chaplaincy Services provided. *See id.*

18. Chesser's final three Central Office-level grievances were all filed while this lawsuit was already pending. *See* Attachment 5 at 26-27. Two of those appeals were rejected back to Chesser for procedural defaults. *See id.* at 26 (870347-A1), 27 (905802-A1).

19. On December 6, 2016, the BOP's Central Office received Chesser's Central Office Administrative Remedy Appeal No. 874193-A1 wherein he alleged his ADX referral was based on his jihadist views. *Id.* at 26. The Central Office responded to this appeal on January 6, 2017. *See* Attachment 7, Administrative Remedy Packet No. 874193-A1, at 1. This filing was fully exhausted, though it was answered as being duplicative of Chesser's earlier filings challenging the reasons for his ADX referral in 2014.

**B. Chesser's remedies gave no indication of the broad teaching and studying privileges that he seeks in his lawsuit.**

20. I have reviewed materials generated in this lawsuit in which Chesser explains the broad scope of his demands to teach other inmates and to engage in his own religious studies. Chesser failed to raise these requests in any request to an ADX staff member, nor did he exhaust either claim.

21. As for teaching other inmates, Chesser claims that he needs to teach as many Muslims as he can, "up to about 10 hours per day." June 22, 2017, Plaintiff's Responses to Defendant's First Set of Interrogatories and Requests for Production of Documents to Plaintiff (excerpts), Attachment 8 at 34-35. He believes that he "should teach Muslims what I know when

they do not have the ability to learn these subjects from people with more knowledge than me, and even when they do, it is good for me to teach them." *Id.* at 33-34.

22.    As for his own religious studies, Chesser claims that he needs to "spend about 10 to 14 hours per day studying in classes" until he achieves his goal of becoming an "Islamic scholar." *Id.* at 33. He needs "however many teachers it takes to allow [him] to study" seven broad subject areas "to the point of becoming a scholar in them on a full-time basis." *Id.* at 32-33, 34-35. But "the lowest plausible minimum would be three [teachers], if all were Islamic scholars." *Id.* at 36 (stating he "must learn from Islamic scholars").

23.    The scholars with whom Chesser studies "would have to be from a sect of Islam which [he] does not consider extremely heretical in the particular subjects they are teaching." *Id.* at 38. Chesser thinks it would be "beneficial" to study with any "Salafi" scholar, "even if they are not Jihadi." *Id.* He identifies six BOP inmates as possible teachers for him, whom he believes are "Islamic scholars or close to that level: (1) Mostafa Kemal Mostafa, (2) Mamdouh Salim, (3) Sulayman Abu Ghayth . . . (4) Ali Al-Timimi, (5) Ahmed Abu Ali, and (6) Mohamed Rashed Al-Owhali." *Id.* Each of these BOP inmates are convicted terrorists. The first five are currently subject to Special Administrative Measures (SAMs) and confined in the ADX Special Security Unit; Al-Owhali was on SAMs in the past. Chesser claims not to know any "scholars" among BOP inmates who do not have ties to terrorism. *Id.* at 41-42. Chesser thinks that Mostafa, Salim, and Abu Ghayth are "muftis" who can issue fatwas, or religious rulings. *Id.* at 40. Chesser claims that he must study Islam to the point that he, too, can issue fatwas, including fatwas to other prisoners. Attachment 9, January 16, 2018, Deposition of Zachary Chesser (excerpt), at 239:16-240:5.

24. There is a vast difference between these extraordinarily broad demands for teaching and studying and the remedy Chesser actually exhausted. Chesser initially stated that he simply wanted "classes," Attachment 6 at 7, then clarified in the subsequent appeal to the Region that he meant "religious classes." *Id.* at 5. Chesser failed to take that opportunity to provide a meaningful explanation of what "religious classes" actually meant, from his perspective. His bare-bones reference to "religious classes" gives no hint of the extraordinary levels of teaching and studying he seeks in this lawsuit.

25. Chesser's remedies never once mention that he must teach other inmates at all, let alone that he must teach as many Muslims as he can up to ten hours a day. The remedies give no indication that the type of "classes" Chesser wanted the Bureau to provide him must be taught by at least three "scholars" who meet Chesser's personal standards; that he had in mind particular "scholars," including convicted terrorists housed in the ADX, to teach him; and that he needs to be in "class" at least ten, and up to fourteen, hours every day. Importantly from the BOP's perspective, Chesser nowhere indicated that one of the end goals of the vague term "religious classes" was to afford him the opportunity of becoming a "scholar" with the authority to issue fatwas to the inmate population.

26. In sum, nothing in Chesser's remedies, or even in his requests to ADX Religious Services staff, gave the Bureau the information it needed to investigate the actual "teaching" and "studying" claims he has brought in this lawsuit. Chesser has not exhausted his administrative remedies regarding his claims that his sincerely held religious beliefs require that he teach other Muslim inmates, or that he take Islamic studies courses outside of what materials are offered by FCC Florence Chaplaincy Services.

