# EXHIBIT C

"Bureau of Prisons' Supplemental
Responses to Plaintiff's Second
Set of Interrogatories"

Plaintiff's Second Motion for Summary Judgment

Chesser v. Dir., Fed. Bureau of Prisons
Civil Action No. 1:15-cv-1939-NYW

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 15-cv-01939-NYW

ZACHARY A. CHESSER,

     Plaintiff,

v.

DIRECTOR, BUREAU OF PRISONS,

     Defendant.

---

**BUREAU OF PRISONS' SUPPLEMENTAL RESPONSES TO PLAINTIFF'S SECOND
SET OF INTERROGATORIES [DOC. 146]**

---

Pursuant to Fed. R. Civ. P. 33, the Federal Bureau of Prisons ("Defendant," the "BOP," or the "Bureau"), through undersigned counsel, hereby responds to Plaintiff's Second Set of Interrogatories to Defendant as follows:

**OBJECTIONS TO PLAINTIFF'S "INSTRUCTIONS," "DEFINITIONS," AND "SCOPE"
OF DISCOVERY**

The BOP objects to all "Instructions" and "Definitions" that do not comport with the requirements of the Federal Rules of Civil Procedure.[1] The BOP incorporates herein by reference its previous objections to these same specific instructions and definitions. *See* May 8, 2017, Bureau of Prisons' Responses to Plaintiff's First Set of Interrogatories, pp. 1-3. In addition, the Court found that Plaintiff "may not pursue any discovery under Claim III based on underinclusivity." Doc. 159 at 14. In connection with Claim IV, the Court further rejected any attempt by Plaintiff to seek information that is not targeted to the ADX or to other institutions in

---

[1] Plaintiff states that "[t]he definitions in # 104 are incorporated herein." Doc. 146 at 1.

the BOP that may be comparable to the ADX. *See id.* at 14-15. These objections are

incorporated in the responses below, where applicable.

## SUPPLEMENTAL RESPONSES TO PLAINTIFF'S SECOND SET OF INTERROGATORIES

**Interrogatory No. 9:** You have previously stated that part of your justification for

holding the Plaintiff in restrictive conditions at ADX is his ability and proclivity to influence

others in ways relating to his ideology in prison and through his external communications. See

Defendant's Int. Resp. Nos. 3, 4 & 6; #67-3 ¶14; #67-11. Please do the following: (a) describe

the aspects of Chesser's ideology which concern you from this perspective; (b) the manner in

which you believe he has or would engage in influencing others; (c) the precise harms you

believe this influence has resulted in or would result in; (d) the extent of Chesser's past influence

in this respect, including all individuals, groups, and terrorism-related activity you believe he

influenced, how he did this, and the degree to which he influenced them; and (e) all evidentiary

support you have for your beliefs regarding the above matters.

**RESPONSE:** Objection. First, Defendant objects that the interrogatory contains multiple

separate interrogatories. Second, Defendant objects that the interrogatory wholly misstates

Defendant's prior responses and filings. Finally, Defendant objects to the interrogatory to the

extent it may seek classified information or information that is privileged, including information

protected by the attorney-client, attorney-work-product, deliberative-process, and/or law-

enforcement privileges.

Subject to and without waiving these objections, Plaintiff was designated to the ADX for

the reasons explained in Mr. Collins' declaration, Doc. 67-3 at ¶¶ 9-16, the related attachments

thereto, and Defendant's Responses to Plaintiff's First Set of Interrogatories, all of which are

incorporated herein by reference. *See also* Fed. R. Civ. P. 33(d) ("If the answer to an interrogatory may be determined by examining . . . a party's business records . . ., and if the burden of deriving or ascertaining the answer will be substantially the same for either party, the responding party may answer by . . . specifying the records that must be reviewed, in sufficient detail to enable the interrogating party to locate and identify them as readily as the responding party could[.]"). Defendant's Responses to Plaintiff's Interrogatory Numbers 3, 4, and 6 specifically underscored that Plaintiff's ADX referral was predicated not on his ideology but on his actions at the Communications Management Unit ("CMU"). These actions included Plaintiff's disruptive conduct, his assault on an inmate outside his faith group, and his attempt to usurp staff's authority, among other acts. *See* Bureau of Prisons' Responses to Plaintiff's First Set of Interrogatories at 11.

Defendant is not concerned about Plaintiff's ideology, or any aspect thereof, for its own sake. Rather, Defendant is charged with protecting the safety of staff, the inmate population, and the general public. Thus, Defendant is only concerned with Plaintiff's ideology to the extent that he would act upon his avowed contempt for *kafir*—persons who, from Plaintiff's perspective, are nonbelievers or apostates—and that such actions would jeopardize safety, institutional order, or attempt to foment group disruption, as he did at the CMU. *See* Doc. 67-3 at ¶15 ("At bottom, Chesser was recommended for ADX designation not because of his radicalized ideology or with whom he associated, but because of how he attempted to exert control over that association of inmates, how he fomented disruption and violence between groups in CMU Marion, and how his actions displayed a very real attempt to organize mass resistance to Bureau policy and institutional security."). As to sub-interrogatories (b) through (e) in this Interrogatory, Defendant

incorporates by reference the rationales, the risks, the activities, and the disruptions catalogued in Plaintiff's ADX referral. *See* Docs. 67-6 at 9; 67-7; 67-8; 67-9; and 67-11.

