# Docket Entry 191-1
# (redacted version)

*Chesser v. Fed. Bureau of Prisons*, No. 15-cv-01939-NYW

# Exhibit A

## "Declaration of Zachary A. Chesser"

Plaintiff's Response to Defendant's
Motion for Summary Judgment

Chesser v. Dir., Fed. Bureau of Prisons

Civil Action No. 1:15-cv-1939-NYW

UNITED STATES DISTRICT COURT
DISTRICT OF COLORADO

Civil Action No. 15-cv-1939-NYW

ZACHARY A. CHESSER,
     Plaintiff,
v.
DIRECTOR, FEDERAL BUREAU OF PRISONS,
     Defendant.

---

DECLARATION OF ZACHARY A. CHESSER IN
SUPPORT OF PLAINTIFF'S RESPONSE TO
DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT

---

I, Zachary A. Chesser, state the following to be true, under penalty of perjury, pursuant to 28 U.S.C § 1746, based on my personal knowledge:

## CLARIFYING HEARSAY

1.  The Bureau of Prisons (BOP) has a Counterterrorism Unit (CTU) located in West Virginia. While I was in the Communications Management Unit (CMU) at United States Penitentiary (USP) Marion and ADX Florence, BOP staff claimed to me that my communications with non-prisoners were forwarded to the CTU, but that CTU analysts, such as David Jones, had no personal knowledge of anything which occurred in my prisons. These admissions included one by Leslie Smith, the deceased former head of the CTU. David Jones has no personal knowledge of my prison conduct, nor was he my CTU analyst until after all the communications he mentions in his declaration. #181-9.

2.  Similarly, nobody in the CTU had personal knowledge of my prison or pre-arrest conduct, so the "Profile and Assessment" cannot be based on personal knowledge. See #181-3 to 181-5.

3.  The Senate report at #180-7 to 180-8 was written by Seamus Hughes, who was not a BOP employee and who has no personal knowledge

1

of anything I've ever done. It isn't even accurate on many issues.

4. Disciplinary Hearing officers (DHO.) operate from remote locations. No DHO ever witnessed anything from my assault nor my alleged extortion incident. See #180-19 & 180-22.

5. While I saw Warden Jeffrey S. Walton in person briefly for a few minutes each week from November 2012 to June 2014, he never witnessed a single thing in my ADX referral [#180-20], and the referral is just copied and pasted from the Profile and Assessment. In fact, as the e-mail at Attachment 1 shows, the CTU itself wrote the referral. David Schiavone succeeded Smith as the head of the CTU. This e-mail by him was produced by the BOP.

6. While Jason Henderson makes many statements evaluating the penological risks of various things [# 180-38], he is a chaplain. I have previously cross examined BOP supervisory chaplain Robert Roloff, and he admitted he was not an expert on penological issues

7. The BOP, ironically, relies on my own opinions and inferences regarding things like my influence, but, with very few exceptions, I have no personal knowledge of who I have influenced nor to what degree. My opinions are mostly just based off of things I see in the news. I haven't put myself forward as an expert to render these inferences admissible. Moreover, a lot of what I have said is rote regurgitation of what others, such as the media and the government, accuse me of and I don't know if it's true or not.

## NATIONAL SECURITY

8. I wrote an article called "Open Source Jihad" in 2010. The article did not discuss terrorism or "lone wolf" attacks. Instead, it pointed out how, even though groups like Al-Qa'idah produced their own

2

recruitment videos and were the ones on various battlefields, the people most responsible for distributing their material were in the West. To whatever extent Al-Qaidah in the Arabian Peninsula (AQAP) extended the idea to actual terrorist attacks, I did not personally advocate that, and I have no personal knowledge of anything relating to AQAP's use of my article.

9. My poem, "The Star of Rolling Stone," was actually approved by the CTU, so it is in the public domain and was not rejected. It is sarcastic and is meant to lampoon Rolling Stone for putting Dzokhar Tsarnaev on its cover in a flattering manner. It also mocks the response to Tsarnaev's attack. I have my own copies of this.

10. "Jihad's my Sabbatical" was written knowing the CTU would reject it. I have my own copies of it, and, like "The Star of Rolling Stone," I can distribute it to inmates. The "disclaimer" in the beginning accurately describes my intent with it.

11. From 2012 to some point in 2014, I deliberately wrote offensive articles and poems and explicitly advocated jihad in many of my external communications just to cause the BOP to censor them. I was planning to file a lawsuit over this type of censorship and wanted to have numerous examples over which I could litigate. I chose satire as a mode of expression for many of the things I wrote, because I thought (and still think) it would make the BOP look excessively oppressive toward free speech. I stopped doing this when I concluded I did not have the time to fight such a case, largely due to my decision to file this case instead. I still advocated jihad, but not in a way in which the BOP's censors would have a say in whether it reached my audience or in a manner they wouldn't reject.

