# Docket Entry 193
# (redacted version)

*Chesser v. Fed. Bureau of Prisons*, No. 15-cv-01939-NYW

UNITED STATES DISTRICT COURT
DISTRICT OF COLORADO

Civil Action No. 1:15-cv-1939-NYW

FILED
UNITED STATES DISTRICT COURT
DENVER, COLORADO

APR 10 2018

JEFFREY P. COLWELL
CLERK

ZACHARY A. CHESSER,
    Plaintiff,

v.

DIRECTOR, FEDERAL BUREAU OF PRISONS,
    Defendant.

## PLAINTIFF'S SECOND MOTION FOR PARTIAL SUMMARY JUDGMENT

Plaintiff Zachary A. Chesser moves this Court, pursuant to Fed. R. Civ. P. 56, for summary judgment on Claim 4 and on Claim 3, to the extent it overlaps with Claim 4.

## INTRODUCTION

In December 2013, the Bureau of Prisons (BOP) removed Zachary A. Chesser from the general population of a Communications Management Unit (CMU) at United States Penitentiary (USP) Marion, Illinois, placed him in a special housing unit (SHU) and referred him to its most secure and restrictive prison, USP Florence - Administrative Maximum security (ADX). At ADX, and in part of the ADX program at USP Florence called "B/B Unit," the BOP has severely restricted Chesser's ability to engage in religious exercise with his fellow Muslims through physical restrictions and a series of bans on various religious interactions. Chesser believes he must engage in these exercises for most of his day, so, in order to relieve this burden, he brought a claim (Claim 4) challenging the restrictions he faces under the Religious Freedom Restoration Act (RFRA), 42 U.S.C. § 2000bb-1, et seq.

RFRA is stronger than the Free Exercise Clause in that it protects *any* exercise of religion, not just those which are compelled nor merely a general ability to practice one's faith, forcing the government to justify any substantial burden to an exercise of religion

i

through strict scrutiny. The BOP will try to deceive the Court into applying the First Amendment standard, instead of RFRA, to argue Chesser's exercises aren't obligatory in prison and that he can now generally practice his faith, because he can practice some of what he believes respecting a single relevant exercise of religion. However, regardless of what any paid theologian says, Chesser's beliefs are sincere and the RFRA standard renders the BOP's case frivolous.

At the outset, apparently to avoid Claim 3, the BOP fled from any admission that Chesser's beliefs, communications and terrorism ties were why he was sent to ADX, arguing instead that he became a leader in the CMU, extorted staff, assaulted an inmate, possessed a code, and engaged in and encouraged "disruptive activities" (by which they mean group prayer). For the purposes of Claim 4, Chesser is happy to take their sworn words at face value. The BOP lacks any evidence he was a leader and admits he wasn't the real threat in the extortion incident. The assault was, quote, "minor." He was given back his code instructions at ADX and group prayer, by BOP admission, didn't harm security and the variety he was punished for is allowed in B/B Unit. Chesser is a "low security" prisoner in a supermax. The BOP cannot justify keeping him away from Muslims.

As for their bans, Chesser can hold secular classes and group activities, but not religious ones, which obviously fails strict scrutiny.

That being said, the above is almost superfluous because of a recent BOP decision. On August 16, 2017, the BOP denied Chesser a referral to return to the CMU, concluding he was no longer dangerous enough. As a result, he went to B/B Unit which is far more restrictive than a CMU. Chesser not being dangerous enough for a CMU is not a compelling reason to impose restrictions on him.

2

As for solutions, the BOP lets inmates choose their cells to be around fellow gang members; it allows secular group activities at ADX; it transports inmates to secular activities on a regular basis; and lets them out of their cells to do things of a secular nature, but it refuses to do the same for Chesser's religious needs, making the case factually similar to *Yellowbear v. Lampert, 741 F.3d 48 (10th Cir. 2014),* as will follow. The BOP also lacks evidence that Chesser is a threat to all inmates, so it could house him in open population with some of them. It further did not refer similarly situated CMU inmates to ADX for worse conduct, indicating the CMU is a solution.

The BOP will attempt to use inadmissible, conclusory statements to overcome its burden under RFRA, but, as the Tenth Circuit and Supreme Court have recently noted, this does not suffice under the standard set forth by Congress. Given the strength of RFRA, the undisputed material facts require summary judgment in Chesser's favor.

## UNDISPUTED MATERIAL FACTS

## Background

Chesser became Muslim in Summer 2008, was arrested two years later on July 21, 2010, and was charged with various speech and terrorism related offenses, for which he eventually received 25 years in prison as a sentence. Ex. A (Decl. of Zachary A. Chesser) ¶ 3.

In April 2011, he entered BOP custody and on May 2, 2011, he arrived at USP Marion's CMU. *Id.* ¶ 4. On December 4, 2013, he was placed in the SHU at USP Marion and referred to ADX, which he reached on June 12, 2014. *Id.* At ADX, he was initially held in ADX's general population (ADX-GP) in F Unit. *Id.* ¶ 5. On January 17, 2017, he progressed to the ADX Step-Down Program (ADX-SDP) in

ADX's J/A Unit. *Id.* While Chesser was in J/A Unit, he was referred back to a CMU instead of going to the next phase of ADX-SDP, but this referral was denied on August 16, 2017. *Id.* The next day, Chesser was transferred to B/B Unit at USP Florence for the next phase of ADX-SDP. *Id.* He remains in "Phase 1" of B/B Unit, but was approved for "Phase 2" in January 2018. *Id.* B/B Unit may move to B/A Unit soon. *Id.* Chesser remains an ADX inmate. *Id.*

## Chesser's Sincere Beliefs

Chesser has been a Sunni Muslim since August 2008. *Id.* ¶6. As part of his religion, he believes he must engage in various forms of group prayer, Islamic classes, gatherings of remembrance, religious celebrations, and interaction to promote communal and spiritual well-being. *Id.* ¶7. [1] Chesser has written a lengthy reference explaining each of these in detail, showing third-party opinions on the bases for these beliefs. *Id.*; Att. A1 (Reference on Plaintiff's Beliefs). [2] The summary of these beliefs is that Chesser believes he should spend about 10 to 14 hours engaged in these exercises with other Muslims each day, that some have specific occasions and times, that their prioritization depends on the situation each day (e.g., celebrating is more important than classes on the 'Id holidays), and that most should be done with as many Muslims as possible. Ex. A ¶8.

Group prayer involves eight separate exercises of religion:

1. **The Five Daily Prayers** (As-Salawah Al-Maktubah): Five different prayers done each day at dawn (Fajr), noon (Zhuhr), mid-afternoon ('Asr), sunset (Maghrib), and night ('Isha');

2. **The Friday Prayer** (Salah Al-Jumu'ah): A prayer and sermon done

---

[1] The classification of the exercises varies slightly from the Third Amended Complaint (ECF 91), but this is just for convenience. Both parties are of the understanding that all remain part of Claim 4. To the extent the Court *sua sponte* limited them to group prayer in its clarification order, that is a clear error it must reconsider, as the BOP never moved to dismiss them.

[2] This document is lengthy and is meant to serve as a reference, not to be read page for page. It is difficult to know which exercises will need more clarification based on the BOP's response and which ones the Court will want more information on. Most appendices containing third-party opinions have been removed for brevity.

4

on Fridays in place of the Zhuhr prayer;

3. **The 'Id Prayer** (Salah Al-'Idayn): A prayer and sermon done on Islam's two holidays, 'Id Al-Fitr and 'Id Al-Adha, between the times of Fajr and Zhuhr;

4. **The Eclipse Prayer** (Salah Al-Kusuf): A prayer and sermon done when one actually sees any eclipse for the duration of its visibility;

5. **The Rain Prayer** (Salah Al-Istisqa'): A prayer and sermon done any time on each day of a drought;

6. **Ramadan Night Prayer** (Salah At-Tarawih): A long series of prayers after the 'Isha' prayer for each night of the holy month of Ramadan (which will be after 9 p.m. this year);

7. **The Funeral Prayer** (Salah Al-Janazah): A prayer done when a Muslim dies at any time;

8. **General Group Prayer** (As-Salah An-Nafilah): Prayers done spontaneously without specific times or occasions, which should be infrequently done in a group.

