**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 15-cv-01939-NYW

ZACHARY A. CHESSER,

      Plaintiff,

v.

DIRECTOR FEDERAL BUREAU OF PRISONS,

      Defendant.

---

## MEMORANDUM OPINION AND ORDER

---

Magistrate Judge Nina Y. Wang

      This matter comes before the court on Defendant Director of Federal Bureau of Prisons' ("Defendant" or the "BOP") Motion for Summary Judgment (or "BOP's Motion") [#180][1] and Plaintiff Zachary Chesser's ("Plaintiff" or "Mr. Chesser") Second Motion for Partial Summary Judgment (or "Mr. Chesser's Motion") [#193].  This civil action was referred to the undersigned Magistrate Judge to fully preside over for all purposes.  *See* [#37]; 28 U.S.C. § 636(c); Fed. R. Civ. P. 73; D.C.COLO.LCivR 72.2(d).  The court concludes that oral argument will not materially assist in the resolution of these matters.  Having reviewed the Motions and associated briefing, the applicable case law, and the entire docket, the court GRANTS the BOP's Motion and DENIES Mr. Chesser's Motion.

---

[1] The BOP has filed its Motion for Summary Judgment and several exhibits under Level 1 Restriction.  *See* [#181 and attached exhibits].  For consistency, the court cites to the restricted Motion [#181], but does not cite to any restricted information.  This is also true of any exhibits similarly filed under Level 1 Restriction.

## PROCEDURAL HISTORY

Plaintiff initiated this civil action on December 22, 2014 in the United States District Court for the District of Columbia. [#1-1]. Plaintiff, a Muslim, alleges that the BOP has substantially burdened his exercise of religion in violation of the Religious Freedom Restoration Act of 1993 ("RFRA"), 42 U.S.C. § 2000bb-1 *et seq. See generally* [*id.*; #3; #58]. The District Court for the District of Columbia transferred this matter to this District on September 8, 2015. *See* [#1]. Upon his transfer to this District, the court directed Mr. Chesser to file an Amended and Second Amended Complaint. *See* [#4; #20]. Plaintiff's Second Amended Complaint alleged four claims against Defendant. *See* [#22]. The Honorable Lewis T. Babcock dismissed two of those claims as duplicative of claims in a separate federal lawsuit pending in the United States District Court for the Southern District of Illinois, *Chesser v. Walton*, 3:12-cv-01198-JPG-PMF (S.D. Ill.) ("*Chesser I*"), but directed that the two remaining claims be drawn to a presiding judge. *See* [#24 at 4]. This action was then drawn to the undersigned Magistrate Judge and the Parties consented to the jurisdiction of a magistrate judge. *See* [#25, #33].

On March 25, 2016, the court denied Plaintiff's Motion to Reconsider the dismissal of two of his four claims, but granted in part his Motion for Leave to Amend [#46]. *See* [#53]. Plaintiff filed his Third Amended Complaint ("TAC"), the operative pleading in this matter, on June 9, 2016. [#58]. The TAC asserted two claims against Defendant for violations of RFRA: the BOP's policy of "holding inmates in solitary confinement due to their ties to terrorism" ("Claim III"), and its conditions of confinement at the ADMAX United States Penitentiary in Florence, Colorado ("ADX") substantially burdens the exercise of Mr. Chesser's sincerely held religious beliefs ("Claim IV"). *See* [*id.*].

Defendant moved to dismiss the TAC on August 3, 2016. *See* [#67]. In ruling on the Motion to Dismiss the court limited Claim III to its purported challenge to the BOP's consideration of Mr. Chesser's ties to terrorism, including his purported association with Jama'ah Ad-Da'wah As-Sahihah and his participation in religious activities—both allegedly deemed terrorist-related by the BOP—as the primary justification for his transfer to ADX, but allowed Claim IV to remain in its entirety. *See* [#86]; *see also* [#159 at 2 & n.1; #163].

The court then entered a Scheduling Order setting, among others, September 25, 2017 as the deadline for discovery and October 27, 2017 as the deadline for dispositive motions. *See* [#100]. Following several impasses with discovery the court granted the Parties' request for a 120-day extension of the discovery and dispositive motions deadline, extending those deadlines to January 23 and February 26, 2018, respectively. *See* [#159]. Each party received an additional extension of time to file their respective dispositive motions. *See* [#174; #179]. The BOP filed its Motion for Summary Judgment on March 2, 2018 [#180] and Plaintiff his Second Motion for Partial Summary Judgment on April 2, 2018 [#193]. The Motions are now ripe for resolution.

## LEGAL STANDARDS

### I.    Summary Judgment

A party may be entitled to summary judgment prior to trial if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Henderson v. Inter–Chem Coal Co., Inc.*, 41 F.3d 567, 569 (10th Cir. 1994). "A 'judge's function' at summary judgment is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014)

(quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 249 (1986)). Whether there is a genuine dispute as to a material fact depends upon whether the evidence presents a sufficient disagreement to require submission to a jury or conversely, is so one-sided that one party must prevail as a matter of law. *Anderson*, 477 U.S. at 248–49; *Stone v. Autoliv ASP, Inc*., 210 F.3d 1132, 1136 (10th Cir. 2000); *Carey v. U.S. Postal Service*, 812 F.2d 621, 623 (10th Cir. 1987). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citing *First Nat. Bank of Ariz. v. Cities Service Com*, 391 U.S. 253, 289 (1968)).

The burden of showing that no genuine issue of material fact exists is borne by the moving party. *Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1190 (10th Cir. 2000). In reviewing a motion for summary judgment, the court views all evidence in the light most favorable to the non-moving party. *See Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1213 (10th Cir. 2002). Where the moving party will bear the burden of proof on an issue at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. *See Celotex Corp.*, 477 U.S. at 323. Once the moving party meets its initial burden, the non-moving party must go beyond the pleadings and, by his own affidavits or discovery, "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The non-movant "may not rest upon mere allegation or denials of [the] pleadings, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256. The court must resolve all doubts in favor of the existence of triable issues of fact. *Boren v. Southwestern Bell Tel. Co.*, 933 F.2d 891, 892 (10th Cir. 1991).

Cross motions for summary judgment are treated separately, and the denial of one does not require the grant of another. *Buell Cabinet v. Sudduth*, 608 F.2d 431, 433 (10th Cir. 1979). Rather, the court may enter summary judgment only if the moving party carries its burden of demonstrating that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law. *See Reed v. Bennett*, 312 F.3d 1190, 1194–95 (10th Cir. 2002). And because Mr. Chesser proceeds *pro se* the court liberally construes his pleadings, *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991), but does not act as his advocate and applies the same procedural rules and substantive law to Plaintiff as to a represented party, *Murray v. City of Tahlequah,* 312 F.3d 1196, 1199 n.2 (10th Cir. 2008).

## II.     Summary Judgment Evidence

At summary judgment, credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. But it is well-settled that a court may consider only admissible evidence at summary judgment. *Gross v. Burggraf Const. Co.*, 53 F.3d 1531, 1541 (10th Cir. 1995); *accord Johnson v. Weld County Colo.*, 594 F.3d 1202, 1209 (10th Cir. 2010) (disregarding hearsay on summary judgment when proper objection to its use was before the court and no exception applied). The evidence need not be in a *form* that is admissible at trial, *e.g.*, affidavits are often inadmissible at trial on hearsay grounds, but the *substance* must be admissible at trial. *See Brown v. Perez*, 835 F.3d 1223, 1232 (10th Cir. 2016). The court, however, "is not required to review large quanta of evidence to ferret out inadmissible statements"—the "objecting party [must] make specific objections detailing the specific evidence [he] wishes to have stricken and stating the specific grounds upon which each piece of evidence should be stricken." *Tucker v. SAS Inst., Inc.*, 462 F. Supp. 2d 715, 722 (N.D. Tex. 2006).

Mr. Chesser levies several challenges to the admissibility of Defendant's summary judgment evidence. *See* [#191 at 3–4; #191-1 at 1–2, 23–29]. I consider those objections below.

### A.    Plaintiff's Deposition Testimony and Discovery Responses

Mr. Chesser lodges three challenges to the use of his own statements. First, he asserts that his views on perjury and a lie he told the FBI during his underlying criminal conviction are irrelevant. [#191-1 at 24 (citing [#181-1 at 20:23–21:25,[2] 80:8–15, 85:14–21, 87:8–18, 89:2–24])]. "The standard for relevancy is particularly loose under rule 401, because any more stringent requirement is unworkable and unrealistic." *Landry v. Swire Oilfield Servs., L.L.C.*, 323 F.R.D. 360, 395 (D.N.M. 2018) (brackets and internal quotation marks omitted). I find this testimony relevant because it concerns Mr. Chesser's beliefs—ones he falsely disclaimed—and resulting behavior, which bear on the issues raised by the BOP's Motion. *See* Fed. R. Evid. 401 (relevant evidence "(a) has any tendency to make a fact more or less probable than it would be without the evidence;" and "(b) the fact bears on the outcome of the action.").

Mr. Chesser next objects to the use of his deposition testimony and his discovery responses concerning his influence on other terrorists as hearsay and impermissible lay opinion. *See* [#191-1 at 24, 27]. While an out of court statement offered to prove the truth of the matter asserted is inadmissible hearsay, *see* Fed. R. Evid. 801(c), Rule 32 of the Federal Rules of Civil Procedure specifically allows an adverse party to use a deposition of an opposing party for "any purpose." Fed. R. Civ. P. 32. In addition, statements made by the declarant who is an opposing party are not hearsay when used against the opposing-party-declarant. *See Kansas City Power & Light Co. v. United States*, 132 Fed. Cl. 28, 45 (2017) (citing Fed. R. Evid. 801(d)); *cf.* Fed. R. Civ. P. 33(c) ("An answer to an interrogatory may be used to the extent allowed by the Federal

---

[2] In citing to a transcript, the court cites to the document number generated by the CM/ECF system but the page and line numbers generated by the transcript.

Rules of Evidence."). Thus, the objected-to statements, *see* [#181-1 at 292:20–293:7, 292:3–293:20, #180-27 at 32–34], are not hearsay and are admissible.

With respect to Mr. Chesser's arguments that his opinions regarding his influence are inadmissible lay opinions, the court concludes that the BOP does not offer such testimony to establish scientific, specialized, or technical knowledge. Rule 701 allows lay witnesses to testify in the form of an opinion if the opinion is (1) rationally based on the witness's perception; (2) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (3) is not based on scientific, technical, or other specialized knowledge within the scope of Rule 702. Fed. R. Evid. 701. And while this court is not necessarily persuaded by the BOP's argument that Mr. Chesser "has inspired many other terrorists,"[3] I find that Mr. Chesser's self-perceptions of his personal influence are relevant to the issues at hand because they pertain to Mr. Chesser's motivations and actions and the appropriateness of the BOP's response. Indeed, "an admission of a party opponent needs no indicia of trustworthiness to be admitted." *Grace United Methodist Church v. City Of Cheyenne*, 451 F.3d 643, 667 (10th Cir. 2006).

## B. Declaration of David Jones

Mr. Chesser objects to David Jones's Declaration [#180-2] on several grounds. He insists that Mr. Jones has "no personal knowledge of anything which occurred in my prison" or of his "prison conduct"; nor was Mr. Jones his Counter Terrorism Unit ("CTU") analyst "until after all the communications [Mr. Jones] mentions in his declaration." [#191-1 at 1]. Mr. Chesser also objects to the documents Mr. Jones relies on throughout his Declaration, arguing that these documents are not business records maintained by the BOP, constitute inadmissible hearsay or lay opinion on matters requiring an expert, or are irrelevant. *See* [*id.* at 24–26].

---

[3] The BOP stated, "For the purposes of this motion, the BOP does not dispute Chesser's claims about his influence." [#181 at 5 n.3].

To start, Mr. Chesser's statements, even those out of court, are not hearsay as discussed above. *See* Fed. R. Evid. 801(d)(2). Accordingly, those paragraphs that quote Mr. Chesser's statements from other documents are not objectionable hearsay, and the court will not strike them as such. The same is also true of Mr. Chesser's communications, even if he made those communications *prior* to Mr. Jones's monitoring of Plaintiff.