9

## II.     The BOP provides Chesser opportunities to practice and study his faith in B/B Unit.

27.     Inmates in the final two phases of the Step-Down Program at ADX Florence have religious privileges. Chesser can engage in group prayer with other inmates, both when he is scheduled for indoor activities and when he is outside on the outdoor recreation yard. Chesser can use the designated room for group religious activities in B/B Unit. Chesser can engage in whatever type of congregate prayer he chooses, including the Friday, or Jumu'ah prayer, if he is out of his cell at that time. He may lead the prayer.

28.     Chesser may also study his faith. He may engage in a group study of Islamic texts with other inmates in the designated room in B/B Unit, so long as he abides by all Bureau and local rules and procedures. He may study as much as he wishes in his living quarters, so long as he does not possess materials that are considered contraband. He may buy books himself from outside vendors. He is able to request written materials from USP Florence Chaplaincy Services in pursuit of his studies. *See* Attachment 4 at BOP 5434-5439 (Chesser's requests to staff for Islamic materials). Chaplaincy Services maintains a library of Muslim books and Islamic teaching videos that Chesser can review upon his request. Attachment 10, USP Chapel Library Muslim Materials Lists. If Chesser has a suggestion for Muslim learning materials that would be beneficial to the entire Muslim population at FCC Florence, he can request that those course materials be purchased by Chaplaincy Services. Chesser also has the option of purchasing religious study materials from outside entities. If he is able to identify any religious correspondence courses that are of interest to him, he can sign up to take those courses. So long as these study materials comport with Bureau rules and institutional guidelines, Chesser would be permitted to have them.

29. Chesser has other options for religious instruction in B/B Unit. He can request that an individual from outside the institution be approved for a pastoral visit for him. Pastoral visits take place in the visiting room at USP Florence. During such a visit, Chesser could discuss Islamic doctrine with his pastoral visitor. Persons participating in pastoral visits must comply with Bureau security procedures and all required background checks.

30. For an ADX inmate in Chesser's position, these means of engaging in religious studies are the most that can be allowed without jeopardizing the secure and orderly running of the institution. The studying privileges Chesser demands are disproportionately greater than any privilege that any other ADX inmate has. There is no other inmate in B/B Unit or in any other ADX unit (or at USP Florence) who is assigned special scholars to teach him and who is allowed to study ten to fourteen hours every day.

31. Permitting Chesser to study in that manner would create the kind of disparity of treatment that jeopardizes the safety and security of the institution. That obvious disparity violates the well-established correctional rule that fairness and the perception of fairness are necessary to maintain security and order in an institution. That cardinal rule would be violated if the Bureau were to provide Chesser the extraordinary studying privileges he seeks in B/B Unit, or if it were to move him to another facility to facilitate his religious studies.

32. I am informed that Chesser suggests that the BOP provide him opportunities for remote learning. However, the security concerns I identified above are also present if Chesser is permitted to connect by electronic means with "scholars" outside the institution. The inmate population would immediately understand that Chesser is receiving a unique benefit that far exceeds any religious privilege they have. There are other serious security concerns attendant on

a remote learning scheme. To ensure that no dangerous information is communicated during these video "classes," Chaplaincy Services personnel would be required to constantly monitor them. This would be done in accordance with Complex Supplement FCC 5360.09f, *Religious Beliefs and Practices* (excerpt), which provides, "[a]ny inmate led-religious programs will have constant visual and audio supervision by staff." Attachment 11, FCC 5360.09f, *Religious Beliefs and Practices* (excerpt), at 2. And, even with monitoring, dangerous communications between Chesser and his teacher could easily be missed. It is extremely difficult for prison personnel to identify all information that might pose threats, and those risks are heightened with real-time communications. Even if staff could identify dangerous information as it was being transmitted, it would take time to sever the communication.

33. It is also a security problem to allow Chesser to interact with inmate teachers or "scholars" outside B/B Unit. In the first place, this would violate the BOP prohibition on communications between inmates in different Bureau institutions. Currently there is no avenue through which a Bureau inmate can speak to an inmate at another Bureau facility via video or even telephone connection. The closest analogue that is allowed by the Bureau is inmate-to-inmate correspondence, though that is confined to written, not telephonic or video, communications. Such correspondence is strictly controlled and extremely limited, and is usually permitted where two inmates demonstrate that they are involved in the same legal matter. *See* 28 C.F.R. § 540.17 ("An inmate may be permitted to correspond with an inmate confined in any other penal or correctional institution if the other inmate is either a member of the immediate family, or is a party or witness in a legal action in which both inmates are involved.").