Finally, as this information shows, Plaintiff's conduct in prison—not his "external communications"—prompted his referral to the ADX. In this way, Plaintiff is distinct from that group of inmates whose elevated stature and influence outside the prison have warranted their placement on Special Administrative Measures. Rather, Plaintiff is like the vast majority of ADX inmates who are participating in programing designed to allow them to progress to a less-restrictive institution. Recently, Defendant determined that Plaintiff was not appropriate for placement in a CMU.

Defendant is in the process of retrieving and reviewing documents containing additional information that may be responsive to this interrogatory. Therefore, Defendant may supplement this response.

**Interrogatory No. 10:** State all of Chesser's ties to terrorism and the Jihadist movement, terrorist training or skills, and involvement in terrorism-related activity of which you are aware as specifically as you can without revealing classified information. If you had to withhold information because it is classified, and you believe it meaningfully supports a conclusion that Chesser is more of a threat than this response indicates, please state any information you can to indicate the nature and degree of this increased threat.

**RESPONSE:** Objection. First, Defendant objects to the interrogatory to the extent it may seek classified information or information that is privileged, including information protected by the attorney-client, attorney-work-product, deliberative-process, and/or law-enforcement privileges. Second, this interrogatory may seek information that is not relevant or proportional to the needs

of this case. The Court found that, insofar as Plaintiff's criminal conviction is concerned, it "agrees with the BOP that consideration of such ties [to terrorism], whether primary or not, does not appear to be actionable under RFRA." *See* Doc. 159 at 2 n.1.

Subject to and without waiving these objections, Defendant incorporates by reference its prior filings in this action, whose contents delineate Plaintiff's ties to terrorism and the Jihadist movement and his skills in radicalization and propagandizing through social media. *See* Docs. 67-1 at 2-3; 67-2 at 3-15; 67-11 at 2-7. Defendant is in the process of retrieving and reviewing documents containing additional information that may be responsive to this interrogatory. Therefore, Defendant may supplement this response.

**Interrogatory No. 11:** How likely is it that Chesser would have been sent to ADX if he had no ties to terrorism or Jihadism and had never been designated to a CMU[2]? What is the rationale of your response? If you contend he would probably still have been sent to ADX, what evidence do you have that this is the case?

**RESPONSE:** Objection. First, Defendant objects to the interrogatory to the extent it may seek classified information or information that is privileged, including information protected by the attorney-client, attorney-work-product, deliberative-process, and/or law-enforcement privileges. Second, Plaintiff's interrogatory calls for speculation predicated on a hypothetical set of facts that are not at issue in this action. For the same reason, the interrogatory seeks information that is not relevant or proportional to the needs of this case. The Court found that it "agrees with the BOP that consideration of such ties [to terrorism], whether primary or not, does not appear to be actionable under RFRA." *See* Doc. 159 at 2 n.1.

---

[2] The Plaintiff would note that it is established that his CMU designation was terrorism-related. #102 ¶ 8.

Subject to and without waiving these objections, Defendant incorporates by reference the rationales for ADX referral articulated in Mr. Collins' declaration and relevant attachments. *See* Doc. 67-3 at ¶ 11. An inmate may be designated to ADX Florence if he meets one or both of two basic criteria: (1) the inmate's placement in other correctional facilities creates a risk to institutional security and good order, or poses a risk to the safety of staff, inmates or others, or to public safety; and/or (2) as a result of the inmate's status, either before or after incarceration, the inmate may not be safely housed in the general population of another institution. *Id.* Plaintiff could have been referred to ADX—even if he had no ties to terrorism—if he had engaged in the same disruptive and dangerous activities at CMU Marion. As to likelihood of that referral, it is impossible to quantify. As previously stated in Defendant's Responses to Plaintiff's First Set of Interrogatories, inmate classification and designation are individualized, case-by-case determinations. Context matters. Here, a key component of that context included Plaintiff's dangerous and disruptive context in a less-restrictive institution. By Plaintiff's own report, his dangerous and disruptive conduct was motivated by his professed jihadism. *See* Doc. 67-11 at 4 (noting that Plaintiff assaulted a fellow CMU inmate "for mocking the Islamic religion" and because the inmate purportedly "had repeatedly made negative comments about Islam").

Yet, notwithstanding Plaintiff's expressed motivations for his conduct, it was his *actions* themselves that led to his placement in the ADX. Plaintiff's "ideology was pertinent to the ADX referral only insomuch as it resulted in his 'conduct, behavior, and communication' that required greater security and controls than could be provided at CMU Marion." Doc. 67 at ¶ 13. Defendant further notes that, while Plaintiff is a convicted terrorist, he was *not* found to "present[] *national security management concerns* which cannot be met in an open population

institution." *See* Doc. 67-3 at ¶ 12 (listing this among the factors that may warrant consideration for ADX placement) (emphasis added); *see also* Doc. 67-11 at 2 (stating that the factor considered in the request for Plaintiff's ADX designation was that he had "been identified as participating in, organizing, or facilitating any group misconduct that adversely affected the orderly operation of a correctional facility"). The vast majority of convicted terrorists and terrorist suspects are never considered for placement in the ADX.