5

12.   My article, "For Immunity, Not Qualified" was used as an exhibit in a public hearing in one of my lawsuits. I still have my own copies of it and can freely distribute it to prisoners. It is called "For Immunity, Not Qualified" as a play on words to inform the BOP they would not receive qualified immunity if they rejected it. It was deliberately explicit in order to get the BOP to censor it even though it criticizes them for censorship. In order to highlight what they were doing, I rephrased holdings and speech which was held protected from various Supreme Court and Seventh Circuit cases, so the BOP would wind up censoring things from court cases. For example, the below is a comparison of some of the sources for my words:

| For Immunity, Not Qualified | Court Cases |
|---|---|
| a. "As a Muslim, I advocate, teach the duty, necessity and propriety of violence as a means of accomplishing reform." | a.  "[T]he mere abstract teaching of communist theory, including the teaching of the moral propriety or even moral necessity for a resort to force and violence, is not the same as preparing a group for violent action and steeling it to such action." *Noto v. United States*, 367 U.S. 290, 297-98 (1961) (per curiam). |
| b. "We are not a vengeful people, but if this country continues to suppress the Muslim people, it is possible that there might have to be some vengeance taken. | b.  "'We're not a revengeant organization, but if our President, our Congress, our Supreme Court, continues to suppress the white, Caucasian race, it's possible that there might have to be some revengeance taken.'" *Brandenburg v. Ohio*, 395 U.S. 444, 446 (1969) (per curiam) (speech held protected in this case). |
| c. "Of course, the vast majority of of the citizenry of this nation believe our ideas to be false and fraught with evil consequence...." | c. The First Amendment protects even that speech which a "vast majority of its citizens believe to be false and fraught with evil consequence." *Whitney v. California*, 274 U.S. 357, 374 (1927) overruled on other grounds by *Brandenburg*. |
| d. "That being said, we will not direct our advocacy toward the production of imminent delinquency under the law, nor shall we incite such activity." | d.  "[T]he constitutional guarantees of free speech do not permit a state to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action" |

4

*Brandenburg,* at #47.

e.   "Nevertheless, this government of pagan immorality shall ever restrict our expression because of its message, its ideas, its subject matter and its content. ... "

e.   The First Amendment removes government power "to restrict expression because of its message, its ideas, its subject matter, or its content." *Ashcroft v. ACLU,* 535 U.S. 564, 573 (2002) (quotation marks omitted).

I even cited some of the cases which I was alluding to. Because this document kept coming up in BOP arguments against me, I asked James Wiercek, in or around 2016, to explain the above so it would no longer be used. He refused on grounds that prisoners should know better than to write satire. He then referenced Chief Judge John Roberts' view on prioritizing minorities in school admissions, that if people want to end discrimination they should stop discriminating. He said that if I didn't want to be punished for satire, I shouldn't right satire. I expressed my view that his analogy made no sense.

13.   None of the inmates whom I supposedly led in my ADX referral [#180-20 p. 6] were referred to ADX. I didn't lead them, but I was the last person referred to ADX from the Communications Management Unit (CMU). It was common in the CMU for inmates to support jihad.

14.   I oppose almost all prison violence on the basis of my beliefs. Even my assault, which I do not believe was wrong morally, is something which I believe could have been more effectively handled without violence. I oppose violence over issues of "respect," harming people for past informing, harming people for being convicted of sex offences, violence of any kind over debts, and more.

15.   A "fatwa" is nothing more than an Islamic scholar's opinion on a religious ruling. It does not bind any Muslim to act on it to any degree whatsoever. However, someone who is not a "mufti," one who can issue fatwas, is not allowed to derive Islamic rulings for the situations they face or which others ask about, many of which will not have been specifically dealt with in written works. Fatwas apply to all areas of

5

Islamic jurisprudence: ablution, prayer, alms, fasting, Hajj, creed, sales, marriage, divorce, manners, etc.   Fatwas do not only deal with violence. The only fatwas I've sought in prison were ones where I was virtually certain the scholar would condemn the violence I was asking about or which had nothing to do with violence.   I have, however, received already-written fatwas in prison on subjects of jihad, which the BOP let me receive. I have also received numerous fatwas from various Jihadi scholars, including

formerly housed in one of the CMUs according to the BOP.                    is still in H Unit according to the BOP — the fatwa I have from him is critizing someone for extremism.

16.   I've openly advocated jihad almost constantly since 2008.   My beliefs and ability to do this have not changed much at all since my arrest.   I did this in the CMU, ADX-General Population and in the ADX Step-Down Program.   If anything, I am more capable of it now than before.   In ADX, I sent a poem called "Je Suis Irhābī" to G Unit from ADX's F Unit,[1] which praised the Charlie Hedbo attacks.