Id. ¶ 9; Att. A1 pp. 2-17. All involve an imam (prayer leader), leading others in rows behind him through scripted movements and sayings and require physical contact. Ex. A ¶ 10. All but general group prayer should be done with as many Muslims as possible in one's area. Ex A ¶ 10; Att. A1 pp. 3-5.

Islamic classes involve the teaching of various Islamic subjects, should be done with as many students as possible if one is teaching, with a scholar if one is learning, and Chesser believes that most of his day should be spent as a teacher or student ( depending on the level of knowledge of those around him). Ex. A ¶ 11; Att. A1 pp. 17-21.

Chesser believes he should engage in as many gatherings of remembrance as possible, which includes Islamic discussions, recitation of the Qur'an, spiritual lectures, and reviewing Islamic texts from memory. Ex. A ¶ 12; Att. A1 pp. 21-22.

He believes that on 'Id Al-Fitr, 'Id Al-Adha and the following three days, and the occasions of weddings (walimahs) and births (aqiqahs) he should engage in various forms of feasting, merriment and visitation of Muslims to celebrate. Ex. A ¶ 13; Att. A1 pp. 22-25.

He believes he should engage in various interactions to promote spiritual and communal well-being among Muslims, including being helpful to others, mixing with Muslims, greeting them, smiling at them, shaking their hands, visiting their sick, enjoining good and forbidding evil, organizing charity and

displaying good manners, and that this should be done as much as possible. Ex. A ¶ 14; Att. A1 pp. 25-31

On some days one exercise might take priority over another or even activities not at issue in this case could become a priority (e.g., legal work could take precedence), and affect the balance of how Chesser believes he should spend his time, but, taken as a whole the exercises should be done for 10 to 14 hours per day. Ex. A ¶ 15.

Chesser did not invent these beliefs. Id. ¶ 16; Att. A1 (generally). He has been engaging in them since before his arrest whenever possible, walking long distances to mosques, Ex. A ¶¶ 18-19; living in one as a caretaker, id. ¶¶ 20-21; and performing them in spite of severe punishments from the BOP, id. ¶ 25, Att. A2 (Incident Reports for Group Prayer). Id. ¶¶ 16-43. Before most of them were banned in B/B Unit, Chesser engaged in them as much as possible there. Id. ¶¶ 26, 30, 37 & 43; see Ex. B (Decl. of Zachary A. Chesser on New B/B Unit Policy)

While the BOP will bring Ammar Amonette to argue that the exercises Chesser believes in are not *obligations* on prisoners and to dispute Chesser's understanding of his religion, Chesser vehemently disagrees with Amonette and even wrote articles against him before he even got involved in one of Chesser's cases. Att. A1 pp. 3-5, 32 & App'x D p. 136:15-25 (Testimony of Ammar Amonette) (referencing the articles). Moreover, Chesser believes he should perform these acts for their spiritual and real-life benefits, not just to avoid sin, so, even if Amonette was correct, Chesser would still believe he should do them. Att. A1 pp. 1-2. In fact, Amonette himself previously testified that even though *he* doesn't believe group prayer is an obligation in prison, it "is beneficial when it is possible." Att. 1, App'x D pp 135:19-136:1.

In short, Chesser is sincere.

## ADX's Burden on Chesser's Exercise of Religion

While in the ADX program, Chesser has been unable to practice the above exercises due to a combination of physical restrictions and bans. Ex. A ¶¶ 44-45.

## I.   An Overview of the ADX Program an its Restrictions

The ADX program begins with a referral, after which the person referred is placed in ADX-GP. Id. ¶ 46.[23] Inmates are held indefinitely in ADX-GP for a minimum of 18 months, after which they can be considered for ADX-SDP if they meet various criteria, including the absence of any incident report for the last year — still, the issue is up to a warden's subjective decision, which can take decades. Id. ¶ 47. In ADX-GP, one is held in a single cell on a range with 8 or 12 cells, which are designed in such a way that intercell communication is only possible in a number of painful and unsafe ways via plumbing and vents (excluding writing). Id. ¶¶ 50-51. One gets five two-hour recreation sessions per week, half of which are indoors, half of which are outdoors, in cages allowing for no physical contact. Id. ¶¶ 52-54. At recreation, one can usually freely speak to one to six other inmates, depending on the circumstances. Id. . Recreation is scheduled and one may not choose when they go, when they return, or who they are placed near — the cages are filled in the order of the cells. Id. ¶ 52. All ADX-GP transport occurs in handcuffs. Id.

ADX-SDP consists of three six-month phases, in which one must meet programming requirements and receive no incident report in order to progress and avoid a return to ADX-GP: (1) J/A Unit, (2) B/B Unit Phase 1, and (3) B/B Unit Phase 2. Id. ¶ 48. After this, one is sent to a high security facility; even Chesser, who is "low security," will have a "management variable" placed on him to achieve this. Id. ¶ 49.

J/A Unit is divided into four recreation groups where inmates

---

[23] The BOP's written policy on the ADX program no longer reflects reality in so many cases that it will simply be ignored. This is how it really is in ADX.

get 90 minutes of indoor and outdoor recreation each day with up to 8 prisoners in each group. Id. ¶¶ 57-59. One has physical contact with their recreation group and can talk to the others at their cells during inside recreation. Id. ¶¶ 59-61. Aside from inside recreation (and orderlies), transportation is the same as ADX-GP. Id. ¶ 62. For inside recreation, staff remotely open the doors. Id.

In B/B Unit, one recieves 270 minutes of recreation in Phase 1, on an average day, and 315 minutes in Phase 2, excluding lockdowns and modified operations, which substantially reduce those numbers. Id. ¶ 65. One is kept in a group of up to 12 inmates in each phase, but they typically range from 1 to 10 inmates. Id. ¶ 64. Inmates are escorted without restraints with their entire group wherever they're transported. Id. ¶ 68. Otherwise, it is similar to O/A Unit. Id. ¶¶ 63-68.

In all phases of the ADX Program, there is a ban on group religious activity, so if Chesser were to engage in the above exercises, he could receive an incident report and have his ADX-GP stay extended or reinstated. Id. ¶¶ 73-76, 80-83; Ex. B ¶¶ 1-2, 4 & 8; Att. B1. The only exceptions are for most of the religious interactions to promote well-being and casual discussion of Islam, and, in B/B Unit, the group prayers not involving a sermon. Ex. A ¶¶ 73-76 & 80-83; Ex. B ¶¶ 1-2, 4 & 8. In B/B Unit, all religious gatherings were allowed absolutely until February 22, 2018, when Chaplain Jason Henderson banned them. Ex. B ¶¶ 1-2, 4 & 8; Att. B1.

## II. How the Restrictions Impacted Chesser

From June 23, 2014 to January 2016, Chesser was held on a range mainly reserved for a Neo-Nazi prison gang and only had access to a Muslim a few times per month, due to where he was housed in ADX-GP. Ex. A ¶¶ 69-70. White Muslims then moved to where Chesser could reach them on his sink, he injured his back and was physically unable to tolerate using it for more

8

than a few minutes and he was unable to go to recreation at all, so he had virtually no access to a Muslim until June 2016, when he began to be able to tolerate recreation. Id. ¶71. After two years of requests to be moved near a Muslim, on July 6, 2017, the BOP moved Chesser to a cell where, even though he did not have a Muslim neighbor, he could see one at recreation. Id. ¶72. Even when that man finished his sentence, it let another Muslim move to his range to be near him. Id.

Due to physical restrictions and the bans in ADX-GP, Chesser was only able to secretly make two group prayers and engage in rare Islamic discussions and interactions to promote well-being, excluding handshaking and organizing charity. Id. ¶¶73-77. Even what he could do was extremely infrequent and he could only do it with one or two Muslims. Id. ¶78.

In J/A Unit, the ban prevented all group prayer and most other exercises, except what was allowed in ADX-GP, a secret 30-minute class Chesser was able to hold on occasion and a partial celebration of 'Id Al-Fitr. Id. ¶¶ 79-83. The physical restrictions would have prevented most group prayer anyway. Id. ¶¶79-80. While Chesser had somewhat more ability to engage in things like religious discussion, recreation was also the only time to exercise, shower, do legal research and more, so it did not allow for anywhere close to three hours of religious interaction, even though a Muslim was in Chesser's group. Id. ¶¶ 79, 82, 84 & 85. Otherwise, it was similar to ADX-GP. Id. ¶¶ 79-85.