Regarding personal knowledge, declarations submitted in support of summary judgment must be based on the declarant's actual perception or observation of the events testified to, and cannot consist of statements of mere belief. *See Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1200 (10th Cir. 2006). Mr. Jones attests that he has been a BOP employee since 1996, a CTU Analyst since 2015, and assigned to monitor Mr. Chesser's communications since February 2017. [#181-2 at ¶¶ 1–4]. He further states that the basis for his declaration is his personal knowledge and "information made known to be from official records reasonably relied upon by me in the course of my employment." [#181-1 at 1]. While Mr. Jones may not actually work in any facility that housed Mr. Chesser, Mr. Jones's testimony about Mr. Chesser's prison conduct is based on his review of several BOP documents. He declares, under penalty of perjury, that all documents relied on "are true and correct copies of records maintained by the [BOP] in the ordinary course of business." [*Id.* at ¶ 3].

Though not explicitly stated, it is clear that the BOP offers Mr. Jones's testimony as a representative of the BOP. Courts considering the issue of whether Rule 56(c)(4)'s personal knowledge requirement applies to Rule 30(b)(6) representative[s], however, have found that a sworn affidavit from a corporate representative—and in this case a governmental official—may be considered when relied on in a motion for summary judgment. *Seifried v. Portfolio Recovery Assocs., LLC*, No. 12-CV-0032-JHP, 2013 WL 6185478, at *2 (E.D. Okla. Nov. 25, 2013)

(citations omitted) (considering Rule 30(b)(6) representative's Declaration even if not based on personal knowledge). And as discussed in detail below, Mr. Chesser's contention that not all documents are BOP business records is insufficient in light of Mr. Jones's sworn testimony to the contrary.

The first document Mr. Chesser takes issue with is a CTU Profile and Assessment of Plaintiff, dated December 11, 2013. He argues it is not a BOP business record and not based on personal knowledge. *See* [#191-1 at 1, 24]. But Mr. Jones states, under oath, "The Profile and Assessment was prepared by CTU personnel, who conducted an exhaustive analysis of available information about Chesser." [#181-2 at ¶ 5]. Mr. Jones continues that he has "studied the information and analysis contained in the Profile and Assessment" and relies on its analysis "in monitoring and analyzing Chesser's communications." [*Id.* at ¶ 6]. Though Mr. Jones may not have compiled the Profile and Assessment, Mr. Chesser's objections go more to the weight of Mr. Jones's testimony, not its admissibility, because there is no dispute Mr. Jones reviewed the Profile and Assessment and the document appears authentic. *See Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114, 1123–24 (10th Cir. 2005) (holding supervisor's declaration was based on her personal knowledge where she reviewed audits maintained by the company that she relied on even if she did not compile the audits or understand the methodology used to compile them). Moreover, the Profile and Assessment, if offered at trial, would be admissible under either Rule 802(d)(2) or Rule 803(6). Thus, Mr. Jones's testimony concerning the Profile and Assessment is based on his personal knowledge, and the court will not strike it.

A similar conclusion is warranted as to the Disciplinary Hearing Officer Reports, Warden Walton's ADX referral memorandum, BOP incident reports, and BOP documentation concerning BOP procedures. Though Mr. Chesser is correct to assert that these documents

contain hearsay, his conclusory assertion that these documents were not maintained in the ordinary course of business by the BOP is unfounded. There appears no dispute as to their authenticity as each contains official BOP markings, is signed by BOP personnel, and were disclosed in discovery. *See Denison v. Swaco Geolograph Co.*, 941 F.2d 1416, 1423 (10th Cir. 1991) (holding that documents prepared on company letterhead and disclosed during discovery support authenticity of such documents). Accordingly, these documents appear admissible pursuant to Rule 803(6), and there is no reason to discredit Mr. Jones's affirmation under oath that he is familiar with these documents given his employment with the CTU.

It is less clear that the Senate Committee on Homeland Security and Governmental Affairs Report relied on by Mr. Jones is properly a BOP business record for hearsay exception purposes. *See* [#180-7; #180-8]. Indeed, the BOP did not compile the Report. However, Mr. Jones's use of this Report largely contains verbatim quotes made by Mr. Chesser. *See, e.g.*, [#181-2 at ¶¶ 12, 13, 16, 23]. And it appears that the Report is appropriately considered under the public records exception of the hearsay rule, given the fact that Mr. Chesser has not persuasively challenged the reliability of the statements contained therein. Fed. R. Evid. 803(8).

Finally, nothing in Mr. Jones's Declaration constitutes improper opinion testimony. *See Bryant*, 432 F.3d at 1124. Rather, his testimony regarding Mr. Chesser's Jihadist beliefs and communications, his underlying criminal conviction, and the events leading to his transfer from CMU Marion to ADX reflect Mr. Jones's perception and knowledge of national security concerns gleaned from the nature of his position with the BOP. *See* Fed. R. Evid. 701 advisory committee's note to 2000 amendments (noting that testimony based on the particularized knowledge of the witness by virtue of his position does not constitute expert testimony based on experience, training, or specialized knowledge within the realm of an expert); *cf. Holder v.*

*Humanitarian Law Project*, 561 U.S. 1, 33–34 (2010) (deferring to the Executive in matters of "sensitive and weighty interests of national security"); *Rezaq v. Nalley*, 677 F.3d 1001, 1014 (10th Cir. 2012) (holding that segregation of inmates with ties to terrorist organizations "stem[s] from a uniquely federal penological interest in addressing national security risks"). The court will not strike Mr. Jones's opinions regarding Mr. Chesser's threat to national security.

### C.    Declaration of David Christensen

Mr. Chesser lodges three main challenges to Associate Warden David Christensen's ("Associate Warden") Declaration [#180-31]: it contains (1) conclusory assertions, (2) hearsay, and (3) impermissible lay opinions on national security. *See* [#191 at 4, 5; #191-1 at 27–28].

First, declarations provided in support of a motion for summary judgment "must set forth facts, not conclusory statements." *BancOklahoma Mortg. Corp. v. Capital Title Co., Inc.*, 194 F.3d 1089, 1101 (10th Cir. 1999). Conclusory statements provide no probative value on summary judgment. *See Nichols v. Hurley*, 921 F.2d 1101, 1113 (10th Cir. 1990); *see also Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004) (explaining that conclusory statements are those based on speculation, conjecture, or surmise). The bulk of Plaintiff's objections assert that the Associate Warden's declarations are conclusory, and appear to target the Associate Warden's statements regarding institutional and national security concerns. *See* [#191-1 at 27–28]. The BOP does not address these objections. Having reviewed the objected-to paragraphs, the court finds that Mr. Chesser's concerns go to the weight of the evidence, not its admissibility.

Regarding hearsay, several of Mr. Chesser's objections do not expound on why the Associate Warden's statements contain inadmissible hearsay. He appears to insinuate that the statements about him are out-of-court statements from others. But this does not appear to be so.

Moreover, his argument also appears to place form over substance; even if the Associate Warden's Declaration itself would be inadmissible at trial, his statements based on personal knowledge of Mr. Chesser would be admissible were he to testify. *See Brown*, 835 F.3d at 1232.

Lastly, the court will not strike the Associate Warden's statements concerning national security as improper lay opinion testimony. I conclude that the testimony is not based on any scientific, technical, or specialized knowledge but, rather, on the Associate Warden's particularized knowledge by virtue of his position within the BOP. *See* Fed. R. Evid. 701 advisory committee's note to 2000 amendments. *See also Holder*, 561 U.S. at 33–34; *Rezaq*, 677 F.3d at 1014.

### D. Declaration of John Oliver

The BOP retained John Oliver as an expert under Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure in the field of correctional security and correctional management, given his specialized knowledge in these fields. *See* [#180-37 at ¶ 1]. Mr. Chesser objects to four paragraphs in Mr. Oliver's Declaration.

Rule 702 of the Federal Rules of Evidence permits:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. Though not framed as a Rule 702 challenge, I find it appropriate to consider Mr. Chesser's objections with that Rule and the court's gatekeeper functions in mind. It is well established that trial courts are charged with the gatekeeper responsibility of ensuring expert testimony or evidence is admitted only if such is relevant and reliable. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147–152 (1999); *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 588–89 (1993). To fulfill that gatekeeper function, courts within this Circuit conduct a two-part inquiry. The court first considers whether the expert's proffered testimony has a reliable basis in the knowledge and experience of his or her discipline by conducting a preliminary inquiry into the expert's qualifications and the admissibility of the proffered evidence. In other words, the court asks whether the reasoning or methodology underlying the testimony is valid. *Cook v. Rockwell Int'l Corp.*, 580 F. Supp. 2d 1071, 1082 (D. Colo. 2006) (*citing Butler v. A.O. Smith Corp.*, 400 F.3d 1227, 1232–33 (10th Cir. 2004)). The court then considers whether the proposed testimony is sufficiently relevant to the issues presented to the factfinder. *See id.* The party offering the expert opinion bears the burden of establishing its admissibility, including the foundational requirements, by a preponderance of the evidence. *United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009); *United States v. Crabbe*, 556 F. Supp. 2d 1217, 1220 (D. Colo. 2008).

First, Plaintiff objects to the conclusions drawn by Mr. Oliver in paragraph 13, but his disagreement goes to the weight, not admissibility, of Mr. Oliver's opinion and is not a sufficient basis for striking this paragraph. *See Jaffrey v. PorterCare Adventist Health Sys.*, No. 15-CV-02297-NYW, 2017 WL 5624572, at *5 (D. Colo. Nov. 22, 2017). Second, Mr. Chesser contends that paragraph 15 is conclusory and unsubstantiated by evidence; however, Mr. Oliver supports paragraph 15 with his "27 years of experience in the field of correctional management, including

23 years of experience in facilities operated by the BOP[]" with positions as Complex Warden of ADX and USP Florence.  *See Heineman v. Am. Home Prod. Corp.*, No. 13-CV-02070-MSK-CBS, 2015 WL 1186777, at *3 (D. Colo. Mar. 12, 2015).   Third, Mr. Chesser asserts that paragraph 19 is speculative, but a review of this paragraph again reveals that Mr. Oliver relies on past experiences to support his assertion that the appearance of a preference towards certain inmates can create hostility.   Finally, Plaintiff objects to paragraph 23 because it is a legal conclusion and its assertions that Plaintiff is safest in his range are unsubstantiated.   But again, Mr. Oliver's opinions are that of a specially-retained expert, and the court's analysis must focus upon his methodology, rather than the conclusions it generates.  *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1222 (10th Cir. 2003).   Mr. Chesser raises no legitimate challenge to Mr. Oliver's background, expertise, or qualifications as an expert witness; rather, he simply takes issue with the opinions Mr. Oliver renders.  [#191-1 at 28].

### E.        Declaration of Jason Henderson

Mr. Chesser objects to several paragraphs in the Declaration of Jason Henderson, Supervisory Chaplain at FCC Florence.  *See* [#180-38].   First, Mr. Chesser asserts that paragraphs 20 and 24 are conclusory.   Each concerns Mr. Chesser's administrative grievances regarding religious studies.   The court will not strike these paragraphs as conclusory as each appears supported by factual assertions.

Next, Mr. Chesser argues that paragraphs 27 and 28 contain "fragrant lie[s]" about his religious privileges in the B/B Unit.  [#191-1 at 28].   He bases this contention on his assertion that Chaplain Henderson cancelled all religious classes and sermons after reading Mr. Chesser's deposition testimony wherein Mr. Chesser admits to conducting these activities without specific authorization.  *See* [#193-20; #186-1].   Indeed, Chaplain Henderson confirms that he ordered Mr.

Chesser to cease "preaching to or teaching other inmates," not that he wholly forbade Mr. Chesser from ever doing so. *See* [#198-3 at ¶¶ 4, 7]. But the court's role on summary judgment is not to determine the credibility of the witnesses; it is to determine whether there is a genuine issue for trial. *See Anderson*, 477 U.S. at 249. Thus, merely because Mr. Chesser disputes these assertions is not a basis to strike the paragraphs, but the court will consider such assertions in determining whether a genuine dispute of fact exists as to his religious privileges in the B/B Unit.