34.     What Chesser proposes here is something that is simply not done, has never been done in the Bureau to my knowledge, and will not be done, and for reasons of penological fundamentals. To every legal extent possible, inmates' communications with outsiders should be monitored, for the sake of the public's, the victims', the Bureau staff's, and the inmates' safety. Permitting Chesser to video- or phone-conference with other inmates could allow them to pass dangerous information to other institutions, including information that would compromise the safety of inmates. Such information can include directives to execute hits on other inmates, and information about conducting the business of gangs and security threat groups. The Bureau has a compelling security interest in ensuring that such communication do not occur.

35.     Allowing Chesser to have electronic communications with inmate "scholars" undermines the correctional goals of placing Chesser in the ADX Step-Down Program. The aim of the Program is to reintroduce Chesser to a traditional open-population facility by incrementally increasing his out-of-cell time and opportunities to interact with other inmates. To allow him to contact other inmates at different institutions would be at odds with these carefully chosen close controls. Even at open-population facilities—like USP Florence or FCI Florence, for example—inmate religious activities take place in the chapel so that they can be supervised by staff. This is to deter the passing of contraband, to prevent fights or assaults, to deter and prevent radicalization, and to detect and prevent the transmission of information that could prove detrimental to institutional or national security. To promote these security interests, an ADX Step-Down inmate like Chesser requires an even greater level of supervision and control. That supervision and control is achieved by confining Chesser's studies in B/B Unit to those discussed in paragraphs 27 to 29, above.

36. Chesser apparently wants to teach other inmates a curriculum of his choosing and also to "preach" or sermonize to other inmates. No ADX inmate is allowed to assume a formal leadership role as a teacher of other inmates or to deliver sermons. That rule is essential in Chesser's case because he openly advocates violence toward others, including particularly non-Muslims and United States citizens. If Chesser begins to marshal control over other ADX inmates and to establish himself as a religious leader, he is in a better position to incite inmates to engage in violent conduct that will threaten the security of the institution. The risks extend to people outside the prison if inmates taught by Chesser are released or are inspired to radicalize their contacts on the street. Chesser cannot be given a BOP-approved means to incite other inmates in ways that could jeopardize institutional security and, potentially, national security. He may study Islam and engage in formulaic prayer as an equal member of the congregation, but he may not elevate or attempt to elevate himself to a role of religious leadership or direction over other Muslim inmates.

37. Chesser has recently demonstrated that he does view himself as an authority figure and that he would attempt to displace the authority of BOP staff, including Chaplaincy Services staff. On February 22, 2018, I was present during a conversation in which Chesser argued with and openly criticized a BOP imam who was visiting B/B Unit. Chesser accused the imam of "helping the enemies of Allah," i.e., BOP officials (including myself). This behavior indicates that Chesser continues to need the close controls of B/B Unit at this time and that he must be carefully monitored to ensure that he does not incite violence among the inmate population.

Case 1:15-cv-01939-NYW   Document 180-38   Filed 03/02/18   USDC Colorado   Page 16 of 16

38.     As long as Chesser respects other inmates' faith and religious autonomy, and as long as he refrains from fomenting group discord like he did at CMU Marion, he may engage as a fellow congregant, as an equal among equals, within the Muslim inmate group in B/B Unit. He will not be permitted to exert control or authority over other inmates or persons outside the institution.

Pursuant to the provisions of 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my information, knowledge, and belief.

Executed this 1st day of March 2018, in Florence, Colorado.

> *s/ Jason Henderson*
> Jason Henderson
> Supervisory Chaplain
> FCC Florence, Colorado

| | |
|---|---|
| **Attachment 1:** | SENTRY Inmate History Quarters |
| **Attachment 2:** | Excerpts of ADX A&O Handbook, June 2012 |
| **Attachment 3:** | Chesser ADX Copouts to Chaplaincy |
| **Attachment 4:** | Chesser USP Florence Copouts to Chaplaincy |
| **Attachment 5:** | Administrative Remedy Generalized Retrieval, dated February 14, 2018 |
| **Attachment 6:** | Administrative Remedy Packet No. 810333-A1 |
| **Attachment 7:** | Administrative Remedy Packet No. 874193-A1 |
| **Attachment 8:** | June 22, 2017, Plaintiff's Responses to Defendant's First Set of Interrogatories and Requests for Production of Documents to Plaintiff (excerpt) |
| **Attachment 9:** | January 16, 2018, Deposition of Zachary Chesser (excerpt) |
| **Attachment 10:** | USP Chapel Library Muslim Materials Lists |
| **Attachment 11:** | Attachment 11, FCC 5360.09f, *Religious Beliefs and Practices* (excerpt) |
| **Attachment 12:** | Federal Bureau of Prisons Intake Screening Form for Chesser |