Finally, prior placement in a CMU (or any other particular prison) is not among the criteria for ADX placement. *See* Doc. 67-3 at 5-6.

**Interrogatory No. 12:** In your response to Int. No. 6, you stated: "The ADX has a number of Muslim inmates who are so radicalized that they were motivated to kill or attempt to kill others in the name of, and because of, their sincerely held religious beliefs. Indeed, Plaintiff's criminal history and his conduct at the CMU place him in this category." Did you mean the Plaintiff killed or attempted to kill people at some point? If so, who and when? If not, what exactly makes the Plaintiff a member of "this category"? Why would an inmate's religious beliefs be a factor in not allowing them to live in an open population setting and how does this apply to the Plaintiff? To the extent you contended "these inmates (including Plaintiff) ... would seek to influence other inmates" in the relevant scenario, how could they meaningfully influence one another in a unit with only terrorists? State all evidence which you contend supports your response.

**RESPONSE:** Objection. First, Defendant objects that the interrogatory contains multiple separate interrogatories. Second, Defendant objects that the interrogatory misstates Defendant's prior responses and filings. Finally, Defendant objects to the interrogatory to the extent it may

seek classified information or information that is privileged, including information protected by the attorney-client, attorney-work-product, deliberative-process, and/or law-enforcement privileges.

Subject to and without waiving these objections, Defendant incorporates by reference Plaintiff's criminal offense history and plea agreement, whose contents delineate Plaintiff's ties to terrorism and the Jihadist movement and his attempt to provide material support to a terrorist organization known to have killed or attempted to kill others. *See* Docs. 67-1 at 2-3; 67-2 at 3-15; 67-11 at 2-7. Plaintiff's attempts to have others killed included his exhortation that "Muslims . . . go buy guns and kill soldiers," fill "a tanker with explosives, and Ricin"; his solicitations of the murder of the creators of the South Park television series, Theodoor van Gogh, Ayaan Hirsi Ali, and others; and his soliciting bomb threats against civilians, law enforcement authorities, and the military forces of the United States and its allies. Doc. 67-2 at ¶¶ 20, 23, 24, 31, 33 & *passim.*

To be clear, an inmate's religious beliefs are not a factor in designating him or not designating him to an open-population setting. A very important factor, however, is what the inmate has done in the way of harming others, jeopardizing safety, usurping authority, or causing group disruption. That those *actions*—and, in Plaintiff's case, they were actions, not just mere ideology—are inspired by religious belief is beside the point in the correctional environment. Correctional officials must take into account those actions if they are to safeguard inmate, staff, and public wellbeing.

Plaintiff asks Defendant to expound on the part of Interrogatory Response No. 6 which states, "To safely manage these highly radicalized inmates, ADX correctional officials must

assume that these inmates (including Plaintiff) have not changed their ideological views and would seek to influence other inmates with whom they would congregate inside an 'open population' housing unit, during group prayer and otherwise." Plaintiff asks how such inmates could "meaningfully influence one another in a unit with only terrorists." Plaintiff's conduct at the CMU answers his own question. Even in a theoretical unit with only fellow jihadist terrorist inmates, they could attempt to establish an alternate power structure to correctional officials, as Plaintiff attempted to do at the CMU when he bartered for one inmate's safety over another's; they could encourage one another to flaunt institutional rules, as Plaintiff encouraged his associates to shirk the rules at the CMU; and equally as important, they could foster a group dynamic that becomes closed-off and insular to correctional supervision to the extent that one inmate attempts to assert a leadership role over others, as Plaintiff attempted at the CMU. In short, Plaintiff's question presumes that concentrating a risk in the inmate population (here, jihadist ideology and its resultant actions within a secure environment) means that the risk would be contained. Sound penological judgment and common sense indicate otherwise. The risk would not be muted, but could easily become exacerbated.

**Interrogatory No. 13:** What are the three biggest threats the Plaintiff poses from the BOP's perspective? In other words, from the points of view of severity and likelihood, overall, what is the BOP most concerned the Plaintiff might do, say or cause if it did not take measures to prevent him from doing, saying, or causing it? State the order of these threats in terms of your concern. State all evidence and information you contend supports your response.

**RESPONSE:** Objection. First, Defendant objects to the interrogatory to the extent it may seek classified information or information that is privileged, including information protected by the

attorney-client, attorney-work-product, deliberative-process, and/or law-enforcement privileges. Second, Plaintiff's interrogatory calls for Defendant to numerate the threats Plaintiff poses, when RFRA does not require a defendant to list its compelling government interests in order of priority or imminence.