---

[1] I forgot this was one of the things I sent in my deposition and was reminded by another inmate later

6

17.   In terms of preventing me from influencing people to support terrorism in prison and outside, the CMUs are far more effective than anything at ADX, except maybe Special Administrative Measures (SAMs).   I was totally unable to circumvent CMU communications monitoring and the CTU rejected dozens of my correspondences for even minor things related to jihad.   Staff frequently informed me they had listened to my conversations with audio devices in the CMU They can restrict my communications more in a CMU than at ADX by policy and more strictly limit my contacts.   Also, even though the CMU is open population, most of the prisoners have terrorism cases or terrorism-related cases. Many of those who don't were known informants. There was not much of an audience to be meaningfully persuaded on the general idea of terrorism.   At ADX, there was a much richer audience for this, including numerous Muslims who did not have terrorism cases.   I could easily write to anyone in my unit to promote jihad, and the subject is not so vast or complex that it requires much writing to do this.   I did do this. This did not stop me from advancing in ADX BOP.

18.   If it was necessary   to my being able to study with a scholar, I'd be willing   to forego studies on issues the BOP considers to support terrorism and lose this accommodation if I violated this and face whatever restrictions the BOP applies to muftis, if I became one, until my release.

19.   At ADX, I frequently accessed a discovery computer which was kept behind glass, so I could not physically access it. I would be given a wireless mouse. For remote classes, the BOP could deny me access to a keyboard or mouse and that way I could not possibly misuse the internet. They could connect me to my class and then leave me alone, which is similar to what they did with my discovery. If necessary, they could deny me access to a microphone or any

7

ability to communicate during the class. I could then use e-mail, letters, and phonecalls in the same way I am already allowed to do, to ask my questions and check my understanding. Or, it could allow me an equivalent amount of time to pose my questions at the end of the lesson via skype or some other method. It could monitor that the same way it does visits, phone calls and other communications. A Skype or phone conversation poses less of a threat than a visit where one has more contact with the person, but visits are allowed at ADX. To be clear, I can't get a non-prisoner scholar to fly out to rural Colorado, and give me a private session in a visit, because they'd have to abandon their own classes with more students and it's simply inconvenient. I'm not in a gang and would never help a gang convey a hit. I'd be willing to be placed in some kind of segregation to achieve this form of study, even though that would burden all of the other exercises, because I view studies as my main priority right now. If this was the only way to study with an inmate scholar, I'd accept it.

## OTHER ARGUMENTS

20.   I did not like ▮▮▮▮▮▮ the inmate at issue in the BOP's false extortion allegation against me, but I had peacefully coexisted with him for more than a year after he left Islam, which is the main reason I didn't like him. In any event, what I said about a threat to his safety was true and staff already knew about it, so what I said couldn't harm ▮▮▮▮▮ Further, I would have preferred him to leave the CMU, so I wouldn't have offered a solution if my intent was to harm him, which it wasn't.

21.   My assault had nothing to do with whether or not ▮▮▮▮▮ mocked Islam or the call to prayer. I was not the one involved in the alleged incident over the call to prayer. Rather, I assaulted

him because guards made it clear that *he was the reason for their* banning of the call to prayer in the CMU. I assaulted him to get it lifted and also because I was frustrated with constant additions to banned religious activities and other issues in the unit, so I was hoping to get sent to the other CMU. I usually only made the call to prayer in the Special Housing Unit or Program Area where it wouldn't even arguably disturb anyone, so I'm not sure what the BOP's basis for claiming they told me not to do it early in the morning is. That never happened.

22.   In 2012, a relatively new Muslim informed me he was still saying prayers from The Bible. It turned out that one of them said God (Allah) ' rested after creating the universe. I asked him if he knew that was rejected in Islam and if he knew it was insulting to Allah to say it. He said he did. I advised him he had committed blasphemy and had to re-enter Islam and repent. He agreed and did this. This isn't controversial in Islam. It would be like a Christian not believing in Jesus. No Islamic sect I'm aware of would disagree with me on this issue. Islam is not some vast amalgamation of all possible beliefs. It has limits and the BOP does not get to define the world's religions. That is the purview of those religions. I also often tell inmates their legal arguments are frivolous and advise them to change them, such as an inmate's argument that his conviction order was invalid because it lacked a "seal." Perhaps, in the BOP's eyes, I was dictating to him what American law was too.