Under the new policy in B/B Unit, there is not much difference with J/A Unit, except that Chesser has a bit more time for the permitted exercises (in B/B Unit, one must also do more chores at recreation than in J/A Unit) and, on some days, he can make one or two of the

9

<u>Five</u> Daily Prayers. Ex. B (in conjunction with what follows). Under the pre-ban policy, he could occasionally make all prayers but the Fajr, Eclipse, and Ramadan Night Prayers; a short Islamic class on some days, and a few other activities; but the physical restraints in B/B Unit limited him due to his need and the needs of others to do things like call their families and shower, due to the small number of Muslims in his group, and the fact that he was still locked down for so much time that he missed many exercises and did not have time for others. *Id.* ¶¶ 87-91.

In B/B Unit, lockdowns render *all* of these exercises impossible and modified operations reduce Chesser's recreation significantly below that of even U/A Unit. *Id.* ¶92.

The small number of Muslims in B/B Unit and its time constraints mean that Chesser is usually only able to spend 60 to 90 minutes per day engaged in these exercises, as it is hard to find overlapping spare time with other Muslims, and this is not enough to accommodate many of the exercises he believes in. *Id.* ¶¶ 93-94

## The BOP's Alleged Rationale

## I   The BOP's Sworn Rationale and Clarifying Post-Hoc Rationalizations

Chesser did everything he could in discovery to try to get the BOP to cite national security interests as its reason for placing him in ADX, but it repeatedly swore that these were not why Chesser was in ADX. Then, its case on Chesser's CMU conduct fell apart over a lack of evidence, so it is now trying to flip-flop on this issue. While it may have been lying before, this section shows what is actually a post-hoc rationalization and clarifies the BOP's vague justifications.

### A.   <u>The BOP's Sworn Denials that Chesser's Commitment to Jihad</u>

<u>and External Communications Played a Role</u>

In an effort to weaken Claim 3, the BOP repeatedly swore that Chesser's beliefs on jihad, ties to terrorism, and external communications were not reasons for his ADX placement:

1.  When asked for "every justification you have used to hold ... Zachary Chesser in ADX and solitary confinement," the BOP referred Chesser to "Mr. Collins's declaration, Doc. 67-3 at ¶¶ 9-16, and the related attachments thereto," and it said, "Had Chesser not engaged in dangerous and disruptive conduct while housed at the [CMU] ..., he would not have been recommended for his current ADX placement — *his status as a terrorist notwithstanding.*" #147-1, Int. No. 3. [4] (emphasis added).

2.  When asked for evidence, it cited the same documents and never cited national security. It said instead, "Plaintiff's disruptive conduct in the CMU, including conduct *interpreted* to usurp the authority of correctional staff, posed dangers to his fellow inmates and to prison staff." *Id.* int. No. 4 (emphasis added). [5]

3.  In response to an Interrogatory aimed at the use of his writings on jihad and his commitment to it, the BOP said: "Plaintiff's ADX referral was predicated *not on his ideology* but on his actions at the [CMU]. These actions included Plaintiff's disruptive conduct, his assault on an inmate outside his faith group, and his attempt to usurp staff's authority, among other acts.... *Defendant is not concerned about Plaintiff's ideology, or any aspect thereof, for its own sake....* Finally, as this information shows, Plaintiff's conduct in prison — *not his "external communications"* — prompted his referral to the ADX." Ex. C (BOP's Supp. Resp. to Plaintiff's 2d set of Ints.), Int. No. 9 pp. 3-4, (emphasis added).

4.  In the above-cited declaration, the BOP said, "At bottom, Chesser was recommended for ADX designation *not because of his radicalized ideology or with whom he associated,* but because of how he attempted to exert control over that association of inmates, how he fomented disruption and violence between groups in CMU Marion, and how his actions displayed a very real attempt to organize mass resistance to Bureau policy and institutional security." #67-3 ¶ 15.

---

[4] Collins and even those who drafted the documents he references lacked personal knowledge of anything they said, so they are not admissible to prove their contents. This is just to prove the BOP's alleged rationale.

[5] "Interpreted" is highlighted because it shows that even the BOP finds its leadership/extortion argument tenuous, as will follow.

11

Perhaps most significantly, the BOP clarifies that even the relation of his beliefs to his actions was irrelevant:

> 5. When asked, "Why would an inmate's religious beliefs be a factor in not allowing them to live in open population...?" the BOP said: "To be clear, an inmate's religious beliefs are not a factor in designating him or not designating him to an open-population setting. A very important factor, however, is what the inmate has done in the way of harming others jeopardizing safety, usurping authority, or causing group disruption. That those actions ... are inspired by religious belief is beside the point in the correctional environment." Ex. C. Int. No. 12 p. 8.

Thus, the BOP's post-discovery national security concerns are decidedly post hoc.

### B. Clarifying the Sworn Justifications

With respect to ADX's physical restrictions on Chesser (as opposed to others who aren't relevant to the case), the BOP cites four general reasons: (1) his allegedly being an inmate leader and trying to usurp staff's authority regarding an inmate's safety, #147-1 Int. Nos. 3&4, Ex. C Int. No. 13, #67-3 ¶¶ 10, 14 &15, #67-6 p.9, #67-9, #67-11 pp. 5-6; (2) his "assault without serious injury" on another inmate, #147-1 Int. Nos. 3&4, #67-3 ¶¶ 10 & 13, #67-6 p.9, #67-7, #67-11 pp. 1 &3-4; (3) his involvement in and encouragement of Islamic group prayer (which it calls "disruptive activities" to avoid the obvious), #147-1 Int. Nos. 3&4, 67-3 ¶ 10, 67-6 p.9, #67-11 pp. 2-3; and (4) his possession of code instructions, #67-3 ¶ 10, #67-6 p.9, #67-8.

The BOP's only explanation for its ban on religious gatherings in ADX-GP and J/A Unit was a vague answer about how B/B Unit's "physical setup" was different and inmate adjustment. Ex. D (BOP Resp. to Plaintiff's 3d Set of Ints.) Int. No. 14. It is completely unclear why the BOP suddenly changed the policy in B/B Unit just before the summary judgment deadline.

## II. The CMU Denial

The CMUs are open-population units where inmates are out of

their cells for about 16 hours per day, or 3.45 times what is available in B/B Unit, and they can freely go wherever they want in the CMU in that time. Ex. A ¶ 95. Even with a ban similar to ADX's, Chesser was far more able to engage in the exercises at issue than even under the old policy in B/B Unit. Id. He had access to about 45 inmates, all of whom had 100% of their incoming and outgoing social communications monitored by the BOP. Id. ¶ 96; Att. A3 CCMU Policy).

From a communications and influence perspective, the CMUs are more secure than ADX-GP and ADX-SDP, because they subject all inmates to total monitoring and largely isolate those with ideological charges like terrorists, unlike ADX, where one mixes with unmonitored inmates, most of whom aren't already terrorists. Ex. A ¶¶ 96-98; Att. A3. Further, the CMUs allow greater restrictions on communications volume and contacts than ADX. Ex. A ¶ 96; Att A3.

Throughout this case, Chesser repeatedly suggested the CMU was a solution, but the BOP claimed the above conduct made him too dangerous for a CMU. #147-1 Int. No. 5 pp.13-14; Ex. C p. 17.

In Spring 2017, however, it actually referred him for CMU placement instead of B/B Unit. Ex. A ¶ 99. On August 16, 2017, however, it denied him CMU placement. Id.; Ex.C p. 4 ("Recently, Defendant determined Plaintiff was not appropriate for a CMU.").

In light of B/B Unit's dramatically more restrictive conditions, he asked why he couldn't have gone back to a CMU instead. The BOP's sole reason and evidence was: "Plaintiff was considered for placement in a [CMU]. The designation criteria for any inmate to be referred to a CMU are contained in 28 C.F.R. § 540.201 (a)-(e). The Defendant determined that Plaintiff did not currently meet those criteria, based upon his adjustment and conduct at ADX Florence, which did not indicate that Plaintiff's communications

with persons in the community would pose a concern." Ex. D. Int. No. 18 p. 3 (emphasis added). Att. A3. at p. 4 shows that all five criteria would only involve posing a greater threat.