Finally, Mr. Chesser seeks to strike several paragraphs that he claims contain impermissible lay opinions on penological matters requiring an expert. These paragraphs largely concern the security risks associated with providing Mr. Chesser the amount and extent of religious accommodations he requests, including the appearance that he is receiving preferential treatment and that he has the ability to flout BOP policies on religious gatherings. *See* [#180-36 at ¶¶ 31–38]. As before, given Chaplain Henderson's position within the BOP, I conclude that these assertions are based on his personalized knowledge particular to his position and I will not exclude them as impermissible lay opinions. *See* Fed. R. Evid. 701 advisory committee's note to 2000 amendments.

With the evidentiary disputes resolved, the court now turns to the merits of the Parties' cross-motions.

## UNDISPUTED MATERIAL FACTS

The following facts, drawn from the record before the court, are undisputed unless otherwise noted. Mr. Chesser is a federal prisoner currently incarcerated at ADX. *See* [#1-1; #58 at ¶ 5; #180-4 at 2; #181-2 at ¶ 9]. As a Muslim, Plaintiff observes the religion of Islam, and "decided to be Sunni, Salafi, Hanbali, and Jihadi, all before [his] arrest and [he] continue[s] to

hold all of these beliefs and approaches." [#193-1 at p.11, ¶ 6]; *see also* [#181-1 at 361:7–8 ("I pretty much have the same beliefs I did [before entering prison].")). Mr. Chesser believes that his faith requires several religious gatherings and interactions with fellow Muslims; these include eight (8) daily prayers led by an imam and requiring "physical contact" with "as many Muslims as possible in one's area", religious classes, gatherings of religious remembrance, religious celebrations, and interactions to promote spiritual and communal well-being—the time for performing each varies depending on the day or the nature of the prayer/gathering. *See* [#193-1 at p.11, ¶ 7 & p.13, ¶ 10]; *see also* [*id.* at pp. 12–32; #180-27 at 5–29; #193-2 at 1–10; #193-4 (detailing the nature of Plaintiff's beliefs)]. According to Plaintiff, he "should spend about 10 to 14 hours each day engaged in a variety of interactions with [his] fellow Muslims." [#193-1 at p. 12, ¶ 8].

Plaintiff also subscribes to Jihadism, *see* [#181-1 at 87:15–16, 141:5–10, 282:5–7], which he describes as an Islamist militant movement "mandated by Islam." [#181-1 at 141:12]. Within two years of converting to Islam Mr. Chesser's Jihadist beliefs became extreme. He began developing and utilizing social media websites (*i.e.*, Facebook, Twitter, and YouTube) to promote and encourage violent Jihadist acts, including threatening the creators of the television series *South Park* and coining the term "Open Source Jihad"—a strategy that promotes "inspired" or "decentralized" acts of terrorism by Westerners "without overseas direction." *See, e.g.*, [#180-6 at ¶¶ 3–31, 35–39, 42–44, 46–48; #180-9; #180-27 at 32–34; #181-1 at 292:20–293:18, 305:4–9; #181-2 at ¶ 5; #181-3; #181-4; #181-5; #193-18 at 3–6]. Mr. Chesser sought to influence others with his social media posts and communications, testifying that he influenced several notable domestic terrorist attacks "as well as virtually every terrorist plot in the West since July 2010[.]" [#180-27 at 32–33]; *see also* [#19-1 at 1 ("My criminal history is notorious"

(emphasis in original)); #181-1 at 292:20–293:18; #181-15]. In July 2010 Federal Bureau of Investigation agents apprehended Mr. Chesser at John F. Kennedy Airport attempting to board a flight to Uganda with an ultimate destination of Somalia to aid a designated terrorist organization Al-Shabaab. *See* [#180-6 at ¶ 50]. On October 20, 2010, Mr. Chesser pleaded guilty to communicating threats, soliciting others to threaten violence, and providing material support to terrorists and terrorist organizations. *See* [#1-1; #58 at ¶ 5; #180-4 at 2; #181-2 at ¶ 9].

Beginning around May 2, 2011, the BOP housed Mr. Chesser at the Communication Management Unit at USP Marion, Illinois ("CMU Marion"). *See* [#67-3 at ¶ 9; #67-4 at 2; #180-10 at 3; #180-32 at 3; #180-39 at 3; #181-2 at ¶ 24]. "[A] CMU is a general population housing unit where inmates ordinarily reside, eat, and participate in all educational, recreational, religious, visiting, unit management, and work programming, within the confines of the CMU." [#67-3 at ¶ 9]; *see also* [#181-2 at ¶ 25; #193-6 at 2]. Inmates receive roughly 16 hours of "out-of-cell time every day, from approximately 6 a.m. to approximately 9:15 p.m.," during which they are completely "unrestrained" and in direct contact with other inmates and BOP personnel. *See* [#181-2 at ¶ 25; #193-6 at 7–9]. CMUs also provide the BOP with the ability to monitor all non-legal communications between inmates and the community. *See* [#181-2 at ¶ 12; #193-6 at 2].

Mr. Chesser received seven (7) incident reports for violations of jail policy at CMU Marion. Although he disputes the nature/severity of his underlying conduct, *see generally* [#193-1; #193-2], it is undisputed he received the following incident reports:

- four (4) incident reports, dated November 3, 2011 to September 17, 2012, for being in an unauthorized area/participating in an unauthorized meeting or gathering, *see* [#67-3 at ¶ 10; #67-5 at 3–4; #67-6 at 9; #67-11 at 4; #181-2 at ¶ 51; #181-5 at 3; #193-1 at p. 18 ¶ 25, p. 19 ¶ 28; #193-2 at ¶ 101; #193-5 at 2–5];

- one (1) incident report, dated August 14, 2013, for assaulting a fellow inmate, *see* [#67-3 at 10; #67-5 at 2; #67-6 at 9; #67-7 at 2–5; #180-19 at 2–5; #181-1 at 165:1–3; #181-2 at ¶ 42; #181-4 at 1; #193-2 at ¶102; #193-7 at 2–5];

- one (1) incident report, dated December 4, 2013, for "extorting/blackmail/protecting" regarding an email Mr. Chesser sent to CMU Marion personnel about the purported safety of an inmate at CMU Marion and his suggestion that the inmate would be safe if BOP personnel dropped a second inmate's proposed transfer to ADX, *see* [#67-3 at ¶ 10; #67-5 at 2; #67-6 at 9; #67-9 at 2–8; #180-22 at 2–5; #181-2 at ¶¶ 44–45, 47; #181-4 at 2; #193-2 at ¶ 103; #193-10 at 2–5]; and

- one (1) incident report, dated December 5, 2013, for "possessing a non-hazardous tool," *i.e.*, instructions for a cypher key to communicate in code, *see* [#67-3 at ¶ 10; #67-5 at 2; #67-6 at 9; #67-8 at 2–3; #181-2 at ¶ 49; #181-14 at 2–3; #193-2 at ¶ 104; #193-12 at 2–3].

The BOP placed Mr. Chesser on administrative detention status at CMU Marion following his two incident reports in December 2013. *See* [#67-14 at 2; #193-1 at ¶ 4]; *see also* [#67-3 at ¶¶ 20–22; #67-13 at 2–3].

On December 19, 2013, former CMU Marion Warden J.S. Walton referred Mr. Chesser for placement at ADX due to institutional security and safety concerns, citing Mr. Chesser's violations of CMU Marion policies, his purported intent to continue to violate jail policies he did not agree with because they violated his religious beliefs, his encouragement of other inmates to violate jail policies, and his "radicalized Islamic philosophy", among others, as reasons for the referral. *See* [#67-11; #180-20; #181-2 at ¶¶ 33–37, 52, 55–59; #193-2 at ¶105; #193-13]; *see also* [#67-3 at ¶ 13; #180-24 at 3, 4 (listing several factors for ADX referral); #181-3 through #181-5; #181-6 through #181-13 & #181-15 (discussing his Jihadist beliefs); #191-1 at 7–8 (stating he has openly "advocated jihad" at CMU Marion, ADX General Population, and ADX Step-Down Program)]. Mr. Chesser received a hearing regarding his ADX referral on April 9, 2014. *See generally* [#180-25; #181-2 at ¶ 60]. Despite Mr. Chesser's written statements and evidence challenging his referral, the Hearing Administrator concluded Mr. Chesser met both

criteria for placement in the ADX—his conduct posed a risk to CMU Marion security and order and his status made general population unsafe. *See* [#180-25 at 3]. The Hearing Administrator's report continued with a summation of Mr. Chesser's underlying conviction and his CMU Marion incident reports. *See* [*id.* at 3–10]. "The Assistant Director of the BOP's Correctional Programs Division approved [Mr.] Chesser for placement in the ADX on April 30, 2014." [#181-2 at ¶ 60]; *see also* [#180-26 at 2]. The BOP transferred Plaintiff to ADX on June 12, 2014. *See* [#67-3 at ¶ 16; #67-4 at 1; #180-31 at ¶ 6; #193-1 at p.10 ¶ 4; #193-14 at 2].

"The ADX is the most secure prison in the federal system, housing less than 0.3% of all [BOP] inmates"—inmates that require "an uncommon level of security." [#180-31 at ¶ 6]; *see also* [#180-33 at 2–5; #180-37 at ¶¶ 4, 8–9; #193-1 at 22–27 (detailing restrictions at ADX)]. The BOP specifically designed the ADX's security and control procedures to facilitate its mission of managing and progressing some of the most dangerous federal inmates from its most restrictive conditions of confinement to placement in less-restrictive or open-population institutions. *See* [#180-31 at ¶ 6; #180-37 at ¶¶ 3–13]. Notwithstanding these protocols, inmate-on-inmate and inmate-on-staff violence is not uncommon. *See* [#180-37 at ¶ 12].

Mr. Chesser spent approximately two-and-one-half years in ADX General Population. *See* [#180-31 at ¶ 8; #193-1 at p.10 ¶¶ 4–5]. In ADX General Population Mr. Chesser occupied a single-inmate cell that did not provide meaningful ways to communicate with others outside his cell. *See* [#193-1 at p.24 ¶ 50]. Inmates in ADX General Population receive two hours of recreation time five days per week; recreation alternates between indoor and outdoor, but in most instances, inmates do not have direct contact with one another. *See* [*id.* at 25–27; #180-33 at 3–4]. As an ADX General Population inmate Mr. Chesser had limited interactions with other Muslim inmates and could not perform religious prayers, classes, gatherings, celebrations, or

interactions, as required by his religion, with a group of Muslims. *See* [*id.* at 31–32; #193-2 at 1–4]. BOP policy prohibits congregate religious services at the ADX. *See* [#67-15 at 4 ("No congregate services will be conducted at the ADX.")].

The BOP approved Mr. Chesser for placement in the ADX Step-Down Program on January 17, 2017. *See* [#180-31 at ¶ 8; #180-33 at 5; #193-1 at p.10 ¶ 5]. The Step-Down Program is "the primary way in which the [BOP] achieves [its] mission of cycling inmates back to open-population institutions." *See* [#180-31 at ¶ 7]. It consists of four distinct steps, each with the goal of preparing an inmate for less-restrictive conditions of confinement, and advancement through the program requires an inmate to meet several conduct-related objectives. *See* [#180-33 at 8–10]. Mr. Chesser has advanced from the Intermediate Phase to the Transitional Unit ("B/B Unit Phase 1") to the Pre-Transfer Unit ("B/B Unit Phase 2") (collectively, "B/B Unit"). *See* [#180-31 at ¶¶ 9–10; #180-33 at 5–10; #193-2 at 4–10; #199-2 at ¶ 3]. Inmates receive more out-of-cell recreation time at each phase, and have unrestrained contact with the other inmates housed in their range. *See* [#180-31 at ¶¶ 12–14; #180-33 at 5–8].