Subject to and without waiving these objections, Defendant incorporates by reference Plaintiff's criminal offense history and plea agreement, whose contents delineate Plaintiff's ties to terrorism and the Jihadist movement and his attempt to provide material support to a terrorist organization known to have killed or attempted to kill others. *See* Docs. 67-1 at 2-3; 67-2 at 3-15. Defendant also incorporates by reference its previous filings in this case, including the December 2013 memorandum authored by the CMU Warden, which articulates the risks Plaintiff posed to an open population unit and the Bureau's correctional judgment as to why those actions jeopardized safety and institutional order and security. *See* Doc. 67-11 at 2-7. Generally speaking, and without placing these threats in any specific order, the Bureau considers that Plaintiff may pose a threat in his willingness to engage in group disruption and his desire to assert a leadership role among other inmates in an open population in contravention of the prison's authority structure. This assessment of the possible threats posed by Plaintiff is based on his criminal history and his behavior at the CMU. Notably, Plaintiff has an established history of acting in ways that jeopardize security. *See* Doc. 67-3 at ¶ 15 (discussing how Plaintiff "attempted to exert control over that association of inmates, how he fomented disruption and violence between groups in CMU Marion, and how his actions displayed a very real attempt to organize mass resistance to Bureau policy and institutional security").

**Interrogatory No. 14:** State any basis you have to contend the policies, practices and/or actions at issue in this case do not substantially burden the Plaintiff's sincere exercise of religion as described in the Third Amended Complaint (#58) and his response to your first interrogatory, including all evidence you have for each contention.

**RESPONSE:** Objection. Defendant objects that the terms "policies, practices and/or actions at issue in this case" is undefined and is vague in this context. Defendant is unsure as to which "policies, practices and/or actions" Plaintiff may deem to be at issue in this case. The Court has found that Claim III, for example, is substantially narrower than Plaintiff may appear to believe that it is. *See* Doc. 159 at 2 n.1 (finding that consideration of Plaintiff's "ties to terrorism" as referring to the substance of his conviction "does not appear to be actionable under RFRA"); *see also id.* at 3 ("[T]he court made clear that its determinations were firmly based on *Mr. Chesser's* remaining RFRA claims—Claim III, to the extent it challenges the BOP's consideration of Mr. Chesser's ties to terrorism as the primary reason for transferring him to ADX without regard to other applicable factors; and Claim IV, which alleges that the conditions of confinement at ADX substantially burden *Mr. Chesser's* sincerely held religious beliefs—and did not intend to allow discovery on any other topic. The court clarified again its understanding that no remaining claims challenged the constitutionality of any national BOP policy or BOP Program Statement 5630.09; rather, Mr. Chesser's claims encompassed only as-applied challenges under the RFRA personal to Plaintiff.") (emphasis in original; internal citations omitted).

Subject to and without waiving this objection, based on information known at this time, Defendant does not anticipate at this time contending that the conditions of confinement at the ADX do not substantially burden Plaintiff's beliefs as he articulated them in response to

11

Defendant's Interrogatory No. 1. *See* Plaintiff's response dated June 22, 2017, at 14-48.
Plaintiff's professed beliefs demand so much physical interaction with others, for so many hours
each and every day, that it is unlikely any form of incarceration, in any prison, would not impose
a substantial burden on those beliefs.

If information becomes available during the discovery process that might support a
different response, Defendant will supplement this response.

**Interrogatory No. 15:** How many incidents of radicalization or terrorist recruitment, as
defined in #19 Ex. 1 Q n.3, and as defined by any metric, written or otherwise, or criteria the
BOP uses to assess the way the influence mentioned in your response to Int. No. 6 and in #67-11
occurs, have actually occurred at ADX? Which units did they occur in and when? Describe the
nature of the radicalization and recruitment. Please do the same for any such incident which did
not occur at ADX but which you contend supports your arguments on this subject. The
incident(s) occurring between 2014 and 2016 involving inmates Kevin James, Mohamed Odeh
and a third inmate where the third inmate was written an incident report related to supporting a
Jihadist organization which James is associated with and which resulted in their being moved to
new cells, would qualify as one of the incidents covered by this request.[3]

**RESPONSE:** Objection. First, Defendant objects to the interrogatory to the extent it may seek
classified information or information that is privileged, including information protected by the
attorney-client, attorney-work-product, deliberative-process, and/or law-enforcement privileges.
Second, Defendant objects that this interrogatory is overly broad, unduly burdensome, and not

---

[3] Chesser is aware of this inmate's name and has seen the incident report. He was held on "C-Upper" in F Unit at ADX after being held in G Unit. Because the inmate is not associated publicly with terrorism, Chesser is not publicizing his name.

proportional to the needs of the case in that the Court has rejected Plaintiff's attempt to obtain information concerning institutions other than the ADX that may not be comparable to the ADX. Doc. 159 at 14-15. Third, Defendant objects that this request seeks information concerning personally identifying information of other ADX inmates which the BOP is not authorized to release in a case to which those inmates are not parties. Fourth, Defendant cannot correlate any definition of radicalization or terrorist recruitment to the citation referenced in this interrogatory.

Subject to and without waiving these objections, as Defendant referenced in its response to Interrogatory No. 6, inmates in the ADX have disrupted the safety and security of the institution by attempting to establish an alternative power structure to correctional staff by setting the standards for how other inmates in their housing units practice their religion. The inmates' actions have triggered hunger strikes and contention within the housing unit between these radicalized inmates and other groups. Defendant is in the process of gathering additional responsive information and will supplement this response.