23.   All three members of my "unit team" in ADX's general population told me I was in ADX for being a member of ████████ group, which is Jama'ah Ad-Da'wah As-Sahihah (JDS). My unit team determined if I'd be considered for ADX's Step Down Programs

This occurred in or around 2016. I asked Counselor Humphreys if I was really in ADX over my disciplinary record, which was less serious than almost all other ADX inmates I encountered. He laughed and said I wasn't. He said they had me "labeled." I asked what he meant, because I was already labeled a terrorist when I was in the CMU. He said I was part of ███ group. I asked where he got that, because I wasn't in JDS. He said the FBI was involved. I later spoke to my unit manager, Sanchez, and asked him about it. He confirmed the allegation and said it was why I was in ADX. He said I'd never be housed with ███ again.[2] I asked if that would affect me going to ADX-SDP if ███ went first. He said we could be kept apart in ADX-SDP. Case Manager Coulson told me similar things. When I got to USP Florence, a staff member interviewed me and asked me about my "group." I told him I wasn't in a group. He said they knew which group I was in already and then asked other questions. ███ was sent to ADX for recruiting people in the CMU. I was the closest person to him and the BOP accuses me of succeeding him as a leader (even though neither of us was a leader) in my ADX referral. Attachment A2 is an e-mail produced to me in discovery, also by David Schiavone, the author in Att. A1. The email describes an assault on ███. After this assault, ███ the victim, was referred to ADX. The last unredacted sentence says, "according to Henry, ███." I can tell it refers to ███ due to both the poor redacting and the context. I have also reviewed documents from *Ajaj v. Bureau of Prisons*, in which a BOP employee explicitly accuses an inmate at ADX, whom I know to be ███ of recruiting inmates in

[2] what supports this is that ███ was originally in F Unit. When I arrived to F Unit, he was moved to G Unit to keep him apart from me.

another prison. This included a deposition. My unit team repeatedly claimed I was in ADX for being in this group and denied me ADX-SPP placement.

24. Prior to the JDs claim, Coulson expressed the notion that I was in ADX over group prayer. In my ADX hearing, the hearing officer said it was one of "three main reasons" to recommend my placement in ADX. I am also unaware of any other "group activity" which my ADX referral could be citing. #1916 is the denial of my appeal to the BOP's North Central Regional Office regarding my ADX transfer

25. Until the ban referenced in Exhibit B of my motion for summary judgment, the Muslims in B/B Unit engaged in religious gatherings of all types wherever we wanted. Even after it, we made no special effort to do things in the                         designated room in B/B Unit, but I think we happened to pray in there when inside each time until the BOP filed its motion for summary judgment claiming we're restricted to it. There are countless nooks and crannies in B/B Unit which aren't visible on camera, including a corner well out of view of the staff's offices. We are allowed to enter one another's cells and we frequently have meals together in our cells. When I first arrived, we didn't have a prayer room. We do prayers (and did other religious activities) wherever we want outside. There is literally nothing about the prayer room which makes it harder for an inmate to carry out an assault, nor to stop him from getting a knife, nor to help staff respond. It's just a room. In fact, only one staff member at a time could respond to violence in that room, because it has a door. On the ranges or the unit floor, which is thousands of square feet, numerous guards could be involved in ending violence and it would be more likely to be seen. Religious activities cause

no more tension than anything else and inmates tend to be respectful of our religious activities. Group prayer involves bowing, prostrating and facing Makkah. If I wanted to "incite" inmates, I would simply approach them and talk to them in a normal setting. If I wanted to disguise it, I'd use a simpler medium like a feaux normal conversation. I've never incited anything in prison that I'm aware of.

26. Right now, Ranges 5 and 7 are 100% compatible with one another. Range 6 is about to only have one inmate on it, as the rest are pending transfer. Two more inmates will join him and then there are months before anyone else will go to Range 6. In that period, it will also be compatible with 5 and 7. I'm on Range 7, but I've been approved for Range 5 since January 2018 (our case manager changed, so I've been stuck waiting on the new one to move me). At this time, combining ranges is feasible. Combining Ranges 5 and 7 would let me be out of my cell essentially as much as I need in my religion. The Pre-Transfer Phase (Ranges 5 and 6) has one incentive. One gets 30 to 60 more minutes of recreation each morning. For many, this just means they can no longer sleep in. Also, nobody wants a cellmate. A cellmate shares a tiny space with you. Only one can see the tus at a time. You have to smell them and hear them using the restroom. You can't exercise in your cell as easily. You typically have to sleep with a murderer. People don't like sleeping in a confined space with no means of escape with people who recently killed other people. It's extremely dangerous. The previous case manager, Castro, told me refusing a cellmate is the main reason people fail out of the step-Down Program. I've witnessed prisoners with cellmates ask to be separated. I've never witnessed one request a cellmate he didn't have to take. After 3 months, the

mandatory period, cellmates often separate. In any event, staff could still keep cellmates for the Pre-Transfer Phase only and the 30-60-minute recreation in the morning for them only and combine it with the Transitional Phase for the remainder of recreation, thus keeping all incentives in place.