The current burden to Chesser's exercise of religion is *solely because* the BOP doesn't consider him *dangerous enough* for a CMU.

## III. The Reality of Chesser's CMU Conduct and ADX

### A. Chesser's Conduct

From November 3, 2011 to September 17, 2012, Chesser received four incident reports for group prayer, over which he lost e-mail access. Ex. A ¶ 101; Att. A2. He generally encouraged group prayer and Islamic classes in spite of a CMU ban the entire time he was in a CMU, until now. Ex. A ¶ 106. On August 14, 2013, he assaulted an inmate and was placed in a SHU pending the investigation, but, after he was convicted, the disciplinary hearing officer (DHO) did not give him SHU time as a sanction, so he was released from the SHU to the CMU. Id. ¶ 102; Atts. A4 & A5.[63] On December 4, 2013, he sent staff a message offering a solution to a known threat to an inmate's safety, for which he was placed in the SHU and convicted of extortion. Ex. A ¶ 103; Atts. A6 & A7. He didn't receive SHU time from the DHO, but was kept in the SHU pending his ADX referral. Ex. A ¶ 103; Att. A7.[7] Also on December 4, 2013, staff found code instructions in his cell and convicted him of an incident report over which he received minor sanctions. Ex. A ¶ 104; Atts. A8 & A9. As for leadership, the BOP's accusation stems from June 2013 or later. Ex. A ¶ 105; Att. A10 (a less-redacted ADX referral).

Chronologically, the code and extortion accusations are the only

---

[63] The words "I defiantly started the exchange," Att. A5 p. 1, are inaccurate and should read "I definitely started the exchange." Ex. A ¶ 102.

[7] As will follow, while the DHO accurately recorded Chesser's statement that he could have hurt the inmate if he wanted, Att. A7 p. 1, it erroneously understood it to mean he could have the inmate hurt if he wanted, Att. 7 p. 3. Ex. A ¶ 103

potential immediate causes of Chesser's ADX referral. Ex. A ¶ 107.

I. The Falsehood of the Extortion and Leadership Allegations

Other than inadmissible hearsay recorded in business records, which do not magically render it admissible and allow accusations with no evidence to stand, the BOP lacks any evidence Chesser was a leader or usurping staff authority.

Chesser was not a leader and hardly had any leadership role at any point in the CMU. Ex. A ¶ 108. The BOP also falsely accused ███████ ███████████████████ of being inmate leaders before sending them to ADX from the CMU, suggesting this was a pretext it employed or that it simply is not skilled at determining the CMU's leaders. Id. ¶¶ 109-110. The BOP does not even accurately identify Chesser's "closest friends" whom he was supposed to have led. Ex. A ¶¶ 111-12; Att. A 10 p. 5.

In November 2013, a non-Muslim inmate attacked a Muslim outside of Chesser's cell, but Chesser peacefully, and at personal risk, separated them by subduing the assailant and telling them to calm down. Ex. A ¶ 113. He further helped prevent further retaliation against the non-Muslim inmate. Id.; #19 Ex. 1H p. 29 (Decl. of Carlos Almonte). Both inmates involved were taken to the SHU. Ex. A ¶ 113.

Over the next couple of weeks, staff consulted numerous inmates on the safety of the non-Muslim inmate and tried to negotiate his release from the SHU, but inmates told staff he wasn't safe in the CMU. Ex. A ¶ 114; #19 Ex. 1H p. 29. This was a common practice by the BOP following any incident in both CMUs. Ex. A ¶ 114; Ex. E (Decl. of Eljvir Duka) ¶ 7 (noting nobody was ever sent to ADX for such negotiations).

In light of this norm, Chesser sought a solution to the inmate's safety and eventually learned that those planning to assault him would agree not to if ███████ ADX referral was dropped. Ex. A ¶ 115;

#19 Ex. 1 H p. 29 & 30-31 (Decl. of Mohammad Amawi). Based on this, Chesser e-mailed staff, suggesting he might be able to help resolve the issue if ▓▓▓▓ referral was dropped. Ex.A ¶115; Att.A6 p. 3 (the e-mail). Chesser had no control over whether or not the inmate was assaulted, did not encourage it, and was not planning to do so himself. Ex.A ¶116. When accused, he explained he wasn't the one who was a threat. Id. In his DHO hearing, he explained how he would have hurt the inmate in the middle of the fight he stopped if he'd wanted to harm him, but the DHO misunderstood him as claiming to have an ability to have the inmate hurt, and convicted him based on this false understanding. Id.; Att. A7.

A few weeks later, while Chesser was in the SHU, the non-Muslim was released to the CMU and was immediately assaulted by a Muslim inmate named Mohammad Amawi. Ex.A ¶117; #19 Ex.1H p. 30. However, the BOP claimed it couldn't consider this evidence in Chesser's ADX hearing. Ex.A ¶118.

Chesser did not extort staff or usurp their authority because he had nothing to do with the threat to the inmate, so his e-mail was just presenting an option — like a security firm's entreaty to a potential client by pointing out their store is in a bad neighborhood. Id. ¶119.

The BOP now admits Chesser was not the source of the threat and simply claims Chesser's advocacy needed to be punished to prevent him from growing bolder, which is flagrant spinning by lawyers:

[S]taff determined that Plaintiff was attempting to exploit a situation for his gain or the gain of the group of inmates with whom he associated. Defendant *does not now maintain... that "Plaintiff was the source of the threat"* to the other inmate's safety. The problem is that Plaintiff attempted to set the terms for how staff were to handle an issue of safety and security.... He wanted to set the terms; he put himself in a position of *perceived* authority to "work something out." This brazenness concerns

16

correctional staff *because, if tolerated or enabled, it can quickly empower an inmate to take bolder and more drastic steps in the future.*

Ex. D, Int. No. 21 p. 7 (emphasis added).

In other words, Chesser wasn't a threat, but was sent to ADX over the BOP's chimeric speculation as to future crimes he might commit, much like the movie *Minority Report's* dystopia envisioned. If the BOP had told Chesser "no," there was no implied nor actual threat from him to the inmate, so it did not harm security for him to give them a third option. (Nor did it impede them from blatantly letting the inmate get assaulted).

Further, in ADX, Chesser was an inmate leader in reality, but this didn't stop his progression through ADX SDP when the BOP learned of it. Ex. A ¶ 136. In the CMUs, the Muslims openly had actual leaders, but they weren't referred to ADX. Ex. A ¶ 109-110; Ex. E ¶ 6.

2.    *The Lack of Severity of the Assault*

The BOP classifies Chesser's assault as "minor violence," its least serious category of violence. Ex. A ¶¶ 125-26; Att. A11. The inmate got a small scratch and bruise and he felt no pain. Ex. A ¶ 127; Att. A12. The BOP characterizes Chesser as having *lost* the fight. Ex. A ¶ 128; Att. A13.[*] Chesser also tried to ensure the victim's safe return to the unit by showing there was no ongoing issue. Ex. A ¶ 130; Att. A14.

Far more serious assaults in the CMU — including a vicious stabbing, a beating with a weapon, and the beating of a BOP employee — occurred and some inmates had more than one incident of violence, but the perpetrators weren't referred to ADX. Ex. A ¶ 129; Ex. E ¶ 8.

[*] Chesser did not "train" for any fight, as the e-mail suggests.

17

██████████████████████ Ex. A ¶ 129; #1a Ex. 1H pp. 30-31;

Ex. E ¶ 5.

### 3. Group Prayer's Lack of a Threat

Chesser was just one of many Muslims in the CMU who flouted its ban on group prayer and the ban was only enforced against Muslims in a discriminatory way. Ex. A ¶¶ 131-32; AH.AZ. The CMU did not restrict secular gatherings. Ex. A ¶ 132. The same type of prayer Chesser was disciplined for is allowed in B/B Unit, even if others aren't. Ex. B. Most telling, however, is that the same warden who referred Chesser to ADX admitted his group prayers never actually harmed security in reality. Ex. A ¶ 133; #1a Ex. 8 (Testimony of Jeffrey Walton).