Currently, two other inmates in Mr. Chesser's range identify as Muslim, and Mr. Chesser can engage in group prayer/gatherings with these inmates in a designated room during indoor recreation, *see* [#180-36 at 2], or in the outdoor recreation yard. *See* [#180-31 at ¶¶ 12–14, 16–18, 23; #180-35; #180-36 at 2; #181-1 at 185:16–22, 186:2–11, 203:8–12, 223:6–14, 224:4–6, 230:11–13 ("there's no particular restriction on what I do when I'm outside my cell."), 248:6–249:25, 254:3–24; #193-1 at p. 19, ¶ 26 ("since coming to B/B Unit, I have led the 'Id Prayer, Salah Al-Jumu'ah and As-Salawah Al-Maktubah whenever feasible."); #193-2 at ¶ 86 ("Religious gatherings are allowed."), ¶ 87 ("Because there is no ban on religious gatherings in B/B Unit, I am able to engage in group prayer at recreation."); #198-3 at ¶ 2]. Despite the

increases in out-of-cell time and contact with Muslim inmates, Mr. Chesser maintains that he cannot perform his religious prayers, classes, gatherings, and interactions in the manner prescribed by his religious beliefs, *i.e.*, for 10 to 14 hours per day with as many as Muslim inmates as possible. *See generally* [#193-2 at 4–10]; *see also* [#181-1 at 186:22–187:14 (testifying that he must perform his morning prayer alone in his cell because he is not released for recreation), 223:6–14, 224:4–6, 248:6–249:25, 254:3–24; #186-1 at ¶¶ 1–4 (attesting that the BOP banned Friday group prayers in the B/B Unit Phase 1 in addition to all classes or gatherings)]. The BOP considered transferring Plaintiff to a CMU but determined that such a placement was not warranted; he currently remains in the ADX Step-Down Program in B/B Unit Phase 2. *See* [#193-22 at 4; #199-2 at ¶ 3].

## ANALYSIS

### I.    The Religious Freedom Restoration Act, 28 U.S.C. § 2000bb-1 *et seq.*

"The genesis of [] RFRA lies in a protracted exchange between the Supreme Court and Congress over the proper standard to apply when reviewing laws that burden religion." *United States v. Wilgus*, 638 F.3d 1274, 1279 (10th Cir. 2011). Congress enacted RFRA in 1990 in response to the United States Supreme Court's holding in *Employment Division v. Smith*, 494 U.S. 872 (1990) that neutral laws of general applicability burdening the exercise of religion are subject to rational-basis scrutiny. Thus, § 2000bb–1(a) of RFRA provides that the "[g]overnment shall not substantially burden a person's exercise of religion." 42 U.S.C. § 2000bb–1(a); *accord Holt v. Hobbs*, 135 S. Ct. 853, 860 (2015) (observing that the Religious

Land Use and Institutionalized Persons Act ("RLUIPA") permits state prisoners "to seek religious accommodations pursuant to the same standard as set forth in RFRA.").[4]

"[A] plaintiff establishes a prima facie claim under RFRA by proving the following three elements: (1) a substantial burden imposed by the federal government on a (2) sincere (3) exercise of religion." *Kikumura v. Hurley*, 242 F.3d 950, 960 (10th Cir. 2001). "The burden then shifts to the government to show that the 'compelling interest test is satisfied through application of the challenged law 'to the person'—the particular claimant whose sincere exercise of religion is being substantially burdened.'" *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1126 (10th Cir. 2013) (quoting *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 420 (2006)). The government must also establish that the substantial burden "is the least restrictive means" of furthering that interest. *Yellowbear v. Lampert*, 741 F.3d 48, 56 (10th Cir. 2014).

Neither Party truly disputes that Mr. Chesser has demonstrated a substantial burden on his sincerely held religious beliefs. Even still, the court has assured itself by review of the record before it that Mr. Chesser has established a prima facie RFRA claim. *E.g.*, *Small v. Lehman*, 98 F.3d 762, 767 (3d Cir. 1996) (deeming that the denial of congregate worship "may amount to a substantial burden on the exercise of [] religion."), *overruled on other grounds by City of Boerne v. Flores*, 521 U.S. 507 (1997). The court's inquiry therefore focuses on the BOP's assertion that the restrictions on Mr. Chesser's sincerely held religious beliefs are the least restrictive means of furthering its compelling interests. In this regard, the "court does not consider the prison regulation in its general application, but rather considers whether there is a compelling

---

[4] For this reason, I also look to RLUIPA precedent in evaluating Mr. Chesser's RFRA claim. *See Dobson v. Sebelius*, 38 F. Supp. 3d 1245, 1254 (D. Colo. 2014) (noting the "substantial burden standard is the same" for RFRA and RLUIPA).

government reason, advanced in the least restrictive means, to apply the prison regulation to the *individual* claimant." *Kikumura*, 242 F.3d at 962 (emphasis added); *see also id.* (explaining that this inquiry is stricter than the more deferential inquiry under *Turner v. Safley*, 482 U.S. 78, 89 (1987)).

Compelling interests are "'only those interests of the highest order.'" *United States v. Hardman*, 297 F.3d 1116, 1127 (10th Cir. 2002) (listing examples of compelling interests) (quoting *Wisconsin v. Yoder*, 406 U.S. 205, 215 (1972)). At summary judgment, the BOP must come forth with evidence of the existence of a compelling interest; a simple declaration of a compelling interest is insufficient. *See Yellowbear*, 741 F.3d at 59 ("[T]he deference this court must extend to the experience and expertise of prison administrators does not extend so far that prison officials may declare a compelling governmental interest by fiat."). "This is not to say, however, that prison officials do not have a compelling interest under RFRA in maintaining institutional safety and order." *Kikumura*, 242 F.3d at 962; *see also Cutter v. Wilkinson*, 544 U.S. 709, 722 (2005) ("We do not read RLUIPA to elevate accommodation of religious observances over an institution's need to maintain order and safety."). Whether an interest qualifies as compelling is a question of law.

But even if the BOP can establish a compelling interest in restricting Mr. Chesser's sincerely held religious beliefs, it must also "demonstrate that there are no feasible less-restrictive alternatives." *Newland v. Sebelius*, 881 F. Supp. 2d 1287, 1298 (D. Colo. 2012). This burden is two-fold: the government "must support its choice of regulation, and it must refute the *alternative schemes offered by the challenger*, but it must do both through the evidence presented in the record." *Wilgus*, 638 F.3d at 1289 (emphasis added); *accord Fowler v. Crawford*, 534 F.3d 931, 940 (8th Cir. 2008) (noting, "[i]t would be a herculean burden to

require prison administrators to refute every conceivable option in order to satisfy the least restrictive means prong of RFRA." (citation and internal quotation marks omitted)).

With this framework in mind, the court considers Plaintiff's two RFRA claims.

## II.     The Transfer to ADX - Claim III

As interpreted by the court, Claim III asserts that the BOP's consideration of Mr. Chesser's association with Jama'ah Ad-Da'wah As-Sahihah ("JDS") and his organization of Islamic group prayer (his so-called "ties to terrorism") were the primary justifications for his transfer to ADX in violation of his sincerely held religious beliefs. *See, e.g.*, [#86; #149; #159; #163]. Only Defendant moves for summary judgment on Claim III. *See* [#181 at 32–24]. Mr. Chesser must therefore demonstrate, with all reasonable inferences drawn in his favor, a genuine dispute of fact that his transfer violated RFRA. *See Celotex Corp.*, 477 U.S. at 323. This Mr. Chesser fails to do. *E.g.*, [#191 at 10 n.4, 19–20 (explaining that he is pursuing Claim III only to preserve his right to appeal the court's limiting of it, and will not pursue Claim III at trial)].

To start, the BOP retains sole authority and discretion over inmate housing designations. *See* 18 U.S.C. § 3621(b); 28 C.F.R. § 0.96(c) (delegating to the BOP the designation of places of imprisonment or confinement). Indeed, courts do not have authority to designate an inmate's place of imprisonment. *See United States v. Williams*, 65 F.3d 301, 307 (2d Cir. 1995) (concluding sentencing court "has no authority to order that a convicted defendant be confined in a particular facility" because that decision was "within the sole discretion of the [BOP]."); *Foy v. United States*, 285 F.R.D. 407, 410 (N.D. Iowa 2012) (same). Courts have consistently held that once the BOP assumes custody of a prisoner, the court has no authority to designate a place of imprisonment. *Foy*, 285 F.R.D. at 410. But it seems to this court that it can review whether the BOP, in exercising its discretion, violated RFRA, even if it cannot specifically order the BOP to

place Plaintiff in a particular facility. *Cf. Aref v. Lynch*, 833 F.3d 242, 252 (D.C. Cir. 2016) (entertaining a challenge to the BOP's procedures for CMU placement). And the court further notes that the BOP itself does not argue that Plaintiff fails to state a cognizable claim as a matter of law.

After review of the record, I conclude that the undisputed evidence reveals that the BOP did not consider Mr. Chesser to be a member of, or otherwise associated with, JDS. *See* [#181-2 at ¶ 63]. Plaintiff's response does not dispute this fact; he instead relies on inadmissible hearsay that unidentified persons told him he was in ADX because of his involvement with JDS and his speculation that the BOP's conclusions in this regard were the product of his relationship with another inmate that was, in fact, transferred to ADX for his recruitment of members to JDS. *See* [#191-1 at p.11, ¶ 23 & p.18]. And, it is also undisputed that Plaintiff's organization of group prayer was not the second motivating factor for his transfer to ADX. Rather, his unauthorized organization of group activities was but one of several incidences of misconduct at CMU Marion that contributed to his transfer to ADX. *See, e.g.*, [#67-5; #67-7; #67-9; #180-19; #180-20; #180-22; #180-24; #180-25]. Mr. Chesser's attempts to dispute the conduct giving rise to his seven (7) incident reports does not create a dispute of fact that he received such reports for violating CMU Marion rules, and the BOP could properly consider his behavior in the transfer decision.

On this record I find that the BOP had a compelling interest in transferring Mr. Chesser to ADX to promote and maintain institutional security at CMU Marion. Mr. Chesser makes much of the notion that the BOP's asserted national security interests are post-hoc rationales for transferring him to ADX. *See* [#193 at 10–12]. The court is not persuaded that this is so, as the undisputed evidence reveals that the BOP transferred Mr. Chesser to ADX based on its

determination that he satisfied the criteria for such placement, which included, among others, those inmates convicted of terrorist-related offenses and who "present *national security management concerns.*" [#67-3 at ¶¶ 11–12; #67-10 at 3 (emphasis added)]. Nor does it appear that Defendant was less than forthcoming in discovery regarding the security concerns Mr. Chesser posed. But even if the court were to disregard any national security interests, it would still find institutional security as a compelling interest for transferring Plaintiff to ADX. *See Kikumura*, 242 F.3d at 962; *cf. Hale v. Fed. Bureau of Prisons*, No. 14-CV-0245-MSK-MJW, 2018 WL 1535508, at *12–15 (D. Colo. Mar. 28, 2018) (holding the BOP had a compelling interest in maintaining institutional security by restricting the plaintiff's mail access given his involvement with Creativity, a religious group designated a security threat by the BOP).

I also find that no less-restrictive means existed given Mr. Chesser's conduct at CMU Marion. And the court will not second-guess the BOP's exercise of discretion on this matter, especially considering Plaintiff's representations that he would not pursue Claim III at trial. Accordingly, the court **GRANTS** summary judgment in favor of Defendant on Claim III.

## III.    The Conditions of Confinement - Claim IV

Claim IV challenges the conditions of confinement at ADX as substantially burdening Mr. Chesser's sincerely held religious beliefs. Both Parties move for summary judgment on this claim. Because it is undisputed that Mr. Chesser establishes a prima facie RFRA claim, the question then becomes whether the BOP has demonstrated that its restrictions on Mr. Chesser's sincerely held religious beliefs are the least restrictive means of furthering its compelling interests. But before reaching this question I must first address the Parties' arguments implicating the court's subject matter jurisdiction. *See United States v. Springer*, 875 F.3d 968, 973 (10th Cir. 2017) ("Jurisdiction is a threshold question that a federal court must address

before reaching the merits" (internal quotation marks omitted)). And because Defendant raises an exhaustion argument, and exhaustion is a prerequisite to suit, I must also address that contention before considering the merits of Claim IV. *See Fitzgerald v. Corr. Corp. of Am.*, 403 F.3d 1134, 1141 (10th Cir. 2005) (explaining that "the plain language of the statutory text [of the Prison Litigation Reform Act] does not allow the court to skip ahead to the merits of the suit," except in limited circumstances).