**Interrogatory No. 16:** State every factual contention you dispute in the Plaintiff's responses to Defendant's Interrogatories Nos. 2 and 3, every reason you contend you cannot implement any of the solutions discussed in those responses (including the sub-parts resulting in modifications of the initial solution), and all evidence which you contend supports your responses.

**RESPONSE:** Objection. First, Defendant objects to the interrogatory to the extent it may seek classified information or information that is privileged, including information protected by the attorney-client, attorney-work-product, deliberative-process, and/or law-enforcement privileges. Second, Defendant objects that the interrogatory contains multiple separate interrogatories.

13

Subject to and without waiving these objections, Defendant incorporates by reference its responses to Plaintiff's Interrogatories Nos. 5, 6, and 7, which discuss the hazards, impracticalities, and, in some cases, illegalities of implementing Plaintiff's proposed solutions in connection with *his* confinement, which is the relevant consideration in his as-applied RFRA claims.

In addition, with regard to Plaintiff's proposed solution "A. Ending the Policies and Practices," including by having the ADX "convert to an open population prison," *see* Plaintiff's June 22, 2017, response at 51-52 & 109, Defendant disputes that the ADX is a "solitary confinement" facility, as Plaintiff's demonstrated ability to obtain extensive information about other inmates incarcerated there shows. The conditions of confinement at the ADX are necessary to safely secure those inmates (1) whose placement in other correctional facilities creates a risk to institutional security and good order, or who pose a risk to the safety of staff, inmates or others, or to public safety, and/or (2) who, as a result of their status, either before or after incarceration, may not be safely housed in the general population of another institution. The vast majority of those inmates who satisfy one or both of these criteria are *not* convicted terrorists. The BOP cannot, consistent with sound correctional judgment, ship "maybe half of [the ADX] population to other prisons . . . . and fill[] up its units with terrorists." *Id.* at 116.

Furthermore, courts have confirmed that the conditions in the ADX do not deprive inmates who are found to warrant placement in that institution of a protected liberty interest. Plaintiff, as a result of his dangerous actions in a less-restrictive prison, is one such inmate. For the reasons explained in Defendant's responses to Interrogatories Nos. 5, 6, and 7, it would be contrary to sound correctional judgment for the BOP to rewrite Plaintiff's history of criminal and

14

institutional misconduct to attempt to ensure that he will never again be found to warrant ADX placement at some unknown point in the future, under circumstances that cannot be known at this time.

In addition, with regard to Plaintiff's proposed solution of "B. Terrorism Unit," and the subheading of "1. Discrimination," *id.* at 51-59, *see also id.* at 109-115 &116, Plaintiff's continued insistence on a "terrorism unit"—which, for him, would consist entirely of Muslim inmates—violates the law, despite his assertions to the contrary. Moreover, the proposal makes no sense from a correctional perspective and rests entirely on Plaintiff's subjective opinions and preferences. For example, it is contrary to sound correctional judgment "to allow all terrorists to designate inmates they felt safe around." *Id.* at 58. It is also contrary to sound correctional judgment to allow Plaintiff to name those inmates who are "most likely to succeed" in a "terrorism unit," *id.* at 113, and the BOP does not agree that Plaintiff—with his history of institutional misconduct at CMU Marion—would fall in that category in any event. The BOP does not allow inmates to choose the inmates with whom they will be incarcerated. As the BOP has repeatedly explained in responses to Plaintiff's discovery requests and other filings in this case, there is no broad, categorical policy that the BOP applies when housing inmates. Inmate designation decisions are based on fact-specific, individualized determinations. Further, an inmate's religion plays no role in determining his security level or his place of incarceration. Thus, Plaintiff's unsupported assertions concerning the appropriateness of housing all terrorists together are false.

In addition, with regard to Plaintiff's subheading of "2. My CMU Conduct," *id.* at 59-65, for the reasons repeatedly set forth in the BOP's responses to Plaintiff's discovery responses and

other filings in this case, BOP correctional professionals disagree with Plaintiff's self-serving

characterization of his criminal conduct and his misconduct at CMU Marion. To take just one

example, Plaintiff's assertion that he has "never tried to kill anyone" is belied by the Statement

of Facts to which he stipulated in support of his plea agreement. *See* Doc. 67-2. The facts known

to the BOP concerning Plaintiff's CMU conduct also contradict his assertion that he has "never

engaged in a collaborative disruption of security . . ." *Id.* at 60. The BOP has thoroughly

examined, and rejected, Plaintiff's justifications and explanations for his conduct at CMU

Marion for the reasons repeatedly explained in the BOP's discovery responses and other filings

in this case.