27. The BOP treats Islam as a gang unlike other religions. Muslims are the only religious group it tries to balance. The CMU, for example, were kept around 50%-Muslim intentionally while I was there. When I arrived to USP Florence, I saw staff record my "political affiliation" as "Muslim." From around December 2014 until January 2016, I received a notice every six months saying I was denied placement in the Step-Down Program which was identical in wording to the one at Attachment A3 (the last of those). The second sentence identifies my original reasons for placement in ADX as the reason. In June 2016, my unit team told me I was going to be approved, but in July 2016, I was denied. They told me Unit Manager Gomez, who was in charge of the Intermediate Phase's unit, J/A Unit, had me rejected because there were "too many Muslims" in J/A Unit. They said he claimed the "unit dynamics" required me to wait even though all other staff recommended I go. In my notice of denial on this occasion, the BOP changed its rationale. Attachment A4 is a copy of this notice, which shows my reasons for ADX placement were no longer the rationale.

Executed on this 20th day of March, 2018, in Florence, CO.

Zachary A. Chesser

# ATTACHMENT   A1

## "CTU   E-mail"

Plaintiff's Response to Defendant's Motion for Summary Judgment

(Exhibit   A)

Chesser v. Dir., Fed. Bureau of Prisons

Civil Action No. 1:15-cv-1939-NYW

| From: | David Schiavone <dschiavone@bop.gov> |
|---|---|
| Sent: | Thursday, February 20, 2014 10:11 AM |
| To: | Catricia Howard <c4howard@bop.gov> |
| Subject: | Re: 76715-083 CHESSER, Zachary Adam |
| Attach: | TEXT.htm |

Hi Catricia:

The CTU concurs with the recommendation. In fact, we actually wrote the referral and provided the supporting documentation for the Warden.

Thanks.

David


>>> Catricia Howard 2/20/2014 11:57 AM >>>
STG 
SHABAAB

David,

Inmate Chesser is currently housed at MAR CMU. We recently received a referral from the NCR for ADX GP consideration. I wanted to make sure you were aware and have no objections. Let me know if additional documentation is required.

Catricia L. Howard, Sr. Designator
Designations & Sentence Computation Center
U.S. Armed Forces Reserve Complex
346 Marine Forces Drive
Grand Prairie, TX 75051
(972) 595-3016 - Office



SENSITIVE/PRIVILEGED COMMUNICATION
The information contained in this electronic message and any and all accompanying documents constitutes sensitive information. This information is the property of the U.S. Department of Justice. If you are not the intended recipient of this information, any disclosure, copying, distribution, or the taking of any action in reliance on this information is strictly prohibited. If you received this message in error, please notify us immediately at the above number to make arrangements for its return to us.

Chesser v. BOP, 15-cv-01939-NYW                                         BOP002493

# ATTACHMENT A2

"CTU E-Mail on ███████████"

(Exhibit A - Decl. of Zachary A. Chesser)

Plaintiff's Response to Bureau of Prisons' Motion for Summary Judgment

Chesser v. Din, Fed. Bureau of Prisons

Civil Action No. 1:15-cv-1939-NYW

**From:**      David Schiavone <dschiavone@bop.gov>
**Sent:**      Tuesday, July 30, 2013 3:11 PM
**To:**        Allen Beard <abeard@bop.gov>; Redacted
               Redacted Katherine Siereveld <ksiereveld@bop.gov>; Leslie Smith
               <lsmith@bop.gov>; Redacted Randy Eternick <reternick@bop.gov>;
               Redacted
**Subject:**   MAR CMU Incident
**Attach:**    TEXT.htm

---

MAR CMU placed three inmates in SHU last night.  We were just now able to obtain information from the institution on the circumstances.



- A unit officer heard commotion on the recreation yard and exited the officers' station to investigate
- upon arrival, staff observed Redacted with Redacted in a head lock and Redacted holding both Redacted and Redacted who were up against a fence
- the three inmates were placed in administrative detention
- no incident reports were written
- a review of closed circuit video surveillance indicated the incident was not captured on a recording as it occurred outside camera range
- Correctional Services is following up and after an investigation will issue incident reports as appropriate
- current information indicates Redacted was attempting to separate Redacted and Redacted
- staff currently believe it will be necessary to formally separate Redacted and Redacted
- Henry Rivas will be completing a Threat Assessment Redacted
- according to Henry, Redacted has been attempting to organize and further radicalize the younger inmates in the unit, particularly Redacted , Chesser and Redacted



BOP002135

# ATTACHMENT A3

# "Jan. 2016 Step-Down Program Denial"

(Exhibit A- Decl. of Zachary A. Chesser)

Plaintiff's Response to Bureau of Prisons' Motion for Summary Judgment

*Chesser v. Dir., Fed. Bureau of Prisons*

Civil Action No. 1:15-cv-1939-NYW

# GENERAL POPULATION AND STEP-DOWN PROGRAM
# (Intermediate Phase)

<u>January 27, 2016</u>
Date

<u>Chesser, Zachary Adam</u>     <u>76715-083</u>     <u>F</u>
Inmate Name            Register Number      Unit