### 4. The Code Instructions' Return

In the CMU, Chesser had no way to get away with and benefit from using a code, unlike at ADX, but, at ADX, the BOP let him see his instructions whenever he wanted, it actually gave them back to him to keep in his cell, and it provides similar code instructions for recreational purposes. Ex. A ¶¶ 120-24; AH.A8 (the non-confidential labeling proves it lets him keep them in his cell — these are the actual instructions).

### 5. The Reality with Chesser

Chesser's assault is the only incident of physical violence he's ever been accused of in his life. Ex. A ¶ 134. His entire disciplinary record failed to raise him from his default "medium security" labeling and he is now labeled "low security" but for an ADX-related "management variable." Id. ¶ 135. The violence which occurs weekly at USP Florence is far more serious than his minor assault. Id. ¶ 139.

Moreover, the BOP ties Chesser's communications to actual terrorist attacks, but it produced no evidence that anyone involved

in his ADX referral has any capability to evaluate if the CMU's greater ability to address national security threats posed by Chesser were outweighed by ADX's physical controls. Ex. A ¶ 140; Att. A15; see also Ex. A ¶¶ 50 & 96-100. Indeed, at least as of 2015, chesser was being held in ADX over his communications, according to a BOP document, even though the CMU is plainly more secure in that respect. Ex. A ¶ 151a; Att. A16.

B.  Inconsistencies in ADX Restrictions

In the ADX program, inmates with terrorism cases twice face greater physical restrictions as a result of decisions they are less dangerous: the transition from Special Administrative Measures to ADX-GP and the transfer to B/B Unit after CMU denials. Ex. A ¶ 137.

As for the bans, they only target religious conduct and (regardless of whether or not some similar ban is in writing) the BOP does not prohibit secular groupings, classes, and celebrations — not even gang meetings. Ex. B ¶¶ 7-10. A Neo-Nazi can give a speech on the desirability of the Holocaust from a Nazi perspective, but a Muslim cannot give one condemning it from an Islamic perspective. Id. ¶ 9. B/B Unit's "layout" and inmate "adjustment" does not explain this distinction.

To the extent the BOP will use its experts    : to argue it needs to prevent influence, vulnerability during prostration, grouping, leadership, and the potential for conflicts, there is no way religious gatherings facilitate this more than secular ones and the vulnerability concerns exist in both the allowed group prayers and individual prayers. Id. ¶ 10.

Further, even though Friday Prayers and other Islamic group worship like classes had happened for more than a year in B/B

19

unit, no incident ever resulted from them prior to their banning. Ex.B ¶ S; Ex. F (Decl. of Mohamed S Odeh) ¶ 3. The BOP's staff knew of them the entire time. Ex. B ¶¶ 2-3; Ex.F ¶ 3. The issue was not serious enough of a threat to discipline Chesser or return him to ADX-GP over it either. Ex. B ¶ 6. The new ban is just a post-hoc effort to make reality match its paid-for-already expert report by John Oliver, which had a false grasp on the policy.

## Alternatives to ADX's Restrictions

### I. Lifting the Ban

As preceded, there is no reason to ban religiously-motivated group activity at ADX and the policies in B/B Unit (although they keep shifting) demonstrate that a partial or total lifting is feasible. This would partially relieve Chesser's burden.

### II. Letting Chesser have a Muslim Neighbor

Another partial solution is to allow Chesser to have a Muslim neighbor (who is not so ill he can't speak, psychologically) or at least place him closer to one so he will see them at recreation. The BOP did the latter for Chesser after two years of requests, and it routinely did both for various inmates, including gangs, for secular reasons. Ex.A ¶ 141.

### III. Transportation and Opening Doors for Religious Services

In response to a suggestion the BOP transport Chesser for religious services, which can also be achieved by opening cell doors, as follows, the BOP cited the following reasons not to do it: (1) the totality of Chesser's beliefs requires 10 to 14 hours of access to Muslims; (2) the times of exercises varies; (3) some have different minimum participants; (4) the other inmates have to be Muslim in Chesser's beliefs; (5) inmate-led group activities can be used to plan harmful activities; and (6) some exercises require physical contact. Ex. C, Int. No. 17 pp. 20-25.

However, in the ADX program, inmates are transported for a whole

host of secular reasons: recreation; medical, dental and psychology appointments; legal calls and visits; accessing the law library and legal materials; social visits; drug, psychology and art classes; work as an orderly; court hearings; and cell rotations and moves to new cells. Id. ¶ 142. In ADX-GP and J/A Unit, the inside orderlies are remotely released from their cells to clean outside of normal recreation hours, and in B/B Unit they were let out all night to wax floors so they'd be shiny for a visit by the Director. Id. ¶ 143. In fact, on that occassion, staff originally planned to mix recreation groups. Id.

Many of Chesser's religious exercises — smiling, most prayers, shaking hands, visiting the sick, etc. — take just a few minutes, so, while fully accommodating his beliefs might take 10 to 14 hours, a partial accommodation could be as little as five minutes per day, week or month. See, e.g., Att.A pp. 16-17. Further, in ADX-GP, it could achieve two to five hours of letting him access a Muslim, five times per week, simply by placing him in a recreation cage next to a Muslim instead of one not next to a Muslim — a de minimis alteration of the current program. Ex.A ¶ 144.

Furthermore, the BOP's claims about duration ignore how many of the secular examples above last all day or four hours at a time. Id. ¶ 145. Simply opening doors, which can be achieved without altering any program's physical contact requirements, does not require transportation. Id. ¶ 146. While the BOP claims it tries to use the same staff both ways for transport, so anything above 5 hours would require altering that, it regularly uses different staff. Id. ¶ 147.

While the times vary for some exercises, most have no set times, most of the rest can be done at one set time all year in spite of the variance, and even the ones which can't, can be planned long in advance and only require a few shifts per year — plus, much of the

21

BOP's concerns are solved by simply leaving Chesser where he is for multiple exercises. Id. ¶148. A partial accommodation could be the same time every day, week, or month year-round.

While Chesser generally believes these should be done with as many Muslims as possible, letting him access even a single Muslim for the exercises is a significant improvement. Id. ¶149. In B/B Unit, if Chesser was allowed access to all the units practicing Muslims, it would not exceed group size limits. Id.

Perhaps slightly conceding this is feasible, the BOP tried to use Chesser's beliefs against him: "IF ADX correctional staff were to transport Muslim inmates for congregate worship, all inmates who identify with that faith would be welcome to attend." Ex. C. p. 23. Chesser has no problem with this and would even welcome those who don't identify as Muslim as long as some Muslims can attend. Ex. A ¶ 150.

There is nothing in a religious activity described above which makes it more prone to use for planning harmful activities than allowed secular activities, like gang meetings.[20] Id. ¶151. While Chesser has never witnessed a religious activity co-opted to harm security, he has witnessed numerous gang meetings to plan gang activity, even discussing murders and Chesser could always just use a secular gathering to plan harmful activity if he wanted anyway. Id.

Physical contact is only necessary for some of the exercises and Chesser can engage in all but handshakes without it, albeit with a burden to the aspects requiring physical contact. Id. ¶152.

On "Death Row," Elvir Duka witnessed similar restrictions to ADX, but Muslims were allowed to meet in cages every Friday for Friday Prayers. Ex. E ¶9.

---

[20] To whatever extent there is a ban on this on paper, it is not enforced at all. Chesser is explaining reality, not bureaucratic theory.

## IV. Ranges or Units with Compatible Inmates

Other than Chesser's abstract beliefs, which it misconstrues to claim he's a threat to everyone, ignoring the nuances which prevent actual prison violence, the BOP has no evidence whatsoever that Chesser poses a physical threat to all other inmates and produced none that he was a threat to Muslims or even non-Muslim terrorists. #147-1, Int. No. 7 pp. 18-19. However, in response to various solutions proposing placing Chesser and various types of compatable inmates in a unit or on a range where they could leave their cells, the BOP cited the following concerns:[103] (1) discrimination, (2) a perception of special treatment by other ADX inmates, (3) the possibility inmates might gain ascendancy over others and work toward harmful ends, (4) the possibility terrorists would influence others, go on hunger strikes and antagonize non-Muslims. #147-1 pp. 16-17; Ex. C pp 15-17.