### A.    Mootness - ADX General Population

Mootness is a threshold issue as federal court jurisdiction depends on a live case or controversy—without a live, concrete controversy, the court cannot consider the plaintiff's claim(s) no matter how meritorious. *Rio Grande Silvery Minnow v. Bureau of Reclamation*, 601 F.3d 1096, 1110 (10th Cir. 2010).[5] "If an intervening circumstance deprives the plaintiff of a personal stake in the outcome of the lawsuit, at any point during litigation, the action can no longer proceed and must be dismissed as moot." *Brown v. Buhman*, 822 F.3d 1151, 1165 (10th Cir. 2016) (internal quotation marks omitted). The inquiry focuses on whether the court's determination of the issues will have "some effect in the real world," which is especially true in actions for prospective relief. *Wyoming v. U.S. Dep't of Argic.*, 414 F.3d 1207, 1212 (10th Cir. 2005) (internal quotation marks omitted). "When prospective equitable relief is requested, the requesting party must show an ongoing, personal stake in the outcome of the controversy, a

---

[5] In addition to constitutional mootness, courts may exercise their discretion to not grant the declaratory or injunctive relief sought despite having the power to do so. *See S. Utah Wilderness All. v. Smith*, 110 F.3d 724, 727 (10th Cir. 1997) (noting that prudential mootness applies in circumstances that are "so attenuated that conditions of prudence and comity for coordinate branches of government counsel the court to stay its hand," as in when the plaintiff seeks an injunction against the government). Defendant argues prudential mootness as an alternative to constitutional mootness, *see* [#199 at 10–11], but because the court concludes that Claim IV is constitutionally moot as to the portions challenging ADX General Population, it does not address Defendant's prudential mootness arguments.

likelihood of substantial and immediate irreparable injury, and the inadequacy of remedies at law." *Rezaq*, 677 F.3d at 1008.  Because of its jurisdictional nature, parties may raise mootness at any stage of the proceedings, *Ind v. Colo. Dep't of Corr.*, 801 F.3d 1209, 1213 (10th Cir. 2015), and courts may raise it *sua sponte*, *McClendon v. City of Albuquerque*, 100 F.3d 863, 867 (10th Cir. 1996).

There are exceptions to mootness, however.  Two are relevant here.  One concerns the defendant's voluntarily cessation of the challenged conduct for purposes of evading judicial review but which the defendant is free to continue at any time.  *See Chihuahuan Grasslands All. V. Kempthorne*, 545 F.3d 884, 892 (10th Cir. 2008).  The *defendant* bears the "formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *Already, LLC v. Nike, Inc.*, 133 S. Ct. 721, 727 (2013) (internal quotation marks omitted).  The second applies where "(1) the challenged action is in its duration too short to be fully litigated prior to cessation or expiration; and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again." *Ghailani v. Sessions*, 859 F.3d 1295, 1301 (10th Cir. 2017) (citations and internal quotation marks omitted).  Contrary to the voluntary cessation exception, where the BOP bears the burden, *Mr. Chesser* bears the burden of proving both elements of the capable of repetition yet evading review exception.  *Al-Owhali v. Holder*, 687 F.3d 1236, 1242 (10th Cir. 2012).  I consider each exception in turn.

***Voluntary Cessation:***  Mr. Chesser argues that no portion of Claim IV is moot, including his challenges to the conditions at ADX General Population.   This is because Defendant has not and cannot meet the formidable burden of establishing that its illegal conduct could not reasonably be expected to recur by merely progressing him through the ADX Step-Down

Program.  *See* [#191 at 2, 19; #193 at 30–31; #207 at 1, 7–9].  He maintains that Defendant could send him back to ADX General Population at any time because he still satisfies the criteria for placement in ADX General Population.  *See* [#191 at 19; #193 at 31; #207 at 8, 9].

The BOP contends that the voluntary cessation exception does not apply because of Mr. Chesser's transfer to the B/B Unit.  *See* [#199 at 9].  But even if it did apply, it has not voluntarily ceased its ADX General Population prohibition on congregate prayer and Plaintiff will not return to ADX General Population.  *See* [#199 at 9–10; #199-2 at ¶ 5].  The court agrees with Defendant that the voluntary cessation exception is inapplicable.

Here, Mr. Chesser seeks a declaration that the conditions at ADX violate his sincerely held religious beliefs in violation of RFRA and injunctive relief righting those alleged wrongs at ADX.  *See generally* [#58].  But "[w]here the prisoner's claims for declaratory or injunctive relief relate solely to the conditions of confinement at the penal institution at which the prisoner is no longer incarcerated, courts have concluded that they are unable to provide the prisoner with effective relief", rendering the claim(s) moot.  *Jordan v. Sosa*, 654 F.3d 1012, 1027 (10th Cir. 2011) (footnote omitted) (collecting cases).  Indeed, the purpose of declaratory and injunctive relief is to have some effect on the defendant's conduct toward the plaintiff, not "simply the satisfaction of a declaration that a person was wronged."  *Cox v. Phelps Dodge Corp.*, 43 F.3d 1345, 1348 (10th Cir. 1994); *see also Green v. Branson*, 108 F.3d 1296, 1300 (10th Cir. 1997) (finding as moot claims against a former prison institution because a declaratory judgment would "amount to nothing more than a declaration that [the plaintiff] was wronged, and would have no effect on the defendant's behavior towards him.").

Mr. Chesser is correct to note that he is not merely suing individuals at a previous institution but the Director of the BOP—a sometimes important distinction.  "[W]here a prisoner

brings a lawsuit challenging policies that apply in a *generally uniform fashion* throughout a prison system, courts have been disinclined to conclude that the prisoner's declaratory or injunctive claims are moot, even after he has been transferred to another prison in that system." *Jordan*, 654 F.3d at 1028 (emphasis added) (citing *Abdulhaseeb v. Calbone*, 600 F.3d 1301, 1312 (10th Cir. 2010) (concluding that the plaintiff's RLUIPA challenge to uniform correctional policies was not moot where the plaintiff sued the director of the correctional department and the plaintiff remained in the defendant's custody despite transferring institutions)). Certainly, the Director of the BOP, defendant here, has the authority to craft the relief Mr. Chesser seeks. The problem, however, is that Mr. Chesser challenges an institution-specific policy, *i.e.*, the prohibition of all congregate religious worship at *ADX General Population*. *See* [#67-15 at 4 ("No congregate services will be conducted at *ADX*." (emphasis added))]. Any declaratory or injunctive relief would therefore have no effect on Defendant's conduct toward Plaintiff, *Jordan*, 654 F.3d at 1033—a point discussed below.

    ***Capable of Repetition Yet Evading Review:*** As mentioned, this exception applies where the conduct at issue is too short in duration to be fully litigated before its expiration, and "there is a reasonable expectation" the plaintiff will be subject to the same conduct again. *Fleming v. Gutierrez*, 785 F.3d 442, 445 (10th Cir. 2015). This exception, however, is narrow and applies only in "exceptional situations." *Wyoming v. U.S. Dep't of the Interior*, 674 F.3d 1220, 1229 (10th Cir. 2012); *cf. Roe v. Wade*, 410 U.S. 113, 125 (1973) (explicating that disputes about abortion regulation are the iconic examples of cases meeting this narrow exception). Mr. Chesser fails to demonstrate that this matter is one of those exceptional situations.

    Mr. Chesser asserts that the length of confinement in ADX General Population is too short a duration to fully litigate, such that he would leave ADX General Population before the

end of this suit.  *See* [#207 at 9; #207-1 at ¶ 2].  The record indicates that, at a minimum, an inmate must spend 12 months in ADX General Population before being eligible for the ADX Step-Down Program.  *See* [#180-33 at 10].  While an inmate's assignment to ADX General Population may exceed 12 months based on his conduct, indeed, Plaintiff spent roughly two-and-one-half years there, *see* [#180-31 at ¶ 8; #193-1 at p.10 ¶¶ 4–5], assuming an inmate's assignment lasted only 12 months I find that this would be too short to fully litigate for purposes of this exception.  *Cf. Turner v. Rogers*, 564 U.S. 431, 440 (2011) (holding that imprisonment for no more than 12 months too short to fully litigate).

Nevertheless, Mr. Chesser fails to establish that *he* is reasonably likely to be subject to ADX General Population again.  *Cf.* [#207 at 10 (arguing that *other* "terrorists have been returned to ADX itself after leaving.")].  Indeed, a majority of Plaintiff's summary judgment filings and his proffered evidence argues that the BOP should *not* have transferred him to ADX initially, and that the BOP failed to send more violent inmates to ADX despite receiving more severe incident reports.  *See, e.g.*, [#193-2 at ¶ 138].  Further, the record reveals that Plaintiff has been steadily progressing through the ADX Step-Down Program and is in the last phase; and the Associate Warden attests that there is no reason for Mr. Chesser to return to ADX General Population upon completion of the Step-Down Program.  *See* [#180-31 at ¶ 10; #199-2 at ¶¶ 3, 5].  It appears mere speculation then that Mr. Chesser will return to ADX General Population, which is insufficient for purposes of the capable of repetition yet evading review exception to mootness.  *See Ind*, 801 F.3d at 1216 (holding the plaintiff's RLUIPA claim moot, because the court "decline[d] to assume" that the plaintiff would "repeat the misconduct" that put him in administrative segregation—the basis for his suit); *McAlpine v. Thompson*, 187 F.3d 1213, 1218 (10th Cir. 1999) (finding the parolee's RFRA challenge to his conditions of confinement moot,

because the court was "not inclined to speculate that [Mr.] McAlpine [would] break the law or otherwise violate" his conditions of release and be sent back to the same institution).

Based on the foregoing, the court concludes that Claim IV's challenges to conditions at ADX General Population are moot. *Cf. Chesser I*, 2016 WL 6471435, at *4. I now address Defendant's exhaustion argument before turning to the merits of Claim IV's challenges to the conditions in the B/B Unit.

### B.     Exhaustion

The Prison Litigation Reform Act ("PLRA") provides, "No action shall be brought with respect to prison conditions under Section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The exhaustion requirement applies to all inmate suits concerning prison life, whether they involve general circumstances or specific episodes. *Woodford v. Ngo*, 548 U.S. 81, 85 (2006); *Booth v. Churner*, 532 U.S. 731, 741 (2001) (holding that prisoners must exhaust administrative remedies before filing a lawsuit regardless of the type of relief prayed for in the complaint). Exhaustion of administrative remedies is mandatory and is intended to give corrections officials an opportunity to address complaints internally before initiation of a federal lawsuit. *See Woodford*, 548 U.S. at 93. Defendant bears the burden of proving this affirmative defense by a preponderance of the evidence. *See Roberts v. Barreras*, 484 F.3d 1236, 1241 (10th Cir. 2007).

Defendant argues that Mr. Chesser filed only one administrative grievance related to this action that vaguely referred to religious classes, and did not sufficiently articulate that this included his desire to learn from Islamic scholars up to 10 to 14 hours per day so that he may teach Muslim inmates. *See* [#181 at 23, 34–35]; *see also* [#180-38 at ¶¶ 17, 20–26; #180-44 at

32

5].  Mr. Chesser responds, and the court agrees, that his Grievance "sufficed to explain to the BOP what it needed to do to address [his] claims[.]"  [#191 at 19].

The Grievance states,

> As a Muslim, I sincerely believe a number of group activities such as five-time daily group prayer, classes and other activities are recommended and/or obligated by my faith.  Long-term solitary confinement substantially burdens my ability to engage in these activities.  I request this policy be amended to allow me to practice my religion.  By "classes," I mean *religious* classes. . . .