 In addition, with regard to Plaintiff's subheading of "3. Ascendancy and Collaboration,"

*id.* at 65-69, this subsection is replete with Plaintiff's unsupported assertions and conjecture,

including his assertions about the "security scores" of Muslim inmates incarcerated at the ADX,

how many incident reports they have, which of them "has been approved for ADX-SDP," and

which of them, in his view, would not be in the ADX but for their ties to terrorism. None of these

unsupported contentions about other inmates provides a solution for addressing the BOP's

compelling interests in housing *Plaintiff* in the ADX and whether those conditions are the least-

restrictive means of furthering the BOP's compelling interests as to *Plaintiff.*

 In addition, with regard to Plaintiff's subheadings "4. Influence" and "5. Hunger Strikes

and Antagonism," *id.* at 69-76, these subsections again rest entirely on speculative and

conjectural suppositions about the supposed benign conduct of terrorists for which Plaintiff

provides no support. Such unsupported contentions about other inmates do not provide a solution

for addressing the BOP's compelling interests in housing *Plaintiff* in the ADX and whether those

16

conditions are the least-restrictive means of furthering the BOP's compelling interests as to

*Plaintiff*. The BOP takes note of the fact that Plaintiff claims to have been the "community

leader" of one of the ADX housing units for a period of time, which further confirms his

continued ability and desire to exert authority over other inmates—which he demonstrated before

at CMU Marion.

In addition, with regard to Plaintiff's proposed solution of "C. CMUs," *id.* at 76-89 &

115-116, the BOP again points to its repeated explanations of Plaintiff's institutional misconduct

at CMU Marion, including his overt attempts to put himself in the position of the authority figure

in the unit. Plaintiff presents nothing that calls into question the BOP's assessment that CMU

placement is not appropriate for him; he simply disagrees with the BOP's correctional judgment

about the dangers associated with his conduct. And Plaintiff's bragging about his supposed

influence over other terrorists, *id.* at 80-83, confirms that he poses risks that can be better

managed at the ADX, where he receives fewer telephone calls and has no access to email—both

mediums in which dangerous communications can be disseminated, notwithstanding close

monitoring by BOP staff.

In addition, Plaintiff's proposed solution "D. Terrorism Prison," *id.* at 89-95, rests on yet

more speculation and unsupported assertions, including the purported fact that terrorists do not

"smuggle drugs or stab one another."  Whether terrorists, as a group, are or are not more violent

than other inmates has no bearing on how the BOP addresses its compelling security interests as

to Plaintiff.  And, for the reasons repeatedly set forth by the BOP, the BOP cannot create a prison

designed to house exclusively those inmates who are (by Plaintiff's definition) members of one

religious faith, nor is the creation of such a prison a "solution" to the BOP's compelling interests

regarding Plaintiff—an inmate who managed to create serious trouble in an open-population unit

that he contends was predominantly Muslim.

In addition, as to Plaintiff's proposed solution "E. Terrorism System": as an initial matter,

Plaintiff is not "pending a transfer to a CMU." *Id.* at 95. To the contrary, he was recently rejected

for CMU placement. Again, Plaintiff's tripartite "system" for housing terrorists (based on his

speculations and unsupported conjecture about sound correctional management), *id.* at 102,

presumes that all "terrorists" can be lumped together as a group. The BOP successfully manages

convicted terrorists in institutions of varying security levels, the vast majority of whom are never

considered for placement on SAMs, in a CMU, or in the ADX, and who function in a safe and

secure manner with inmates who are not terrorists. Indeed, as to these inmates, Plaintiff's

proposed system would be a significantly *more* restrictive means of managing them. Nor does

this "system" show that it would be an appropriate mechanism for managing Plaintiff's risks,

which include his propensity to physically attack other inmates and to subvert the authority of

prison staff.

With regard to Plaintiff's proposed solutions "F. Smaller Groups," "G. Reduced

Solitary," "H. Restraints," "I. Recreation," "L. Intercoms/Radios/Computers," and "N. Specific

Exercises," please see Defendant's response to Interrogatory No. 17, below, which is

incorporated herein by reference.

In addition, with regard to Plaintiff's proposed solution "J. Consolidation in Solitary," as

explained above, the BOP does not allow inmates to have "a say in terms of their neighbors." *Id.*

at 104. The BOP makes housing decisions by taking into account a complex array of factors that

do not involve inmate preference. And, for these reasons and those explained repeatedly above, the BOP will not construct a "terrorist" housing unit.

In addition, with regard to Plaintiff's proposed solution "M. Remote Learning," *id.* at 106, no ADX inmate is allowed to have access to computers or to telephones (other than for legal research and approved social and legal calls). Access to electronic devices, especially a telephone, creates security risks in the ADX environment. Inmates can use a computer or a telephone to engage in unauthorized communications with persons outside the prison, including communications that might jeopardize security measures that might disseminate escape routes and plans or pass coded communications. Plaintiff can purchase written learning materials that are determined to be not detrimental to safety and security in accordance with BOP policy.

In addition, with regard to "K. SAMs," *id.* at 105, while Plaintiff may be willing to go on SAMs, in the judgment of Department of Justice officials involved in the SAMs decision making process, Plaintiff is not a candidate for a SAM.

**Interrogatory No. 17:** What, if any, reasons do you have for not transporting me and at least some inmates I can practice my faith with in the exact same manner as you do when transporting us to recreation, medical appointments, and other routine events at ADX like psychology classes, to some location where we can interact religiously for at least some religious exercise? In other words, is there any difference between these types of transportation? If the Plaintiff and others were willing to forego their normal recreation to have such an opportunity would this solve your concerns? State all evidence which you contend supports your responses.