<u>January 2016</u>
Month Reviewed

You have been denied placement into the Intermediate Phase by the Step-Down Program Committee. Specifically, due to the circumstances involving your placement at the ADX, it was determined that additional time is needed to determine whether you can function in a less secure environment without: posing a risk to institutional security and good order; posing risk to the safety and security of staff, inmates, or others, including yourself; and/or posing a risk to public safety. We encourage you to continue to participate in and complete all programs recommended by the Unit Team; demonstrate positive behavior, including respectful and appropriate conduct towards staff and other inmates; and demonstrate positive overall institution adjustment to include, but not limited to, personal hygiene, and cell sanitation. You will be reviewed again for placement in the Intermediate Phase during your regularly scheduled six month Program Review in June 2016, provided you continue to meet the basic-eligibility requirements identified in Institution Supplement 5321.07K(1), <u>General Population and Step-Down Unit Operations</u>. You may appeal this decision by utilizing the Federal Bureau of Prisons' Administrative Remedy Program.

_M.C._____
M. Carr, Associate Warden (P)

# ATTACHMENT A4

## "July 2016 Step-Down Program Denial"

(Exhibit A - Decl. of Zachary A. Chesser)

Plaintiff's Response to Bureau of Prisons' Motion for
Summary Judgment

Chesser v. Dir., Fed. Bureau of Prisons

Civil Action No. 1:15-cv-1939-NYW

# GENERAL POPULATION AND STEP-DOWN PROGRAM
## (Intermediate Phase)

July 13, 2016
Date

Chesser, Zachary Adam          76715-083          F
Inmate Name                    Register Number    Unit

July 2016
Month Reviewed

You have been denied placement into the Intermediate Phase by the Step-Down Program Committee. The Committee determined at this time safety and security concerns prevents your advancement into the Step-Down Program. Therefore, additional time is needed to determine whether you can function in a less secure environment without posing a risk to institutional security and good order, posing risk to the safety and security of staff, inmates, or others, including yourself; and/or posing a risk to public safety. We encourage you to continue to participate in and complete all programs recommended by the Unit Team; demonstrate positive behavior, including respectful and appropriate conduct towards staff and other inmates; and demonstrate positive overall institution adjustment to include, but not limited to, personal hygiene, and cell sanitation. You will be reviewed again for placement in the Intermediate Phase during your regularly scheduled six month Program Review in November 2016, provided you continue to meet the basic-eligibility requirements identified in Institution Supplement 5321.07K(1)B, General Population and Step-Down Unit Operations. You may appeal this decision by utilizing the Federal Bureau of Prisons' Administrative Remedy Program.

R. Hudgins, Associate Warden

# EXHIBIT B

"Evidentiary Objections"

Plaintiff's Response to Defendant's Motion
for Summary Judgment

Chesser v. Dir., Fed. Bureau of Prisons

Civil Action No. 1:15-cv-1939-NYW

The Plaintiff asserts the following objections to the evidence of the Bureau of Prisons:

| DOCUMENT | OBJECTIONS |
|---|---|
| Dep. Tran. Zachary Chesser [#180-1/181-1] | Plaintiff's moral views on perjury and a decade old lie he told which wasn't under oath are irrelevant. [pp. 20-21 & 80-94]<br><br>Plaintiff's testimony about what Anwar Al-Awlaki and Samir Khan did is hearsay (as the testimony makes clear) and his opinions on his influence are both hearsay and lay opinion. [pp. 292-293] |
| Decl. of David Jones [#180-2/181-2] | [#3] Not all documents are business records nor maintained by the BOP. See response.<br><br>[#5-7] As explained in the Response, the "Profile and Assessment" is not a business record nor is it based on personal knowledge.<br><br>[#8] No personal Knowledge.<br><br>[#10] No personal Knowledge; irrelevant what Al-Shabaab did after Chesser's arrest.<br><br>[#12] Jones has no personal Knowledge of what Plaintiff said to the Senate, nor is anything in the Senate Report admissible, as explained in the Response — whole ¶ is hearsay.<br><br>[#13] The information in parentheses is hearsay and lay opinion based on inadmissible documents.<br><br>[#14] Information in parentheses is hearsay.<br><br>[#16] Whole ¶ is hearsay.<br><br>[#18] First sentence and the referenced "discussing [of] video" is hearsay.<br><br>[#20] First sentence is false and is hearsay even though it cites admissible evidence. Second sentence is Chesser's inadmissible lay opinion about "the law" and the conduct was not illegal — no statute cited. Fourth and sixth sentences are hearsay which falsely characterize the document. Cited discussion is hearsay.<br><br>[#21] Cited discussion is hearsay. |