The BOP, however, already subjects some inmates to special treatment in limited open population settings in ADX's J/B and K/B Units and in ADX-SDP. Ex. A ¶153. To avoid discrimination, the BOP need only use neutral criteria like the CMU criteria, a lack of "serious violence," terrorism ties, or the need for religious accommodation and extend the same or similar priviledges to all similarly situated inmates of each faith. Id. ¶154. However, the BOP frequently discriminates in housing decisions based on race and religion, as it does in ADX-SDP, J/B Unit and the CMUs (which had a 50%-Muslim policy). Id. In K/B Unit, one must be 55 years old to get in. Id. In fact, in January 2016, Chesser was denied placement in ADX-SDP solely due to the BOP's opinion that it had too many Muslim terrorists already. Id.

The BOP simply lacks evidence that this idea would lead to "ascendancy"

[103] It's worth noting that it did not cite concerns Chesser would assault anyone, use code, engage in extortion, etc.

nor to distinguish it, in this sence, from what is already in place.

As for influence, this problem already exists in ADX's program, but it is easily solved by segregating terrorists where they can only influence one another, which could even have a positive result. Id. ¶ 156.

The BOP's concerns about antagonism are similarly solved in this method. In H Unit, the apparent source of this allegation, white supremacists antagonized Muslims, so Muslims responded in kind. Ex. F ¶ 4. The BOP solved this by dividing the recreation in H Unit into the white supremacists and those close to them and a group with Muslims and those close to them. Id. If this idea was so impossible it couldn't be done, the BOP wouldn't have done it. Also, the BOP lacks evidence this would occur with Chesser.

Similarly, the BOP has no evidence that Chesser would go on hunger strike. This notion also appears to be based on events in H Unit, but, as Mr. Oden explains, those hunger strikes were due to H Unit's uniquely harsh conditions. Ex. F ¶ 5. As he notes, he and two other former H Unit terrorists have not gone on hunger strike in ADX-SDP, because it is not as harsh. Id. It should be noted that there is no evidence H Unit's terrorists were separated over this and the BOP could always just kick hunger strikers out of the unit.

Finally, Mr. Duka provides concrete proof that ADX inmates do not absolutely require restrictive conditions. Even though Mr. Duka is a former CMU inmate with terrorism charges on his second stay in ADX, who is actually slightly behind Chesser in progressing through its program, Ex E ¶ 4, the BOP held him in open population in a jail —— not even a secure prison. Id. ¶ 10. He had a Muslim cellmate, contact visits, physical contact with more than 100 prisoners for 900 minutes each day, and the

ability to engage in all religious exercises relevant to this case, while on a writ to FDC Philadelphia, in the middle of his most recent stay in ADX. Id. ¶10. Chesser and Mr. Duka are in the same recreation group. Id. ¶14.

## V. CMUs

Chesser's CMU denial and the BOP's lack of a basis not to return him there is clear proof that it is now a feasible solution, but it always was too.

In *both* CMUs, there were inmate leaders recognized by staff, staff frequently negotiated with inmates over the safety of other inmates, and assaults as serious as Chesser's occurred, but none of those involved were sent to ADX. Ex. A ¶157; Ex. E ¶¶96-8. In the Terre Haute CMU, those assaults included a BOP employee being beat up, a brutal stabbing, and a beating with a weapon — this inmate also being involved in an assault in the Marion CMU. Ex. A ¶157; Ex. E ¶8. At Marion extortion incidents occurred and one inmate assaulted another and then threatened him to force staff to keep him in the SHU until he was released, and he wasn't even disciplined for this clear threat. Ex. A ¶157. Moreover, the three inmates actually referred to ADX from CMU Marion were all falsely accused of being leaders while the actual leaders were left alone. Id. ¶¶108-10.

This suggests that the BOP at least can handle inmates like Chesser in a CMU, even by its worst allegations against him.

The CMUs are significantly more secure than ADX from the perspective of preventing communications on terrorism and in keeping terrorists from influencing new recruits.[11] Ex. A ¶¶96-98. Terrorist

___
[11] Nothing in here is meant to imply that the BOP's desire to censor these forms of speech is legal under the First Amendment or RFRA.

recruitment occurs at ADX, Id. ¶ 98, but there is no evidence it occurs in CMUs. Chesser is alleged to have influenced numerous people to become terrorists and his writings are tied to the invention of the lone wolf strategy. See Att. A15; #18 Dd 181 pp. 3-9. When Chesser pointed out some of the allegations against him, Ex. G (Plaintiff's Int. Resp.), and questioned how preventing his run-of-the-mill prison conduct justified increasing his ability to influence others to commit terrorism, the BOP's only response was that in ADX Chesser had fewer calls and no e-mail). Ex. C ¶ 17. However, this fails to address the other restrictions in the CMU, see Att. A3, the heightened monitoring in them, the ability to influence inmates and to smuggle writings. Moreover, in the CMU, staff could (and did) turn off Chesser's e-mail and phone access, Ex. A ¶ 158.

Betraying the BOP's arguments about Chesser's CMU conduct is how, at least as of 2015, Chesser was being held in ADX over his communications, not his CMU conduct. In a request to keep him at ADX, his "Unit Team" said, "The Unit Team believes he continues to require the security offered at a Maximum Security facility based on his (sic) nature of his                instant offense and need for heightened communication security." Ex. A ¶ 115a; Att. A16 (Management Variable Request) (emphasis added).

In short, even though ADX is more restrictive than a CMU, the CMU is better at handling someone like Chesser.

## LEGAL STANDARD[123]

Summary judgment is appropriate only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Henderson v. Inter-Chem Coal Co., Inc., 41 F.3d 567, 569 (10th Cir. 1994).

[123] This section, with slight alterations to suit the case, is largely a quote from Bruce v. Oogie, 2017 U.S. Dist. LEXIS 79175, No. 14-cv-2085-RM-NYW (D. Colo. May 23, 2017)

26

belief are not competent summary judgment evidence. *See Bones v. Honeywell Int'l, Inc.*, 360 F.3d 869, 875 (10th Cir. 2004). The nonmoving party's evidence must be more than "mere reargument of his case or a denial of an opponent's allegations" or it will be disregarded. *See* 10B Charles Alan Wright, et al., *Federal Practice and Procedure* § 2738 at 356 (3d ed. 1998). [33]

"A pro se litigant's pleadings are to be construed liberally and held to a less stringent standard than formal pleadings drafted by lawyers." *Hall v. Bellmon*, 935 F.2d 1100, 1110 (10th Cir. 1991) (citing *Haines v. Kerner*, 404 U.S. 519, 520-21 (1972). "The *Haines* rule applies to all proceedings involving a pro se litigant, including... summary judgment proceedings." *Id.* at n.3 (citations omitted). However, the court cannot be a pro se litigant's advocate. *Yang v. Archuleta*, 525 F.3d 925, 927 n.1 (10th Cir. 2008).

## ARGUMENT

Due to the strength Congress gave to the protection of religious liberty in RFRA, the above facts necessitate summary judgment in Chesser's favor. The BOP cannot adequately dispute each solution nor the non-existence of a compelling interest, especially after the CMU denial. As for Chesser's burden, the BOP indicated in discovery that it would be pursuing frivolous First Amendment arguments. Hopefully they will sensibly avoid them. However, for this reason, it helps to clarify the strength of RFRA versus the First Amendment before addressing the facts.

## I    RFRA is stronger than *Turner-O'Lone* and the First Amendment.

In 1987, the Supreme Court articulated a reasonableness standard to evaluate a prisoner's Free Exercise Clause claim, which asks courts to consider: (1) the policy's rational relation to a neutral penological interest, (2) the prisoner's general ability to practice his religion, (3) how the exercise would impact staff and other prisoners, and (4) the existence of obvious alternatives. *O'Lone v. Estate of Shabazz*, 482 U.S. 342 (1987); *Turner*

---

[33] Here, Chesser has facts while the BOP has largely conclusory say-so and speculation. The Court is encouraged to do just this — disregard the inadmissible conclusory statements.

v. Safley, 482 U.S. 78 (1987). While Turner-O'Lone is silent on the issue, in non-prisoner cases one must face a substantial burden to a central or obligatory exercise in their faith. See, e.g., Hobbie v. Unemployment Appeals Comm'n of Fla., 480 U.S. 136, 141-42 (1987).