[#180-44 at 5].  While the Grievance lacks specificity as to the breadth of what religious classes entails, the court concludes that this Grievance "provides prison officials with enough information to investigate and address the inmate's complaint internally."  *Kikumara v. Osagie*, 461 F.3d 1269, 1285 (10th Cir. 2006), *overruled on other grounds by Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007), as explained in *Robbins v. Oklahoma*, 519 F.3d 1242, 1246–47 (10th Cir. 2008).  Indeed, the Grievance captures the very nature of Claim IV, *i.e.*, his inability to congregate with other Muslims for group prayer or classes, and otherwise violates his religious rights.  Accordingly, the court concludes that Mr. Chesser has properly exhausted his administrative remedies insofar as Claim IV alleges that the conditions of the B/B Unit that prevent his congregation with other Muslim inmates violate RFRA.

### C.     Merits - B/B Unit

Both Parties move for summary judgment regarding the restrictions on Mr. Chesser's sincerely held religious beliefs while housed in the B/B Unit.  Because it is the BOP's burden to demonstrate that those restrictions are the least restrictive means of furthering its compelling interests, the subsequent discussion begins with an examination of the BOP's proffered compelling interests, followed by an examination of Mr. Chesser's suggested less-restrictive means, and concludes with the BOP's reasoning for refuting those suggestions.

### i. Compelling Interests

The BOP contends that the restrictions on Mr. Chesser's ability to engage in congregate prayers, religious classes, gatherings of religious remembrance, religious celebrations, and interactions to promote spiritual and communal well-being with as many Muslims as possible for up to 10 to 14 hours per day further its compelling interests in maintaining institutional and national security. Defendant focuses on Mr. Chesser's radical Jihadist beliefs that he harbored and promoted while in CMU Marion, his assault of another inmate at CMU Marion, his intentional violation of CMU Marion rules and his encouragement of other inmates to defy CMU Marion rules, and the security risks posed to the ADX Step-Down Program that would arise from providing Mr. Chesser the religious accommodations he desires. *See* [#67-3; #180-36; #180-37; #180-38; #181 at 2–17, 21–22; #199 at 11–15; #200 at 8–9]; *accord Hale*, 2018 WL 1535508, at *14 (finding justified the BOP's mail-restrictions on the plaintiff given the plaintiff's conviction for soliciting the murder of a federal judge and his attempts to induce others to incite violence despite the plaintiff's professions that he was innocent and non-violent). In the BOP's judgment it is imperative for Mr. Chesser to complete the ADX Step-Down Program so that he may successfully reintegrate into an open population institution without the risk of repeating his disruptive CMU conduct. *See* [#180-31 at ¶¶ 25–32].

Mr. Chesser raises several arguments in opposition to the BOP's institutional and national security interests, but after considering the evidence before it, this court concludes that none creates a genuine dispute of material fact on this point or establishes that these compelling interests fail as a matter of law. I consider each in turn.

*First*, Plaintiff argues that the BOP's compelling interests are invalid because they violate his First Amendment rights. He spends great lengths arguing that the BOP cannot restrict his

right to promote his Jihadist beliefs in prison; he further argues that the BOP cannot demonstrate that his Jihadist writings would incite violence. *See* [#191 at 12–17]. But Plaintiff's arguments are misguided. While he is correct that RFRA imposes a stricter burden on the government than the "relaxed standard from *Turner*," *Ghailani*, 859 F.3d at 1305 (internal brackets and quotation marks omitted), and that courts may draw guidance from First Amendment case law, there is no claim regarding a violation of Plaintiff's free speech included in this action. The RFRA inquiry focuses on the justifications provided by the BOP for its restrictions imposed on Plaintiff's ability to congregate with other Muslims in the various religious prayers and gatherings required by his faith, so whether Plaintiff's writings (satirical or not) invoked violence or constituted a clear threat is irrelevant to this matter. Instead, it is undisputed that the BOP found that Mr. Chesser's Jihadist beliefs and violent writings played a role in his disruptive *conduct* at CMU Marion and was but one of several reasons for the restrictions in the ADX Step-Down Program. *E.g.*, [#67-3 at ¶¶ 13–15; #67-11 at 3–6; 180-27 at 32–33; #180-31 at ¶¶ 25–27, 47–50; #181-1 at 87:15–16, 141:5–10, 282:5–7, 292:20–293:18; #181-2 at ¶¶ 33–37, 52, 55–59; #181-3 through #181-5; #181-6 through #181-13 & #181-15; #191-1 at 4(admitting to writing "offensive articles and poems and explicitly advocated jihad" for purposes of a "censorship" claim), 7–8 (stating he has openly "advocated jihad" at CMU Marion, ADX General Population, and ADX Step-Down Program)].

**Second**, Mr. Chesser disputes the nature/severity of his CMU Marion conduct giving rise to his transfer to ADX and highlights the BOP's recent decision not to return him to a CMU, urging that he is not as dangerous as the BOP's compelling interests suggest. *See* [#191 at 9–10, 17; #191-1 at ¶¶ 14–15, 20–21, #193 at 14–19; #193-1 at 2, 3; #193-2 at 13–25; #193-22 at 4]. But Plaintiff admits to intentionally flouting CMU Marion's rules prohibiting unauthorized

group activities, *see* [#67-11 at 3–4; #193-1 at p. 18, ¶ 25 ("I ignored this ban [on group prayer]" at the CMU); #193-2 at ¶¶ 106, 131 (admitting to advocating group prayer despite restrictions on congregate activities)]; he admits to assaulting another inmate, *see* [#191-1 at 9–10; #193-2 at ¶¶ 102, 125–130)]; he admits to possessing code instructions, *see* [#181-2 at ¶ 49; #193-2 at ¶¶ 104, 120–123; #193-12 at 2]; and he did email CMU Marion staff to discuss an inmate's apparent safety at CMU Marion and to explain that "if you all will drop the attempt to send [redacted inmate's name] to ADX or SMU, then I believe I could probably work something out with regard to this unit" [#108-21 at 2]. Plaintiff's re-characterization of his conduct does not create a genuine dispute of material fact that the *BOP* perceived and found this conduct to be a security risk to CMU Marion personnel and institutional safety. *See* [#67-3 at ¶ 15 ("At bottom, Chesser was recommended for ADX designation not because of his radicalized ideology or with whom he associated, but because of how he attempted to exert control over that association of inmates, how he fomented disruption and violence between groups in CMU Marion, and how his actions displayed a very real attempt to organize mass resistance to Bureau policy and institutional security.")]. Nor is the court persuaded that the BOP's recent decision not to return Plaintiff to a CMU supports his notion that he is not as dangerous so as to warrant placement in the B/B Unit. This evidence connotes only that the BOP considered and rejected his placement at a CMU, and the court will not infer any implicit concession that this rebuts the BOP's compelling interests.

**Third**, Plaintiff again argues that the BOP's national security interest is a post-hoc rationale and, therefore, does not pass summary judgment muster. *See* [#191 at 4–5; #193-1 at 1 n. 16, 2]. While most of Plaintiff's arguments appear focused towards the reasons for his *transfer* to ADX, rather than the *conditions* at ADX and the B/B Unit, the court concludes that the BOP's national security interests are not post-hoc rationales. *Cf. Yellowbear*, 741 F.3d at 57–

58 (deeming the defendant's safety concerns, raised for the first time on *appeal*, as post-hoc rationales for denying the plaintiff access to a sweat lodge). Mr. Chesser argues that Defendant "lied" and "evade[d]" discovery on national security interests and cannot now raise this as a compelling interest. *See* [#193 at 11; #193-1 at 2]. But, as above, the BOP does consider whether an inmate presents "national security management concerns which cannot adequately be met in an open population institution." [#67-3 at ¶¶ 11–12; #67-10 at 3]. Indeed, Plaintiff even quotes this factor in his TAC. *See* [#58 at 5]. And the BOP explained in discovery that Plaintiff's writings and communications were not the sole reason for his transfer; rather it was how his Jihadist beliefs and writings had motivated and manifested in his disruptive CMU Marion conduct that prompted the transfer. *E.g.*, [#67-6; #67-11; #147-1 at 11; #193-21 at 4 (explaining that Defendant was not concerned with Plaintiff's ideology for its own sake but, rather, it is charged with protecting "the safety of staff, the inmate population, and the general public" to the extent Plaintiff would act on those beliefs to jeopardize institutional safety and order), 11]. Further, it does not appear that the BOP evaded discovery into the national security interests implicated by the *conditions* of confinement at the ADX and B/B Unit. *See generally* [#147-1; #193-21; #193-22]. Even disregarding the BOP's national security interest altogether, Mr. Chesser fails to dispute the BOP's compelling interest in maintaining institutional security and safety, which justify his restrictions in the B/B Unit.

*Lastly*, Mr. Chesser argues that Defendant's compelling interests must fail because of their underinclusiveness, *i.e.*, the BOP permits secular exceptions more readily than religious ones. *See Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 547 (1993) (stating that a law's compelling interest may not be so compelling "when it leaves appreciable damage to [the] supposedly vital interest unprohibited." (internal quotation marks omitted)). Mr.

Chesser declares that the BOP has recently banned religious gatherings, but that "[g]angs, for example, are given free reign [sic] to meet at ADX and B/B Unit . . . and they can and do talk about how to run their gangs and commit crimes." [#186-1 at ¶ 9]. He also proclaims that Neo-Nazis have the same ability, and it is only Muslims that face discipline for such gatherings even though Muslim inmates could exert control and influence over other inmates during allowed group prayer. *See* [*id.* at ¶¶ 9–10]; *see also* [#193-24 at ¶ 3 (Mohamed Saddiq Odeh declaring to a ban on Muslim-led "religious discussion or sermon" but not secular gatherings)].

Assuming these allegations to be true, underinclusiveness, by itself, does not automatically invalidate Defendant's compelling interests. *See United States v. Friday*, 525 F.3d 938, 957–59 (10th Cir. 2008) (holding that the government's greater enforcement of criminal prosecutions for intentional eagle killings, even if for religious purposes, as opposed to unintentional killings did not suggest that its compelling interest in protecting eagles was not really compelling). For instance, it is undisputed that Mr. Chesser may engage in both group prayer (and may lead such prayers) and religious classes/studies with other Muslims when he is outside or inside his cell. *See* [#180-31 at ¶¶ 12–14, 16–18, 23; #180-35; #180-36 at 2; #180-36 at ¶¶ 27–29; #181-1 at 185:16–22 (testifying to praying twice with Muslim inmates during indoor recreation), 186:2–11, 203:8–12, 223:6–14, 224:4–6, 230:11–13 ("there's no particular restriction on what I do when I'm outside my cell."), 248:6–249:25, 254:3–24; #193-1 at p. 19, ¶ 26 ("since coming to B/B Unit, I have led the 'Id Prayer, Salah Al-Jumu'ah and As-Salawah Al-Maktubah whenever feasible."); #193-2 at ¶ 86 ("Religious gatherings are allowed."), ¶ 87 ("Because there is no ban on religious gatherings in B/B Unit, I am able to engage in group prayer at recreation."); #198-3 at ¶ 2]. What he may not do, similar to all ADX and B/B Unit inmates, is achieve a formal leadership role over religious gatherings and classes, such that he

38

can preach or sermonize a curriculum of his choosing to other inmates, *see* [#180-31 at ¶¶ 56–57; #180-38 at ¶¶ 36–37; #198-3 at ¶¶ 3–4; #199-2 at ¶¶ 7–8]—something Plaintiff aspires to do, *e.g.*, [#180-27 at 16 ("I am obligated to study until I become a scholar in these [Islamic] subjects"); #180-46 at 5–7; #180-47; #193-1 at 19–20; #193-2 at 7–8,  #193-4 at 22–24].  And even if Plaintiff witnessed the underenforcement of this policy as to secular groups, the BOP has still carried its burden of demonstrating why these restrictions on *Mr. Chesser* further its compelling interests in maintaining institutional and national security, *i.e.*, Plaintiff's subscription to violent Jihadist beliefs that manifested in his disruptive CMU Marion behavior and his promotion and advocacy of such beliefs to other inmates to encourage their defiance of BOP policies.