**RESPONSE:** Objection. Defendant objects to the interrogatory to the extent it may seek

classified information or information that is privileged, including information protected by the

attorney-client, attorney-work-product, deliberative-process, and/or law-enforcement privileges.

Subject to and without waiving this objection, Defendant states that various aspects of

Plaintiff's practicing his faith, as he articulates those practices in his Responses to Defendant's

First Set of Interrogatories, would pose challenges and risks quantifiably different than those

posed by transporting ADX inmates to outdoor recreation, health services, or group psychology.

The manner of transporting Plaintiff and his fellow congregants would be much the same

(assuming Plaintiff and his fellow congregants were housed in the same ADX housing unit) as

how staff currently escort ADX inmates to group psychology enclosures or to recreation

enclosures. The material difference, however, would be in the duration, variance,

unpredictability, and self-selecting nature of Plaintiff's proposed congregate worship. These four

factors make it unfeasible, unsafe, and unpredictable for staff to escort Plaintiff and his fellow

worshippers in a manner similar to other escorts at ADX, such as to health services, group

psychology, or outdoor recreation.[4]

First, the individual and cumulative duration of each session of Plaintiff's proposed group

prayer is considerably longer than the duration of other ADX group activities. A group

psychology treatment session lasts only an hour or two. ADX inmates are placed in outdoor

recreation enclosures for roughly the same length of time. In his Responses to Defendant's First

---

[4] For ease of reading, and solely for purposes of these Responses, Defendant uses the shorthand "ADX group activities" to describe the activities to which Plaintiff compares congregate worship: outdoor recreation, group psychology sessions, and medical appointments. To be clear, the latter is not a group function, considering the fact that an ADX inmate is escorted to his appointment without other inmates. But because Plaintiff asks Defendant to compare the institutional demands and compelling interests triggered by his proposed congregate worship, Defendant lumps all three current escort reasons into a shorthand of "ADX group activities."

Set of Interrogatories, Plaintiff states, "I generally believe that I should engage in these activities for about 10 to 14 hours per day, but the precise way in which I allocate my time on a given day might vary due to any number of factors, such as responsibilities in court cases, health, and the events of daily life. Also, which acts I prioritize on a given day could vary." *Id.* at 8.  The lengthy duration—leaving aside for the moment its variable nature, which is discussed in turn below—is significantly different than any other ADX group activity, and its length impinges on the safe, secure, and orderly operation of the institution. The other ADX group activities are typically begun and finished within the same shift: the escort team who transported the inmates is the same team who returns them to their cells. This continuity ensures that the same escort personnel are aware of what, if anything, the inmate brought with him during the escort, so that the inmate is not attempting to take materials back to his cell that do not belong to him.

Second and relatedly, Plaintiff makes clear that his faith requires congregate worship that varies greatly both in the number of congregants and in duration of worship.  As to the latter, Plaintiff states, "Each of these prayers can be done in under five minutes, but ideally Fajr and Zhuhr last around 30 minutes, 'Asri around 15 minutes, and 'Isha is around 10 minutes. However, the tolerances of the congregation impact the ideal time, as the imam is not supposed to make the prayer difficult for people." *Id.* at 25; *see also* 30 ("I also believe I should engage in at least some group prayer without a special occasion from the above. It can be totally random or have a reason."). The Bureau has a compelling interest in ensuring systematized, predictable operations in ADX—these are one way that staff ensure the safety of staff, inmates, and the public.  Plaintiff's nebulous schedule of crosshatching liturgical gatherings would critically jeopardize the institution's ability to predict and plan inmate movements, to say nothing of

providing adequate staffing components to escort a varying number of inmates to a varying array of group worship meetings. By way of comparison, the other ADX group activities are set at repeating, predictable times, and are scheduled well in advance. This does not seem to be practicable given Plaintiff's proposed transport needs for congregate prayer with other Muslims at ADX.

The same problem is exacerbated by Plaintiff's oscillating statements on the required number of Muslim participants in the group prayer. Plaintiff will first state that "two to three Muslim participants" (*id.* at 18, 25) is sufficient to practice his faith in one type of prayer or worship, then elsewhere state that "[i]f all of the Muslims I am with believe ten [congregants] is the minimum, I'd need access to other Muslims to engage in the prayer." *Id.* at 18-19; *see also id.* at 43-44 (Speaking of teaching, learning, and studying, Plaintiff states, "I believe I should engage in as many of these acts as I can with as many people as I can without interfering with other more important aspects of my faith. The general amount will depend on different situations."). Similar to the preceding paragraph, Defendant relies upon a predictable and set number of inmate participants in ADX group activities. For example, there are five enclosures available for group psychology treatment; thus, staff can anticipate that a maximum of five inmates will need to be escorted to those enclosures (and again, at set, prescheduled times). Similarly, there is a set number of outdoor recreation enclosures. This finitude and its attendant predictability plays a real role in running an orderly, secure, and safe institution, and it is this precise and quantifiable nature that is lacking in Plaintiff's liturgical group meetings.