| DOCUMENT | OBJECTIONS |
|---|---|
| | [¶23] Whole ¶ is hearsay. Plaintiff's wife was not "deported." |
| | [¶25] First sentence is Jones' subjective belief. |
| | [¶26] First sentence is Jones' subjective belief. Second sentence contradicts CMU policy. see Att. A3 to PMSJ. |
| | [¶27] Jones has no personal knowledge of any of this. |
| | [¶28] Same; this renders Att. 8 of his decl. inadmissible. The cited document is entirely hearsay too. Further, to the extent Chesser expressed opinions on his article and events outside of prison, this is hearsay and lay opinion. |
| | [¶29] Cited analysis is hearsay. |
| | [¶30] Jones lacks personal knowledge of any of this and the cited discussion is hearsay. The poem is admissible via the deposition. |
| | [¶31] This is hearsay and isn't even a correct reading of the document, which uses first-person narrative as a literary device and explains it as such···· |
| | [¶33] This is hearsay. No "business record" has the referenced information. |
| | [¶34] Same. |
| | [¶35] Same. |
| | [¶36] Same. |
| | [¶37] Same. |
| | [¶38] Same. |
| | [¶39] Same. |
| | [¶40] This ¶ literally explains itself as hearsay. It is layers of hearsay and the first sentence is lay opinion. Fourth sentence is also lay opinion and subjective belief. |
| | [¶41] Conclusory & hearsay—whole ¶. |

| DOCUMENT | OBJECTIONS |
|---|---|
| | [¶42] Hearsay. Further, the first sentence cannot be derived from the cited document, because staff only witnessed Chesser being "bear-hugged," not the nature of his assault. Third sentence is entirely hearsay and lay opinion. |
| | [¶43] Whole ¶ is hearsay. |
| | [¶44] Same. |
| | [¶45] First sentence is hearsay and conclusory. |
| | [¶46] Second sentence is hearsay and conclusory. |
| | [¶48] This is a random, bizarre paragraph which is, at best, conclusory. It isn't even evidence, but is a set of declarations about what Jones seems to think are moral truths. |
| | [¶49] Hearsay. Nothing about why Chesser did anything is admissible. Jones fails to cite a policy, so his declaration that one exists is conclusory. |
| | [¶50] Hearsay and conclusory. |
| | [¶51] Hearsay (Jones has no knowledge of CMU rules from 2011 to 2013). Allegation at end is conclusory. |
| | [¶52] Hearsay insofar as it explains why BOP officials did anything. |
| | [¶¶ 54-59] Hearsay insofar as it characterizes documents or alleges Chesser did anything. |
| | [¶60] Second sentence is hearsay. As Chesser notes in his own motion, the officer actually said he could not consider Chesser's evidence. |
| | [¶62] Hearsay. |
| | [¶63] Hearsay. Jones wasn't part of the ADX referral. Second-to-last sentence is admissible. |
| Profile & Assessment [#181-3 to -5] | Not a business record and is hearsay. See Response |
| Zachary Chesser: A Case Study... (Senate Report) [#180-7 to -8] | Not a business record nor a public record and is hearsay. See Response. |

3

| DOCUMENT | OBJECTIONS |
|---|---|
| Assault DHO Report [#180-19] | Hearsay insofar as it reports the events of the assault |
| ADX Referral [#180-20] | Hearsay insofar as it discusses Chesser's conduct |
| Extortion DHO Report [#180-22] | Hearsay insofar as it discusses Chesser's conduct |
| Plaintiff's Discovery Responses [#180-27] | [pp. 80-82] Plaintiff is simply reporting what others say (hearsay) or is expressing his lay opinion |
| Decl. of David Christensen [#180-?] | [¶5] Christensen is not a national security expert. <br><br> [¶21] Conclusory and lay opinion on national security ("NS"). <br><br> [¶22] Last sentence is conclusory and makes no sense. <br><br> [¶23] Second sentence is conclusory. <br><br> [¶24 n.6] Conclusory/subjective belief. <br><br> [¶25] Hearsay. <br><br> [¶26] Hearsay/Conclusory. <br><br> [¶27] Conclusory statements about legal conclusions and the final sentence is conclusory factually. <br><br> [¶29] Conclusory. There is no data to know if a 3% failure rate is "extremely effective" or not, nor to judge the rate at which people fail in the program. If the 3% who return to ADX are, e.g., murdering people, that is an incredibly high murder rate. <br><br> [¶30] Hearsay and conclusory. Chesser has one incident of physical violence in his entire record, which hardly suggests he has "never" had proper social skills. <br><br> [¶31] Conclusory and lay opinion. Christensen is not a psychiatrist who can tell what might "re-trigger" behaviors. <br><br> [¶32] Conclusory. <br><br> [¶34] Same. <br><br> [¶35] Same (last sentence). <br><br> [¶¶ 36-37] Conclusory. |