In 1993, Congress overruled Turner-O'Lone with RFRA; and, in 2000, it amended it to eliminate the centrality-obligation requirement by passing the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. §2000cc-1 et seq. [14] RFRA provides:

> (a) In general. Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability, except as provided in subsection (b) of this section.

> (b) Exception. Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person -- (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling interest.

§2000bb-1(a)-(b).

In Burwell v. Hobby Lobby Stores, Inc., 189 L. Ed. 2d 675, 684 (2014), the Supreme Court explained the RLUIPA amendment:

> Before RLUIPA, RFRA's definition [of "exercise of religion"] made reference to the First Amendment. In RLUIPA, in an obvious effort to effect a complete separation from First Amendment case law, Congress deleted the reference to the First Amendment and defined the "exercise of religion" to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." §2000cc-5(7)(A). And Congress mandated that this concept "be construed in favor of a broad protection of religious exercise, to the maximum extent permitted by the terms of this chapter and the Constitution." §2000cc-3(g).

The BOP has twice failed to get the Tenth Circuit to "overrule" or "amend" RFRA in cases involving ADX terrorists. In Kikumura v. Hurley, 242 F.3d 950, 962 (10th Cir. 2001), the Tenth Circuit held that "neither the text, nor the legislative history of RFRA suggest that [the] relaxed standard [from Turner-O'Lone] applies to the government's burden when a prisoner makes a RFRA claim." Explaining Kikumura, it said, "Thus, under RFRA, a court does not consider the prison regulation in its general application, but rather

---

[14] Because RFRA and RLUIPA have the same standard in prison cases, this motion cites cases under RLUIPA without distinction. See Holt v. Hobbs, 135 S. Ct. 853, 860 (2015)

considers whether there is a compelling governmental reason, advanced in the least restrictive means, to apply the prison regulation to the individual claimant. *Ghailani v. Sessions,* 859 F.3d 1295, 1305 (10th Cir. 2017). In other words, BOP claims about interests generally implicated by some prisoners who aren't Chesser are irrelevant, such as the two murders at ADX when Chesser was in high school.

In *Holt v. Hobbs,* 135 S.Ct. at 862-63, the Supreme Court unequivocally rejected *Turner-O'Cone* considerations in RFRA/RLUIPA cases: "Under those cases, the availability of alternative means of practicing religion is a relevant consideration, but RLUIPA provides greater protection. RLUIPA's 'substantial burden' inquiry asks whether the government has burdened religious exercise...., not whether the RLUIPA claimant is able to engage in other forms of religious exercise." In other words, it hardly matters if Chesser can partially engage in some of these exercises when the rest are substantially burdened (and the burden on those he can partially engage in is still substantial anyway).

In *Holt,* the Supreme Court also held that it was irrelevant whether a claimant's "religion would 'credit' him for attempting to follow his religious beliefs, even if that attempt proved unsuccessful," because, like RFRA, "RLUIPA applies to an exercise of religion regardless of whether it is 'compelled.'" *Id.* at 862 (quoting § 2000cc-5(7)(A)); *see also Abdulhaseeb v. Calbone,* 600 F.3d 1301, 1314 (10th Cir. 2010). The BOP has hired a man named Ammar Amonette to argue that whenever it burdens Chesser's religion, he would receive "'credit'... for attempting to follow his religious beliefs." *Cf. Holt,* at 862. Hopefully it will not waste the Court's time with this now with the similarly frivolous argument that not all exercises are obligations. If it does, then Amonette's testimony has been deemed irrelevant before. *See Lindh v. Warden, Fed. Corr. Inst., Terre Haute, Ind.,* 2013 U.S. Dist. LEXIS 4432, pt. II.A.1 (S.D. Ind. Jan. 11 2013) (Amonette's testimony that group prayer is not obligatory in prison is irrelevant); *Caruso v. Zenon,* 2005 U.S. Dist. LEXIS 45904 (D.Colo.

30

Jul. 25, 2005) (Amonette's testimony that eating real meat was not obligatory is irrelevant). While it was just a recommendation, not an order, and it recommended a denial based on a rationale rejected in *Holt*, the court in *Chesser v. Walton*, No. 3:12-cv-1198-JPG-PMF, #68 p.3 (S.D.Ill. Jan. 21, 2014), actually found Amonette attached testimony *supported* Chesser's case for a preliminary injunction.

## II. The ADX restrictions substantially burden multiple exercises of religion which Chesser sincerely believes in.

"RFRA analysis follows a burden-shifting framework. A plaintiff establishes a prima facie claim under RFRA by proving the following three elements: (1) a substantial burden imposed by the federal government on a (2) sincere (3) exercise of religion. The burden then shifts to the government to demonstrate its law or policy advances a compelling interest implemented through the least restrictive means available. The government must show that the compelling interest test is satisfied through application of the challenged law to the person — the particular claimant whose sincere exercise of religion is being substantially burdened." *Little Sisters of the Poor Home for the Aged v. Burwell*, 794 F.3d 1151, 1175 (10th Cir. 2015) (quotation marks, citations and brackets omitted).

### A. Each exercise is an independent exercise of religion.

The BOP indicated in discovery that it will argue Chesser no longer faces a substantial burden to his religion, because, in B/B Unit, he can engage in a couple of the *Five Daily Prayers*. The BOP, however, is merely *considering* allowing Chesser out of the ADX program and it never argued mootness of the ADX-GP part of the claim, even though the burden is entirely the defendant's in a case of voluntary cessation (or "mitigation," in this case). *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 190 (2000); *Ghailani*, 859 F.3d at 1302. Further, the conditions are easily capable of repetition but evading review due to how Chesser began this suit as soon as possible in 2014 and can always go back to ADX. *FEC v. Wis. Right to Life, Inc.*, 551 U.S. 449, 462 (2007).

The BOP's failure to move for dismissal on these grounds means it cannot be considered, and it would fail anyway.

Further, Holt, at 862-63, rejected the notion that a general ability to practice one's faith suffices with respect to particular exercises, and, as explained in Hobby Lobby, 189 L.Ed.2d at 689, the court must give "exercise of religion" the broadest possible interpretation. Thus, each type of group prayer, class, gathering of remembrance, celebration and interaction to promote well-being is a separate exercise for RFRA purposes.

Courts often deal with claims on some of the specific exercises Chesser raises. In Cantwell v. Connecticut, 310 U.S. 296 (1940), the Supreme Court, under the First Amendment, upheld the rights of two individuals to engage in radical anti-Catholic proselytizing, which equates to Chesser's enjoining good and forbidding evil exercise.[15] In Ghailani, the Tenth Circuit reversed dismissal of a claim addressing both the Friday Prayer and Five Daily Prayers. Id. at 1299. In Williams v. Wilkinson, 645 Fed.Appx 692 (10th Cir. 2014), it reversed dismissal of a RLUIPA claim addressing solely the Friday Prayer. In Brown v. Livingston, 17 F.Supp. 3d 616 (S.D. Tex. 2014), the court enjoined a prison policy, under Turner-O'Lone and RLUIPA, which limited religious gatherings to four inmates, because it violated the rights of Muslims to engage in the Friday Prayer, Islamic classes, and Qur'an studies; which overlaps Chesser's classes category and the gatherings of remembrance. Id., at III.E. In Lindh, the court enjoined restrictions on group prayer in the CMU, even though Muslims could pray in "small groups throughout the CMU" for all five of the Five Daily Prayers, in large groups during Ramadan, and in a large group for the Friday Prayer. Id., at Findings of Fact ¶¶ 32-34 & 57-58. Gathering for worship and doing good in one's community are clearly religious exercises. Yellowbear,

---

[15] Cantwell shows that the BOP's baseless argument in discovery that Chesser being Jihadi makes him insincere is wrong. Moreover, it shows how the BOP's desire in its motion for summary judgment to prevent "radical" messages would violate the First Amendment, not just RFRA.