Accordingly, I conclude that the BOP has established its compelling interests in maintaining institutional and national security as reasons for restricting Mr. Chesser's sincerely held religious beliefs.  The BOP must now demonstrate that it employs the least restrictive means of furthering these compelling interests.

### ii.    Least Restrictive Means

Throughout his papers and various filings Plaintiff offers several less-restrictive means that the BOP could employ in the B/B Unit.  These include:

1. Imposing Special Administrative Measures ("SAMs") on Plaintiff to increase his physical contact with other Muslim inmates though restricting his communications;

2. Transferring Plaintiff back to a CMU;

3. Housing Plaintiff with Muslim neighbors;

4. Opening cells and transporting Muslim inmates to designated areas for religious activities;

5. Co-mingling all ranges in the B/B Unit to increase the number of Muslim inmates Plaintiff has contact with;

6. Creating Muslim and/or terrorist prisons or prison units;

7. Providing Plaintiff remote access to Islamic scholars; and

8. Lifting all restrictions on religious activities in the B/B Unit.

For its part, Defendant addresses each in kind. For the following reasons, the court respectfully concludes that the conditions in the B/B Unit *as applied to Mr. Chesser* are the least restrictive means of furthering the BOP's compelling interests in maintaining institutional and national security.

*Alternatives 1–3:* Based on the undisputed record, the court can easily dispose of Alternatives 1–3. Regarding SAMs, it is undisputed that the Attorney General has sole discretion over the imposition of SAMs, and Mr. Chesser's declarations that he meets that criteria do not refute the fact that the BOP cannot impose such restrictions. *See* 28 C.F.R. § 501.3. Likewise, the BOP has considered and rejected Plaintiff for placement back at a CMU, determining that he must complete the ADX Step-Down Program; the court will not second-guess this decision. *See* 18 U.S.C. § 3621(b); 28 C.F.R. § 0.96(c); *see also* [#180-31 at ¶ 34 (explaining that the BOP has determined that Mr. Chesser must complete the ADX Step-Down Program)]. In addition, it is undisputed that Plaintiff now has Muslim inmates in his current range in the B/B Unit, *see* [#180-31 at ¶¶ 12–14, 16–18, 23; #180-36 at 2#180-35; #181-1 at 185:16–22, 186:2–11, 203:8–12, 223:6–14, 224:4–6, 248:6–249:25, 254:3–24; #193-1 at p.13, ¶10; #193-2 at ¶¶ 72, 86, 141]; and he has explained that access to even one Muslim inmate "is a significant improvement," *see* [#193-2 at ¶ 149 (declaring that there are 4 Muslim inmates in his recreation group and two other Muslim inmates in the B/B Unit)]; *see also* [#180-27 at 39

(stating the BOP could employ several alternatives to "where [he] would have access to just one other Muslim.")].

*Alternatives 4 and 5:* Mr. Chesser proposes that the BOP transport himself and Muslim inmates to a designated area for all or some of his required religious prayers and gatherings, like its transporting of inmates to recreation, medical appointments, and classes. *See* [#193 at 20–22; #193-2 at ¶¶ 142, 148]. He also suggests that the BOP could merely "open" his and other Muslims' cell doors at certain times so that they could pray together while other inmates are locked down, which is easier than transporting inmates. *See* [#181-1 at 203:25–204:23, 224:18–20, 228:1–21; #193 at 21; #193-2 at ¶ 146]. Or, to avoid transporting inmates and opening cells, he asserts that the BOP could simply combine certain ranges for recreation so that he has even greater access to Muslim inmates in the B/B Unit. *See* [#181-1 at 203:21–24; #193 at 23–25; #193-2 at ¶¶ 153–156].

Regarding transportation, it appears that this suggestion is most applicable to ADX General Population, *see e.g.*, [#193-21 at 20–26], and is therefore moot as discussed above. Further, it does not appear that transportation is required in the B/B Unit. *See* [#193-2 at ¶ 146 ("In B/B [Unit] . . . staff would only need to open the doors of our cells to let us be together, which requires no transportation.")]. Nevertheless, I find that the BOP has put forth undisputed evidence that transportation of Mr. Chesser and other Muslim inmates to a designated area for religious activities outside scheduled recreation hours poses serious logistical and security problems, *e.g.*, requiring the same staff transport the inmates to ensure no contraband is returned to their cells, coordinating the transportation of a varying group of inmates at various times throughout the day, and allowing Mr. Chesser to have more physical contact with other inmates than deemed appropriate by the BOP. *See, e.g.*, [#180-31 at ¶¶ 30–31; #180-37 at ¶ 22; #193-21

at 20–26]. Additionally, the appearance that certain inmates are receiving preferential treatment creates a risk of retribution to not only BOP personnel but to Mr. Chesser and other Muslim inmates as well. [#180-37 at ¶¶ 17, 19–20]; *see also* [#180-31 at ¶¶ 32, 43–45; #180-38 at ¶¶ 30–32].

A similar conclusion is warranted regarding the "open" cell doors suggestion. To start, the BOP explains that providing Mr. Chesser with additional out-of-cell opportunities would frustrate the BOP's purpose of carefully limiting his out-of-cell time to successfully reintegrate him to a less-restrictive institution. *See* [#180-31 at ¶ 42; #180-37 at ¶ 22]. Plaintiff's self-serving attestations that he is not as dangerous as the BOP suggests does not defeat this contention. Further, as above, providing additional out-of-cell time to Mr. Chesser creates the possibility of unrest among other inmates and may pose a risk to institutional security if other inmates perceive Mr. Chesser as receiving preferential treatment. [#180-37 at ¶¶ 17, 19–20]; *see also* [#180-31 at ¶¶ 32, 43–45; #180-38 at ¶¶ 30–32]. Indeed, the BOP carefully calibrates the B/B Unit activity schedule to ensure all inmates receive the same out-of-cell time to avoid this situation. *See* [#180-37 at ¶¶17–20].

Relatedly, the BOP provides sufficient, undisputed explanations for why it cannot co-mingle all ranges within the B/B Unit or allow only Muslim inmates out of their cells when Mr. Chesser is out for recreation. In addition to the explanations offered above, *e.g.*, [#180-31 at ¶ 37 (both phases of the B/B Unit were designed to house a small number of inmates to allow effective monitoring of their progress to less-restrictive conditions); #180-37 at ¶ 20 (allowing out-of-cell time for Muslim inmates to join Mr. Chesser at recreation would create an appearance of unfairness)], the BOP explains that limiting the number of inmates in Phases 1 and 2 of the B/B Unit is critical to maintaining institutional security, as it reduces the risk of violent attacks

on staff and inmates—attacks that are not uncommon. *See* [#180-31 at ¶ 38 (providing examples of recent violence); #180-37 at ¶¶ 3–13 (same), 19–20 (same)]. The BOP carefully selects and screens which inmates it can safely house in either phase of the B/B Unit; combining Phases 1 and 2 increases the potential for inmate-on-inmate disputes and violence, *see* [#180-31 at ¶ 39], and frustrates the BOP's purpose of incentivizing inmates to earn more out-of-cell time as they progress from Phase 1 to Phase 2, *see* [*id.* at ¶ 40]. Further, Defendant explains that it does not have the space at ADX to combine Phases 1 and 2, and forcing the BOP to transfer ADX inmates to other institutions to accommodate all of the B/B Unit poses unreasonable security risks, as ADX inmates require a greater level of security than other facilities can provide. [*Id.* at ¶ 36]. Plaintiff's assertions to the contrary, based on his own speculation and beliefs [#191 at 11; #191-1 at p.13, ¶ 26], do not create a genuine dispute of material fact on this issue. *See Ciempa v. Jones*, 745 F. Supp. 2d 1171, 1198 (N.D. Okla. 2010) ("Ciempa's mere speculation that items could contain pork by-products is insufficient to create a genuine issue of material fact.").

*Alternative 6:* Plaintiff makes much of the idea that the BOP could simply house all Muslims or terrorists in a distinct BOP facility or within a specific range. *E.g.*, [#180-27 at 31, 35–39]. He suggests that, aside from having to build new facilities, the BOP could merely place all such inmates in an already established CMU, or convert a portion of an existing facility into a CMU, or it could employ a non-discriminatory set of criteria that would allow the housing of such inmates in similar ranges. He declares that the BOP regularly discriminates in its housing decisions, such that his solutions would be feasible. *See* [#193-2 at ¶¶ 154–155]. I find, however, that the BOP sufficiently refutes the feasibility of these suggestions.

*First*, the BOP explains that accommodating Mr. Chesser's requests, which essentially amount to a transfer to a new facility, would frustrate its compelling interest in progressing Mr.

Chesser through the ADX Step-Down Program. *See* [#180-31 at ¶ 34]. And, as discussed, this is likely outside of the court's authority, given the authority to place inmates within the BOP lies within the discretion of the executive branch. The court agrees with the BOP that it has demonstrated with undisputed evidence that, in its judgment, Mr. Chesser must complete the ADX Step-Down Program given his CMU Marion misconduct and that he is not an appropriate candidate for returning to a CMU. *See* [#67-3 at ¶ 15]. Plaintiff has failed to create a genuine issue material of fact that the BOP violated RFRA in exercising that discretion. Again, Plaintiff's re-characterizations and self-serving declarations that he is not as dangerous as the BOP believes do not create a genuine dispute of material fact on this point. *See Beard v. Banks*, 548 U.S. 521, 530 (2006) (explaining that the court "must distinguish between evidence of disputed facts and disputed matters of professional judgment"; the latter being accorded deference).

*Second*, as to building new institutions, the court agrees that this authority lies with Congress, not the BOP. *See* Pub. L. No. 71-218, 46 Stat. 325 (1930) (creating the BOP within the Department of Justice); NATHAN JAMES, CONG. RESEARCH SERV., R42937, THE FEDERAL PRISON POPULATION BUILDUP: OPTIONS FOR CONGRESS 5 n.10 (2016) ("Congress funds BOP's operations through two accounts: Salaries and Expenses [] and Buildings and Facilities []."). Further, building new facilities would require a fundamental overhaul of BOP operations that "extend far beyond alterations to the ADX Step-Down Program." [#180-31 at ¶ 42]. This is equally true of the specific housing units Mr. Chesser proposes. And the court agrees with Defendant that RFRA does not require it to subsidize Plaintiff's religious beliefs by building new institutions, creating Muslim/terrorist-specific units, or overhauling its operations. *Cf. Werner*, 49 F.3d at 1480 ("[RFRA] need not drive a prison to employ clergy from every sect or creed

found within its walls"); *accord Abdulhaseeb*, 600 F.3d at 1320 (agreeing with the district court that "RLUIPA requires the government to refrain from substantially burdening religion, not to affirmatively subsidize religion.").

*Third*, the BOP contends that the placement of Mr. Chesser in these Muslim/terrorist-specific units poses an unreasonable security risk, given his proclivities for violent Jihadist rhetoric and beliefs as he would have access to inmates that may harbor similar beliefs and encourage Mr. Chesser to act on those beliefs. *See* [#147-1 at 17–18; #193-21 at 9–10]. For example, Supervisory Special Agent of the Federal Bureau of Investigation ("FBI") Mary Sonnen attests that the FBI determined that Mr. Chesser could not depose Mostafa Kemal Mostafa, a convicted terrorist and an inmate subject to SAMs, because doing so "could cause a grave risk of bodily harm to others" and may "further radicalize [Mr.] Chesser in ways that may prove dangerous to other inmates, prison staff, and persons outside the prison" given that Mr. Chesser appears "extremely susceptible to [Mr. Mostafa's] influence." [#121-1 at ¶¶ 8, 16].