Next, Plaintiff's congregate prayer requirements would pose a critical security hazard in the fact that its membership is entirely of Plaintiff's choosing. He believes he must engage in

22

group worship with other Muslims, but states, "'Muslim' here is a religious definition and does

not include every single person who calls themselves a Muslim, nor to every religion which has

some relation to Islam (e.g., I do not consider the 'Nation of Islam' to be a Muslim group)." *See*

*id.* at 19-20. After he concedes that most people "who identify as Muslim qualify as Muslim in

my view," he then carves out other faith groups who he believes do not qualify as sufficiently

Muslim to join in his congregate prayer. *Id.* at 20. In a correctional environment, it would be

highly dangerous to allow Plaintiff to perform this gatekeeping function. If he were to have his

way, he could exercise a pocket veto on which inmates or which religious groups are sufficiently

devout, pious, or conservative enough to engage in Plaintiff's congregation. No inmate—whether

for liturgical, political, or any other reason—can be allowed to exercise this control over fellow

inmates. To allow as much would fly in the face of basic correctional judgment and common

sense. For Plaintiff to practice his own faith is one thing; for him to stand in judgment of others'

as a condition of their entry into his group's activities is another thing entirely. Defendant also

reiterates and incorporates by reference its Response to Plaintiff's Interrogatory No. 6, which

outlined how the Bureau has a compelling interest in adhering to 28 C.F.R.

§ 551.90 (barring discrimination in "administrative decisions and providing access to work,

housing and programs"). In other words, if ADX correctional staff were to transport Muslim

inmates for congregate worship, all inmates who identify with that faith would be welcome to

attend. There would be no piety threshold, imposed by Plaintiff, Defendant, or anyone else.

What's more, Plaintiff's self-selection of the congregate prayer participants stands in

stark contrast to the existing ADX group activities. No inmate can bar another inmate from

coming to the outdoor recreation enclosures; none can bar another from engaging in group

psychology therapy. Defendant has a compelling interest in ensuring inmate and staff safety insomuch that neither Plaintiff nor any other inmate may elevate himself above the rest[5] to determine who is in and who is out. In other words, ADX group activities are offered on a come-one, come-all basis within the limits of space and available escorting staff.

Another important distinction between Plaintiff's request and existing ADX group activities is that those other activities can be proctored to ensure that the activity stays within the appropriate boundaries for that activity. For example, psychology therapy is directed by a licensed psychologist who is in charge of the group. In Plaintiff's group religious activity scenarios, Plaintiff (or another inmate) would be the leader of this group, making the group activity easy to co-opt for purposes that could include planning activities that jeopardize institutional security or the safety of staff, inmates, or the public.

Finally, and most critical to Defendant's compelling interest of institutional, inmate and staff security, Plaintiff's request is different than existing group ADX activities in that he calls for no physical barriers between inmates: "Physical contact is required for all group prayer. It is not valid to pray with someone with physical separations such as walls or cages unless there is no way to avoid the separation." *Id.* at 21. As Plaintiff notes, both group psychology and outdoor recreation at ADX are performed with the inmate-participants in individual enclosures. The inmates can exchange gestures like shaking fingers and touching one another's hands, but the enclosures restrict all other physical touching. This is so for a reason. As Plaintiff has noted in this case, ADX used to permit contact recreation, meaning that inmates freely interacted with one

---

[5] This compelling interest is borne out in another respect: Plaintiff believes he must teach and lead other inmates. *See id.* at 33. He states, "The closer I am to being a scholar and the higher my relative level of Islamic knowledge is within a community, the more I believe I should teach, up to about 10 hours per day. My experience is that I have always been in environments in the BOP where I believed I should teach other Muslims." *Id.* at 34; 35. The Bureau does not permit inmates to assert a leadership role over other inmates, in any sense.

another without any physical enclosures or barriers separating them. Then in 2005, ADX inmates murdered other inmates in separate incidents. As a result and ever since, ADX general population inmates recreate outdoors in individual enclosures. Similarly, group psychology treatment is done in five adjacent enclosures, with one inmate to each enclosure with inmates from the same housing unit to prevent transmittal of messages between housing units. Plaintiff indicates that his faith requires no physical barriers between him and his fellow congregants. This is not currently done in any ADX general population unit.

## VERIFICATION OF INTERROGATORIES

I, Mark Collins, hereby certify that the foregoing responses to Interrogatories are true and correct to the best of my information, knowledge, and belief.

Dated this 14th day of August, 2017.

<u>s/ Mark Collins</u>
Mark Collins
Florence, Colorado

DATED August 14, 2017.

As to legal responses:

ROBERT C. TROYER
Acting United States Attorney

s/ *James P. Wiencek*
James P. Wiencek
Special Assistant United States Attorney
Susan Prose
Assistant U.S. Attorney
1801 California St., Suite 1600
Denver, CO  80202
Telephone:  303-454-0100
Fax:  303-454-0404
Email:  susan.prose@usdoj.gov

Counsel for the Federal Bureau of Prisons

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**CERTIFICATE OF SERVICE (CM/ECF)**

I hereby certify that on August 14, 2017, I hand-delivered the foregoing document to the following non-CM/ECF participant:

Zachary A. Chesser
Reg. No. 76715-083
ADX – Florence
P.O. Box 8500
Florence, CO  81226

s/ *James P. Wiencek*
James P. Wiencek