| DOCUMENT | OBJECTIONS |
|---|---|
| | [¶41] Conclusory. |
| | [¶44] Speculation / conclusory. |
| | [¶45] Same. |
| | [¶46] Conclusory. |
| | [¶47] Conclusory / lay opinion on NS. |
| | [¶¶48-50] Same. |
| | [¶¶56-58] Same. |
| Decl. of John Oliver [#180-37] | [¶13] It is not rational to conclude three assaults in three years means physical contact makes them more likely, especially when Oliver cites multiple assaults without physical contact. ¶¶ 11-12. |
| | [¶15] Conclusory. Oliver's expertise does not give him magical insight into things where he has no evidence to back it up. |
| | [¶19] Speculation. |
| | [¶23] Legal conclusion (first sentence); no evidence to support idea that Plaintiff's range is safer for him than others. |
| Decl. of Jason Henderson [#180-38] | [¶20] Conclusory. |
| | [¶24] Conclusory. |
| | [¶27] This is a flagrant lie. See PMSJ Ex. B, Att. A1. |
| | [¶28] Same. |
| | [¶31] Lay opinion — the chaplain is not a penological expert. |
| | [¶32] Same. |
| | [¶33] Same. |
| | [¶34] Same. |
| | [¶35] Same. |
| | [¶36] Same and he also isn't a national security expert. |

5

| DOCUMENT | OBJECTIONS |
|---|---|
| | [¶37] Same. |
| | [¶38] Not evidence of anything. Random declaration of policy in Henderson's mind. |

# EXHIBIT C

## "Declaration of Eljvir Duka"

Plaintiff's Response to Defendant's Motion for summary Judgment

Chesser v. Din, Fed. Bureau of Prisons

Civil Action No. 1:15-cv-1939-NYW

# UNITED STATES DISTRICT COURT
## DISTRICT OF COLORADO

Civil Action No. 1:15-cv-1939-NYW

**ZACHARY A. CHESSER,**
  Plaintiff,

v.

**DIRECTOR, FEDERAL BUREAU OF PRISONS,**
  Defendant

FILED
UNITED STATES DISTRICT COURT
DENVER, COLORADO

APR 02 2018

JEFFREY P. COLWELL
CLERK

## DECLARATION OF ELJVIR DUKA

I, Eljvir Duka, state the following to be true, under penalty of perjury, pursuant to 28 U.S.C. § 1746, based on my personal knowledge:

1. I was previously housed in the Communications Management Unit (CMU) at FCI Terre Haute. Based in part on staff admissions and in part on my personal knowledge, the CMU I was in housed two prisoners who were able to issue fatwas.

2. Because the CMU subjected all inmates to 100% monitoring and the inmates mostly had ideological charges like terrorism, it would be more difficult in a CMU than at ADX to sneak out a communication on terrorism or influence other inmates to support it. In ADX, it was easy to send written correspondences to other inmates and many were not subject to total monitoring. Also, most of those at ADX do not already have ideological charges.

Executed on this 26th day of March, 2018, in Florence, CO.

Eljvir Duka

1

# EXHIBIT D

# Declaration of Mohamed S. Odeh

Plaintiff's Response to Defendant's Motion for Summary Judgment

Chesser v. Dir., Fed. Bureau of Prisons

Civil Action No. 1:15-cv-1939-NYW

UNITED STATES DISTRICT COURT
DISTRICT OF COLORADO

Civil Action No. 1:15-cv-1939-NYW

ZACHARY A. CHESSER,
    Plaintiff,

v.

DIRECTOR, FEDERAL BUREAU OF PRISONS,
    Defendant.

---

## DECLARATION OF MOHAMED SADDIQ ODEH

I, Mohamed S. Odeh, state the following to be true, under penalty of perjury, pursuant to 28 U.S.C. §1746, based on my personal knowledge:

1.   I have known    Mamdouh Salim for decades, including while housed under Special Administrative Measures (SAMs) in H Unit at ADX Florence in the Bureau of Prisons (BOP).   Salim is not Jihadi and does not support terrorism.  While I knew him, he frequently criticized terrorist tactics by Al-Qaidah (Al-Qaeda) and other groups. Salim's beliefs are the same as the Muslim Brotherhood's.  He was never an actual part of Al-Qaidah.

2.   In H Unit, Muslims are more concentrated than in other parts of ADX.  No matter where one is housed in H Unit, they would have daily contact with Muslims.  H Unit is replete with recording devices by which the government is able to listen to all inmate conversations. J/B Unit at ADX is similar in these respects.

Executed on this 20th day of March, 2018, in Florence, CO.

_____
Mohamed Saddiq Odeh

1