Lampert, 741 F.3d 48, 54 (10th Cir. 2014).

Chesser's desire to worship all day might be monk like, but there is no doubt RFRA extends to monasticism.

B. Chesser's beliefs are sincere.

Now-Supreme Court Justice Neil Gorsuch wrote that courts may not ask if "the claimant's religious belief is true.... [F]ederal judges are hardly fit arbiters of the world's religions. When inquiring into a claimant's *sincerity*, then, our task is instead     a more modest one, limited to asking whether the claimant is (in essence) seeking to perpetrate a fraud upon the court." *Yellowbear*, at 54.

Chesser produced a lengthy explanation of the basis of his beliefs and has been engaging in them at every opportunity, often under extreme hardship and the threat of punishment, for a decade. There are few, if any, cases where sincerity is so easily proven.

The BOP has indicated it will use Amonette to argue Chesser's beliefs are idiosyncratic. "[H]is belief is by no means idiosyncratic. But even if it were, the protection of R[FRA], no less than the Free Exercise Clause, is 'not limited to beliefs which are shared by all members of a religious sect.'" *Holt*, 135 S. Ct. at 862-63 (quoting *Thomas v. Review Bd. of Indiana Employment Security Div*, 450 U.S. 707, 715-16 (1981)). "Even if others of the same faith may consider the exercise at issue unnecessary, or less valuable than the claimant, that doesn't take them outside the law's protection." *Yellowbear* at 55. "To determine whether plaintiffs have made a prima facie RFRA claim, courts do not question whether the petitioner correctly perceived the commands of his or her faith." *Little Sisters of the Poor*, 794 F.3d at 1175 (quotation marks, brackets and ellipses omitted). In other words, if the BOP uses Amonette's opinions in light of the evidence of Chesser's sincerity, it will be violating Rule 11.

The BOP has also indicated it will, with no evidence, argue Chesser is just trying to further Jihadist beliefs. Even if that was true, Jihadism is a religion.

33

C. **The restrictions of the ADX program substantially burden Chesser's exercise of religion.**

In *Yellowbear*, the Tenth Circuit articulated the following standard, originally found in *Abdulhaseeb*:

> [A] burden on a religious exercise rises to the level of being "substantial" when (at the very least) the government (1) requires the plaintiff to participate in an activity prohibited by a sincerely held religious belief, (2) prevents the plaintiff from participating in an activity motivated by a sincerely held religious belief, or (3) places considerable pressure on the plaintiff to violate a sincerely held religious belief — for example, by presenting an illusory Hobson's choice where the only realistically possible course of action available to the plaintiff trenches on sincere religious exercise.

*Yellowbear,* at 55 (citing *Abdulhaseeb,* at 1315).

The BOP has indicated it will argue Chesser gets the same reward one way or another based on Amonette's beliefs, but Chesser's beliefs are different. Nowhere in RFRA is a judge asked to stand as the Judge of Judges and decide the respective rewards and punishments a claimant will face on the Day of Judgment. Nor does RFRA extend only to beliefs which encompass the idea of divine reward and punishment. As Chesser explained, he not only does these exercises for the reward, but he does them for their own sake — the sense of spirituality and devotion he experiences when performing them. The RFRA inquiry asks if one sincerely believes in an exercise of religion and the extent of the burden to that exercise as the claimant understands it.

In *Yellowbear,* the claimant was denied access to a sweat lodge, much like how Chesser was denied access to Muslims. *Id.* at 56. The Tenth Circuit held that this easily fit "*Abdulhaseeb's* second category — flatly prohibiting Mr. Yellowbear from participating in an activity motivated by a sincerely held religious belief." *Id.* Courts have little difficulty finding substantial burdens with far less extreme bans and physical restrictions than this. *See, e.g., Holt,* at 862 (ban on beards); *Greene v. Solano County Jail,* 513 F.3d 982, 988 (9th Cir. 2008) (ban and physical restriction on attending religious gathering) ("We have little difficulty in concluding that a ban on a particular religious exercise is a substantial

34

burden on that exercise"); *McKinley v. Maddox*, 2012 WL 3292389, at *5 (10th Cir. 2012) (ban on attending service); *Brown*, at III.E. (ban on religious gatherings except one hour each week and except with four or fewer prisoners); *Lindh*, at II.A.2 (ban on group prayer except in small groups, during Ramadan, and a two-hour window on Fridays); *Clark v. Small*, 2011 WL 2004132, at *10 (S.D.Cal. May 23, 2011) (preventing Muslim from attending services during *occasional* lockdowns); *Phillips v. Ayers*, 2010 WL 1947019 (C.D. Cal. May 12, 2009) (ban on group worship); *Lee v. Gurney*, 2009 WL 3109850, at *6 (E.D. Va. Sep. 25, 2009) (same); *Hummel v. Donahue*, 2008 WL 2518268, at *8 (S.D. Ind. 2008) (same); *Meyer v. Teslik*, 411 F. Supp. 2d 983 (W.D. Wis. 2006) (preventing particular prisoner's attendance).

Virtually all of these cases but *Yellowbear* involved a less coercive ban than one which is in place at all times and carries the threat of ADX-GP placement or extension. In *Lindh* and *Brown*, the plaintiffs could actually engage in the exercises whenever they wanted, but group size was limited, so, even with respect to group prayer with *Lindh*, or the Friday Prayer and Islamic classes in *Brown*, Chesser faces a far greater burden in B/B Unit due to the ban and his lack of access to Muslims. In *Clark*, the claimant experienced occasional lockdowns. Even in B/B Unit, Chesser's burden is greater due to occasional lockdowns, built-in restrictions on out-of-cell time, and a ban on most exercises. Chesser was better able to exercise his religion in the same type of unit at issue in *Lindh*, and is arguing he could be sent back. The CMU conditions may burden religious exercise, but there is such a difference between them and ADX —even B/B Unit— that Chesser is not making it an issue.

## III. The ADX restrictions are not the least restrictive means of furthering a compelling interest implicated by Chesser.

As preceded, it is the BOP's burden to prove its policy is the least restrictive means of furthering a compelling interest against Chesser, not others, and the sorts of conclusory statements with no evidence and hearsay

in the BOP's discovery responses won't suffice to overcome its evidentiary burden at summary judgment. The BOP will fail in this due to the lack of grave interests actually addressed by ADX, the implications of Chesser's CMU denial, the underinclusiveness of their policies which allow for secular exceptions but not religious ones, and their inability to prove Chesser's solutions aren't feasible.

The BOP will, without admissible evidence, make sweeping assertions about Chesser, prison security and national security.[D67] In Holt, 135 S.Ct. at 863, however, the Supreme Court said:

> The Department argues that its grooming policy represents the least restrictive means of furthering a broadly formulated interest, namely, the Department's compelling interest in prison safety and security. But RLUIPA, like RFRA, contemplates a more focused inquiry and requires the government to demonstrate that the compelling interest test is satisfied through application of the challenged law to the person — the particular claimant whose sincere exercise of religion is being substantially burdened. RLUIPA requires us to scrutinize the asserted harm of granting specific exemptions to particular religious claimants and to look to the marginal interest in enforcing the challenged government action in that particular context.

(internal quotation marks, citations and brackets omitted). The BOP will rely on prison deference to try to admit unsupported conclusory allegations, but:

> RLUIPA ... does not permit such unquestioning deference. RLUIPA, like RFRA, makes clear that it is the obligation of courts to consider whether exceptions are required under the test set forth by Congress. The test requires the Department not merely to explain why it denied the exemption but to prove that denying the exemption is the least restrictive means of furthering a compelling governmental interest. Prison officials are experts in running prisons and evaluating the likely effects of altering prison rules, and courts should respect that expertise. But that respect does not justify the abdication of responsibility, conferred by Congress, to apply RLUIPA's rigorous standards.

Holt, at 864 (quotation marks and citation omitted). In other words, "the deference this court must extend to the experience and expertise of prison administrators does not extend so far that prison officials may declare a compelling governmental interest by fiat." Yellowbear, at 59.

---

[D67] Because the BOP's national security concerns were raised for the first time in its motion for summary judgment, they are posthoc rationalizations. To the extent they are not, Chesser's response will show their lack of legal and evidentiary basis.

36