Plaintiff counters that there is no evidence that such units would be harder to manage from a national security standpoint because "it is harder to influence terrorists in a meaningful way than non-terrorists." [#193-2 at ¶ 156]. But it is only Plaintiff's speculation that all Muslim and terrorist inmates are susceptible to the same conditions of confinement, and it is undisputed that the BOP renders housing determinations, even those for Muslim inmates or those with terrorism convictions, on an individualized, case-by-case basis. *See* [#67-3 at ¶¶ 7–8, 11–12, 17–27; #147-1 at 14–16; #193-21 at 16]. He also claims that there is concrete evidence that Muslim and terrorist inmates are not threats to institutional and national security, given that Eljvir Duka, an inmate convicted of terrorism-related crimes, was housed in an open-population BOP institution without incident. [#193-23 at ¶¶ 9–10]. While policies at other institutions may be

relevant, they are not controlling, *see Knight v. Thompson*, 797 F.3d 934, 947 (11th Cir. 2015), and Mr. Chesser's assertions that this constitutes concrete evidence that all Muslim and terrorist inmates pose no threat to institutional security does not defeat the BOP's rationales for rejecting this alternative as to *him*, *see* [#193-21 at 15–20]; *cf. Yellowbear*, 741 F.3d at 58 (proclaiming that the relevant inquiry focuses on the context of the particular case, "not in the abstract"). He further proposes that the BOP could employ "neutral" criteria, such as "the CMU criteria, a lack of 'serious violence,' terrorism ties, or the need for religious accommodation and extend the same or similar privileges to all similarly situated inmates of each faith." [#193 at 23; #193-2 at ¶ 154]. Again, it is undisputed that housing determinations are individualized assessments, and it is simply conjecture that a "neutral" set of criteria would yield the results Mr. Chesser proclaims. *See* [#67-3 at ¶¶ 7–8, 11–12, 17–27; #147-1 at 14–16; #193-21 at 16]; *see also* 28 C.F.R. § 551.90 (prohibiting the BOP from "discriminat[ing] against inmates on the basis of race, religion, national origin, sex, disability, or political belief", which "includes . . . providing access to . . . housing . . . .").

*Finally*, Defendant highlights the security risks created by the appearance of giving Muslim and terrorist inmates preference over other inmates in terms of housing decisions, cellmate selection, and unfettered out-of-cell privileges. *See* [*id.* at ¶ 43]. According to the BOP, if other inmates perceive that Muslim inmates are "streamlined through or given priority of place in the ADX Step-Down Program, or that special housing conditions . . . are available only to Muslims, that obvious disparity in treatment would create an untenable security situation in B/B Unit[.]" [*Id.* at ¶ 44]; *see also* [*id.* at ¶ 32 (Associate Warden declaring that any perceived preferential treatment towards Plaintiff poses a risk to institutional security and Plaintiff's wellbeing)]. As John Oliver attests, the ADX General Population and ADX Step-Down Program

are unique institutions housing some of the most dangerous federal inmates, and the BOP has carefully crafted protocols for managing this population of inmates so that they may progress to less-restrictive institutions. *See* [#180-37 at ¶¶ 3–13]. Despite these protocols, violence (both inmate-on-inmate and against BOP personnel) is not uncommon. *See* [*id.* at ¶ 12 (listing notable incidences of violence); #180-31 at ¶ 38 (same)]. And both the Associate Warden and Mr. Oliver describe instances of disturbances and violence related to perceived disparities among inmates. *See* [#180-31 at ¶ 38 (discussing a fight in the B/B Unit over an inmate's perception that another inmate was overusing the communal computer); #180-37 at ¶ 19 (discussing a potential disturbance at USP Florence over Muslim inmates extended use of the chapel, cutting into a Christian group's time)].

*Alternative 7:* Plaintiff also proposes that he receive "remote" access to Islamic scholars so he can "study until [he] become[s] a scholar" in specific Islamic subjects and then he can "teach Muslims what [he] know[s]." [#180-46 at 5]. He asserts he should spend about 10 to 14 hours per day attending religious classes to achieve his goal, and "should have however many teachers it takes to allow [him] to study all of the [Islamic] subjects to the point of becoming a scholar in them on a full-time basis." *See* [*id.* at 5–7, 10 (explaining the teacher(s) would have to be from a sect of Islam he does not consider "extremely heretical")]. He continues that this could be achieved using a computer (like how he accesses his discovery materials) with prohibitions on his ability to use the internet or access a keyboard, mouse, or microphone during the lecture, but with the ability to utilize Skype or other approved methods to ask questions at the end of the lecture; or he could merely listen to lectures via telephone or audio recording. *See* [#180-27 at 41; #191 at 8; #191-1 at ¶ 19].

In response, the BOP first argues that it cannot accommodate this request because no inmate, whether for religious or secular purposes, may ascend to the position of "teacher" so as to be seen as a leader. The Associate Warden explains that reaching this position contravenes the "fundamental principle of sound correctional management that no inmate [be] allowed to exercise authority over or provide directions to any other inmate[.]" [#180-31 at ¶ 50]. He states this is especially so in Mr. Chesser's case, because "according [him] the status of a teacher-scholar gives added authority to his opinions"—opinions that advocate violent Jihadist beliefs. [*Id.*]; *see also* [#199-2 at ¶ 7 (Associate Warden declaring that Plaintiff cannot establish himself as an imam or instructor, "thereby establishing an alternate leadership structure in the unit" and that this is prohibited in secular situations as well)]. Chaplain Henderson echoes that sentiment. *See* [#180-38 at ¶ 36 ("If Chesser begins to marshal control over other ADX inmates and to establish himself as a religious leader, he is in a better position to incite inmates to engage in violent conduct", and could threaten institutional and national security); #198-3 at ¶¶ 2–3 ("[Plaintiff] may lead any [] prayers . . . [but he] has never been allowed to [] personally assume a formal leadership role in a congregate activity setting by 'preaching' or sermonizing to other inmates.")]. Further, the BOP elucidates it would face the added security risk (both institutionally and to the public) of allowing Mr. Chesser to communicate with Islamic scholars that may subscribe to the same radical beliefs as Mr. Chesser, requiring constant monitoring of the communications to ensure they are not used to incite violence. *Cf. Hale*, 2018 WL 1535508, at *15 (finding a complete ban on the plaintiff's correspondences with members of his religious group the least restrictive means, given the BOP's determination that the plaintiff's correspondences revealed his intent to use his leadership role to "exert influence" on other

members). I find these explanations sufficiently supported by the record and undisputed for the purposes of summary judgment.

Defendant also avers that providing Mr. Chesser remote access to an unlimited number of Islamic scholars presents an institutional security risk because no other inmates receive this privilege. *See* [#180-31 at ¶ 51]; *see also* [*id.* at ¶¶ 32, 37, 43–44; #180-37 at ¶¶ 19–20; #180-38 at ¶¶ 30–31]. In this regard, Mr. Chesser has the ability to engage in religious prayers, gatherings, and other exercises while at outdoor or indoor recreation, similar to all other inmates in the B/B Unit; he can request pastoral visits from persons outside the institution subject to BOP approval; he may study unabated in his living quarters, and may request and buy books and videos for his personal use; and he may purchase and enroll in "any religious correspondence course" so long as the study materials do not violate BOP rules and institutional guidelines. *See* [#180-31 at ¶¶ 12–14, 16–18, 23; #180-35; #180-36 at 2; #180-38 at ¶¶ 27–29; #180-41; #180-42; #180-48; #181-1 at 185:16–22, 186:2–11, 203:8–12, 223:6–14, 224:4–6, 230:11–13, 248:6–249:25, 254:3–24; #193-1 at p. 19, ¶ 26; #193-2 at ¶¶ 86–87; #198-3 at ¶ 2]. Further, no inmates may possess computers, and the computers used for discovery are read-only machines, allowed only for discovery purposes, with no ability to access the internet. *See* [#180-31 at ¶ 53; #191-1 at ¶ 19]. Providing Mr. Chesser access to a computer with internet access or Skype capabilities for purposes other than discovery would be a privilege no other inmate receives. Again, RFRA only prohibits restrictions on an inmate's sincerely held religious beliefs—it does not require the government to subsidize those beliefs. *See Battles v. Anne Arundel Cty. Bd. of Educ.*, 904 F. Supp. 471, 477 (D. Md. 1995) ("More to the point, Maryland is not required to 'subsidize' Battles' particular religious beliefs by eliminating contrary viewpoints from the required [homeschooling] curriculum."). And, as above, the court concludes that the BOP has sufficiently

explained why providing the remote studying opportunities Mr. Chesser seeks could create disparity between him and other inmates, which could pose serious institutional safety and security concerns.

*Alternative 8:* The most obvious solution Mr. Chesser proposes is for the BOP to simply do away with any restrictions on his ability to engage in religious prayers, gatherings, or exercises, even if only partially. *See* [#193 at 20]. This the BOP demonstrates it cannot do.

As discussed, ADX General Population and the ADX Step-Down Program are unique institutions housing some of the most dangerous federal inmates, and the BOP has carefully crafted protocols for managing this population of inmates so that they may progress to less-restrictive institutions. *See* [#180-37 at ¶¶ 3–13; #180-31 at ¶ 6 ("The ADX is the most secure prison in the federal system, housing less than 0.3% of all Bureau inmates.")]; *see also* [#67-16]. Indeed, the "Step-Down Program is the primary way in which the [BOP] achieves [its] mission of cycling inmates back to open-population institutions." [#180-31 at ¶ 7]. The Associate Warden declares that the Step-Down Program's approach of incrementally granting additional freedoms to inmates has been "extremely effective," as "less than 3 percent of the inmates who complete the Program are returned to ADX." [*Id.* at ¶ 29]. To achieve this goal, the BOP attests that it has carefully calculated the amount of time and the location for inmates in the B/B Unit to engage in congregate religious exercises, including the designated room during indoor recreation and anywhere at outdoor recreation. *See* [*id.* at ¶¶ 16–24; #180-37 at ¶¶ 15–22; #180-38 at ¶¶ 27–29]. And Mr. Chesser may engage in unrestricted study in his living quarters and may request and/or purchase approved religious materials. *See* [#180-38 at ¶¶ 27–29; #180-41; #180-42; #180-48].

The BOP has demonstrated that these conditions are the least restrictive means as applied to Mr. Chesser to carefully monitor his congregate religious exercises to avoid increased risks to institutional and national security, and Plaintiff has failed to point to any evidence that creates a genuine issue of material fact that the BOP could achieve its compelling interest with less-restrictive conditions. *See* [#180-31 at ¶¶ 16–24]. Put another way, given Mr. Chesser's CMU Marion misconduct, Defendant has determined that Mr. Chesser must complete the Step-Down Program as is to assure the BOP that he can be effectively managed at a less-restrictive institution. *See* [*id.* at ¶ 27]. And based on the undisputed record before the court, I conclude that the BOP has established that permitting Mr. Chesser to be out of his cell for 10 to 14 hours per day so that he may freely engage in congregate religious exercises is not a feasible less-restrictive alternative. Thus, the restrictions imposed in the B/B Unit are the least restrictive means of furthering the BOP's compelling interests, and are not capable of being eradicated or partially modified.

* * *

Based on the foregoing and the undisputed evidence, the court concludes that the BOP has considered and rejected the feasibility of all alternatives Mr. Chesser has offered. *See Wilgus*, 638 F.3d at 1289. The court further concludes that Defendant has demonstrated that the restrictions on Mr. Chesser's sincerely held religious beliefs are the least restrictive means of furthering its compelling interests, and that no rational fact-finder could conclude otherwise. Accordingly, the court **GRANTS** summary judgment in favor of Defendant on Claim IV.

## CONCLUSION

For the reasons stated herein, **IT IS ORDERED** that:

(1)     Defendant's Motion for Summary Judgment [#180] is **GRANTED**;

(2)    Plaintiff's Second Motion for Partial Summary Judgment [#193] is **DENIED**;

(3)    Summary Judgment shall be entered in favor of Defendant on Claims III and IV and against Plaintiff, and Claims III and IV are **DISMISSED with prejudice**;

(4)    The Clerk of the Court shall **ENTER** Final Judgment accordingly, and award costs to the Director Federal Bureau of Prisons as the prevailing party; and

(5)    A copy of this Order shall be sent to the following:

> Zachary A. Chesser #76715-083
> FLORENCE HIGH
> U.S. PENITENTIARY
> Inmate Mail/Parcels
> P.O. BOX 7000
> FLORENCE, CO 81226

DATED:  August 6, 2018                                     BY THE COURT:

Nina Y. Wang
United States Magistrate Judge